## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS EL | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| v. | : | No. 02CV3591 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | JURY TRIAL DEMAND |
| TRANSPORTATION AUTHORITY | : | |
| | : | |
| Defendant and Third Party Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| KING PARATRANSIT SERVICES, INC. | : | |
| et al. | : | |
| Third Party Defendants. | : | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT

## OF ITS MOTION FOR SUMMARY JUDGMENT

## <u>AGAINST PLAINTIFF</u>

Defendant, Southeastern Pennsylvania Transportation Authority (hereafter "SEPTA")

submits the within Memorandum of Law in Support of its Motion for Summary Judgment against

Plaintiff.  For the reasons that follow, SEPTA's motion should be granted and the Amended

Complaint should be dismissed with prejudice.

## I.    <u>INTRODUCTION</u>

The Americans with Disabilities Act of 1990 ("ADA") made SEPTA responsible for

providing public transportation to individuals who, because of a disability or handicap, are unable

to use fixed-route transportation.  These services are known as "paratransit" services."
Beginning in 1991, SEPTA determined that it would subcontract paratransit services to private
entities pursuant to written contracts to meet its obligations under the ADA.

Pursuant to these contracts, SEPTA required that the private entities hire personnel
including drivers to effectuate the purposes of the contracts.  Initially, with respect to hiring
drivers to transport that handicapped, the private entities were responsible for checking applicants
for drug and alcohol abuse and ensuring that such individuals had a safe driving record.  That
changed in 1994.

In 1994, a paratransit driver with a history of drunken driving arrests became involved in a
fatal accident on I-95 while he was operating a paratransit van.  The driver was drunk at the time
of the accident which left one 24 year old woman dead, and her 26  year old sister critically
injured.  Only three days later, another paratransit driver was arrested for auto theft.  A
subsequent check of his criminal history revealed that this driver had previously been convicted of
involuntary deviate sexual intercourse.

SEPTA determined that more expansive background checks of paratransit drivers were
needed to protect the handicapped and disabled who utilize paratransit services.  Thus, as a
consequence of these incidents, revisions were made to the paratransit contracts to require that
the providers conduct criminal background checks of individuals who applied for jobs as drivers.
The paratransit contracts also were revised to make clear that individuals who had prior
convictions for certain crimes including murder, rape and assault could not work as a paratransit
driver because they would have constant contact with the public.

By this action, Plaintiff and the class that he purports to represent challenge SEPTA's right to safeguard the disabled who rely on SEPTA to provide transportation. They claim that SEPTA has no right to disqualify them from employment as a driver unless the providers (or SEPTA) takes into account the time that has elapsed since the last conviction, the circumstances surrounding the conviction and the relationship between the conviction and the position sought no matter what the conviction was for. This contention is utter nonsense as are the individual claims of Plaintiff.

The so-called class representative is a convicted murderer. He was involved in the shooting death of a 16 year old boy. Plaintiff claims that the contractual provision that prohibited his prospective employer from hiring him as a paratransit driver is discriminatory. Plaintiff, moreover, claims that the real reason that SEPTA changed its contract in 1994 was to discriminate against him and those similarly situated because they are African American or Hispanic.

This Court need only consider the horror endured by Lisa Pokalsky, a paratransit customer of SEPTA, to dismiss this action. On September 6, 2000, Ms. Pokalsky was brutally raped by David DeSouza. At the time of the rape, Mr. DeSouza was working as a driver for King Paratransit Services, Inc. ("King"). Ms. Pokalsky suffered from cerebral palsy, weighed 80 pounds and was confined to a wheelchair. Prior to hiring Mr. DeSouza, King did not conduct a criminal background check as required by its contract with SEPTA. Had it done so, King would have learned that Mr. DeSouza had been previously arrested for the rape of a disabled woman. Presumably, armed with this information, King would have a conducted a further investigation before turning Mr. DeSouza loose on Ms. Pokalsky.

As we demonstrate more fully below, Plaintiff's claims are devoid of merit and should be dismissed.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action by filing a Complaint against SEPTA on June 4, 2002. Therein, Plaintiff alleged a single cause of action against SEPTA under Title VII of the Civil Rights Act of 1964, as amended.  Specifically, Plaintiff alleged that a provision included in a paratransit contract between SEPTA and King (hereafter "the Agreement") that prohibited the employment of individuals with certain criminal convictions has a disparate impact on African Americans and Hispanics. Complaint at ¶ 3.

According to Plaintiff, he was hired by King as a paratransit driver in January 2000. Complaint at ¶ 21.  Plaintiff alleges that his employment with King was thereafter terminated solely because he is a convicted murderer and, this he claims, constitutes unlawful employment discrimination.  Id. at ¶ 21.  Plaintiff also purports to represent a class of individuals who were denied employment with King and other entities with whom SEPTA subcontracts paratransit services pursuant to SEPTA's "policy."  See Complaint at ¶¶ 17, 34-36.  However, to date, Plaintiff has not identified a single potential member of the class that he purports to represent nor has he moved for class certification. [1]

On or about November 13, 2002, Plaintiff amended his complaint.  In addition to alleging a violation of Title VII as above, Plaintiff alleges also that SEPTA violated his equal protection

---

[1] Local Rule 23.1(c) of the Local Rules of the United States District Court for the Eastern District of Pennsylvania specifies that a party must move for class certification within 90 days of filing a complaint, unless the period is extended by the Court for good cause shown by the moving party.   SEPTA has not been served with any written motion by Plaintiff to request more time to move for class certification.

rights under the United States Constitution, his right to public employment under the

Pennsylvania Constitution and the Pennsylvania Criminal History Record Information Act when

King terminated his employment. Plaintiff also purports to represent a class of violent convicted

criminals whose rights were also violated by SEPTA in this regard.

On December 9, 2002, SEPTA filed its Answer and Affirmative Defenses to Plaintiff's

Amended Complaint. Therein, SEPTA denied liability to Plaintiff or any member of the class that

he purports to represent. SEPTA also asserted that the provision in the Agreement was justified

by business necessity and that Plaintiff's individual claims were time barred.

On December 23, 2002, SEPTA filed Third Party Complaints against each of the

paratransit providers with whom it subcontracts during the period 1991 to present. The basis for

the third party actions is a provision in the paratransit contracts that requires all paratransit

providers to indemnify and hold SEPTA harmless for any claims that arise in the performance of

the paratransit contracts.

With the exception of Atlantic Paratrans, Inc, every paratransit provider including King,

Edens Corporation, Triage, Inc., Community Transit, Inc., P&D Jagicla, Enterprises, Krapfs CPS,

Inc., Anderson Travel and King Limousine Service, Inc. has filed an answer to the Third Party

Complaint, denying any liability to SEPTA.

On August, 25, 2003, Krapfs filed its motion for summary judgment against SEPTA. On

October 8, 2003, Third Party Defendants, Community Transit and King moved for summary

judgment against SEPTA. Anderson Travel and Triage moved for summary judgment against

SEPTA on October 14, 2003. On October 17, 2003, Edens moved for summary judgment

against SEPTA. SEPTA filed an opposition to the Third Party Defendants' Motions for

Summary Judgment on October 29, 2003.

SEPTA now moves for summary judgment against Plaintiff. For the reasons that follow, judgment should be entered in favor of SEPTA and against Plaintiff and the Amended Complaint should be dismissed forthwith.

III.    **STATEMENT OF UNDISPUTED FACTS**

1.    Plaintiff is an African American and was convicted of homicide. Amended Complaint at ¶ 22.

2.    SEPTA is a body corporate and politic that exercises the public powers of the Commonwealth of Pennsylvania and is as an agency and instrumentality thereof. Answer to Amended Complaint at ¶ 9.

