## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| DOUGLAS EL | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| v. | : | No. 02CV3591 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | JURY TRIAL DEMAND |
| TRANSPORTATION AUTHORITY | : | |
| | : | |
| Defendant. | : | |

_____

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS AMENDED MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF**

Defendant, Southeastern Pennsylvania Transportation Authority (hereafter "SEPTA")

submits the within Memorandum of Law in Support of its Amended Motion for Summary

Judgment against Plaintiff.  For the reasons that follow, SEPTA's motion should be granted and

the Amended Complaint should be dismissed with prejudice.

## I.     INTRODUCTION

The Americans with Disabilities Act of 1990 ("ADA") made SEPTA legally responsible

for providing public transportation to individuals who, because of a disability or handicap, are

unable to use fixed-route transportation.[1]  These services are known as "paratransit services."  For

various reasons, SEPTA determined that it would subcontract with private transportation

companies to provide this important service to the disabled community.  Thus, SEPTA entered

into written contracts with these companies pursuant to which companies would be responsible

_____

[1] Fixed route refers to SEPTA's bus lines, subways, subway-surface lines, trolleys, Market-Frankford El and commuter rail lines.

for transporting the disabled.

To effectuate the purposes of these contracts, the transportation companies were responsible for hiring personnel including paratransit drivers to transport the disabled. Initially, with respect to hiring drivers to transport the disabled, the private entities with whom SEPTA contracted conducted limited pre-hire background checks of driver applicants that did not include screening for prior job-related convictions. That changed in August 1994.

In 1994, a paratransit driver with a history of drunken driving arrests became involved in a fatal accident on I-95 while he was operating a paratransit van. The driver was drunk at the time of the accident which left one 24 year old woman dead, and her 26  year old sister critically injured. Only three days later, another paratransit driver was arrested for auto theft. A subsequent check of his criminal history revealed that this driver had previously been convicted of involuntary deviate sexual intercourse.

As a result of these incidents, SEPTA determined that more expansive background checks of paratransit driver applicants were needed to further safeguard the handicapped and disabled who utilize paratransit services. Revisions were made to the paratransit contracts to require that the providers thereafter conduct criminal background checks of individuals who applied for jobs as paratransit drivers in SEPTA service. Significantly, the paratransit contracts disqualified driver applicants in SEPTA service who had convictions for certain violent crimes including murder, rape and assault.

The application of this contractual conviction requirement resulted in Plaintiff being terminated from employment by King Paratransit Company ("King") as a paratransit driver. Plaintiff was convicted of murdering a 16 year old boy.

By this action, Plaintiff and the class that he purports to represent challenge SEPTA's right to safeguard the disabled who rely on SEPTA to provide safe and efficient transportation. Plaintiff claims that SEPTA had no right to disqualify him from employment as a driver because his conviction was too remote in time.   But that is not the issue here.  The real issue is whether SEPTA and its paratransit contractors should be required to take the risk of hiring someone who is responsible for safeguarding the disabled when that individual has a known and documented history of violence.

This Court need only consider the horror endured by Lisa Pokalsky, a paratransit customer of SEPTA, to answer that question.  On September 6, 2000, Ms. Pokalsky was brutally raped by David DeSouza.  At the time of the rape, Mr. DeSouza was working as a paratransit drive in SEPTA service for King Paratransit Services, Inc.  ("King").  Ms. Pokalsky suffered from cerebral palsy, weighed 80 pounds and was confined to a wheelchair.  Prior to hiring Mr. DeSouza, King did not conduct a criminal background check as required by its contract with SEPTA.  Had it done so, King would have learned that Mr. DeSouza had been previously arrested (but for unknown reasons – not convicted) for the rape of a disabled woman. Presumably, armed with this information, King would have a conducted a further investigation before turning Mr. DeSouza loose on Ms. Pokalsky.

## II.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action by filing a Complaint against SEPTA on June 4, 2002. Therein, Plaintiff alleged a single cause of action against SEPTA under Title VII of the Civil Rights Act of 1964, as amended.  Specifically, Plaintiff alleged that a provision included in a paratransit contract between SEPTA and King (hereafter "the Agreement") that prohibited the

employment of individuals with certain criminal convictions had a disparate impact on African Americans and Hispanics. Complaint at ¶ 3.

According to Plaintiff, he was hired by King as a paratransit driver in January 2000. Complaint at ¶ 21. Plaintiff alleges that his employment with King was thereafter terminated solely because he is a convicted murderer and, this he claims, constitutes unlawful employment discrimination. Id. at ¶ 21. Plaintiff also purports to represent a class of individuals who were denied employment with King and other entities with whom SEPTA subcontracts paratransit services pursuant to SEPTA's "policy." See Complaint at ¶¶ 17, 34-36. However, to date, Plaintiff has not identified a single potential member of the class that he purports to represent nor has he even moved for class certification.[2]

On or about November 13, 2002, Plaintiff amended his complaint. In addition to alleging a violation of Title VII as above, Plaintiff alleges also that SEPTA violated his equal protection rights under the United States Constitution, his right to public employment under the Pennsylvania Constitution and the Pennsylvania Criminal History Record Information Act when King terminated his employment. Plaintiff also purports to represent a class of violent convicted criminals whose rights were allegedly violated by SEPTA in this same regard.

On December 9, 2002, SEPTA filed its Answer and Affirmative Defenses to Plaintiff's Amended Complaint. Therein, SEPTA denied liability to Plaintiff or any member of the class that he purports to represent. SEPTA also asserted that the criminal conviction provisions in the

---

[2]       Local Rule 23.1(c) of the Local Rules of the United States District Court for the Eastern District of Pennsylvania specifies that a party must move for class certification within 90 days of filing a complaint, unless the period is extended by the Court for good cause shown by the moving party. Thus, the only claim before this Court is that of the Plaintiff. See East Texas Motor Freight v. Rodriguez, 431 U.S. 395, 399-400 (1977).

Agreement are justified by business necessity and that Plaintiff's individual claims were time barred.

On December 23, 2002, SEPTA filed Third Party Complaints against each of the paratransit providers with whom it subcontracted during the period 1991 to present. The basis for the third party actions was a provision in the paratransit contracts that requires that all paratransit providers indemnify and hold SEPTA harmless for any claims that arise in the performance of the paratransit contracts. These claims were subsequently dismissed by the Court on December 10, 2003.

On November 12, 2003, SEPTA filed its initial motion for summary judgment in accordance with the Court's Scheduling Order. However, the Court did not rule on SEPTA's Motion at that time or thereafter. Instead, at the request of Plaintiff, the discovery deadline was extended to March 15, 2004. On February 26, 2004, the Court, by stipulation of the parties, extended the period for taking discovery from third parties until June 14, 2004.

Thereafter, the case deadlines for filing motions and serving expert reports were extended several times by the Court. In accordance with this Court's latest Order, SEPTA now moves for summary judgment against Plaintiff. For the reasons that follow, judgment should be entered in favor of SEPTA and against Plaintiff and the Amended Complaint should be dismissed forthwith.

## III.    STATEMENT OF UNDISPUTED FACTS

1.    Plaintiff is an African American. Plaintiff was convicted of homicide. Amended Complaint at ¶ 22.

2.    SEPTA is a body corporate and politic that exercises the public powers of the Commonwealth of Pennsylvania and is as an agency and instrumentality thereof. Answer to

5

Amended Complaint at ¶ 9.

3.      King is a private entity that is no longer in business.  Fiorillo Dep. at 8 (Exhibit "A"). [3]

4.      The Americans with Disabilities Act of 1990 requires SEPTA to provide transportation services to individuals who are unable to use fixed-route transportation within a defined service area because of their disability.  Corressel Dep. at 108-109 (Exhibit "B"); Amended Complaint at ¶ 12 and Answer to Amended Complaint at ¶ 12 (Exhibit "C").  These services are referred to as paratransit services.  Id.  Paratransit service, moreover, involves door to door transportation to the disabled and the elderly.  Foley Dep. at 49 (Exhibit "D").


5.      Individuals who use paratransit services include children, adults and senior citizens who are blind, deaf, paralyzed, have severe developmental disabilities, Alzheimer's, autism, multiple sclerosis, Down's Syndrome, and other serious and debilitating conditions.  Corressel Dep. at 109-110, Spicer Dep. at 109-110, (Exhibit "E"); Rishel Dep. at 191, (Exhibit "F").  Because of the population that is served by paratransit, SEPTA is especially concerned with the safety of these passengers.  Corressel Dep. at 106, 113-114; Spicer Dep. at 56, 111; Montague Dep. at 162;171 (Exhibit "G"); Elliot Dep. at 51 ("Exhibit "H"); Rishel Dep. at 191.

6.      SEPTA provides paratransit services in Philadelphia and the four surrounding counties, Bucks, Chester, Delaware and Montgomery by contracting with outside providers including King.  Answer to Amended Complaint at ¶¶ 2, 13; Foley Dep. at 44.

---

[3]      The Exhibit Letter refers to the accompanying exhibits in Support of SEPTA's Motion for Summary Judgment.

7.     Pursuant to the paratransit contracts, providers were required to hire their own employees including drivers in SEPTA service to effectuate the purposes of the contract.  Brandis Affidavit at ¶ 13. (Exhibit "I").

8.     Paratransit drivers in SEPTA service are responsible for providing door to door transportation service to the disabled. Foley Dep. at 50. The job requirements for a paratransit driver in SEPTA service also includes assisting disabled individuals from their homes to the paratransit van and from the van to their destination.  Paratransit drivers in SEPTA service also must ensure that handicapped individuals are properly secured in the paratransit van and are required to collect fares from such individuals. Corressel Dep. at 112.  Brandis Affidavit at ¶ 15; El Deposition at 85 (Exhibit "J"); Hartman Dep. at 143 (Exhibit "K"); Spicer Dep. at 107; Corressel Dep. at 106.  Paratransit drivers in SEPTA drive a different route each day and are often alone on the vans with disabled passengers.  Spicer Dep. at 108.  Corressel Dep. at 114.

9.   In August 1994, Michael Graham, a paratransit driver employed by VPSI Paratransit, a SEPTA paratransit provider, was involved in a fatal accident on I-95 when his northbound traveling paratransit van jumped a guardrail and crashed into a vehicle in the southbound lanes of I-95. Walsh Affidavit at ¶ 7 (Exhibit "L"); Brandis Affidavit at ¶ 6a; Brandis Dep. at 168-69 (Exhibit "M"); Foley Dep. at 77; Challenger Dep. at 61 (Exhibit "N"); Montague Dep. at 89-90; Corressel Dep. at 44; and exhibits 1 and 2 attached thereto.  See also, newspaper accounts of the incident which are attached hereto as Exhibit "O."  One passenger of the vehicle that was struck by Mr. Graham was killed and the other was critically injured.  Walsh Affidavit at ¶ 7; Brandis Affidavit at ¶ 6a and Exhibit "O."  Mr. Graham was charged with vehicular homicide and driving under the influence as a result of this accident.  Walsh Affidavit at ¶ 8; Brandis Affidavit at ¶ 6a.  At the time

of the accident, Mr. Graham was a fugitive having failed to appear in court for 2 drunk driving arrests that occurred in 1992.  Id.  Mr. Graham had also been arrested 2 times for driving under the influence in the 3 week period immediately preceding the date of the accident.  Id.  A total of $4.5 million was paid to resolve claims related to this accident.  Walsh Affidavit at ¶ 8.

10.     On August 5, 1994, a paratransit driver employed by Triage Paratransit Company was arrested for auto theft.  A subsequent criminal record check revealed that the driver, Michael Donaldson, had been previously convicted of involuntary deviate sexual intercourse.   Walsh Affidavit at ¶ 10; Brandis Affidavit at ¶ 6b; Brandis Dep. at 169; see also, newspaper accounts of the incident which are attached hereto as Exhibit "P."

11.     Because of incidents set forth in paragraphs 9 and 10, the community demanded that SEPTA take action to prevent these kinds of incidents from happening in the future.  Corressel Dep. at 44, 92, See Also, newspaper articles attached hereto as Exhibit "Q";  Spicer Dep. at 60-61; Walsh Affidavit at ¶ 11.

12.     Prior to the incidents referred to in paragraphs 9 and 10, providers were not required to conduct a criminal background check for driver applicants in SEPTA service.  Walsh Affidavit at ¶ 9; Brandis Dep. at 103-105; Corressel Dep. at 34-35 and Exhibit P-2 attached thereto.

13.     As a result of the incidents referred to in paragraphs 9 and 10 above, SEPTA undertook to develop more expansive standards for screening applicants for paratransit driving positions in SEPTA service including background checks for a record of criminal convictions.  Walsh Affidavit at ¶ 12; Montague Dep. at 89-90; 125; Brandis Affidavit at ¶ 6; Brandis Dep. at 169-170; Spicer Dep. at 56.  These new requirements prohibited paratransit providers from

employing individuals with previous convictions for committing violent crimes and driving under the influence as paratransit drivers in SEPTA service.  SEPTA implemented these new requirements only to make paratransit services safer for disabled individuals who used paratransit services. Walsh Affidavit at ¶ 13; Brandis Affidavit at ¶¶ 5, 8;  Brandis Dep. at 169; Corressel Dep. at 106; Krajewski Dep. at 73 (Exhibit "R"); Elliott Dep. at 51; Montague Dep. at 161-162; Spicer Dep. at 74, 111; Foley Dep. at 96, 174-175, 181; Soltner Dep. at 159-160; Rishel Dep. at 99, 190-192.