3.    The Americans with Disabilities Act of 1990 requires SEPTA to provide transportation services to individuals who are unable to use fixed-rate transportation. Amended Complaint at ¶ 12 and Answer to Amended Complaint at ¶ 12. These services are referred to as paratransit services. Id.

4.    SEPTA provides paratransit services in Philadelphia and the four surrounding counties, Bucks, Chester, Delaware and Montgomery by contracting with outside providers including King. Answer to Amended Complaint at ¶¶ 2, 13. Answer of King and King Limousine at ¶ 3.

5.    Pursuant to the paratransit contracts, providers were required to hire their own employees including drivers to effectuate the purposes of the contract. Brandis Affidavit at ¶ 13. A copy of the Affidavit of Frank Brandis is attached to the accompanying Exhibits in Support of SEPTA's Motion for Summary Judgment as Exhibit A.

6.      Paratransit drivers are responsible for providing door to door transportation service to disabled and handicapped individuals who require paratransit services. This includes assisting disabled individuals from their homes to the paratransit van and from the van to their destination. Drivers also must ensure that handicapped individuals are properly secured in the van and are required to collect fares from such individuals. Brandis Affidavit at ¶ 15; El Deposition at 85. Copies of the relevant pages of Douglas El's deposition transcript are attached to the accompanying Exhibits in support of SEPTA's Motion for Summary Judgment as Exhibit B.

7.      In August 1994, Michael Graham, a paratransit driver employed by VPSI Paratransit was involved in a fatal accident on I-95 when his northbound traveling paratransit van jumped a guardrail and crashed into a vehicle in the southbound lanes of I-95. Brandis Affidavit at ¶ 6a. One passenger of the vehicle that was struck by Mr. Graham was killed and the other was critically injured. Id. Mr. Graham was charged with vehicular homicide and driving under the influence as a result of this accident. At the time of the accident, Mr. Graham was a fugitive having failed to appear in court for 2 drunk driving arrests that occurred in 1992. Id. Mr. Graham had also been arrested 2 times for driving under the influence in the 3 week period immediately preceding the date of the accident. Id.

8.      On August 5, 1994, a paratransit driver for Triage Paratransit Company was arrested for auto theft. A subsequent criminal record check revealed that the driver, Michael Donaldson, had been previously convicted of involuntary deviate sexual intercourse. Brandis Affidavit at ¶ 6b.

9.      Prior to the incidents referred to in paragraphs 7 and 8, paratransit providers were required only to screen applicants for driving positions for drug and alcohol abuse and to obtain a

driving record for such individuals.

10.    As a result of the incidents referred to in paragraphs 7 and 8, SEPTA undertook to develop more expansive standards for screening applicants for driving positions including background checks for a record of a criminal convictions.  These new requirements barred paratransit providers from employing individuals with previous convictions for committing violent crimes and driving under the influence.  SEPTA implemented these new requirements only to make partransit services safer for disabled individuals who used paratransit services.  Brandis Affidavit at ¶¶ 5, 8.

11.    It was SEPTA's belief that criminal background checks were necessary to provide additional protection for disabled individuals who rely on paratransit services.   Brandis Affidavit at ¶¶ 4-5. To that end,  SEPTA narrowly tailored the criminal conviction provision in the paratransit contracts so that it would provide additional safeguards and not unlawfully discriminate against individuals because of their race or any other reason.

12.    On or about July 1, 1999, SEPTA and King entered into a written contract pursuant to which King agreed to provide paratransit services to customers on behalf of SEPTA (hereafter "Agreement").  A true and correct copy of the Agreement is attached to the accompanying Exhibits in Support of SEPTA's Motion for Summary Judgment as Exhibit C.

13.    Pursuant to the Agreement, King was required to provide to SEPTA a list of its personnel to be used in providing services.  Moreover, the Agreement made clear that all such personnel "shall be considered employees of the Contractor [King] or its subcontractors and in no event shall any of the personnel employed in the performance of the Agreement be considered employment of SEPTA."  Exhibit C at PMC-2; Brandis Affidavit at ¶ 13.

14.     The Agreement also specified that King agrees to abide by SEPTA's EEO and Affirmative Action requirements. Exhibit C at PMC-14. More specifically, King agreed that it would not discriminate in any manner against any of its employees or applicants for employment on the basis of race, religion, color, age, creed, sex or national origin. Exhibit C at PMC-A.

15.     King is considered an independent contractor under the Agreement and is prohibited from holding itself out as being an agent or representative of SEPTA. In addition, the Agreement makes clear that King has no authority to obligate SEPTA in any manner. Exhibit C at PMC-16.

16.     With respect to King hiring drivers to effectuate the purposes of the Agreement, SEPTA included in the Agreement the requirement that criminal background checks be performed on drivers only. Brandis Affidavit at ¶ 4, 10. More specifically, the Agreement provides that King must complete a background investigation for all of its applicants for driving positions to include a check on the applicant's driving record and a criminal background check. Exhibit C at 22; Brandis Affidavit at ¶ 4.

17.     Pursuant to the Agreement, King was prohibited from employing anyone in a driving position that:

a.     has a current record or conviction for driving under the influence of alcohol or other substance.

b.     has a felony or misdemeanor conviction for a crime of moral turpitude or of violence against any person including homicide, rape, robbery, risking a catastrophe, assault, aggravated assault, indecent assault and other crimes of violence including attempts to commit crimes of violence.

9

    c.    has a felony conviction in the last seven years preceding employment for crimes of theft or crimes against property.

    d.    has a misdemeanor conviction in the last seven years preceding employment for crimes of theft and crimes against persons and property including indecent exposure, misdemeanor indecent assault, trespass, corruption of minors and crimes involving narcotics, alcohol and firearms.

Exhibit C at 23; Brandis Affidavit at ¶ 4.

18.    The purpose of these prohibitions related to the employment of drivers was to provide additional safeguards to ensure the safety of disabled individuals who use paratransit services.  Brandis Affidavit at ¶ 5.

19.    Paratransit drivers are responsible for providing door to door transportation service to disabled individuals.  Thus, drivers assist disabled individuals from their homes to the paratransit van, ensure that they are properly secured in the van and assist disabled individuals to their destination.  Paratransit drivers therefore constantly interact with disabled customers. Brandis Affidavit at ¶15.  Paratransit drivers including those employed by King are also responsible for collecting fares from patrons who use paratransit services, and it is for this reason that SEPTA requires that its drivers have no convictions for crimes involving theft in the seven years preceding employment with a paratransit provider. Id; Exhibit C at 40-41.

20.    On September 6, 2000, David DeSouza, a paratransit driver for King, sexually assaulted and raped Lisa Pokalsky, a paratransit customer.  See Pokalsky v. SEPTA, 2002 U.S. Dist. LEXIS 16175 *3 (E.D.Pa. 2002), Fiorillo Dep. at 68-69; Brandis Affidavit at ¶ 9.  A copy of this decision is attached to the accompanying Exhibits in Support of SEPTA's Motion for

Summary Judgment as Exhibit D. Copies of relevant pages of the deposition of Pamela Fiorillo are attached to the Exhibits of SEPTA in support of its Motion for Summary Judgment as Exhibit E.

21.     At the time of this incident, Ms. Pokalsky suffered from cerebral palsy, was confined to a wheelchair and weighed only 80 pounds. Exhibit D; Brandis Affidavit at ¶9.