14.    In addition, because paratransit drivers handle money, provide hands on care to the disabled, escort the disabled to and from their front doors and are required to accurately record data for FTA oversight, SEPTA requires that its drivers have no convictions for crimes involving theft and other offenses in the seven years preceding employment with a paratransit provider. Walsh Affidavit at ¶ 14; Hartman Dep. at 144; Spicer Dep. at 111-112; Elliot Dep. at 88-89; Corressel Dep. at 40-41.  These prohibitions were specifically concerned with the trustworthiness of driver applicants.  Walsh Affidavit at ¶ 14.

15.    Pursuant to its contacts with paratransit providers, such providers were thereafter prohibited from employing anyone in a driving position in SEPTA service that:

a.    has a current record or conviction for driving under the influence of alcohol or other substance.

b.    has a felony or misdemeanor conviction for a crime of moral turpitude or of violence against any person including homicide, rape, robbery, risking a catastrophe, assault, aggravated assault, indecent assault and other crimes of violence including attempts to commit crimes of violence.

9

c.     has a felony conviction in the last seven years preceding employment for crimes of theft or crimes against property.

d.     has a misdemeanor conviction in the last seven years preceding employment for crimes of theft and crimes against persons and property including indecent exposure, misdemeanor indecent assault, trespass, corruption of minors and crimes involving narcotics, alcohol and firearms.  Walsh Affidavit at ¶ 15; King Agreement (Exhibit "S" at 23); Brandis Affidavit at ¶ 4; Second Brandis Affidavit at ¶ 6-7 and Exhibit 1 attached thereto (Exhibit "T"). [4]

16.     On or about July 1, 1999, SEPTA and King entered into a written contract pursuant to which King agreed to provide paratransit services to customers on behalf of SEPTA (hereafter "Agreement"), (Exhibit "S").

17.     The Agreement made clear that all such personnel "shall be considered employees of the Contractor [King] or its subcontractors and in no event shall any of the personnel employed in the performance of the Agreement be considered employees of SEPTA."  Exhibit "S" at PMC-2; Brandis Affidavit at ¶ 13.

18.     King is considered an independent contractor under the Agreement and is prohibited from holding itself out as being an agent or representative of SEPTA.  In addition, the Agreement makes clear that King has no authority to obligate SEPTA in any manner.  Exhibit "S" at PMC-16.

---

[4] In addition to the King Agreement, SEPTA had contracts with, among others, Krapfs, Edens, Triage, Anderson Travel, Community Transit of Delaware, Service Plus, J&D Jagiela, and Metro Care which contain virtually identical provisions as those contained in the King Agreement.

19.    With respect to King hiring drivers to effectuate the purposes of the Agreement, SEPTA included in the Agreement the requirement that criminal background checks be performed on drivers in SEPTA service only as set forth in Paragraph 15 above. Brandis Affidavit at ¶ 4, 10. More specifically, the Agreement provided that King must complete a background investigation for all of its applicants for driving positions in SEPTA service to include a check on the applicant's driving record and a criminal background check. Exhibit "S" at 22; Brandis Affidavit at ¶ 4; Second Brandis Affidavit at ¶ 3.

20.    In addition to the criminal history provisions, the contract also required that driver applicants meet the following minimum requirements, all of which are related to safety, before being employed as a paratransit driver in SEPTA service:

a.    pass a  physical examination performed by a licensed physician to include a drug and alcohol screen and confirmation that the applicant can lift up to fifty pounds minimum;

b.    Have a valid driver's license;

c.    Have a safe driving record;

d.    Have a valid driver's license for a minimum of three years;

e.    Speak and understand English;

f.    Have knowledge of the service area and the ability to use a map.

Second Brandis Affidavit at ¶ 3 and Exhibit 1 attached hereto.

21.    To aid the contractors in applying the criminal conviction requirements of the paratransit contracts, SEPTA sent to each provider a matrix which showed the types of convictions that would disqualify an individual from being used by a paratransit provider as a driver in SEPTA service. Ward Dep. at 34 and Exhibit 3 attached thereto (Exhibit "U"); Brandis

11

Dep. at 196-197; Hartman Dep. at 118, 125, 148 and Exhibit 19 attached thereto; Second Brandis

Affidavit at ¶ 5-7 and Exhibit 2 attached thereto.  The matrix was consistent with the Agreement

and other paratransit contracts. Hartman Dep., Exhibit 19; Ward Dep. at 84-85; Second Brandis

Affidavit at Exhibit 2.

     22.     Thus, the paratransit contracts do not bar the employment of individuals who have

been convicted of any crime as drivers in SEPTA service.  Hartman Dep. at  43, 46; Soltner Dep.

at 78, 112 (Exhibit "V"); Montague Dep. at 163; Second Brandis Affidavit at ¶¶ 8-9.  For

example, an individual who had been convicted of larceny, retail theft, reckless endangerment and

criminal mischief would not be barred from employment as a paratransit driver in SEPTA service

if the conviction occurred more than 7 years prior to the date of application.  Hartman Dep. 153-

157 and Exhibits 23-25 attached thereto; Brandis Dep. at 196-197; Second Brandis Affidavit at ¶

7 and Exhibit 2 attached thereto.  Similarly, an individual who had been convicted of felony arson

eight years before applying for a position of paratransit driver in SEPTA service would not be

disqualified for consideration as a paratransit driver in SEPTA service as a result of this

conviction.  Montague Dep. at 165; Second Brandis Affidavit at ¶ 7 and Exhibit 2 attached

thereto.

     23.     Community Transit, a paratransit provider for SEPTA, has hired between 20 and

25 individuals as drivers in SEPTA service who had a record of a conviction.  Soltner Dep. at 79,

150-152 and Exhibits 13 and 14 attached thereto.  Other providers have also hired individuals

with prior convictions as paratransit drivers in SEPTA service.  See  Haurin Affidavit at Exhibit 1

(Exhibit "W");  Second Brandis Affidavit at ¶ 9 and Exhibit 3 attached thereto; Memo from

Counsel for Plaintiff to William Fairley dated June 9, 2004 attached hereto as Exhibit "X"; Affidavit of David Griffin, Exhibit 1 at 5 (Exhibit "Y") (hereafter "Griffin Report").

24.     The requirements contained in the paratransit contracts regarding general minimums including the criminal record requirements apply only to applicants for paratransit driving positions in SEPTA service. Brandis Dep. at 85; Montague Dep. at 114-115; Spicer Dep. at 78; Soltner Dep. at 162. This means that SEPTA does not have the authority under the contracts to prohibit contractors from hiring individuals in other positions who do not meet the general minimums. Soltner Dep. at 162; Hartman Dep. at 64; Spicer Dep. at 78; Brandis Dep. at 85; Montague Dep. at 163; Second Brandis Affidavit at ¶ 10.

25.     It was SEPTA's belief that criminal background checks were necessary to provide additional protection for disabled individuals who rely on paratransit services. Walsh Affidavit at ¶ 16; Brandis Affidavit at ¶¶ 4-5; Foley Dep. at 179, 181; Montague Dep. at 171; Corressel Dep. at 106; Spicer Dep. at 74, 111. To that end, SEPTA narrowly tailored the criminal conviction provisions in the paratransit contracts so that it would provide additional safeguards to the disabled and not unlawfully discriminate against applicants for these safety-sensitive positions. Walsh Affidavit at ¶ 16.

26.     SEPTA's efforts to provide additional safeguards to its disabled customers through a pre-hire background investigation is a common practice in the paratransit industry. Moreover, completing prehire checks of criminal backgrounds of individuals seeking employment as drivers in the paratransit industry is a standard safety practice and is critical to the safety of the passengers. Rishel Dep. at 35, 68, 95, 97, 190-192. Refusing to hire individuals as drivers in the paratransit industry because of a criminal conviction is also a standard employment practice.

Rishel Dep. at 35.

27.    Among others, New Jersey Transit ("NJT") conducts criminal background checks of individuals seeking employment as paratransit drivers.  Rishel Dep. at 25; Corressel Dep. at 22-23.  NJT also bars individuals from employment as paratransit drivers who have criminal convictions.  Rishel Dep. at 25.  Unlike the policy that applied to Plaintiff here, NJT's criminal conviction policy provides that a conviction for any felony was an absolute prohibition to employment as a paratransit driver.  Corressel Dep. at 32; Rishel Dep. at 188, 199.  Thus, Plaintiff would not have been eligible for hire as a paratransit driver by NJT either.  Rishel Dep. at 189.

28.    Access Group, a paratransit provider in Los Angeles likewise has a policy that prohibits the hiring of individuals with criminal records.  Rishel Dep. at 40-41.  Tri-County Metropolitan Transportation District of Oregon which is the Portland transit system broadly prohibits the hiring of any paratransit driver for any crime which impacts public safety, property or life.  Rishel Dep. at 173 and Exhibit 13 attached thereto at 10477.

29.    Prior to implementing the criminal conviction policy, SEPTA considered its possible discriminatory impact and concluded that the policy was justified by business necessity.  Walsh Affidavit at ¶ 16.

30.    On September 6, 2000, David DeSouza, a paratransit driver for King, sexually assaulted and raped Lisa Pokalsky, a paratransit customer.  See Pokalsky v. SEPTA, 2002 U.S. Dist. LEXIS 16175 *3 (E.D.Pa. 2002) (Exhibit "Z"), Fiorillo Dep. at 68-69; Brandis Affidavit at ¶ 9; Walsh Affidavit at ¶ 18.

31.    At the time of this incident, Ms. Pokalsky suffered from cerebral palsy, was confined to a wheelchair and weighed only 80 pounds.  See Pokalsky v. SEPTA at *3. Exhibit

14

"Z"; Brandis Affidavit at ¶9.

32.    King did not conduct a background check of Mr. DeSouza before it hired him as a driver and, had it done so, it would have learned that Mr. DeSouza had been previously arrested for the rape of a disabled woman.  Pokalsky at *4; Brandis Affidavit at ¶ 9; Walsh Affidavit at ¶ 18. Ms. Pokalsky received $900,000 in settlement of her claims against King and SEPTA.  Walsh Affidavit at ¶ 18.

33.    Individuals with disabilities are more susceptible to being victims of violence and abuse than individuals who have no disabilities. See Affidavit of Dr. Dick Sobsey, Exhibit 1 at 4-5 (Exhibit "AA") (hereafter "Sobsey Report").

34.    Moreover, studies show that people with disabilities experience a very high risk of becoming victims of violence and exploitation. Sobsey Report at 5. For example, children with disabilities experience a much higher rate of victimization than children who have no disabilities. Id. at 7.  Such children are victimized at rates 3-4 times more than children with no disabilities and about 1/3 of school age children with disabilities have been victimized. Id. Adults with disabilities are about 4 times as likely to be victimized by violence as individuals with no disabilities. Id. at 8

35.    Individuals with severe mental illness are more than 20 times more likely to be the victim of a sexual assault.  Sobsey Report at 8.  57% of women and 24.5% of men with severe mental disabilities have been sexually assaulted sometime in their adulthood.  Sobsey Report at 8. Such individuals, moreover, experience higher rates of victimization in every violent crime category and property crimes than those who are not disabled. Id. at 8-9.

36.    Public transportation has been identified as a high risk environment for both violent and property crime. Sobsey Report at 9.  Most of the victims of these crimes are passengers who

15

are described as captive passengers or captive riders because they have no access to other kinds of

transportation. Id. Among the most frequent captive passengers are children, the disabled and

the elderly - - who are also considered the most vulnerable to crime. Id. at 9-10.

37.     Paratransit services are particularly dangerous environments for the disabled

because the vehicles operate with only one or few passengers, without a fixed or standard

schedule, many passengers have limited communication skills and therefore are unable to act as

witnesses to offenses and others are unable to defend themselves against attack. Sobsey Report at

10-11.

38.     A recent study revealed that up to 88% of all paratransit riders required the service

because of intellectual disabilities or mental health disabilities or had some other cognitive or

mental health disabilities in addition to a physical disability. Sobsey Report at 10. Others may

have visual or hearing impairments. Id. This means that a great many paratransit customers have

impairments that affect their abilities to perceive or describe an offense in a manner deemed

credible. Id. at 11.

39.     Dr. Sobsey conducted a study in 1991 which was updated in 1994 that revealed

215 cases of sexual abuse of children and adults with disabilities. 11 of these cases were

perpetrated by a transportation provider. Sobsey Report at 11. The study further revealed that a

transportation provider was responsible for 13.2 times as many cases of sexual abuse as would be

expected based upon their proportion of the adult population. Id. These sex crimes were most

frequently committed when only the victim and perpetrator were in the vehicle. Id. at 12.

40.     Paratransit drivers act in a position of trust with regard to passengers with

disabilities and these drivers have been identified as perpetrators of violence against the disabled in

16

a significant number of cases.  Sobsey Report at 13-14.