22.     King did not conduct a background check of Mr. DeSouza before it hired him as a driver and, had it done so, it would have learned that Mr. DeSouza had been previously arrested for the rape of a disabled woman. Exhibit D at *4; Brandis Affidavit at ¶ 9.

23.     With regard to the employment of drivers by King (and other paratransit providers), SEPTA does not:

    a.     interview or hire applicants for driving positions;

    b.     establish work schedules or set the hours that drivers work;

    c.     establish pay rates for drivers;

    d.     direct the manner in which drivers perform their jobs;

    e.     supervise drivers;

    f.     involve itself in the day to day operations of King or other paratransit providers;

    g.     provide employee benefits for drivers;

    h.     treat drivers as its own employees for tax purposes;

    i.     retain the right to assign work to drivers;

    j.     discipline drivers employed by paratransit providers for job misconduct or poor job performance;

11

    k.    evaluate the performance of drivers; or

    l.    promulgate work rules that apply to drivers.

Brandis Affidavit at ¶ 13, [2] Fiorillo Dep. at 11-13; El Dep. at 78-79.

    24.    Drivers for King worked from its location in King of Prussia, Pennsylvania and this is the location that Plaintiff received the majority of his training for his position as a driver for King.  El Dep. at 76-77; 86.

    25.    Plaintiff never applied for employment with SEPTA, nor was he ever denied employment with SEPTA.  Requests for Admission at No. 5. [3]  Plaintiff has never worked for SEPTA.  Id. at No. 6.  A copy of the Requests for Admission is attached to the Exhibits of SEPTA in support of its Motion for Summary Judgment as Exhibit F.

    26.    Plaintiff was convicted of homicide.  Requests for Admission at No. 4, El Deposition at 13.  He was involved in the shooting death of Earl Jones, a 16 year old boy.  El Deposition at 19.  In addition to his arrest and conviction for homicide, Plaintiff has been arrested for drug related charges on 5 or 6 occasions.  El Dep. at 22 and Exhibit 2 attached to the Deposition of Douglas El.  Plaintiff was found guilty of drug related charges on 3 occasions.  El Dep. at 27-33.

    27.    On January 3, 2000, Plaintiff completed an application for employment with King for a position as a driver.  Requests for Admission at No. 3 and Exhibit 2 attached thereto.  The

---

[2]  The Agreement, however, provides that SEPTA may remove drivers from services for certain misconduct including the commission of a violent crime against a paratransit customer.  Brandis Affidavit at ¶ 13.

[3]  Requests for Admission were served on Plaintiff pursuant to Rule 36 of the Federal Rules of Civil Procedure on June 5, 2003.  No responses or objections were ever submitted by Plaintiff to the Requests and, therefore such requests are deemed admitted. Fed.R.Civ.P. 36(a).

application included Plaintiff's work history which Plaintiff admitted was false.  El Dep. at  55-58

and Exhibit 4 attached to the deposition of Douglas El.

28.    The job application referred to in the immediately preceding paragraph revealed

that Plaintiff had previously been convicted of homicide.  Id.

29.    Notwithstanding the requirements contained in the Agreement that prohibit the

employment of violent convicted felons, Plaintiff was inexplicably hired as a driver by King.  El

Dep. at 71-72.

30.    Plaintiff commenced training for the position of driver at King on or about January

17, 2000 with approximately 30 other individuals who likewise commenced training to become a

driver on that date.  El Dep. at 76-77.  Plaintiff was compensated by King for the time spent in

training.   El Dep. at 78.  The training was led by a King employee, Sen Wen Wieh.  El Dep. at

76.

31.    Of the approximately 30 individuals who commenced training at the same time that

Plaintiff commenced training at King, the vast majority ("99%" according to Plaintiff)  of those

individuals were African Americans.  El Dep. at 81;  See Also, Fiorillo Dep. at 35-36.

32.    On January 18, 2000, Plaintiff executed a conditional offer of employment and a

release on behalf of King that allowed it, among other things, to obtain information concerning his

criminal background.  El Dep. at 87 and Exhibits 5 and 6 attached thereto; Fiorillo Dep. at 26.

SEPTA does not obtain criminal background checks for applicants who seek employment with

paratransit providers.  Brandis Affidavit at ¶ 16.

33.    Plaintiff testified that he attended a second week of training.  Like the first week,

the majority of the driver-trainees were also African Americans.  El Dep. at 100.

34.     Following the commencement of Plaintiff's employment, King obtained a criminal history report regarding Plaintiff's criminal background. Fiorillo Dep. at 17-18 and Exhibit 1 attached thereto. King obtains criminal background histories for all of its prospective employees. Fiorillo Dep. at 26. This is not required by the Agreement. Brandis Affidavit at ¶¶ 4, 10.

35.     On January 27, 2000, Ms. Fiorillo advised Mr. Wieh that Plaintiff could not continue in the employment of King because of a criminal conviction for homicide. Fiorillo Dep. at 18, 41, 51 and Exhibit 2 attached thereto. Ms. Fiorillo did not discuss her decision to separate Plaintiff's employment with King with anyone from SEPTA. Id. at 25.

36.     Mr. Wieh advised Plaintiff that he could not work at King in any capacity because of his conviction of homicide and that he was not allowed to remain on its premises. El. Dep. at 104.

37.     Plaintiff was removed from the payroll at King on January 27, 2000, and his employment was terminated on that date. Fiorillo Dep. at 25.

38.     On November 30, 2000, Plaintiff filed a charge of discrimination against SEPTA. Requests for Admission at No. 1 and Exhibit 1 attached thereto; El Deposition at 128.

39.     Although the EEOC charge indicates that Plaintiff was terminated on February 8, 2000, Plaintiff acknowledged at his deposition that his last date of employment could have been January 27, 2000 which is consistent with the records of King. El Dep. at 113.

40.     Plaintiff commenced this action by filing a Complaint against SEPTA on June 4, 2002. According to Plaintiff, he believes that SEPTA discriminated against him on the basis of his race because of the provision in the Agreement involving minimum requirements that SEPTA "imposed" on King. El. Dep. at 126.

14

IV.    **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The mere existence of a factual dispute does not defeat an otherwise properly supported motion for summary judgment. *See* Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Therefore, summary judgment is proper if the party opposing the motion fails to establish an essential element of his or her case. See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In evaluating a motion for summary judgment, the court must read the facts in the light most favorable to the nonmoving party. Anderson v. Liberty Lobbys, Inc., 477 U.S. 242 at 255 (1986). Nevertheless, a mere "scintilla" of evidence, or evidence that is only "colorable" or is not sufficiently probative, is not enough to defeat summary judgment. Id. Instead there must be evidence upon which a jury could reasonably find in the non-moving party's favor. Id.

SEPTA submits that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.

V.    **ARGUMENT**

    A.    **PLAINTIFF HAS FAILED TO ADDUCE ANY EVIDENCE
           SHOWING THAT THE HIRING POLICY
                CONTAINED IN THE AGREEMENT HAS A DISPARATE
                IMPACT ON AFRICAN AMERICANS OR HISPANICS.**

Plaintiff's claim under Title VII fails as a matter of law because he cannot make a prima facie showing that the criminal conviction provision of the Agreement has a disparate impact on

African Americans or Hispanics. In fact, the only group that is adversely impacted by the policy is convicted violent felons like Plaintiff.