41.    Newspaper accounts reviewed by Dr. Sobsey in this case reveal that sexual offenses involving passenger transportation drivers are frequently reported.  Sobsey Report at 16. For example, newspaper accounts reported the following:

a.    377 alleged offenders and 623 victims and 49 alleged offenders and 68 alleged victims in the first 9 months of 2004;

b.    The vast majority of cases involving sexual offenses were committed by drivers against passengers;

c.    The most frequently victimized (73%) were children under the age of 18 and 25% of those children were reported to be disabled;

d.    Of the adults victimized by sexual offenses (27%), 68.7% of those adults had a disability of some kind;

e.    previous criminal convictions were reported for 15.3% of the drivers who were alleged to have committed a sexual offense and another 1.2% of the offenses were alleged to have been committed by drivers who had criminal charges pending against them;

f.    In only 6.7% of the cases of sexual offenses reported, the driver involved had no prior conviction or passed a criminal record screen;

g.    For cases involving paratransit or specialized transportation, 19.1% of the drivers were reported to have prior criminal convictions and only 5.6% were identified as having no prior conviction or as having passed a criminal record screen;

h.    19.1% is a conservative estimate; when known cases are studied, 77.2% of sexual offenses were committed by drivers with prior criminal records;

17

i.      90% of the alleged sexual offenses reported were committed against vulnerable victims, most frequently children and adults with disabilities;

j.      Based on these reports, the rate for drivers with previous convictions being implicated in sexual offenses is 40 times higher than drivers with no prior convictions.

Sobsey Report at 16-18.

42.     Paratransit is a higher risk environment for crime than most bus services for six reasons:

a.      Paratransit riders are "captive passengers" which has been identified as high risk for crime;

b.      Paratransit riders are often unable to unfasten their seatbelts or leave the van without driver assistance;

c.      Paratransit riders are often alone with drivers increasing the risk if the driver is a potential offender;

d.      Paratransit riders often have impaired communication skills so that the ability to report criminal activity is compromised;

e.      Paratransit operates on a different schedule which varies day to day; and

f.      Because paratransit drivers must assist paratransit passengers, there is often personal contact between the two.

Sobsey Report at 12-13.

43.     The best protection for paratransit riders would be eliminating all driver applicants with criminal convictions. Sobsey Report at 19, 21. Screening applicants for prior convictions is essential to control crime against the disabled. Id.

18

44.     A reduction or elimination of completing criminal background checks for paratransit drivers by SEPTA or its contractor would likely increase the risk of disabled passengers who use paratransit service. Sobsey Report at 19-20. Furthermore, the hiring of an individual who has been convicted of a violent or sexual offense increases the risk to the disabled. Id. at 20.

45.     SEPTA's criminal conviction policy for paratransit drivers reduces the risk of victimization for a population that is known to have an elevated risk of being victimized. Sobsey Report at 21.

46.     In June 2002, the Department of Justice released the results of a study conducted regarding recidivism rates of prisoners released from prison in 1994. A copy of that report is attached hereto as Exhibit "BB". The study tracked 272,000 prisoners who were released from prison in 1994 for a 3-year period. Id. The report revealed the following staggering statistics:

a.     Within 3 years of release, 67.5% of the prisoners were rearrested for a new offense;

b.     Within 3 years of release; 46.9% of prisoners were reconvicted for a new crime;

c.     Within 3 years of release, 25.4% of prisoners were resentenced to prison terms for a new crime;

d.     Within 3 years of release, 61.7% of violent offenders were arrested for a new offense;

e.     Of those rearrested within 3 years, they were charged with 744,000 new crimes or about 4 per person. Of this number, more than 100,000 charges involved crimes of

violence including 2,900 homicides, 2,400 rapes, 3,200 other sexual assaults, 21,200 robberies, 54,600 assaults and 13,900 other violent crimes;

   f.  53.7% of all prisoners released had a prior arrest for a violent crime and 21.6% were arrested for a violent crime after their release.

  47.  The 1994 report was strikingly similar to a report that tracked the rates of recidivism of prisoners released in 1983.  Affidavit of Alfred Blumstein, Exhibit 1 at 3-4 (Exhibit "CC") (hereafter "Blumstein Report").  In 1983, like 1994, about 2/3 of prisoners were rearrested, about ½ were reconvicted of a new crime and about ½ were back in prison within three years of release. Blumstein Report at 4.

  48.  The data from the 1994 report reveals that the risk of crimes being committed by released prisoners is appreciably greater than the general population. Griffin Affidavit at ¶ 5-7 and Table 2 (Exhibit "II"). Blumstein Report at 3. For example, an individual within three years of release from prison is 31.4 times more likely to commit a murder, 5.5 times more likely to commit a rape, 7.4 times more likely to commit a robbery and 10.5 times more likely to assault someone. Id.

  49.  It is well recognized that individuals who have been convicted of a violent crime have a higher incidence of future criminal conduct than those who have never been convicted of a crime.  Blumstein Report at 3.  In fact, criminologists are in agreement that "the literature can identify no indicator that is better or more reasonable of an individual likely to engage in a violent event in the future than one who has done so in the past."  Blumstein Report at 4.

  50.  Although an individual's propensity to commit a violent crime in the future decreases as the duration for being crime free increases, there is no way for a trained criminologist

to predict with any reasonable level of certainty whether a particular individual may commit a crime in the future. Blumstein Report at 5. Thus, criminologists cannot predict whether a particular individual with a criminal record might commit a crime in the future with any assurance that they will be correct. Blumstein Report at 7. Nevertheless, it is known that the risk of an individual committing a crime in the future is always higher for someone who has previously committed a crime when compared to someone who has never committed a crime. Id.

51.     Neither SEPTA nor its contractors who make hiring decisions for paratransit drivers are in position to make a judgment that parole boards have difficulty making -- identifying individuals who pose a risk to the disabled from those who do not. Blumstein at 8. Therefore, it is entirely prudent for SEPTA to require that paratransit drivers be free of convictions for violent crimes. Id. Moreover, the 7 period for property crimes is reasonable given the amount of trustworthiness that is involved in being a paratransit driver. Id.

52.     Plaintiff was convicted of homicide. Requests for Admission at No. 4,[5] El Deposition at 13. He was convicted in the shooting death of Earl Jones, a 16 year old boy. El Deposition at 19.

53.     Plaintiff never applied for employment with SEPTA, nor was he ever denied employment with SEPTA. Requests for Admission at No. 5 (Exhibit "DD"). Plaintiff has never worked for SEPTA. Id. at No. 6.

54.     In addition to his arrest and conviction for homicide, Plaintiff has been arrested for drug related charges on 5 or 6 occasions. El Dep. at 22 and Exhibit 2 attached to the Deposition

---

[5]        Requests for Admission were served on Plaintiff pursuant to Rule 36 of the Federal Rules of Civil Procedure on June 5, 2003. No responses or objections were ever submitted by Plaintiff to the Requests and, therefore such requests are deemed admitted. Fed.R.Civ.P. 36(a).

of Douglas El. Plaintiff was found guilty of drug related charges on 3 occasions. El Dep. at 27-33. These drug convictions occurred long after Plaintiff's conviction for murder. El Deposition at Exhibit 2.

55.     Notwithstanding the requirements contained in the Agreement that prohibit the employment of violent convicted felons, Plaintiff was inexplicably hired by King as a paratransit driver to work in SEPTA service. El Dep. at 71-72.

56.     Plaintiff commenced training for the position of driver at King on or about January 17, 2000 with approximately 30 other individuals who likewise commenced training to become a driver on that date. El Dep. at 76-77. Of the approximately 30 individuals who commenced training at the same time that Plaintiff commenced training at King, the vast majority ("99%" according to Plaintiff) of those individuals were African Americans. El Dep. at 81; See Also, Fiorillo Dep. at 35-36.

57.     Following the commencement of Plaintiff's employment, King obtained a criminal history report regarding Plaintiff. Fiorillo Dep. at 17-18 and Exhibit 1 attached thereto. King apparently obtained criminal background histories for all of its prospective employees. Fiorillo Dep. at 26. This is not required by the Agreement. Brandis Affidavit at ¶¶ 4, 10.

58.     On January 27, 2000, Ms. Fiorillo advised Sen Wan Wieh, King's supervisor, that Plaintiff could not continue in the employment of King because of a criminal conviction for homicide. Fiorillo Dep. at 18, 41, 51 and Exhibit 2 attached thereto. Ms. Fiorillo did not discuss her decision to separate Plaintiff's employment with King with anyone from SEPTA. Id. at 25.

59.     Plaintiff was advised by King that he could not work there in any capacity because of his conviction of homicide. El. Dep. at 104.

22

60.    Plaintiff was removed from the payroll at King on January 27, 2000, and his employment was terminated on that date.  Fiorillo Dep. at 25.

61.    On November 30, 2000, Plaintiff filed a charge of discrimination against SEPTA. Requests for Admission at No. 1 and Exhibit 1 attached thereto; El Deposition at 128.

62.    With regard to paratransit drivers in SEPTA service, SEPTA does not:

      a.    interview or hire applicants for driving positions;

      b.    establish work schedules or set the hours that drivers work;

      c.    establish pay rates for drivers;

      d.    direct the manner in which drivers perform their jobs;

      e.    supervise drivers;

      f.    involve itself in the day to day operations of King or other paratransit providers;

      g.    provide employee benefits for drivers;

      h.    treat drivers as its own employees for tax purposes;

      i.    retain the right to assign work to drivers;

      j.    discipline drivers employed by paratransit providers for job misconduct or poor job performance;

      k.    evaluate the performance of drivers; or

      l.    promulgate work rules that apply to drivers.

Brandis Affidavit at ¶ 13, Fiorillo Dep. at 11-13; El Dep. at 78-79; Ward Dep. at 87-88, 91-92 ; Soltner Dep. at 153-156; Kern Dep. at 214-215 (Exhibit "EE").

23

63.    Some of the paratransit drivers employed by the contractors are represented for purposes of collective bargaining by labor organizations.  Challenger Dep. at 111-112; Soltner Dep. at 13, 153.  SEPTA does not participate in negotiations with the labor organizations for a collective bargaining agreement either.  Challenger Dep. at 112; Soltner Dep. at 153.

64.    Plaintiff commenced this action by filing a Complaint against SEPTA on June 4, 2002.  According to Plaintiff, he believes that SEPTA discriminated against him on the basis of his race because of the provision in the Agreement involving minimum requirements that SEPTA "imposed" on King.  El. Dep. at 126.

65.    Representations of paratransit contractors who provide paratransit services pursuant to a contract with SEPTA have testified that the majority of individuals that they employed in driving positions are African American. Hartman letter attached hereto as Exhibit "FF"; Ward Dep. at 86; Fiorillo Dep. at 35-36. For example, 85% of Edens' paratransit drivers are African American. (Exhibit "FF").

66.    SEPTA maintains an internal policy regarding criminal background checks for applicants seeking employment with SEPTA.  Elliott Dep. at 64, 120.

67.    Unlike the policy contained in the paratransit contracts which applies to paratransit drivers in SEPTA service only, SEPTA's internal policy applies to every applicant for employment in every job at SEPTA.  Carpenter Affidavit at ¶ 4 (Exhibit "GG").  Elliott Dep. at 120.  Thus, SEPTA's policy applies to applicants for jobs in the mailroom, administrative assistants, mechanics and lawyers. Elliot Dep. at 121.

68.    Pursuant to its internal policy, SEPTA would not approve for hire as an operator any individual who had previously been convicted of a serious physical offense. Carpenter

Affidavit at ¶ 8, 9. The reason for this exclusion is apparent. It is a concern for the safety of the public that SEPTA serves. Carpenter Affidavit at ¶ 9; Elliott Dep. at 88-89, 105.

69.     Because of his conviction for murder, Mr. El would not be eligible for hire at SEPTA as an operator. Foley Dep. at 190; Elliott Dep. at 116-117, 124, 126, 129; Carpenter Affidavit at ¶ 11. The standards for hiring operators at SEPTA are comparable in practice to the requirements contained in the paratransit contracts regarding the hiring of drivers in SEPTA service. Foley Dep. at 51-52.

70.     Unlike paratransit drivers who provide door-to-door service to the disabled on different daily route, SEPTA operators drive on the same fixed route everyday picking up and discharging passengers at predetermined locations at predetermined times. Spicer Dep. at 107; Corressel Dep. at 113-14; Foley Dep. at 50.          71.     SEPTA buses are approximately 40 feet in length and hold up to 100 passengers. Spicer Dep. at 107-108; Corressel Dep. at 114. By contrast, paratransit vans are much smaller and hold only a few passengers. Corressel Dep. at 20-21.

72.     SEPTA operators are rarely, if ever, alone with a single passenger. By contrast, paratransit drivers are alone with disabled passengers on a daily basis. Corressel Dep. at 114.

73.     SEPTA operators do not generally help passengers on and off the vehicles. Spicer Dep. at 107-108. By contrast, paratransit drivers are required to assist the disabled on and off the vans, escort them to and from their doors, provide other hands on assistance and secure the disabled for safe passage. Foley Dep. at 190-91; Corressel Dep. at 114; Walsh Affidavit at ¶ 14.

## IV.    <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The mere existence of a factual dispute does not defeat an otherwise properly supported motion for summary judgment. *See* <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986).  Therefore, summary judgment is proper if the party opposing the motion fails to establish an essential element of his or her case. <u>See</u>, <u>e.g.</u>, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

In evaluating a motion for summary judgment, the court must read the facts in the light most favorable to the nonmoving party.  <u>Anderson v. Liberty Lobbys, Inc.</u>, 477 U.S. 242 at 255 (1986).  Nevertheless, a mere "scintilla" of evidence, or evidence that is only "colorable" or is not sufficiently probative, is not enough to defeat summary judgment. <u>Id.</u>  Instead there must be evidence upon which a jury could reasonably find in the non-moving party's favor. <u>Id.</u>

SEPTA submits that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.