In this regard, Plaintiff's testimony on the racial composition of the drivers employed by King is dispositive. Plaintiff commenced training for the position of paratransit driver at King on or about January 17, 2000 with approximately 30 other individuals who likewise commenced training on that date. El Dep. at 76-77. Of the approximately 30 individuals, Plaintiff testified that 99% of those individuals were African Americans. El Dep. at 81. Plaintiff testified also that another training class that he attended at King consisted of 15 to 20 individuals, the majority of whom were African Americans. El Dep. at 100. Pamela Fiorillo, Human Resource Manager for King, confirmed that "a good portion of King's employees were African Americans." Fiorillo Dep. at 36. In light of this testimony, Plaintiff cannot possibly make a prima facie showing of disparate impact discrimination.

It is well recognized that to establish a prima facie case of disparate impact discrimination, Plaintiff must first demonstrate that a facially neutral policy caused a significant disparate impact on a protected group. Lawton v. Sunoco, 2002 U.S. Dist. LEXIS 13039 (E.D.Pa. 2002), aff'd, 2003 U.S. App. LEXIS 8802 (3d Cir. 2003); Banks v. East Baton Rouge School Board, 320 F.3d 520 (5th Cir. 2003), cert. denied 2003 WL 21274461 (U.S. 2003); Settles v. Illinois Department of Human Services, 2002 U.S. App. LEXIS 15268 (7th Cir. 2002); Kerr v. Valdez, 2002 U.S. App. Lexis 27267 (10th Cir. 2002); Malave v. Potter, 320 F.3d 321, 325 (2d Cir. 2003) ("To make out a case of disparate impact, a plaintiff must: "(1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two.") (citation omitted); Chaney v. Southern Railway Company, 847 F.2d 718, 724 (11th Cir. 1988) ("to

establish a prima facie case of impact discrimination, a plaintiff must show by a preponderance of the evidence that a facially neutral employment practice had a substantial adverse impact upon a protected group.").  The record demonstrates that Plaintiff cannot show a racial disparity exists with respect to drivers employed by King, much less causation between a facially neutral policy and an adverse impact on African Americans or Hispanics.

In short, Plaintiff's claim of disparate impact claim fails at the outset.  Indeed, the evidence adduced in this case shows that no disparity in hiring exists which precludes Plaintiff from proceeding with his dubious Title VII claim.  See Hayden v. County of Nassau, 180 F.3d 42, 52 (2d Cir. 1999) (disparate impact claim fails where plaintiffs cannot show that the policy at issue fell more harshly on them); McCraven v. City of Chicago, 109 F.Supp.2d 935, 944 (N.D.Ill. 2000) (plaintiff's disparate impact claim fails because there is not sufficient evidence to show that African Americans are disproportionately represented on the Chicago Police Department); Matthews v. Runyon, 860 F.Supp. 1347, 1357 (D.Wis. 1994) (claim fails because plaintiff cannot even show that a racial disparity exists with respect to the position applied for).

Moreover, to establish causation, statistical evidence is required "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group."  Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988), Lawton, 2002 U.S. Dist. Lexis 13039 *29 (same).  Causation requires more than statistical disparities in the workforce; rather, a plaintiff must show "specific employment practices responsible for the disparities and statistical evidence which illustrates that the disputed practice caused the exclusion of job applicants in the protected class."  Smith v. Tennessee Valley Authority, 1991 U.S. App. LEXIS 1754 *10 (6th Cir. 1991); see also, Lawton,

2002 U.S. Dist. Lexis 13039 *31 (statistics must compare the racial composition of the at issue

jobs and the racial composition of the qualified population in the relevant labor market);   EEOC

v. Carolina Freight Carriers Corp., 723 F. Supp. 734, 751 (S.D.Fla. 1989) (proper statistical

inquiry focuses on the national origin composition of the jobs at issue and the national origin

composition of the relevant labor market in case alleging that an employer's policy of not hiring

individuals who have been convicted of felony theft or larceny had a disparate impact on

Hispanics).  Plaintiff has come forward with no statistical evidence showing the requisite

causation either.

        As set forth above, the racial composition for the job for which Plaintiff was disqualified

makes clear that the vast majority of the driving jobs at King were filled by African Americans,

barring any claim for disparate impact discrimination.  Count I of the Amended Complaint should

therefore be dismissed.

> **B.     SEPTA'S POLICY WAS NOT INTENDED TO DISCRIMINATE;
> RATHER THE POLICY IS DESIGNED TO PROTECT THE
> DISABLED PUBLIC FOR WHOM PARATRANSIT
> SERVICES                    ARE PROVIDED.**

        Even if Plaintiff was able to establish a prima facie case of disparate impact discrimination,

which he cannot, Count I of the Amended Complaint should be dismissed because the provision in

the Agreement involving criminal convictions is supported by business necessity.  42 U.S.C. §

2000e-2(k);  Griggs v. Duke Power, 401 U.S. 424, 431-32 (1971).  Moreover, Plaintiff cannot

possibly demonstrate that there exists a policy or procedure that would have a lesser impact on a

protected group and still serve SEPTA's and King's legitimate needs.  Id.  Indeed, it is

inconceivable that Plaintiff could make this showing.  The criminal conviction provision was

included in the Agreement to protect the disabled public who rely on paratransit services from individuals who have a history of violence and may be inclined to commit violent crimes again. The only possible way to do this is to ensure that murderers like Plaintiff and other violent offenders are not employed in positions that have constant contact with disabled and handicapped customers. See Brandis Affidavit at ¶ 15.

The record shows that the criminal conviction provision was first established by SEPTA in 1994 for inclusion in its paratransit contracts. Brandis Affidavit at ¶ 6. On August 2, 1994, a paratransit driver for VPSI, a paratransit provider under contract with SEPTA, was involved in a fatal accident when the northbound van that he was driving jumped an I-95 guardrail into the southbound lanes and sheered off the roof of a southbound car. Id. at ¶ 6a. A 24-year old woman was killed, and her 26 year old sister was taken to a local hospital with critical injuries to her head. Id. The driver of the van, Michael Graham, was arrested for drunk driving and homicide. Id. This was Mr. Graham's 5th arrest for driving under the influence and he had been arrested 2 times in July 1994 alone for this offense. Id. At the time of this incident, paratransit providers were required only to screen applicants for drug and alcohol abuse and to check the driving history of the applicants. Id. at ¶ 6b.

On August 5, 1994, a paratransit driver employed by Triage Paratransit Company was arrested for auto theft. Brandis Affidavit at ¶6b. A subsequent check of his criminal record revealed that the driver, Michael Donaldson, was on probation for involuntary deviate sexual intercourse. Id. Following this latest incident, there was a public outcry regarding the safety of paratransit customers and SEPTA responded by requiring more stringent background checks to ensure the safety of the disabled public who use paratransit services in the Philadelphia

metropolitan area.  Id. at ¶ 8.

It must also be emphasized that the criminal background provision in the Agreement is not

a blanket disqualification from employment for individuals who apply for any position with King.

On the contrary, the criminal background checks were required only for drivers because they deal

constantly with the public.[4]  Brandis Affidavit at ¶¶ 10, 15.  Thus, a paratransit provider like King

could have employed Plaintiff in any  number of positions without breaching its contractual

obligations to SEPTA.  Id. at ¶ 18. Nevertheless, Plaintiff testified that King advised him that he

could not be employed in any position there because of his conviction for homicide.  El Dep. at

104.  This was King's decision, not SEPTA's.  Brandis Affidavit at ¶¶ 11, 18.

Similarly, not all criminal convictions result in a blanket disqualification for an individual

who applies for a driving position with a paratransit provider. Pursuant to the Agreement, King is

prohibited from employing anyone in a driving position that:

        a.     has a current record or conviction for driving under the influence of alcohol

or other substance.

        b.     has a felony or misdemeanor conviction for a crime of moral turpitude or

of violence against any person including homicide, rape, robbery, risking a catastrophe, assault,

aggravated assault, indecent assault and other crimes of violence including attempts to commit

crimes of violence.

        c.     has a felony conviction in the last seven years preceding employment for

crimes of theft or crimes against property.