V.    <u>**ARGUMENT**</u>

    A.    **PLAINTIFF HAS FAILED TO ADDUCE ANY EVIDENCE SHOWING THAT THE CHALLENGED HIRING POLICY CONTAINED IN THE AGREEMENT HAS A DISPARATE <u>IMPACT ON AFRICAN AMERICANS OR HISPANICS.</u>**

Plaintiff's claim under Title VII fails as a matter of law because he cannot even make a prima facie showing that the criminal conviction provision of the Agreement has a disparate impact on African Americans or Hispanics.  In fact, the only group that is adversely impacted by the policy is convicted violent felons like Plaintiff.

26

It is well recognized that to establish a prima facie case of disparate impact discrimination, Plaintiff must demonstrate that a facially neutral policy caused a significant disparate impact on a protected group.  Wards Cove v. Antonio, 490 U.S. 642, 656 (1989); Lawton v. Sunoco, 2002 U.S. Dist. LEXIS 13039 (E.D.Pa. 2002), aff'd, 2003 U.S. App. LEXIS 8802 (3d Cir. 2003); Banks v. East Baton Rouge School Board, 320 F.3d 570 (5th Cir. 2003), cert. denied; 124 S. Ct. 82 (U.S. 2003); Settles v. Illinois Department of Human Services, 2002 U.S. App. LEXIS 15268 (7th Cir. 2002); Kerr v. Valdez, 2002 U.S. App. Lexis 27267 (10th Cir. 2002); Malave v. Potter, 320 F.3d 321, 325 (2d Cir. 2003); Chaney v. Southern Railway Company, 847 F.2d 718, 724 (11th Cir. 1988).  In Wards Cove v. Antonio, 490 U.S. 642, 657 (1989), the Court discussed Plaintiff's burden of proof in disparate impact cases:

> As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.  Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.

To prove causation, Plaintiff must therefore isolate the facially neutral policy challenged and show that its application resulted in a disparity. Wards Cove, supra. Moreover, to establish causation, statistical evidence is required "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotion because of their membership in a protected group." Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988); NAACP v. City of Bayonne, 134 F.3d 113, 122 (3rd Cir. 1998)(dismissing claim because Plaintiffs failed to isolate the discriminatory effect of the practice they challenged); Lawton, 2002 U.S. Dist. Lexis 13039 *29 (statistics must compare the racial composition of the at issue jobs and the racial composition of the qualified population in the relevant labor market). Smith v.

27

Tennessee Valley Authority, 1991 U.S. App. LEXIS 1754 *10 (6th Cir. 1991); Spence v. City of Philadelphia, 2004 WL 1576631 (E.D. Pa. 2004) ("Plaintiff must show a casual connection between the challenged policy… and a racially unequal result.")

      As discussed below, Plaintiff's proofs fall short of meeting these well defined standards. Indeed, the record is devoid of any evidence showing that the application of the criminal conviction requirements in the paratransit contacts had a disparate impact on African Americans or Hispanics for the jobs at issue.  In fact, Plaintiff cannot even state with any degree of certainty whether the individuals that he has identified as being "dismissed" lost their employment or were denied employment for not coming to work, failing a map test, failing a drug test or some other reason unrelated to the individual's criminal record.  This is fatal to Plaintiff's claim because he never isolates the practice that he challenges. Instead, Plaintiff asks this Court to speculate what might have happened if the conviction policy was actually applied to individuals its expert witness has identified as being denied an employment opportunity because of application of the policy. Such speculation, however, fails to establish causation.  See McNeil v. McDonough, 648 F.2d 178, 182 (3d. Cir.1981).

      To be sure, in support of his prima facie case, Plaintiff apparently relies on the so-called expert report of Dr. William Fairley to demonstrate that the application of the criminal conviction policy has a disparate impact on African Americans and Hispanics.  A copy of the report is attached hereto as Exhibit "II."  However, Dr. Fairley's conclusions are seriously flawed inasmuch as he never analyzes the issue before this Court.  See Griffin Report at 1. Furthermore, Dr. Fairley includes in his analysis of those "dismissed" individuals with criminal records who were hired by providers as paratransit drivers in SEPTA service (40 cases), individuals whose

reported charges were dropped, individuals where no disposition of the charge is listed, no charges of any kind were reported and the individuals with reported charges would not have resulted in a disqualification. Griffin Report at 5.[6]  Thus, Dr. Fairley mistakenly equated having a record of any kind as being an automatic disqualifying event and for reasons unknown also included 18 cases where there was no criminal charge even reported. Griffin Report at 5.

This gross misjudgment cannot be repaired nor even explained. Indeed, Dr. Fairley testified that some convictions would not result in a loss of employment. Fairley Dep. at 10, 52, 140. See also Cohen Memo to Fairley dated June 9, 2004 noting that the most frequent reason for termination was a violation of the "no show policy." Nevertheless, Dr. Fairley chose not to isolate the facially neutral policy and ascertain whether its application resulted in a disparity in the workforce.

Dr. Fairley readily admitted at his deposition that he could not identify individuals who were terminated or denied employment because of a conviction. Fairley Dep. at 47, 61-62, 68. Dr. Fairley testified that he did not think it was necessary to actually ascertain whether the policy resulted in African Americans and Hispanics losing job opportunities because of their membership in a protected group. Id. at 51-52, 58. As Dr. Fairley explained:

> My analysis was not really premised on actual dismissals, but was premised on looking at the impact on a group of a policy with respect to          convictions records that they – that they could be dismissed on those grounds.
>
> So my emphasis was not on actual dismissal or in trying to sort out different reasons for dismissal, but rather on the relative

_____

[6]    Dr. Griffin analyzed the 472 minority so called "dismissals" identified by Dr. Fairley as having resulted from the application of the criminal conviction policy and found that at least 276 of those dismissals were for reasons that had nothing to do with the individual's criminal record. Griffin Report at 5.

impact of two groups of a conviction record with respect to
their exposure to dismissal for that reason.

Fairley Dep. at 172 (emphasis added). But a review of actual dismissals in relation to the policy is

what is required by Wards Cove. See also, NAACP v. City of Bayonne, supra; See also, Bryant v.

International Schools Services, Inc. 675 F.2d 562, 572 (3rd Cir. 1982). In re Employment

Litigation, 198 F.3d 1305, 1312 (11th Cir. 1999) ("plaintiff must. . . . show that there is a legally

significant disparity between (a) the racial composition caused by the employment practice, of the

pool of those enjoying a job or job benefit; and (b) the racial composition of the qualified

applicant pool).[7]

As a result, Dr. Fairley's opinions are entitled to no weight in this proceeding because they

are not based on individuals who were actually denied employment as a result of the application of

the policy at issue. Fairley Dep at 143, 172. Instead, Dr. Fairley's opinions are based solely on his

unsupportable supposition that "on the order of two-thirds or more of individuals with records

were denied employment." Id. at 68-69

But this supposition finds no support in the record either. Indeed, Dr. Fairley included in

his analysis of 472 dismissals individuals who were actually approved for hire by SEPTA despite

the presence of a criminal conviction. See Griffin Report at 5; Second Brandis Affidavit at ¶ 10

---

[7]        In this regard, Plaintiff's testimony on the racial composition of the drivers employed by King is
telling. Plaintiff commenced training for the position of paratransit driver at King on or about January 17,
2000 with approximately 30 other individuals who likewise commenced training on that date. El Dep. at
76-77. Of the approximately 30 individuals, Plaintiff testified that 99% of those individuals were African
Americans. El Dep. at 81. Plaintiff testified also that another training class that he attended at King
consisted of 15 to 20 individuals, the majority of whom were African Americans. El Dep. at 100. Other
witnesses who testified on behalf of paratransit contractors confirmed that the majority of their drivers were
African American as well. See, e.g., Ward Dep. at 86. Fiorillo Dep. at 35-36. For example, at Edens,
85% of the paratransit drivers are African American. Exhibit FF.

and Exhibit 3 attached thereto.   What's more, Dr. Fairley included individuals with criminal records from Community Transit as those who were dismissed because of the policy.  See Fairley Report at Charts 5, 6, and 7.  This despite Community's representation that it could not identify a single employee or applicant who was disqualified because of a substandard criminal history. Soltner Dep. at 79 and 150-152 and Exhibits13 and 14 attached thereto.  126 of the dismissals identified by Dr. Fairley fell into this group.  Griffin Report at 4. This is particularly troubling because records produced by Community show that many individuals with criminal records were hired as paratransit drivers. Soltner Dep. at 149-150, 151-152, Exhibit 13.

Dr. Fairley's report and testimony simply gloss over these glaring problems. Thus, on page 11 of his report, Dr. Fairley states that "Chart 5 gives for each provider the number of minority employees who were dismissed due to conviction records. . ."  In fact, it does not.  Instead, Chart 5 shows only the number of minorities with a conviction record; some of whom were hired and some of whom may have been denied employment for any number of reasons. See e.g., Soltner Dep. at Exhibit 13.[8]  Thus, there is no factual basis to support Dr. Fairley's ultimate conclusion that the criminal conviction policy at issue here has a disparate impact on African Americans or Hispanics because he never considered the issue.   As a consequence, Plaintiff's proofs are lacking on his prima facie case.

Plaintiff's claim of disparate impact discrimination therefore fails at the outset because his statistical evidence is lacking.  Thus, the evidence adduced in this case shows that no disparity in

---

[8]  Dr. Fairley's Charts 5 and 7 also purport to analyze 472 minority individuals with records as a basis for his conclusion that the policy has a disparate impact.  However, as noted by Dr. Griffin, at least 58% of these dismissals were reflected in Dr. Fairley's data "non-criminal in nature." See Griffin Report at 4-5.

hiring exists which precludes Plaintiff from proceeding with his dubious Title VII claim. <u>Ward's Cove v. Antonio</u>, 490 U.S. 657 (1989) (application of a specific practice must create disparate impact); <u>NAACP v. City of Bayonne</u>, 134 F.3d 113, 124 (3d Cir. 1999) (same).

  Finally, it should be noted that Plaintiff also made no effort to review actual applicant flow or analyze the appropriate labor market and compare it to representation of African Americans and Hispanics in the disputed positions which also renders Dr. Fairley's analysis meaningless in this matter.  As the Supreme Court observed in <u>Ward's Cove</u>, the proper method of comparison in determining whether a facially neutral policy has a disparate impact is to compare the racial composition of the at-issue jobs and the racial composition of the qualified persons in the labor market or applicant pool.  490 U.S. at 651; <u>see</u> <u>also</u>, <u>Connecticut v. Teal</u>, 457 U.S. 440, 443 (1982) (analyzing actual data of persons who took a written examination);  <u>Lawton</u>, 2002 U.S. Dist. Lexis 13039 *31 (statistics must compare the racial composition of the at issue jobs and the racial composition of the qualified population in the relevant labor market);  <u>EEOC v. Carolina Freight Carriers Corp.</u>, 723 F. Supp. 734, 751 (S.D.Fla. 1989) (proper statistical inquiry focuses on the national origin composition of the jobs at issue and the national origin composition of the relevant labor market in case alleging that an employer's policy of not hiring individuals who have been convicted of felony theft or larceny had a disparate impact on Hispanics).[9]  Here, there is simply no evidence of a racial imbalance for the at issue jobs, much less a racial imbalance cause by the application of the conviction policy. <u>Hayden v. County of Nassau</u>, 180 F.3d 42, 52 (2d Cir. 1999) (disparate impact claim fails where plaintiffs cannot show that the policy at issue fell more

---

[9]  When an appropriate analysis of the actual data is undertaken, the record shows that, in fact, no legally significant disparity exists as a result of the application of the conviction policy. Griffin Report at 20-21.

harshly on them); McCraven v. City of Chicago, 109 F.Supp.2d 935, 944 (N.D.Ill. 2000)

(plaintiff's disparate impact claim fails because there is not sufficient evidence of show that

African Americans are disproportionately represented on the Chicago Police Department);

Matthews v. Runyon, 860 F.Supp. 1347, 1357 (D.Wis. 1994) (claim fails because plaintiff cannot

even show that a racial disparity exists with respect to the position applied for).

Count I of the Complaint must therefore be dismissed.

**B.    SEPTA'S POLICY WAS NOT INTENDED TO DISCRIMINATE;
RATHER THE CONVICTION POLICY IS DESIGNED TO
PROTECT THE DISABLED PUBLIC FOR WHOM
PARATRANSIT SERVICES ARE
PROVIDED.**

Even if Plaintiff was able to establish a prima facie case of disparate impact discrimination,

which he cannot, Count I of the Amended Complaint should be dismissed because disqualifying

violent criminals from transporting the vulnerable disabled is prudent and supported by business

necessity.  42 U.S.C. § 2000e-2(k);  Griggs v. Duke Power, 401 U.S. 424, 431-32 (1971).

Moreover, Plaintiff cannot possibly demonstrate that there exists a policy or procedure that would

have a lesser impact on African Americans and Hispanics and still serve SEPTA's and King's

legitimate needs.  Id.  Instead, Plaintiff apparently maintains that SEPTA should relax its

standards to let more convicts work in positions that involve care giving to the disabled.

Here, the criminal conviction provision was included in the Agreement to protect the

disabled public who rely on paratransit services from individuals who have a history of violence

and may be inclined to commit violent crimes again.  Walsh Affidavit at ¶ 13. The only possible

way to do this is to ensure that murderers like Plaintiff and other violent offenders are not

employed in positions that have constant contact with the disabled.

33

1.    **Genesis of the Policy**

The record shows that the criminal conviction provision was first established by SEPTA in

1994 for inclusion in its paratransit contracts.   Walsh Affidavit at ¶ 11; Brandis Affidavit at ¶ 6.