---

[4] Drivers also handle money in connection with the performance of their jobs and this is the
reason that convictions for theft- related offenses in the last 7 years bar the employment of
applicants for driving positions.  El Deposition at 85.

d.    has a misdemeanor conviction in the last seven years preceding employment for crimes of theft and crimes against persons and property including indecent exposure, misdemeanor indecent assault, trespass, corruption of minors and crimes involving narcotics, alcohol and firearms.

Brandis Affidavit at ¶4; Exhibit C at 23.

In short, criminal background checks and the subsequent policy of not hiring individuals as drivers who have been convicted of violent crimes like Plaintiff are narrowly drawn and serve an important public interest - - the safety of disabled individuals who rely on paratransit services. For this reason, Plaintiff cannot maintain a cause of action under Title VII for unlawful employment discrimination in connection with his termination from employment with King even if he establishes a prima facie case of disparate impact discrimination.

Indeed, Courts have uniformly upheld the use of criminal convictions as a criterion for disqualifying job applicants where, as here, the conviction is related to the performance of the job. For example, in Richardson v. Hotel Corporation of America, 332 F. Supp. 519 (D. La. 1971), the court held that it was lawful for a hotel to require that persons employed in positions where they have access to valuable property of others have a record free from convictions for serious property related crimes, aff'd, 468 F.2d 951 (5th Cir. 1972).  In Field v. Orkin Exterminating Co., 2001 U.S. Dist. LEXIS 24068 (E.D. Pa. 2001), the court observed that a refusal to hire persons with criminal records would not violate Title VII where the conviction involved conduct which demonstrates a person's lack of qualifications for a job.  The court cited an example of a bank not hiring a person who previously had been convicted of embezzlement as one that would not violate discrimination laws.

21

In a case with facts similar to those presented here, the court found that an employer's refusal to hire an individual who previously was convicted of a violent crime was justified by business necessity. Thus, in <u>Moses v. Browning-Ferris Industries</u>, 1986 U.S. Dist. LEXIS 20073 (D. Kan. 1986), the plaintiff, who was African American, applied for a position with the defendant as a helper on a trash truck. During the interview, the plaintiff revealed that he previously had been convicted of rape and robbery. The defendant refused to hire the plaintiff who was otherwise qualified for the position based upon this conviction because it involved a crime of moral turpitude. Thereafter, plaintiff alleged that the policy had a disparate impact on African Americans. Finding that the hiring policy was justified by business necessity, the court noted that waste disposal workers come in close contact with the general public and the policy was therefore "understandable given the <u>great potential for liability in the event of misconduct</u>." (emphasis added)

The <u>Moses</u> Court relied upon the decision in <u>New York Transit Authority v. Beazer</u>, 440 U.S. 568 (1979), in which the Court held that a transit authority's exclusion of persons with a history of drug use furthered the legitimate goal of public safety and efficiency. Thus, the goal of promoting public safety is a legitimate goal for imposing hiring restrictions based upon a job candidate's criminal conviction history.

Undeterred, Plaintiff maintains that King and SEPTA should have taken into account the fact that his conviction occurred many years before he applied for a position with King. This argument defies logic and reason and should be summarily rejected. Indeed, it is preposterous to suggest that an employer conduct a fact specific investigation of every convicted violent offender who seeks employment as a paratransit driver.

22

What's more, establishing a rule that violent felons should only be disqualified if the conviction occurred in the last 5, 10 or 15 years for example would be based only on subjective guesswork.  This approach was rejected by the court in <u>EEOC v. Carolina Freight</u>, 723 F.Supp. 734, 754 (S.D.Fla. 1989).  There, the court held that an employer's policy that barred the employment of an individual who had ever been convicted of a felony theft or larceny which resulted in a jail sentence was justified by the employer's legitimate business concern regarding employee theft.  Significantly, the court stated that although a past criminal record was not a sufficient basis to predict that a future crime may be committed, it was more likely that those who have been convicted of crimes would commit a crime in the future than individuals who have never committed a crime.  <u>Id</u>. at 753.  Therefore, the court concluded that it was perfectly reasonable for the employer to ban the employment of individuals who served jail sentences for serious property crimes.   It follows that a conviction for a violent crime like murder, regardless of the date of the conviction, is job related in this case.

Any other finding by this Court would subject King, SEPTA and, most importantly, the handicapped to foreseeable risks of harm that are easily avoided by common sense and sound business judgment.

**C.    PLAINTIFF CANNOT DEMONSTRATE A VIOLATION OF THE   <u>EQUAL POTECTION CLAUSE</u>.**

Count II of the Amended Complaint purports to allege a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution in that Plaintiff (and the class that he purports to represent) was denied public employment because of his conviction for murder. Amended Complaint at ¶ 46.  Stated simply, this claim is frivolous.

First, Plaintiff was denied employment with King, not a public entity. Thus, the record reflects that Plaintiff applied for employment with King, was hired by King and was terminated by King. El Dep. at 65, 66, 78, 102-103; Fiorillo Dep. at 17-19. Moreover, Plaintiff never applied for employment with SEPTA, was never hired by SEPTA and was never fired by SEPTA. Requests for Admission at Nos. 5 and 6; El Dep. at 117, 138. Thus, Plaintiff's claim fails because there is no evidence in the record showing that King is a public employer, or that Plaintiff was denied public employment.

Plaintiff's claim fails also because there is not a shred of evidence that SEPTA implemented the criminal conviction provision in the Agreement to intentionally discriminate against African Americans or Hispanics. See El Deposition at 126-127. To the contrary, the only evidence in the record on this issue shows that the contract minimums related to criminal convictions were established to protect vulnerable disabled individuals who rely on paratransit services. Brandis Affidavit at ¶ 5.

In assessing the sufficiency of an equal protection claim in a disparate impact case, the Supreme Court of the United States has observed that a facially neutral law will not violate the equal protection clause simply because it has a disparate impact on a particular race. See e.g., Washington v. Davis, 426 U.S. 229, 240-42 (1976). Rather, the disproportionate impact must be traced to a purposeful intent to discriminate on the basis of race. Id. In Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999), the court likewise held that impact evidence alone is not

sufficient to demonstrate intent for the purpose of establishing an equal protection violation.[5]  See also Indianapolis Minority Contractors Ass'n v. Wiley, 187 F.3d 643, 653 (7th Cir. 1999).

In Washington, the Supreme Court upheld the constitutionality of a job-related employment test that had a disparate impact on African Americans because, as here, there was no evidence that racial discrimination entered into the establishment or formulation of that test. Here, there is not a shred of evidence in this record that supports the notion that SEPTA intended to discriminate against African Americans or Hispanics when, in 1994, it implemented the provisions involving criminal background checks in the Agreement with King or any of its other paratransit contracts.  Indeed, given the racial composition of drivers at King, it is simply absurd for Plaintiff to suggest that invidious intentional discrimination was at work here.

Thus, Plaintiff's 14th Amendment claim fails in two regards.  First, he cannot even make a threshold showing of disparate impact.  Second, even if he could, he cannot show that SEPTA, King or anyone else intended to exclude African Americans or Hispanics from employment as a paratransit driver.  Count II of the Amended Complaint should be dismissed.