On August 2, 1994, a paratransit driver for VPSI, a paratransit provider under contract with

SEPTA, was involved in a fatal accident when the northbound van that he was driving jumped an

I-95 guardrail into the southbound lanes and sheered off the roof of a southbound car.  Walsh

Affidavit at ¶ 7. A 24-year old woman was killed, and her 26 year old sister was taken to a local

hospital with critical injuries to her head.  Id. The driver of the van, Michael Graham, was arrested

for drunk driving and homicide.  Walsh Affidavit at ¶ 8. This was Mr. Graham's 5th arrest for

driving under the influence and he had been arrested 2 times in July 1994 alone for this offense.

Id. At the time of this incident, paratransit providers were required only to screen applicants for

drug and alcohol abuse and to check the driving history of the applicants.  Id. at ¶ 9.  This

accident resulted in the payout of claims totaling $4.5 million. Walsh Affidavit at ¶ 8.

On August 5, 1994, a paratransit driver employed by Triage Paratransit Company was

arrested for auto theft.  Walsh Affidavit at ¶ 10.  A subsequent check of his criminal record

revealed that the driver, Michael Donaldson, was on probation for involuntary deviate sexual

intercourse.  Id.  Following this latest incident, there was a public outcry regarding the safety of

paratransit customers and SEPTA responded by requiring more stringent background checks to

ensure the safety of the disabled public who use paratransit services in the Philadelphia

metropolitan area.  Walsh Affidavit at ¶ 11-13; Brandis Affidavit at ¶ 8; Corressel Dep. at 92.

Thus, following these incidents, SEPTA undertook to consider the possibility of requiring

more stringent background checks for paratransit drivers.  Walsh Affidavit at ¶ 12.  The general

minimum for such drivers were revised to include criminal background checks and identifies

certain offenses as being disqualifying events.  Walsh Affidavit at ¶ 13-15.  Significantly, SEPTA

considered the impact that the policy might have on the workforce and determined that the

adopted policy was justified and did not run afoul of applicable state and federal law.  Walsh

Affidavit at ¶ 16.

      Thus, SEPTA determined that additional safeguards were needed to protect its disabled

patrons.  And it is for this reason that SEPTA took action.  There can be no doubt that its action

here was prudent and supported by business necessity.

      **2.      The Criminal Conviction Policy Is Job Related and Consistent
with Business Necessity.**_____

      **a.  The Policy Is Narrowly Drawn**

      Throughout this litigation, Plaintiff has attempted to demonstrate that SEPTA bars the

employment of any individual as a paratransit driver who has ever been convicted of any crime.

Similarly, Plaintiff has attempted to show that SEPTA prohibits contractors from hiring

individuals with any conviction in any job with providers.  However, Plaintiff is wrong on both

counts and he knows it. Consideration of the competent evidence confirms:

      1.      The conviction policy did not bar the employment of any individual who had a

conviction of any kind;[10]  and

_____

[10]      Thus, the record reflects that numerous individuals with criminal records have been hired
as paratransit drivers in SEPTA service.  See e.g., Haurin Affidavit at Exhibit 1; Second Brandis
Affidavit at ¶ 9 and Exhibit 3 attached thereto.  Soltner Dep. at Exhibit 13.  The individuals who
actually made the hiring decisions in this case likewise have confirmed that individuals with certain
convictions (even felony convictions) have been hired as paratransit drivers in SEPTA service.
See Ward Dep. at 83-85; Soltner Dep. at 78, 112, 149 and Exhibit 13 attached thereto; Hartman
Dep. at 46, 118, 125, 148, 157-58; Kerns Dep. at Exhibit 2.  Finally, even counsel for Plaintiff and

2.    The conviction policy applied only to drivers who were being used to transport SEPTA's disabled customers.

Thus, the criminal background provision in the Agreement is not a blanket disqualification from employment for individuals who apply for any position with King or any other paratransit contractor. On the contrary, the criminal background checks were required only for drivers in SEPTA service because they deal constantly with the public, must be trustworthy and involve the transportation and care of the very vulnerable disabled. Second Brandis Affidavit at ¶¶ 10; Walsh Affidavit at ¶ 14-15, 17; Brandis Dep. at 40; Montague Dep. at 165; Foley Dep. at 109; Spicer Dep. at 40; Hartman Dep. at 153-157.

Pursuant to the Agreement, King was prohibited from employing anyone in a driving position in SEPTA service that:

     a.    has a current record or conviction for driving under the influence of alcohol or other substance.

     b.    has a felony or misdemeanor conviction for a crime of moral turpitude or of violence against any person including homicide, rape, robbery, risking a catastrophe, assault, aggravated assault, indecent assault and other crimes of violence including attempts to commit crimes of violence.

     c.    has a felony conviction in the last seven years preceding employment for crimes of theft or crimes against property.

---

his expert witness have recognized that the policy is not a complete bar to employment. Fairley Dep. at 10; Cohen Memo dated June 9, 2004.

36

d.    has a misdemeanor conviction in the last seven years preceding

employment for crimes of theft and crimes against persons and property including indecent

exposure, misdemeanor indecent assault, trespass, corruption of minors and crimes involving

narcotics, alcohol and firearms.

Brandis Affidavit at ¶4; Exhibit "S" at 23.

The language in the Agreement is consistent with the manner in which the policy has been

applied by King and other contractors.  SEPTA also developed a matrix that further explained the

kinds of convictions that would result in a disqualification as a paratransit driver in SEPTA

service.  Second Brandis Affidavit at ¶ 6-8 and Exhibit 2 attached thereto; Ward Dep. at 34 and

Exhibit 3 attached thereto; Brandis Dep. at 196-97; Hartman Dep. at 118, 125, 148.  The matrix

was provided to all of SEPTA's contractors and delineates specifically the types of convictions

that would result in a disqualifying event.  Id.

Furthermore, SEPTA never directed any provider to hire or fire any job applicant.  The

Contractors are free to hire any person for any position. SEPTA's only concern was that

individuals who fell below the general minimums in the contract (including the conviction policy)

not be used to transport SEPTA's disabled patrons.  Second Brandis Affidavit at ¶ 10; Spicer

Dep. at 78,; Montague Dep. at 114-115; Soltner Dep. at 162; Hartman Dep. at 64.  For example,

a paratransit provider like King could have employed Plaintiff in any number of positions without

breaching its contractual obligations to SEPTA.  Brandis Affidavit at ¶ 18.  Nevertheless, Plaintiff

testified that King advised him that he could not be employed in any position there because of his

conviction for homicide. El Dep. at 104.  However, this was King's decision, not SEPTA's.

Brandis Affidavit at ¶¶ 11, 18.

b.   **The Disabled Who Rely On Paratransit Service Are Especially Vulnerable To Being Victimized Or Exploited. _____**

It has long been recognized that the population served by paratransit is extremely vulnerable and, as a result, are easy targets for would be criminal offenders. [11] Thus, paratransit passengers include the very young and very old who have varying degrees of disabilities and include those with severe developmental disabilities and physical disabilities.  Spicer Dep. at 109-110; Rishel Dep. at 191; Corressel Dep at 109-110.

Dr. Richard Sobsey, a leading expert on the victimization of the disabled, notes in his expert report that those who are disabled are particular vulnerable to being victims of violence and exploitation.  Sobsey Report at 4.  Moreover, studies show that people with disabilities experience a very high risk of becoming victims of violence and exploitation. Sobsey Report at 5.  For example, children with disabilities experience a much higher rate of victimization than other children who have no disabilities.  Id. at 7.  Such children are victimized at rates 3-4 times more than children with no disabilities and about 1/3 of school age children with disabilities have been victimized. Id. Adults with disabilities are about 4 times as likely to be victimized by violence as adults who have no disability. Id. at 8

Individuals with severe mental illness are especially vulnerable to being a victim of a sexual offense -- more than 20 times more likely to be the victim of a sexual assault.  Sobsey Report at 8.

---

[11]   In 1998, Congress enacted the Crime Victims with Disabilities Awareness Act which is codified as a note to 42 U.S.C. § 3732 to look at the problem of the victimization of the disabled.  There, Congress noted that "research conducted abroad demonstrates that individuals with developmental disabilities are 4 to 10 times more likely to becoming crime victims than those without disabilities . . . ." Id. at §3732(a)(1).  As a result, Congress directed the Attorney General to conduct a study "to increase knowledge and information about crimes against individuals with developmental disabilities that will be useful in developing new strategies to reduce the incidence of crime against those individuals." Id.

57% of women and 24.5% of men with severe mental disabilities had been sexually assaulted

sometime in their adulthood. Sobsey Report at 8. Such individuals, moreover, experience higher

rates of victimization in every violent crime category and property crimes than those who are not

disabled. Id. at 8-9.

Not only are the disabled especially vulnerable, public transportation has been identified as

a high risk environment for both violent and property crime. Sobsey Report at 9. Most of the

victims of these crimes are passengers who are described as captive passengers or captive riders

because they have no access to other kinds of transportation. Id. Among the most frequent

captive passengers are children, the disabled and the elderly - - who are also considered the most

vulnerable to crime. Id. at 9-10.

Paratransit services are particularly dangerous environments for the disabled because the

vehicles operate with only one or few passengers, without a fixed or standard schedule, many

passengers have limited communication skills and therefore are unable to act as witnesses to

offenses and others are unable to defend themselves against attack. Sobsey Report at 10-11. In

fact, a recent study of paratransit riders revealed that up to 88% of all paratransit riders required

the service because of intellectual disabilities or mental health disabilities or had some other

cognitive or mental health disabilities in addition to a physical disability. Sobsey Report at 10.

Others have visual or hearing impairments. Id. This means that a great many paratransit

customers (SEPTA's included) have impairments that affect their abilities to perceive or describe

an offense in a manner that is credible. Id. at 11.

Dr. Sobsey conducted a study in 1991 which was updated in 1994 that revealed in 215

cases of sexual abuse of children and adults with disabilities. Eleven of those cases were

perpetrated by a transportation provider. Sobsey Report at 11. The study further revealed that a transportation provider was responsible for 13.2 times as many cases of sexual abuse as would be expected based upon their proportion to the adult population. Id. These sex crimes were most frequently committed when only the victim and perpetrator were in the vehicle. Id. at 12 - - a situation that occurs daily on SEPTA paratransit vans. Spicer Dep. at 108; Corressel Dep. at 114.

What's more, paratransit driver acts in a position of trust with regard to passengers with disabilities and these drivers have been identified as perpetrators of violence against the disabled in a significant number of cases. Sobsey Report at 13-14.

Newspaper accounts studied by Dr. Sobsey reveal that sexual offenses involving passenger transportation drivers are frequently reported. Sobsey Report at 16. For example, newspaper accounts reported the following:

1.    377 alleged offenders and 623 victims and 49 alleged offenders and 68 alleged victims in the first 9 months of 2004;

2.    the vast majority of these cases involved sexual offenses committed by drivers against passengers;

3.    the most frequently victimized (73%) were children under the age of 18 and 25.7% of those children were reported to be disabled;

4.    of the adults victimized by sexual offenses (27% of the total), 68.7% of those adults had a disability of some kind;

5.    previous criminal convictions were reported for 15.3% of the drivers and another 1.2% of the offenses were alleged to have been committed by drivers who had criminal charges pending against them;

6.    in only 6.7% of the cases of sexual offenses reported, the driver involved had no prior conviction or passed a criminal record screen; and

7.    for cases involving paratransit or specialized transportation, 19.1% of the drivers were reported to have prior criminal convictions and only 5.6% were identified as having no prior conviction or as having passed a criminal record screen. Sobsey Report at 16-18.

Dr. Sobsey also made clear in his report that the19.1% mentioned above is a conservative estimate.  Dr. Sobsey suggests that up to 77% of sexual offenses reported were committed by paratransit drivers with prior criminal records.  These accounts are even more alarming because 90% of the alleged sexual offenses reported were committed against vulnerable victims, most frequently children and adults with disabilities.  Based on these reports, Dr. Sobsey estimated that the rate for drivers with previous convictions being implicated in a sexual offense is up to 40 times higher than drivers with no prior convictions.   Sobsey Report at 16-18.[12]

Dr. Sobsey has concluded that criminal record checks provide an essential component of necessary protection for the disabled. This is true because the vulnerable disabled are in a high risk environment in a paratransit van. Sobsey Report at 19-20. Furthermore, Dr. Sobsey reviewed SEPTA's paratransit policy and concluded that it reduced the risk of victimization for a population that is known to have an elevated risk and was prudent.  Id. at 20, 21.  [13]

Dr. Sobsey's findings are undisputed on this record and more than substantiate the need

---

[12]    Dr. Sobsey also compared paratransit service to a traditional bus service and found That paratransit service is a more dangerous environment.  Sobsey Report at 12-13.  This is discussed in greater detail in Section B4, infra at 49.

[13]  The record reflects also that the policy is working. Other than the rape of Lisa Pokalsky when the policy was not followed, there have been no other arrests of paratransit drivers in SEPTA service for committing a violent act against a disabled passenger since the policy was first implemented.  Walsh Affidavit at ¶ 19.

for paratransit providers to conduct criminal background checks and refuse employment to those

who have convictions for violent offenses or other offenses that are not remote in time.  On this

record, it is clear that SEPTA's policy is job-related and consistent with business necessity.

           c.  **There Is No Way to Predict With Any Certainty Whether an <u>Individual</u> <u>May Commit a Crime in the Future.</u>**

Plaintiff maintains that he should not have been denied employment with King because his

conviction occurred so long ago.  This argument should also be rejected. Simply stated, the risk

of hiring Plaintiff for this safety-sensitive job is far too great for the reasons set forth above and

those involving recidivism which is discussed below.