**D.    PLAINTIFF'S    STATE    CONSITUTIONAL    CLAIM    FAILS    TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

---

[5]      In Hayden, the court observed that a policy could violate the equal protection clause in 3 ways: (1) where the policy expressly classifies persons on the basis of race or gender; (2) a facially neutral policy is applied in a way that is discriminatory; or (3) a facially neutral policy violates equal protection if it is motivated by discriminatory animus and has a discriminatory impact.  180 F.3d at 48.  (citations omitted).  The provision in the Agreement at issue here does not classify persons on the basis of race or gender, nor is it applied in a discriminatory way.  Moreover, as noted above, the only credible evidence in the record on the issue of impact establishes that the policy does not have a discriminatory impact on African Americans or Hispanics which also defeats this claim.  See El Dep. at  81, 100.

Count III of the Amended Complaint alleges that SEPTA has violated Article I, Section I of the Pennsylvania Constitution when he was denied "public employment." Amended Complaint at ¶ 50. This claim lacks merit as well.

First, as set forth above, Plaintiff was not denied public employment. Indeed, Plaintiff made clear that he never sought employment with SEPTA and was never denied employment with SEPTA. Requests for Admission at Nos. 5 and 6. Plaintiff was denied employment with King, a private entity. [6] Cf. Warfel v. York County Earned Income Tax Bureau, 78 Pa. Commomwealth Ct. 528, 467 A.2d 1216, 1217 (1983) (holding that an employee of a tax bureau is not a public employee; he is an employee of the bureau not school districts and municipalities that created the bureau); Booth v. McDonnel Douglas Truck Services, 401 Pa. Super. 234, 585 A.2d 24, 28 (1991) (dispute between private parties does not implicate the state constitution), appeal denied, 528 Pa. 620, 597 A.2d 1150 (1991)

More important, even if Plaintiff was denied public employment with SEPTA, his state constitutional claim under Article I, Section I of the State Constitution fails as a matter of law. Article I, Section I of the Pennsylvania Constitution provides that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of

---

[6]    A public employer is defined under the Pennsylvania Public Employee Relations Act as "the Commonwealth of Pennsylvania, its political subdivisions including school districts and any officer, board, commission, agency authority, or other instrumentality thereof and any nonprofit organization, or institution and any charitable, religious, scientific, literary, recreational, health, educational or welfare institution receiving grants or appropriations from local, State or Federal governments . . ." 43 P.S. § 1101.301. An individual who is employed by a public employer is a public employee. Id. While SEPTA clearly meets the definitional test of public employer, King does not.

enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

In Hunter v. Port Authority of Allegheny County, 277 Pa. Super. 4, 419 A.2d 631, 635 (1980), the court concluded that an individual could only be denied public employment based upon a prior conviction if the conviction "is reasonably related to the person's fitness to perform the job sought, or to some other legitimate governmental objective . . ." Public safety certainly qualifies as a legitimate governmental objective. See New York Transit Authority v. Beazer, 440 U.S. 568 (1979). Plaintiff was denied employment as a paratransit driver because he murdered another human being. And this is the reason and the only reason that he cannot drive for a paratransit provider who contracts with SEPTA.

There is no constitutional claim here. Count III of the Amended Complaint should be dismissed.

## E. PLAINTIFF HAS FAILED TO STATE A VIOLATION OF THE CRIMINAL HISTORY RECORD INFORMATION ACT AGAINST SEPTA.

Count IV of the Amended Complaint alleges that SEPTA has violated the Pennsylvania History Record Information Act (the "Act") by enforcing its policy that prohibits the employment of certain individuals who have been convicted of crimes as paratransit drivers. Like Plaintiff's other claims, Count IV of the Amended Complaint is frivolous.

In relevant part, the Act provides that "[f]elony and misdemeanor convictions may be considered by an employer [in making hiring decisions] only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied." 18 Pa.C.S. §

27

9125(b) (emphasis added). How or in what manner this statute applies to SEPTA as it relates to Plaintiff's employment with King is characteristically unexplained. In short, SEPTA was never Plaintiff's employer. See infra at Argument H.

More important, as demonstrated above, Plaintiff's conviction for murder is certainly related to his suitability for the position of paratransit driver. For SEPTA's part, the use of Plaintiff's conviction record here was narrowly tailored to promote a legitimate business purpose – public safety. Thus, it is absurd for Plaintiff to allege a violation of the Act against SEPTA. It should also be recalled that it was King who disqualified Plaintiff from all employment with King based upon his conviction record, without any input from SEPTA. El Deposition at 104, Brandis Affidavit at ¶¶ 17-18.

What's more, as shown above, the criminal conviction provision in the Agreement as applied to violent offenders like Plaintiff does not run afoul of Title VII because the policy is supported by business necessity. It can hardly be gainsaid that if the policy passes muster under the business necessity test set forth in Title VII, it does not run afoul of the Act.

Equally absurd is the allegation that SEPTA violated the Act because it failed to provide Plaintiff written notice of the reason he was denied employment with King. See Amended Complaint at ¶ 55. SEPTA had no knowledge that Plaintiff ever applied for employment with King, much less knowledge that King terminated his employment because he is a murderer. Fiorillo Dep. at 25; Brandis Affidavit at ¶ 17. Count IV of the Amended Complaint should be dismissed.

### F.    PLAINTIFF'S CLAIMS ARE BARRED BY THE APPLICABLE LIMITATIONS PERIODS.

1.    <u>Title VII</u>

According to King's records and the deposition testimony of its human resources manager, Pamela Fiorillo, Plaintiff's employment with King was terminated on January 27, 2000. <u>See</u> Amended Complaint at Exhibit F; Fiorillo Dep. at 29-30, 40.  Ms. Fiorillo unequivocally stated also that this was the day that Plaintiff was removed from King's payroll and this was the date for which Plaintiff was last paid.  Fiorillo Dep. at  51.

At his deposition, Plaintiff could not recall the date of his termination.  Thus, in relevant part, Plaintiff testified that his last day of employment could have been on January 27, 2000 which is consistent with King's employment records.  El Deposition at 13.  This means that Plaintiff needed to file his charge of discrimination with the EEOC on or before November 22, 2000 to preserve his discrimination claim.  <u>See</u> <u>Malone v. Specialty Products & Insulation</u>, 85 F.Supp.2d 503, 505 (E.D.Pa. 2000).  This he failed to do.

Instead, Plaintiff did not file his charge of discrimination with the EEOC until 8 days later on November 30, 2000.  Amended Complaint at ¶ 11(a) and Exhibit A attached thereto; Requests for Admission at Exhibit 1. As a result, Plaintiff cannot proceed with his Title VII claim here because he failed to timely exhaust his administrative remedies which is a prerequisite to filing a discrimination claim in federal court.  <u>Oliphant–Johns v. City of Philadelphia</u>, 2002 U.S.Dist. LEXIS 23991 *5 (E.D.Pa. 2002).[7]

2.    <u>U.S. Constitution</u>

---

[7]    Under the Court's analysis in <u>Oliphant-Johns</u>, Plaintiff's charge of discrimination would have been deemed filed on January 29, 2001, which is well beyond the 300 day period for filing a charge of discrimination because he first filed with the EEOC.        2002 U.S.Dist. LEXIS 23991 at *6.