Two separate studies commissioned by the U.S. Department of Justice show that

individuals released from prison recidivise at alarming rates.  See, Exhibit "BB" and Blumstein

Report at 3-4..  For example, a study of prisoners released from prison in 1994 revealed that,

within 3 years of release, 67.5% of prisoners are rearrested for a new offense, 46.9% of prisoners

were convicted of a new crime, 25.4% were resentenced to a new prison term and 61.7% of

violent offenders are rearrested for a new offense. The prisoners rearrested were charged with a

staggering 744,000 new crimes or about 4 per person.  This study reveals that the vast majority of

those released from prison return to a life of criminal conduct soon after release from

incarceration. [14]

To make matters worse, criminologists are unable to predict with any certainty whether a

---

[14]  A released prisoner within three years of release is 31.4  times more likely to commit murder, 5.5 times more likely to commit a rape, 7.4 more likely to commit a robbery and 10.5 times more likely to commit an assault than the general adult population.  Griffin Affidavit at ¶ 5-7 and Table 2; Blumstein Report at 3.

particular individual is likely to commit a crime in the future. [15]  Blumstein Report at 5, 7.

However, criminologists agree that there is no indicator that is "better or more reasonable" of an

individual who might commit a crime of violence than by reviewing prior criminal activity.

Blumstein Report at 4.  Moreover, an individual with a criminal history is always a greater risk

than an individual who has never committed a crime even if that individual remains crime free for

a number of years.  Blumstein Report at 5.

Dr. Blumstein reviewed carefully the policy at issue in this case and also concluded that

"SEPTA's policy is entirely prudent and reasonable."  Blumstein Report at 8.  His opinion in this

regard is based simply on risk assessment – it is unreasonable for SEPTA paratransit providers to

be required to hire violent felons like Plaintiff to work in these safety sensitive positions.

The foregoing compels a conclusion that SEPTA not only must prohibit the employment

of those with certain criminal convictions in these care giving jobs to protect their disabled

patrons, it has a responsibility to do so. Indeed, SEPTA and its providers would certainly be

subjected to liability if it allowed an individual like Plaintiff to be employed as a paratransit driver

and he then victimized a passenger with a disability.  See Walsh Affidavit at ¶ 8. This is a risk that

no prudent person would take and it is preposterous for Plaintiff to suggest that SEPTA "engage

in high-stakes gambling when it comes to public safety. . ."  Lanning v. SEPTA, 308 F.3d 286,

292 (3d Cir. 2002).

It must be also be emphasized that Courts have uniformly upheld the use of criminal

convictions as a criterion for disqualifying job applicants where, as here, the conviction is related

---

[15]    If a criminologist cannot make this determination, then persons charged with hiring paratransit drivers are certainly not qualified to make a decision on who might commit a crime on the future.  Blumstein Report at 8.

to the performance of the job.  For example, in <u>Richardson v. Hotel Corporation of America</u>, 332

F. Supp. 519 (D. La. 1971), <u>aff'd</u>, 468 F.2d 951 (5th Cir. 1972), the court held that it was lawful

for a hotel to require that persons employed in positions where they have access to valuable

property of others have a record free from convictions for serious property related crimes.

   Noting that a past conviction was not an indicator of whether any particular person might

commit a crime in the future, the Court stated that "the evidence indicates that a group of persons

who have been convicted of serious crimes have a higher incidence of future criminal conduct

than those who have never been convicted." 332 F.Supp. at 521.  <u>Richardson's</u> conclusion in this

regard is confirmed by Department of Justice statistics, and the Report of Dr. Blumstein, a leading

criminologist.

   <u>Field v. Orkin Exterminating Co.</u>, 2001 WL 34368768 (E.D. Pa. 2001), observed that a

refusal to hire persons with criminal records would not violate Title VII where the conviction

involved conduct which demonstrates a person's lack of qualifications for a job.  The court cited

an example of a bank not hiring a person who previously had been convicted of embezzlement as

one that would not violate discrimination laws.

   In a case involving a violent felon, the court found that an employer's refusal to hire such

an individual was justified by business necessity.  Thus, in <u>Moses v. Browning-Ferris Industries</u>,

1986 U.S. Dist. LEXIS 20073 (D. Kan. 1986), the plaintiff, who was African American, applied

for a position with the defendant as a helper on a trash truck.  During the interview, the plaintiff

revealed that he previously had been convicted of rape and robbery.  The defendant refused to

hire the plaintiff who was otherwise qualified for the position based upon this conviction because

it involved a crime of moral turpitude.  Thereafter, plaintiff alleged that the policy had a disparate

impact on African Americans. Finding that the hiring policy was justified by business necessity, the court noted that waste disposal workers come in close contact with the general public and the policy was therefore "understandable given the <u>great potential for liability in the event of misconduct</u>." (emphasis added).

The <u>Moses</u> Court relied upon the decision in <u>New York Transit Authority v. Beazer</u>, 440 U.S. 568 (1979), in which the Court held that a transit authority's exclusion of persons with a history of drug use furthered the legitimate goal of public safety and efficiency. Thus, the goal of promoting public safety is a legitimate goal for imposing hiring restrictions based upon a job candidate's criminal conviction history. <u>See Lanning v. SEPTA</u>, 308 F.3d 286, 289 (3d Cir. 2002) ("the business necessity standard takes public safety into consideration"). [16]

Here the relationship of the policy to the safety of the disabled passengers cannot be seriously disputed, nor can the safety of the disabled be compromised in the manner suggested by Plaintiff. Plaintiff is a convicted murdered – his record of violence cannot be ignored. As SEPTA has demonstrated above, Plaintiff is more likely to commit a violent act in the future that someone who has never committed a violent crime. King was perfectly justified in denying Plaintiff employment as a paratransit driver. Count I of the Amended Complaint should be dismissed.

### 3.    No Lesser Standard Then Those Set Forth in the Paratransit Contracts

---

[16]     In <u>Lanning v. SEPTA</u>, 308 F.3d at 289, (quoting <u>Lanning v. SEPTA</u>) 181 F.3d 478, 490 n.16 (3rd Cir.1999)) the Court noted for the second time:

To the limited extent that the Supreme Court's pre-Wards Cove jurisprudence instructs that the public safety is a legitimate consideration, application of the business necessity standard to SEPTA is consistent with that jurisprudence because the standard itself takes public safety into consideration  If, for example, SEPTA can show on remand that the inability of a SEPTA transit office to reach a certain aerobic level would significantly jeopardize public safety, this showing would be relevant to determine if that level is necessary for the successful performance of the job.  Clearly a SEPTA officer who poses a significant risk to public safety could not be considered to be performing his job successfully.

**Would Serve SEPTA's Legitimate Need to Protect the
Disabled.**

Undeterred, Plaintiff steadfastly maintains that King should have hired him as a

paratransit driver because his conviction for murder occurred a long time ago.  This

argument defies logic and reason and should be summarily rejected for several reasons

including those noted by Dr. Blumstein.

First, it is absurd to suggest that an employer conduct a quasi parole board

investigation of every convicted violent offender who seeks employment as a paratransit

driver.  The evidence in this case shows that that providers process hundreds of job

applications each year for driving positions which would leave human resource personnel

with little time to attend to other important duties.  Soltner Dep. at 168-169.

More important, the record shows also that the individuals that would be charged

with making these decisions are simply not qualified to do so.  As an example, Lisa Soltner,

who is responsible for hiring at Community Transit, lacks any human resource experience.

Soltner Dep. at 20.  Other individuals with hiring authority also have very little human

resource experience.  Hartman Dep. at 12-13.   Thus, the case-by-case approach suggested

by Plaintiff is not only unworkable, it would not serve SEPTA's legitimate need to protect

its disabled passengers because decisions on whether a particular applicant is a "good risk"

would be left to individuals who lack any qualifications to make such decisions.

Even trained criminologists are unable to identity whether a particular individual is

likely to commit a crime is in the future.  Blumstein Report at 8.   What is known is that a

person who has committed a violent crime in the past is more likely to commit another

crime in the future than someone who has never committed such a crime. Blumstein Report at 4. This increased risk never goes away despite the passage of time. Blumstein Report at 5. What is also known is that the disabled are victimized at rates much higher than those who have no disabilities. Sobsey Report at 4-8  Under such circumstances, it would be reckless to allow Plaintiff to work as a caretaker for the very vulnerable disabled.

Therefore, establishing a rule that violent felons like Plaintiff should only be disqualified if the conviction occurred in the last 5, 10, 15 or even 20 years for example would be based only on subjective guesswork. [17] This approach was rejected by the court in EEOC v. Carolina Freight, 723 F.Supp. 734, 754 (S.D.Fla. 1989). There, the court held that an employer's policy that barred the employment of an individual who had ever been convicted of a felony, theft or larceny which resulted in a jail sentence was justified by the employer's legitimate business concern regarding employee theft. Significantly, the court stated that although a past criminal record was not a sufficient basis to predict that a future crime may be committed, it was more likely that those who have been convicted of crimes would commit a crime in the future than individuals who have never committed a crime. Id. at 753. Therefore, the court concluded that it was perfectly reasonable for the employer to ban the employment of individuals who served jail sentences for serious property crimes. The Court's decision has been confirmed by the Department of Justice in two separate studies. The stakes are much higher here and as noted by Dr. Blumstein even criminologists and parole boards are unable to determine whether a particular individual

---

[17]  A review of Plaintiff's criminal history reveals the problems with this approach.  Indeed, more than 10 years elapsed between Plaintiff's conviction for murder and subsequent drug convictions.  See Plaintiff's Dep. at Exhibit 2.

poses a risk in the future.

It follows that a conviction for a violent crime like murder, regardless of the date of the conviction, is job related in this case. Any other finding by this Court would subject King, SEPTA and, most importantly, the disabled to foreseeable risks of harm that are easily avoided by common sense and sound business judgment.

**4.    Paratransit Service Cannot Be Compared to Bus Service at SEPTA.**

Grasping as straws, Plaintiff also would have this Court conclude that the paratransit conviction policy is unlawful because he claims that it is more restrictive than the policy that applies to SEPTA's job applicants. However, the uncontradicted evidence in this case shows that Plaintiff would not have been eligible for hire at SEPTA in an operator position because he is a convicted murderer. Foley Dep. at 190. Elliot Dep. at 116-117, 124, 126, 129; Carpenter Affidavit at ¶ 9, 11. What's more, Plaintiff cannot cite a single case in which SEPTA employed an individual as an operator who would have been disqualified from consideration as a paratransit driver because of that conviction. See Haurin Affidavit at ¶ 7.

More important, it is simply incongruous to compare a bus driver or any other employee at SEPTA with a paratransit driver. Dr. Sobsey compared the paratransit services environment to most bus services and found that the paratransit services environment is much more risky for the passengers. This is true for several reasons:

(1)    Paratransit riders are "captive passengers" which has been identified as high risk for crime;

(2)    Paratransit riders are often unable to unfasten their seatbelts or leave the van without driver assistance because of a physical disability;

(3)    Paratransit riders are often alone with drivers increasing the risk if the driver is a potential offender;

(4)    Paratransit riders often have impaired communication skills so that the ability to report criminal activity is compromised;

(5)    Paratransit operates on a different schedule on a daily basis which makes deviations from the route more difficult to detect; and

(6)    Because paratransit drivers must provide hands on assistance to passengers, there is often personal contact between the two.

Sobsey Report at 12-13.

SEPTA's paratransit service is no different. SEPTA paratransit provides door to door service to individuals that cannot use the bus and train who, as shown above, are victimized at rates much greater than those who are not disabled. See Sobsey Report at 4-8. Paratransit drivers in SEPTA service are alone with their passengers on a daily basis unlike bus drivers. Paratransit drivers in SEPTA service run different routes each day in contrast to SEPTA bus drivers who drive on fixed route that make scheduled stops at predetermined times. Spicer Dep. at 107-108; Corressel Dep. at 20-21, 114; Foley Dep. at 50.

Therefore, Plaintiff's misguided attempt to compare an operator at SEPTA to a paratransit driver in SEPTA service misses the mark. They are simply not comparable

jobs. In any event, Plaintiff would not be eligible for employment as an operator at SEPTA either.

### 5.    SEPTA's Policy is Consistent with Industry Standards

Finally, it should be noted that the criminal conviction policy in the Agreement is far from unique.  Indeed, conducting criminal background checks for individuals seeking employment as a paratransit driver is a standard practice in this industry and is crucial to the safety of passengers. Rishel Dep. at 35, 68, 95, 97,190-192.  Likewise, denying employment to individuals with criminal convictions is a standard practice as well.  Rishel Dep at 35.

As an example, New Jersey Transit ("NJT") conducts criminal background checks for its paratransit drivers.  Rishel Dep. at 25, Corressel Dep. at 22-23.  According to two witnesses, the policy at NJT bars the employment of an individual with a conviction for any felony regardless of the date of conviction.  Coressel Dep. at 32; Rishel Dep. at 188, 189. The Portland, Oregon municipal transportation authority broadly bars from employment as a paratransit driver anyone with a conviction that is related to the job without any consideration given as to the date of conviction.  See Rishel Dep. at 173 and exhibit 13 attached thereto at 10477.