Count II of the Amended Complaint must also be dismissed on timeliness grounds. As shown above, Plaintiff's employment with King was terminated on January 27, 2000. However, Plaintiff waited until November 13, 2002 to bring this claim for the first time which is well beyond the two year limitation period applicable to such claims.[8]

It is well recognized that the limitations period for federal constitutional claims is based upon the limitations period prescribed for personal injury claims which in Pennsylvania is two years. Garvin v. City of Philadelphia, 2002 U.S. Dist. LEXIS *4 (E.D.Pa. 2002); New v. Brown, 1997 U.S.Dist. LEXIS 16644 *15 (E.D.Pa. 1997) (citing cases); Robinson v. Officer John Kelly, 1986 U.S. Dist. LEXIS 15781 *6-7 (E.D.Pa. 1986) (allegations that Defendants violated First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution are subject to Pennsylvania's two year limitations period that applies to claims seeking damages for personal injury). The limitations period is 2 years from the date Plaintiff was aware or should have been aware that SEPTA violated his constitutionally protected rights. Garvin at *4 (limitations period commences on the date of the event about which the plaintiff complains); see also Delaware State College v. Ricks, 449 U.S. 250, 258-259 (1980) (limitations period on Section 1981 claim commences on the date that the plaintiff first learns about the adverse employment action about which he complains).

In this case, the limitation period on Plaintiff's claims commenced on the date that he was advised that his employment with King was terminated because he was a convicted murderer. This was January 27, 2000. El Dep. at 113. To preserve his constitutional claim, Plaintiff needed

---

[8]    The original complaint was filed on or about June 4, 2002 which is likewise beyond the two year limitation period applicable to such claims.

to file his complaint on or before January 27, 2002.[9]  This he failed to do.  As a consequence, Count II of the Amended Complaint should be dismissed.

### 3.    Pennsylvania Constitution

Although it is not entirely clear, Plaintiff apparently alleges that SEPTA violated the State Constitution when his employment with King was terminated. Plaintiff first raised this state constitutional claim in the Amended Complaint on or about November 13, 2002 which is beyond the two year limitation period applicable to such claims.

In Storch v. Miller, 137 Pa. Commonwealth Ct. 325, 328 585 A.2d 1173, 1174 (1991), the Court found that the two year limitation period set forth in 42 Pa.C.S. § 5524(7) applied to plaintiffs' state constitutional claims.  Similarly, in Graham v. City of Philadelphia, 2002 U.S.Dist. LEXIS 13201 * 20 (E.D.Pa. 2002), the Court observed that Pennsylvania's two year limitation period applied to claims brought directly under the State Constitution. The Graham case involved allegations that the plaintiff's  employment with the City was wrongfully terminated.

Here, it is clear that Plaintiff did not timely file his claim under the State Constitution either.  Count III of the Amended Complaint must therefore be dismissed on this basis as well.

### 4.    Pennsylvania Criminal History Information Act

---

[9]  The limitations period on constitutional claims is not tolled by the pendency of an EEOC charge.  Bradley v. City of Philadelphia, 1998 WL 784238 * 4, n.3 (E.D.Pa. 1998) (citing cases).

The Criminal History Record Information Act (the "Act") contains no specific limitations period. However, Plaintiff claims that his employment with King was wrongfully terminated in violation of the Act.

Even assuming that Plaintiff had a viable claim against SEPTA under the Act, his claim is barred by the applicable limitations period. Where, as here, a statute does not have a specific limitations period, the appropriate limitations period is that found in cases most analogous to the cause of action asserted by the Plaintiff. Anderson v. Consolidated Rail Corporation, 297 F.3d 242, 251 (3d Cir. 2002). In Pennsylvania, the limitation period for claims for wrongful discharge is two years. Id.; 42 Pa.C.S.A. § 5524(7); Kuhn v. Oehma Carrier Corp., 255 F.Supp.2d 458, 467 (E.D.Pa. 2003). Here, Plaintiff's employment with King was terminated on January 27, 2000. Yet, he did not commence this action until June 4, 2002. What's more, Plaintiff did not allege a violation of the Act until November 13, 2002. Accordingly, his claim for a violation of the Act must be dismissed because it was filed beyond the 2-year limitation period applicable to such claims.


### G.    SEPTA IS IMMUNE FROM SUIT UNDER THE CRIMINAL HISTORY RECORD INFORMATION ACT.

It has long been recognized that SEPTA is a Commonwealth party for purposes of sovereign immunity. Williamson v. SEPTA, 154 Pa. Commonwealth Ct. 448, 624 A.2d 218, 222 (1993) (citing Chambers v. SEPTA, 128 Pa. Commonwealth Ct. 368, 563 A.2d 603 (1989); See also, Feingold v. SEPTA, 512 Pa. 567, 517 A.2d 1270 (1986) (punitive damages are not

recoverable against SEPTA because it is an authority created by an act of the General Assembly). As such, SEPTA may only be sued in cases where immunity for the plaintiff's claims have been waived. Here, Plaintiff's claim of a violation of the Criminal Record History Information Act has not been waived.

The General Assembly of Pennsylvania intended to exempt the Commonwealth from immunity only in specific, clearly defined situations and it is the duty of this Court to strictly construe this limited waiver. Davidow v. Anderson, 83 Pa. Commonwealth Ct. 86, 476 A.2d 998, 1000 (1984). Thus, in Section 8522(b) of the Judicial Code, 42 Pa.C.S.A. § 8522(b), the General Assembly specified that a waiver of immunity for Commonwealth parties extended only to: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) national guard activities; and (9) toxoids and vaccines. As is evident by the above-cited statute, the General Assembly has elected to waive sovereign immunity only in limited circumstances.

In Poliskiewicz v. East Stroudsburg University, 113 Pa. Commonwealth Ct. 13, 536 A.2d 472 (1988), the court considered whether the University was immune from suit under the Act. Poliskiewicz, involved a university police officer who was suspended pending the outcome of charges after he was arrested for disorderly conduct and public drunkenness. Thereafter, all of the charges against the plaintiff were dismissed, however, the University refused to rehire the plaintiff. The plaintiff alleged that the University's refusal to rehire him violated Sections 9124 and 9125 of the Act. In dismissing his claim, the court held that the University was immune from suit under the Act because there was no specific provision in the Act that waived immunity as to

33

the Commonwealth nor was there any implied waiver of immunity. 536 A.2d at 475. Like the University, SEPTA is a Commonwealth party and is treated as the Commonwealth for purposes of sovereign immunity. Poliskiewicz teaches that an aggrieved party may not maintain a suit against the Commonwealth under the Act. Count IV of the Amended Complaint must therefore be dismissed.

### H. THE AMENDED COMPLAINT SHOULD BE DIMISSED IN ITS ENTIRETY BECAUSE PLAINTIFF CANNOT SHOW THAT SEPTA WAS HIS EMPLOYER UNDER FEDERAL OR STATE LAW.

Each of the claims asserted by Plaintiff in his Amended Complaint are predicated on a finding that SEPTA was Plaintiff's employer. See e.g. Amended Complaint at ¶ 10. For example, 42 U.S.C. § 2000e-2 makes it unlawful for an employer to refuse to hire or terminate an individual because of the individual's "race, color, religion, sex or national origin…" The Criminal History Record Information Act prohibits employers from considering criminal convictions in making employment decisions when the convictions relate to the applicant's suitability for employment. 18 Pa.C.S. § 9125(b). Similarly, the Act mandates that the employer notify the applicant in writing if the decision not to hire is based on the criminal history of the applicant, in whole or in part. Id. at § 9125(c). Here, there is no evidence showing that SEPTA was Plaintiff's employer under federal or state law.

#### 1. Federal Law

As has been discussed throughout this memorandum, Plaintiff's claims against SEPTA fail as a matter of law because he cannot demonstrate that SEPTA was his employer. First, Title VII applies to employers and their employees. 42 U.S.C. § 2000e-2(a)(1). An employer under Title

VII is defined as one who has 15 or more employees for each working day in twenty or more

calendar weeks in the current or preceding year. Id. at § 2000e(b). An employee is vaguely

defined as "an individual employed by an employer . . . ." Id. at § 2000e(f).