Other transportation providers similarly conduct criminal background checks for individuals who have contact with the public including SEPTA for its own operators. Thus, Krapfs Coaches, a SEPTA paratransit provider, has its own conviction policy that applies to all individuals who seek driving positions including those in paratransit service. Kern Dep. at 82-83 and Exhibit 2 attached thereto.

The bottom line is that SEPTA is not exceptional in disqualifying individuals with criminal convictions from transporting the disabled.  The disqualification of applicants for paratransit driving positions because of a substandard criminal record is a prudent one for the reasons stated above and is a standard safety practice in the industry.

Count I of the Amended Complain must be dismissed because the policy at issue here is clearly supported by business necessity.

C.    PLAINTIFF CANNOT DEMONSTRATE A VIOLATION OF THE    EQUAL POTECTION CLAUSE.

Count II of the Amended Complaint purports to allege a violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution in that Plaintiff (and the class that he purports to represent) was denied public employment because of his conviction for murder.  Amended Complaint at ¶ 46.  Stated simply, this claim is frivolous.

First, Plaintiff was denied employment with King, not a public entity.  Thus, the record reflects that Plaintiff applied for employment with King, was hired by King and was terminated by King. El Dep. at  65, 66, 78, 102-103; Fiorillo Dep. at 17-19.  Moreover, Plaintiff never applied for employment with SEPTA, was never hired by SEPTA and was never fired by SEPTA.  Requests for Admission at Nos. 5 and 6; El Dep. at 117, 138.  Thus, Plaintiff's claim fails because there is no evidence in the record showing that King is a public employer, or that Plaintiff was denied public employment.

Plaintiff's claim fails also because there is not a shred of evidence in the record that SEPTA implemented the criminal conviction provision in the Agreement to intentionally discriminate against African Americans or Hispanics.  See El Deposition at 126-127; Walsh

Affidavit at ¶¶ 16-17.  To the contrary, the only evidence in the record on this issue shows that the contract minimums related to criminal convictions were established to protect vulnerable disabled individuals who rely on paratransit services after a deadly accident on I-95 and the arrest of another paratransit driver.   Walsh Affidavit at ¶ 12; Brandis Affidavit at ¶ 6a; Brandis Dep. at 168-169; Foley Dep. at 77; Challenger Dep. at 61; Montague Dep. at 89-90; Corressel Dep. at 44.

   In assessing the sufficiency of an equal protection claim in a disparate impact case, the Supreme Court of the United States has observed that a facially neutral law will not violate the equal protection clause simply because it has a disparate impact on a particular race.  See e.g., Washington v. Davis, 426 U.S. 229, 240-42 (1976).  Rather, the disproportionate impact must be traced to a purposeful intent to discriminate on the basis of race.  Id.  In Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999), the court likewise held that impact evidence alone is not sufficient to demonstrate intent for the purpose of establishing an equal protection violation.  See also Indianapolis Minority Contractors Ass'n v. Wiley, 187 F.3d 743, 753 (7th Cir. 1999).

   In Washington, the Supreme Court upheld the constitutionality of a job-related employment test that had a disparate impact on African Americans because, as here, there was no evidence that racial discrimination entered into the establishment or formulation of that test.  Here, there is not a shred of evidence in this record that supports the notion that SEPTA intended to discriminate against African Americans or Hispanics when, in 1994, it implemented the provisions involving criminal background checks in the Agreement with King or any of its other paratransit contracts.  See Walsh Affidavit at ¶ ¶13,16.  Indeed,

given the racial composition of drivers at King and other paratransit contractors for SEPTA, it is simply absurd for Plaintiff to suggest that invidious intentional racial discrimination was at work here.  El Dep. at 81.

Thus, Plaintiff's 14th Amendment claim fails in two regards.  First, he cannot make a threshold showing of disparate impact.  Second, even if he could, he cannot show that SEPTA, King or anyone else intended to exclude African Americans or Hispanics from employment as a paratransit driver.  In this regard, Plaintiff admitted at his deposition that he had no evidence that SEPTA had any knowledge of his situation at King.  El Deposition at 104.  Count II of the Amended Complaint should be dismissed.

**D.    PLAINTIFF'S STATE CONSITUTIONAL CLAIM FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Count III of the Amended Complaint alleges that SEPTA has violated Article I, Section I of the Pennsylvania Constitution when he was denied "public employment."  Amended Complaint at ¶ 50.  This claim lacks merit as well.

First, as set forth above, Plaintiff was not denied public employment.  Indeed, Plaintiff made clear that he never sought employment with SEPTA and was never denied employment with SEPTA.  Requests for Admission at Nos. 5 and 6. Plaintiff was denied employment with King, a private entity. [18]  Cf. <u>Warfel v. York County Earned Income Tax</u>

---

[18]    A public employer is defined under the Pennsylvania Public Employee Relations Act as "the Commonwealth of Pennsylvania, its political subdivisions including school districts and any officer, board, commission, agency, authority, or other instrumentality thereof and any nonprofit organization, or institution and any charitable, religious, scientific, literary, recreational, health, educational or welfare institution receiving grants or appropriations from local, State or Federal governments . . ." 43 P.S. § 1101.301.  An individual who is employed by a public employer is a public employee. <u>Id</u>.  While SEPTA meets the definitional test of public employer, King does not.

<u>Bureau</u>, 78 Pa. Commonwealth Ct. 528, 467 A.2d 1216, 1217 (1983) (holding that an employee of a tax bureau is not a public employee; he is an employee of the bureau not school districts and municipalities that created the bureau); <u>Booth v. McDonnel Douglas Truck Services</u>, 401 Pa. Super. 234, 585 A.2d 24, 28 (1991) (dispute between private parties does not implicate the state constitution), <u>appeal</u> <u>denied</u>, 528 Pa. 620, 597 A.2d 1150 (1991).

More important, even if Plaintiff was denied public employment with SEPTA, his state constitutional claim under Article I, Section I of the State Constitution fails as a matter of law.  Article I, Section I of the Pennsylvania Constitution provides that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

In <u>Hunter v. Port Authority of Allegheny County</u>, 277 Pa. Super. 4, 419 A.2d 631, 635 (1980), the court concluded that an individual could only be denied public employment based upon a prior conviction if the conviction "is reasonably related to the person's fitness to perform the job sought, or to some other legitimate governmental objective . . ."  Public safety certainly qualifies as a legitimate governmental objective.  <u>See</u> <u>New York Transit Authority v. Beazer</u>, 440 U.S. 568 (1979); <u>Lanning v. SEPTA</u>, 308 F. 3d 286 (3rd Cir. 2002).  Plaintiff was denied employment as a paratransit driver because he murdered another human being.  And this is the reason and the only reason that he cannot drive for a paratransit provider in SEPTA service. For the reasons discussed in great detail above, this conviction is related to Plaintiff's fitness for performing the work of a paratransit driver.

There is no State Constitutional claim here. Count III of the Amended Complaint should be dismissed.

E.    PLAINTIFF HAS FAILED TO STATE A VIOLATION OF THE CRIMINAL HISTORY RECORD INFORMATION ACT AGAINST SEPTA.

Count IV of the Amended Complaint alleges that SEPTA has violated the Pennsylvania Criminal History Record Information Act (the "Act") by enforcing its policy that prohibits the employment of certain individuals who have been convicted of crimes as paratransit drivers in SEPTA service. Like Plaintiff's other claims, Count IV of the Amended Complaint is frivolous.

In relevant part, the Act provides that "[f]elony and misdemeanor convictions may be considered by an employer [in making hiring decisions] only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied." 18 Pa.C.S. § 9125(b) (emphasis added). How or in what manner this statute applies to SEPTA as it relates to Plaintiff's employment with King is characteristically unexplained. In short, SEPTA was never Plaintiff's employer. See infra at Argument H.

More important, as demonstrated above, Plaintiff's conviction for murder is certainly related to his suitability for the position of paratransit driver for the numerous reasons previously cited. It should also be recalled that it was King who disqualified Plaintiff from all employment with King based upon his conviction record, without any input from SEPTA. El Deposition at 104; Fiorillo Dep. at 25; Brandis Affidavit at ¶¶ 17-18.

What's more, as shown above, the criminal conviction provision in the Agreement as applied to violent offenders like Plaintiff does not run afoul of Title VII because the policy is supported by business necessity. It can hardly be gainsaid that if the policy passes muster under the business necessity test set forth in Title VII, it does not run afoul of the Act.

Equally absurd is the allegation that SEPTA violated the Act because it failed to provide Plaintiff written notice of the reason he was denied employment with King. See Amended Complaint at ¶ 55. Moreover, King had the exclusive responsibility for providing written notice to Plaintiff. See Exhibit S at 24, Section F2.10.5. SEPTA had no knowledge that Plaintiff ever applied for employment with King, much less knowledge that King terminated his employment because he is a murderer. Fiorillo Dep. at 25; Brandis Affidavit at ¶ 17. Count IV of the Amended Complaint should be dismissed.

**F.    PLAINTIFF'S CLAIMS ARE BARRED BY THE APPLICABLE LIMITATIONS PERIODS.**

**1.    Title VII**

According to King's records and the deposition testimony of its human resources manager, Pamela Fiorillo, Plaintiff's employment with King was terminated on January 27, 2000. See Amended Complaint at Exhibit F; Fiorillo Dep. at 29-30, 40. Ms. Fiorillo unequivocally stated that this was the day that Plaintiff was removed from King's payroll and this was the date for which Plaintiff was last paid. Fiorillo Dep. at 51.

At his deposition, Plaintiff could not recall the date of his termination. Thus, in relevant part, Plaintiff testified that his last day of employment could have been on January

27, 2000 which is consistent with King's employment records.  El Deposition at 113.  This means that Plaintiff needed to file his charge of discrimination with the EEOC on or before November 22, 2000 to preserve his discrimination claim.  See Malone v. Specialty Products & Insulation, 85 F.Supp.2d 503, 505 (E.D.Pa. 2000).  This he failed to do.

Instead, Plaintiff did not file his charge of discrimination with the EEOC until 8 days later on November 30, 2000.  Amended Complaint at ¶ 11(a) and Exhibit A attached thereto; Requests for Admission at Exhibit 1. As a result, Plaintiff cannot proceed with his Title VII claim here because he failed to timely exhaust his administrative remedies which is a prerequisite to filing a discrimination claim in federal court.  Oliphant–Johns v. City of Philadelphia, 2002 U.S.Dist. LEXIS 23991 *5 (E.D.Pa. 2002).

2.    U.S. Constitution

Count II of the Amended Complaint must also be dismissed on timeliness grounds.  As shown above, Plaintiff's employment with King was terminated on January 27, 2000.  However, Plaintiff waited until November 13, 2002 to bring this claim for the first time which is well beyond the two year limitation period applicable to such claims.[19]

It is well recognized that the limitations period for federal constitutional claims is based upon the limitations period prescribed for personal injury claims which in Pennsylvania is two years. Garvin v. City of Philadelphia, 2002 U.S. Dist. LEXIS *4 (E.D.Pa. 2002);  New v. Brown, 1997 U.S.Dist. LEXIS 16644 *15 (E.D.Pa. 1997) (citing cases); Robinson v. Officer John Kelly, 1986 U.S. Dist. LEXIS 15781 *6-7 (E.D.Pa. 1986)

---

[19]    The original complaint was filed on or about June 4, 2002 which is likewise beyond the two year limitation period applicable to such claims.

(allegations that Defendants violated First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution are subject to Pennsylvania's two year limitations period that applies to claims seeking damages for personal injury).  The limitations period is 2 years from the date Plaintiff was aware or should have been aware that SEPTA violated his constitutionally protected rights.  Garvin at *4 (limitations period commences on the date of the event about which the plaintiff complains); see also Delaware State College v. Ricks, 449 U.S. 250, 258-259 (1980) (limitations period on Section 1981 claim commences on the date that the plaintiff first learns about the adverse employment action about which he complains).

In this case, the limitations period on Plaintiff's claims commenced on the date that he was advised that his employment with King was terminated because he is a convicted murderer.  This was January 27, 2000.  El Dep. at 113. To preserve his constitutional claim, Plaintiff needed to file his complaint on or before January 27, 2002.[20] This he failed to do.  As a consequence, Count II of the Amended Complaint should be dismissed.

3.    Pennsylvania Constitution

Plaintiff also apparently alleges that SEPTA violated the State Constitution when his employment with King was terminated. Plaintiff first raised this state constitutional

---

[20]    The limitations period on constitutional claims is not tolled by the pendency of an EEOC charge.  Bradley v. City of Philadelphia, 1998 WL 784238 * 4, n.3 (E.D.Pa. 1998) (citing cases).

claim in the Amended Complaint on or about November 13, 2002 which is beyond the two year limitation period applicable to such claims.

In <u>Storch v. Miller</u>, 137 Pa. Commonwealth Ct. 325, 328, 585 A.2d 1173, 1174 (1991), the Court found that the two year limitation period set forth in 42 Pa.C.S. § 5524(7) applied to plaintiffs' state constitutional claims.  Similarly, in <u>Graham v. City of Philadelphia</u>, 2002 U.S.Dist. LEXIS 13201 * 20 (E.D.Pa. 2002), the Court observed that Pennsylvania's two year limitation period applied to claims brought directly under the State Constitution. The <u>Graham</u> case involved allegations that the plaintiff's  employment with the City was wrongfully terminated.

Here, it is clear that Plaintiff did not timely file his claim under the State Constitution either.  Count III of the Amended Complaint must therefore be dismissed on this basis as well.