Because Congress did not define employee more precisely in Title VII, this Court should

employ the common law agency test to determine if Plaintiff was an employee of SEPTA under

Title VII. Nationwide Mutual Insurance v. Darden, 503 U.S. 318, 323 (1992). The common law

test was summarized by the Court in Darden:

> In determining whether a hired party is an employee under the general
> common law of agency, we consider the hiring party's right to control
> the manner and means by which the product is accomplished. Among
> the other factors relevant to this inquiry are the skill required, the
> source of the instrumentalities and tools; the location of the work; the
> duration of the relationship between the parties; whether the hiring
> party has the right to assign additional projects to the hired party; the
> extent of the hired party's discretion over when and how long to
> work; the method of payment; the hired party's role in hiring or
> paying assistants; whether the work is part of the regular business of
> the hiring party; whether the hiring party is in business; the provision
> of employee benefits; and the tax treatment of the hired party.

503 U.S. at 323-324 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-

752 (1989)).    This test examines the totality of the circumstances but "places its greatest

emphasis on the hiring party's right to control the manner and means by which the work is

accomplished." Lattanzio v. Security National Bank, 825 F.Supp. 86, 89 (E.D.Pa. 1993).

Application of the common law agency test set forth in Darden, to the facts presented here

establish unequivocally that Plaintiff was never an employee of SEPTA.

First, SEPTA had no right to control the manner and means in which Plaintiff performed

services for King. Plaintiff did not work at any SEPTA location; although he testified that he

35

received some limited training at SEPTA.  El Dep. at 89.  SEPTA had no right to assign projects

to Plaintiff nor any control over the hours that Plaintiff worked or the schedule that he worked.

SEPTA did not provide employee benefits to Plaintiff, did not pay any salary to Plaintiff and did

not treat him as an employee in any other way.  Brandis Affidavit at ¶ 13. [10]

        In addition, SEPTA does not establish the compensation and level of benefits that are

provided to drivers, nor does it promulgate work rules that apply to drivers employed by King.

Brandis Affidavit at ¶ 13; Fiorillo Dep. at 11-13.  SEPTA is not involved in the day-to-day

supervision of King drivers either.  Brandis Affidavit at ¶ 13; Fiorillo Dep. at 13.  Finally, no

employee records are maintained by SEPTA that apply to King drivers such as tax information,

insurance information or payroll information.  Brandis Affidavit at ¶ 14. Indeed, the release that

Plaintiff signed that allowed King to obtain his criminal record and the conditional offer of

employment that Plaintiff signed are not maintained by SEPTA, but are maintained by King who

produced these documents in this litigation.  Brandis Affidavit at ¶ 14; Fiorillo Dep. at 26.

        King hired Plaintiff, supervised Plaintiff, set his schedule, paid him, withheld taxes from his

paycheck and terminated his employment without any input from SEPTA.  Fiorello Dep. at 11-13;

28-29. Brandis Affidavit at ¶ 17. Moreover, the Agreement specifies that King is an independent

contractor for SEPTA and is also the employer of all individuals hired to perform the services

contained therein. Exhibit C at PMC-2.  Many courts have relied on contract language in

concluding that an individual was not an employee and therefore unable to sustain a claim made

under Title VII.  <u>Holtzmann v. The World Book Company</u>, 174 F. Supp. 2d 251, 254, n.4

---

[10]  Even Plaintiff admitted that he never applied for employment with SEPTA, never worked for
SEPTA and was never denied employment with SEPTA.  Requests for Admission at Nos. 5 and 6.

(E.D.Pa. 2001) (citing cases). In <u>Holtzmann</u>, the court stated that although an agreement was

not dispositive, it was strong evidence that an individual was an independent contractor and not

an employee. 174 F. Supp. at 254. On this record, there is no evidence to suggest that SEPTA

was Plaintiff's employer.

Nor can any argument be advanced that SEPTA and King were joint employers of

Plaintiff.[11] In <u>NLRB v. Browning-Ferris, Indus. of Pa, Inc.</u>, 691 F.2d 1117, 1124 (3d Cir. 1984,

the Court held that two entities are joint employers where "they share or co-determine those

matters governing the terms and conditions of employment." The courts generally consider three

factors when determining if this test has been met:

> (1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) day-to-day supervision of employees, including employee discipline; and (3) control of employee records, including payroll, insurance, taxes and the like.

<u>Podzobinski v. Roizman</u>, 1998 WL 67548 *3 (E.D.Pa. 1998) (quoting <u>Zarnoski v. Hearst</u>

<u>Business Communications</u>, 1996 WL 11301 *8 (E.D.Pa. 1996)).

The undisputed facts in this case establish that no joint employment relationship is present

here. Indeed, SEPTA's sole connection to this case is a provision in a contract to which it is a

party that requires that drivers employed by King meet certain minimum requirements set forth

therein. This is not the kind of oversight that could establish that SEPTA is Plaintiff's employer

under either common law agency rules or a joint employer theory.[12] As a convicted murderer,

---

[11] Plaintiff has not alleged that SEPTA and King are joint employers in his Amended Complaint.

[12] The maintenance of some power by a party other than the actual employer does not convert the relationship to one of joint employers. For example, in <u>Metropolitan Detroit Bricklayers District Council v. J.E. Hoetger</u>, 672 F.2d 580, 584 (6th Cir. 1982), a general contractor was not

Plaintiff fell below those minimums and was therefore terminated by King from his position with King. It must be emphasized that King did not seek the input of SEPTA when it hired or fired Plaintiff. Nor did it inquire as to whether Plaintiff could be employed in another capacity. Fiorillo Dep. at 25. Had it done so, King would have been advised that Plaintiff could be employed by King in any capacity other than as a driver. Brandis Affidavit at ¶ 11.

Because Plaintiff's federal claims are viable only if he can establish an employment relationship with SEPTA, his claims must be dismissed.

> **2.     State Law**

The same result obtains under state law. In the seminal case of <u>Sweet v. Pennsylvania Labor Relations Board</u>, 457 Pa. 456, 322 A.2d 362, 365 (1974), the Supreme Court of Pennsylvania observed that "[t]he relation of an employer and employee exists when a party has the right to select the employee, the power to discharge him, and the right to direct both the work to be done and the manner in which such work shall be done." As set forth above, these powers are vested alone in King.

It equally is clear that Plaintiff cannot establish that King and SEPTA were joint employers under state law. A joint employer relationship can exist "where no one single entity controls all of the terms of the employment relationship." <u>Costigan v. Philadelphia Finance Dep't</u>, 462 Pa. 425, 341 A.2d 456, 461 (1975). SEPTA retained no control over Plaintiff's employment with King or the manner in which King directed Plaintiff's employment. SEPTA only had the right to enforce the terms of the Agreement. This Court cannot find that SEPTA is liable to Plaintiff under the

---

considered to be a joint employer with a subcontractor even though their contract required the subcontractor to hire only union workers and the general contractor retained the right to escrow funds to insure that union benefits were paid.

State Constitution or the Criminal History Record Information Act because no employer-employee relationship existed between SEPTA and Plaintiff under state law either.

## V.    <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment should be entered in favor of SEPTA and against Plaintiff and the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

_____
Robert J. Haurin
SAUL H. KRENZEL & ASSOCIATES
42 South 15th Street, Suite 800
Philadelphia, PA 19102
(215) 977-7230

Dated:  November 12, 2003