### 4.    Pennsylvania Criminal History Information Act

The Criminal History Record Information Act (the "Act") contains no specific limitations period.  However, Plaintiff claims that his employment with King was wrongfully terminated in violation of the Act.

Even assuming that Plaintiff had a viable claim against SEPTA under the Act, his claim is barred by the applicable limitations period.  Where, as here, a statute does not have a specific limitations period, the appropriate limitations period is that found in cases most analogous to the cause of action asserted by the Plaintiff.  <u>Anderson v. Consolidated Rail Corporation</u>, 297 F.3d 242, 251 (3d Cir. 2002).  In Pennsylvania, the limitation period for claims for wrongful discharge is two years.  <u>Id</u>.; 42 Pa.C.S.A. § 5524(7); <u>Clark v.</u>

<u>Chmielewski,</u> 2004 WL 1503762 (E.D.Pa. 2004); <u>Kuhn v. Oehma Carrier Corp.</u>, 255

F.Supp.2d 458, 467 (E.D.Pa. 2003).  Here, Plaintiff's employment with King was

terminated on January 27, 2000.  Yet, he did not commence this action until June 4, 2002.

What's more, Plaintiff did not allege a violation of the Act until November 13, 2002.

Accordingly, his claim for a violation of the Act must be dismissed because it was filed

beyond the 2-year limitation period applicable to such claims.

### G.    SEPTA IS IMMUNE FROM SUIT UNDER THE CRIMINAL HISTORY RECORD INFORMATION ACT.

It has long been recognized that SEPTA is a Commonwealth party for purposes of

sovereign immunity.  <u>Williamson v. SEPTA</u>, 154 Pa. Commonwealth Ct. 448, 624 A.2d 218,

222 (1993) (citing <u>Chambers v. SEPTA</u>, 128 Pa. Commonwealth Ct. 368, 563 A.2d 603

(1989); <u>See</u> <u>also</u>, <u>Feingold v. SEPTA</u>, 512 Pa. 567, 517 A.2d 1270 (1986) (punitive damages

are not recoverable against SEPTA because it is an authority created by an act of the

General Assembly).  As such, SEPTA may only be sued in cases where immunity for the

plaintiff's claims have been waived.  Here, Plaintiff's claim of a violation of the Criminal

Record History Information Act has not been waived.

The General Assembly of Pennsylvania intended to exempt the Commonwealth from

immunity only in specific, clearly defined situations and it is the duty of this Court to

strictly construe this limited waiver.  <u>Davidow v. Anderson</u>, 83 Pa. Commonwealth Ct. 86,

476 A.2d 998, 1000 (1984).  Thus, in Section 8522(b) of the Judicial Code, 42 Pa.C.S.A. §

8522(b), the General Assembly specified that a waiver of immunity for Commonwealth

parties extended only to: (1) vehicle liability; (2) medical-professional liability; (3) care,

60

custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody and control of animals; (7) liquor store sales; (8) national guard activities; and (9) toxoids and vaccines. As is evident by the above-cited statute, the General Assembly has elected to waive sovereign immunity only in limited circumstances.

In <u>Poliskiewicz v. East Stroudsburg University</u>, 113 Pa. Commonwealth Ct. 13, 536 A.2d 472 (1988), the court considered whether the University was immune from suit under the Criminal History Act. <u>Poliskiewicz</u>, involved a university police officer who was suspended pending the outcome of charges after he was arrested for disorderly conduct and public drunkenness. Thereafter, all of the charges against the plaintiff were dismissed, however, the University refused to rehire the plaintiff. The plaintiff alleged that the University's refusal to rehire him violated Sections 9124 and 9125 of the Act. In dismissing this claim, the court held that the University was immune from suit under the Act because there was no specific provision in the Act that waived immunity as to the Commonwealth nor was there any implied waiver of immunity. 536 A.2d at 475. Like the University, SEPTA is a Commonwealth party and is treated as the Commonwealth for purposes of sovereign immunity. <u>Poliskiewicz</u> teaches that an aggrieved party may not maintain a suit against the Commonwealth under the Act. Count IV of the Amended Complaint must therefore be dismissed.

      H.     THE AMENDED COMPLAINT SHOULD BE DIMISSED IN ITS ENTIRETY BECAUSE PLAINTIFF CANNOT SHOW THAT SEPTA WAS HIS EMPLOYER UNDER FEDERAL OR STATE LAW.

Each of the claims asserted by Plaintiff in his Amended Complaint are predicated on a finding that SEPTA was Plaintiff's employer. See e.g. Amended Complaint at ¶ 10. For example, 42 U.S.C. § 2000e-2 makes it unlawful for an employer to refuse to hire or terminate an individual because of the individual's "race, color, religion, sex or national origin…" The Criminal History Record Information Act prohibits employers from considering criminal convictions in making employment decisions when the convictions do not relate to the applicant's suitability for employment. 18 Pa.C.S. § 9125(b). Similarly, the Act mandates that the employer notify the applicant in writing if the decision not to hire is based on the criminal history of the applicant, in whole or in part. __Id.__ at § 9125(c). [21] Here, there is no evidence showing that SEPTA was Plaintiff's employer under federal or state law.

### 1.    __Federal Law__

As has been discussed throughout this memorandum, Plaintiff's claims against SEPTA fail as a matter of law because he cannot demonstrate that SEPTA was his employer. First, Title VII applies to employers and their employees. 42 U.S.C. § 2000e-2(a)(1). An employer under Title VII is defined as one who has 15 or more employees for each working day in twenty or more calendar weeks in the current or preceding year. __Id.__

---

[21]    Moreover, the Agreement specifically states that King must comply with the requirements of the Act. Exhibit S at 24.

at § 2000e(b).  An employee is vaguely defined as "an individual employed by an employer .

. . ." Id. at  § 2000e(f).

Because Congress did not define employee more precisely in Title VII, this Court

should employ the common law agency test to determine if Plaintiff was an employee of

SEPTA under Title VII.  Nationwide Mutual Insurance v. Darden, 503 U.S. 318, 323

(1992).  The common law test was summarized by the Court in Darden:

> In determining whether a hired party is an employee under the
> general common law of agency, we consider the hiring party's
> right to control the manner and means by which the product is
> accomplished.  Among the other factors relevant to this inquiry
> are the skill required, the source of the instrumentalities and
> tools; the location of the work; the duration of the relationship
> between the parties; whether the hiring party has the right to
> assign additional projects to the hired party; the extent of the
> hired party's discretion over when and how long to work; the
> method of payment; the hired party's role in hiring or paying
> assistants; whether the work is part of the regular business of the
> hiring party; whether the hiring party is in business; the
> provision of employee benefits; and the tax treatment of the hired
> party.

503 U.S. at 323-324 (quoting Community for Creative Non-Violence v. Reid, 490 U.S. 730,

751-752 (1989)).      This test examines the totality of the circumstances but "places its

greatest emphasis on the hiring party's right to control the manner and means by which

the work is accomplished."  Lattanzio v. Security National Bank, 825 F.Supp. 86, 89

(E.D.Pa. 1993); see also, Rodriguez v. Lauren, 77 F.Supp.2d 643, 646 (E.D.Pa. 1999)

(employing common law test endorsed in Darden in determining whether an individuals

was an employee under Title VII).   Application of the common law agency test set forth in

**Darden**, to the facts presented here establish unequivocally that Plaintiff was never an employee of SEPTA.

First, SEPTA had no right to control the manner and means in which Plaintiff performed services for King.  Plaintiff did not work at any SEPTA location; although he testified that he received some limited training at SEPTA.  El Dep. at 89.  SEPTA had no right to assign projects to Plaintiff nor any control over the hours that Plaintiff worked or the schedule that he worked.  SEPTA did not provide employee benefits to Plaintiff did not pay any salary to Plaintiff and did not treat him as an employee in any other way.  Brandis Affidavit at ¶ 13. [22]

In addition, SEPTA does not establish the compensation and level of benefits that are provided to drivers, nor does it promulgate work rules that apply to drivers employed by King.  Brandis Affidavit at ¶ 13; Fiorillo Dep. at 11-13.  SEPTA is not involved in the day-to-day supervision of King drivers either.  Brandis Affidavit at ¶ 13; Fiorillo Dep. at 13.  Finally, no employee records are maintained by SEPTA that apply to King drivers such as tax information, insurance information or payroll information.  Brandis Affidavit at ¶ 14. Indeed, the release that Plaintiff signed that allowed King to obtain his criminal record and the conditional offer of employment that Plaintiff signed are not maintained by SEPTA, but are maintained by King who produced these documents in this litigation.  Brandis Affidavit at ¶ 14; Fiorillo Dep. at 26.

---

[22]     Even Plaintiff admitted that he never applied for employment with SEPTA, never worked for SEPTA and was never denied employment with SEPTA.  Requests for Admission at Nos. 5 and 6.

King hired Plaintiff, supervised Plaintiff, set his schedule, paid him, withheld taxes from his paycheck and terminated his employment without any input from SEPTA. Fiorello Dep. at 11-13; 28-29. Brandis Affidavit at ¶ 17. Moreover, the Agreement specifies that King is an independent contractor for SEPTA and is also the employer of all individuals hired to perform the services contained therein. Exhibit S at PMC-2.  Many courts have relied on contract language in concluding that an individual was not an employee and therefore unable to sustain a claim made under Title VII.  Holtzmann v. The World Book Company, 174 F. Supp. 2d 251, 254, n.4 (E.D.Pa.  2001) (citing cases).  In Holtzmann, the court stated that although an agreement was not dispositive, it was strong evidence that an individual was an independent contractor and not an employee.  174 F. Supp. at 254.   On this record, there is no evidence to suggest that SEPTA was Plaintiff's employer.

Nor can any argument be advanced that SEPTA and King were joint employers of Plaintiff.[23]  In NLRB v. Browning-Ferris, Indus. of Pa, Inc., 691 F.2d 1117, 1124 (3d Cir. 1984, the Court held that two entities are joint employers where "they share or co-determine those matters governing the terms and conditions of employment."  The courts generally consider three factors when determining if this test has been met:

> (1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) day-to-day supervision of employees, including employee discipline; and (3) control of employee records, including payroll, insurance, taxes and the like.

---

[23]    Plaintiff has not alleged that SEPTA and King are joint employers in his Amended Complaint.

**Podzobinski v. Roizman**, 1998 WL 67548 *3 (E.D.Pa. 1998) (quoting **Zarnoski v. Hearst**

**Business Communications**, 1996 WL 11301 *8 (E.D.Pa. 1996)).

The undisputed facts in this case establish that no joint employment relationship is present here. Indeed, SEPTA's sole connection to Plaintiff are provisions in a contract to which it is a party that requires that drivers employed by King meet certain minimum requirements set forth therein. This is not the kind of oversight that could establish that SEPTA is Plaintiff's employer under either common law agency rules or a joint employer theory.[24]  As a convicted murderer, Plaintiff fell below those minimums and was therefore terminated by King from his position with King.  It must be emphasized that King did not seek the input of SEPTA when it hired or fired Plaintiff.  Nor did it inquire as to whether Plaintiff could be employed in another capacity. Fiorillo Dep. at 25.  Had it done so, King would have been advised that Plaintiff could be employed by King in any capacity other than as a paratransit driver in SEPTA service.  Brandis Affidavit at ¶ 11.

 Because Plaintiff's federal claims are viable only if he can establish an employment relationship with SEPTA, his claims must be dismissed.

　　　　2.　　State Law

The same result obtains under state law.  In the seminal case of **Sweet v.**

**Pennsylvania Labor Relations Board**, 457 Pa. 456, 322 A.2d 362, 365 (1974), the Supreme

---

[24]    The maintenance of some power by a party other than the actual employer does not convert the relationship to one of joint employers.  For example, in Metropolitan Detroit Bricklayers District Council v. J.E. Hoetger, 672 F.2d 580, 584 (6th Cir. 1982), a general contractor was not considered to be a joint employer with a subcontractor even though their contract required the subcontractor to hire only union workers and the general contractor retained the right to escrow funds to insure that union benefits were paid.

Court of Pennsylvania observed that "[t]he relation of an employer and employee exists when a party has the right to select the employee, the power to discharge him, and the right to direct both the work to be done and the manner in which such work shall be done."  As set forth above except for establishing minimum requirements for paratransit drivers in SEPTA service, these powers were vested alone in King.

It equally is clear that Plaintiff cannot establish that King and SEPTA were joint employers under state law.  A joint employer relationship can exist "where no one single entity controls all of the terms of the employment relationship."  <u>Costigan v. Philadelphia Finance Dep't</u>, 462 Pa. 425, 341 A.2d 456, 461 (1975).  SEPTA retained no control over Plaintiff's employment with King or the manner in which King directed Plaintiff's employment. SEPTA only had the right to enforce the terms of the Agreement.  This Court cannot find that SEPTA is liable to Plaintiff under the State Constitution or the Criminal History Record Information Act because no employer-employee relationship existed between SEPTA and Plaintiff under state law either.

V.    <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment should be entered in favor of SEPTA and against Plaintiff and the Amended Complaint should be dismissed with prejudice.

Respectfully submitted,

_____
SAUL H. KRENZEL, ESQUIRE
ROBERT J. HAURIN, ESQUIRE

**SAUL H. KRENZEL & ASSOCIATES**
**42 South 15th Street, Suite 800**
**Philadelphia, PA 19102**
**Dated:  October 8, 2004**               **(215) 977-7230**