IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| DOUGLAS EL | : | CIVIL ACTION |
| Plaintiff | : | |
| v. | : | No. 02CV3591 |
| SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY | : | JURY TRIAL DEMAND |
| Defendant. | : | |

---

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**

**MOTION FOR A DAUBERT HEARING**

Defendant, Southeastern Pennsylvania Transportation Authority (hereafter "SEPTA") submits the within Memorandum of Law in Support of its Motion for a Daubert Hearing. For the reasons that follow, SEPTA's motion should be granted.

**I.   INTRODUCTION**

This case involves Plaintiff's claim that he was discriminated against on the basis of his race when he was denied employment with King Paratransit Service because he is a convicted murderer. Plaintiff maintains that King denied him employment based on the application of a conviction policy contained in an agreement between King and SEPTA for the provision of paratransit services.

The criminal conviction policy along with certain other minimum requirements contained in the agreement specified minimum qualifications for paratransit drivers in SEPTA service. One

such minimum qualification provides that no driver could be hired as a paratransit driver in SEPTA service if they had a prior conviction for a violent crime. Plaintiff claims that the application of this policy, which is admittedly facially neutral, has a disparate impact on African Americans and Hispanics. In support of his claim, Plaintiff submitted a report from Dr. William B. Fairley dated July 15, 2004. See Exhibit 1.

SEPTA brings this motion for a Daubert hearing after having had an opportunity to review thoroughly that report and the subsequent deposition testimony of Dr. Fairley. That review revealed that neither Dr. Fairley's report nor his proposed testimony is reliable. As a result, Dr. Fairley should be precluded from testifying at trial and this case should be dismissed with prejudice.[1]

## II.    ARGUMENT

### A.    APPLICABLE LEGAL STANDARDS.

SEPTA brings this motion to challenge the admissibility of the report of Dr. Fairley and his testimony at trial. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

---

[1] It is SEPTA's position that Plaintiff has failed to meet his prima facie case of disparate impact discrimination by relying on the report of Dr. Fairley. As set forth in SEPTA's Memorandum of Law in Support of its Amended Motion for Summary Judgment, Dr. Fairley utterly failed to isolate the policy at issue in this case and demonstrate that the conviction policy caused a significant disparate impact on a protected group. Wards Cove v. Antonio, 490 U.S. 642, 656 (1989); Lawton v. Sunoco, 2002 U.S. Dist. LEXIS 13039 (E.D.Pa. 2002), aff'd, 2003 U.S. App. LEXIS 8802 (3d Cir. 2003).

>sufficient facts or data, (2) the testimony is the product or reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court charged trial courts with the obligation of acting as a gatekeeper to exclude unreliable expert testimony - - proposed testimony that does not meet the requirements of Rule 702; see also, Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (trial court acts as a gatekeeper "by means of a so-called "**Daubert hearing** . . ."). (emphasis supplied).  The admissibility of expert testimony turns on whether the expert is qualified, the methodology used by the expert is valid and that the expert opinions would assist the fact finder.  Daubert, 509 U.S. at 590-91; see also Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 200) (3 factors are qualifications, reliability and fit).

To determine whether expert testimony is reliable, it must first be shown that the expert has good grounds to support the testimony.  Daubert, 509 U.S. at 590.  This means that an expert's opinions must be based on "reliable principles and methods" as opposed to subjective belief or unsupported speculation. Fed.R.Evid. 702; Daubert, 509 U.S. at 590; Mause v. Global Household Brands, Inc., 2003 WL 22416000 (E.D.Pa. 2003).  In addition, this Court should consider whether the methodology used by Dr. Fairley is generally accepted, whether such methodology has been subjected to peer review, the known or potential rate of error in the methodology used, the existence and maintenance of standards controlling the operation of the methodology "as well as any other factors that are relevant." Oddi v. Ford Motor Company, 234 F.3d 136, 145 (3d Cir. 2000) (citing In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717, 742 (3d Cir. 1994)); Dearson v. Bostrom Seating, Inc., 241 F.Supp.2d 494, 496 (E.D.Pa. 2003).

What's more, the trial court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." Oddi v. Ford Motor Company, 234 F.3d at 146 (citation omitted).

The focus of reliability is therefore on the principles and methodologies used rather than the conclusions that they generate. Dearson v. Bostrom Seating, Inc., 241 F.Supp.2d 494, 496 (E.D.Pa. 2003). Where, as here, there is too great a gap between the data and the conclusions of the expert, such testimony is unreliable. Oddi v. Ford Motor Company, 234 F.3d at 146 (citation omitted). In short, Plaintiff cannot possibly demonstrate by a preponderance of the evidence that the opinions offered by Dr. Fairley are based on "valid reasoning and reliable methodology" for the reasons set forth in great detail below. Dearson, 234 F.Supp.2d at 496-97.

B. **THE FAIRLEY ANALYSIS.**

On July 15, 2004, Dr. Fairley issued his so called "expert report." A copy of the report is attached hereto as Exhibit 1. The deficiencies in Dr. Fairley's methodology are so numerous as to render his opinions utterly unreliable. Many of these flaws were discussed in great detail in the Report of Dr. David Griffin dated October 7, 2004. A copy of Dr. Griffin's Report is attached hereto as Exhibit 2.

The most glaring deficiency in the analysis of Dr. Fairley is that he never considered the actual impact of the conviction policy. Instead, Dr. Fairley equated an individual with a record as one who was dismissed or denied employment based on the existence of that record. Griffin Report at 1. Thus, Dr. Fairley included in his analysis of those "dismissed" individuals with criminal records who were hired by providers as paratransit drivers in SEPTA service (40 cases), individuals whose reported charges were dropped, individuals where no disposition of the charge

is listed, individuals who had no charges of any kind and individuals with reported charges where such charges would not have resulted in a disqualification. Griffin Report at 5, 22-26.[2]

Thus, in his overzealous effort to establish a prima facie case, Dr. Fairley included 18 dismissals as a result of the application of the conviction policy where the individual listed had no criminal record at all. Griffin Report at 5, 24-25. What's more, although noting that some crimes would not result in a disqualification for consideration as a paratransit driver, Dr. Fairley chose not to apply these exceptions. Fairley Dep. at 15. Copies of the relevant pages of the transcript from the deposition of Dr. Fairley are attached hereto as Exhibit 3.

Dr. Fairley also included individuals with criminal records from Community Transit as those who were dismissed because of the policy. See Fairley Report at Charts 5, 6, and 7. This despite Community's representation that it could not identify a single employee or applicant who was disqualified because of a substandard criminal history. Griffin Report at 4, 31. This resulted in 126 cases identified by Dr. Fairley as being dismissed by application of the conviction policy where there is no available data to support him. Id. at 4. This is particularly troubling because records produced by Community show that many individuals with criminal records were hired as paratransit drivers.

Dr. Fairley readily admitted at his deposition and in his report that he could not identify individuals who were terminated or denied employment because of a conviction. Fairley Dep. at 47, 61-62, 68; Fairley Report at 6 ("For the most part these employees were dismissed under

---

[2]   Dr. Griffin analyzed the 472 minority "dismissals" identified by Dr. Fairley as having resulted from the application of the criminal conviction policy and found that at least 276 of those dismissals were for reasons that had nothing to do with the individual's criminal record. Griffin Report at 5.

5

SEPTA's policy."). Dr. Fairley testified that he did not think it was necessary to actually ascertain whether the policy resulted in African Americans and Hispanics losing job opportunities because of their membership in a protected group. Id. at 51-52, 58. As Dr. Fairley explained:

> <u>My analysis was not really premised on actual dismissals</u>, but was premised on looking at the impact on a group of a policy with respect to convictions records that they – that they could be dismissed on those grounds.
>
> <u>So my emphasis was not on actual dismissal or in trying to sort out different reasons for dismissal</u>, but rather on the relative impact of two groups of a conviction record with respect to their exposure to dismissal for that reason.

Fairley Dep. at 172 (emphasis added). But a review of actual dismissals in relation to the policy is what is required by <u>Wards Cove v. v. Antonio</u>, 490 U.S. 642, 656 (1989); <u>see also</u>, <u>NAACP v. City of Bayonne</u>, 134 F.3d 113, 122 (3rd Cir. 1998) (dismissing claim because Plaintiffs failed to isolate the discriminatory effect of the practice they challenged); <u>Bryant v. International Schools Services, Inc</u>. 675 F.2d 562, 572 (3rd Cir. 1982) (proof of actual discrimination is required); <u>In re Employment Litigation</u>, 198 F.3d 1305, 1312 (11th Cir. 1999) ("plaintiff must. . . . show that there is a legally significant disparity between (a) the racial composition caused by the employment practice, of the pool of those enjoying a job or job benefit; and (b) the racial composition of the qualified applicant pool).

Next, Dr. Fairley relied on data compiled and interpreted by Plaintiff's counsel for Triage and Service Plus, two SEPTA paratransit providers. Apparently, counsel for Plaintiff randomly selected files for review and completed coding forms that were subsequently submitted to Dr. Fairley. <u>See</u> Fairley Report at 2; Memo from David Cohen to William Fairley dated June 9, 2004 (hereafter "Cohen Memo") Exhibit 4; Fairley Dep. at 27-28. Thus, instead of reviewing all

6

available and actual data, Dr. Fairley reviewed only a sample of applicants from these providers and the information reviewed was not the source information.[3] To state that it is unusual for an expert witness to rely on data that has been interpreted by a party with a vested interest in the outcome of the litigation would be an understatement. To compound this coding mistake, the samples were not weighted with the consequent result that his calculations regarding racial disparity are grossly exaggerated even when Dr. Fairley's faulty data is analyzed. Griffin Report at 2, 6, 27-29.

With regard to Triage, "Active" personnel files were not reviewed due to time constraints and "[a]bout 9 file boxes of personnel records for employees with criminal records were collected but not copied due to the time and expense involved." Cohen Memo at 5. It is no surprise that such information was not analyzed because it would have revealed additional employees who were hired despite having a criminal conviction. As noted in the Cohen Memo, the most common reason for unemployment was not the conviction policy; it was violation of the "no show" policy. Dr. Fairley recognized that consideration of those dismissed for other reasons including "no shows" would have an impact on his analysis, but curiously chose not to consider such issues. Fairley Dep. at 137-139. Instead, Dr. Fairley made assumptions that he thought were reasonable. Id. But equating having a conviction record as a likely termination is belied by the overwhelming evidence adduced in this case, defies reason and logic and renders Dr. Fairley's analysis and testimony unworthy of any serious consideration by this Court. See Fairley Dep. at 56-57, 81.

With regard to Anderson Travel and Edens Corporation, Plaintiff again elected not to

---

[3]     In connection with his review, David Griffin was provided source information for all driver applicants at Triage and Service Plus.

review all available data for driver applicants, First, according to the Cohen Memo, Plaintiff decided not to review any available applicant information for Anderson "because of time constraints." Exhibit 4, page 1. It was also noted there that Anderson records "are available if necessary." Id. Plaintiff at least was right on this point as SEPTA provided all available Anderson applicant information to Dr. Griffin for his review. Dr. Griffin considered the Anderson data in his analysis. See e.g. Griffin Report at 17, 20-21

Edens information was provided to Dr. Fairley only for the 280 applicants who had convictions. Fairley Report at 2; Cohen Memo at 2. Plaintiff understood that Edens had 23 boxes of applicant information that was available for his review. Again, Plaintiff elected not to review this data. This relevant information was reviewed by SEPTA, provided to Dr. Griffin and included in his analysis.[4] Griffin Report at 2, 17, 20-21. According to Dr. Griffin, if Dr. Fairley analyzed the Edens data in conjunction with a relevant analysis of actual dismissals as a result of the application of the conviction policy, he could not have concluded that there was a statistically meaningful disparity in dismissals by race. Id. at 2.

Like Edens, Dr. Fairley reviewed data only for convicted employees at King - - the entity who terminated Plaintiff's employment because he is a convicted murderer. Fairley Report at 2. It cannot be disputed that it is not possible to measure the racial impact at King without corresponding data for employees who have no record. Griffin Report at 13. Nevertheless, Dr. Fairley undertook to estimate the racial impact of the policy at Edens and King using his dubious findings for 4 other vendors. Fairley Report at Chart 6. Interestingly, Dr. Fairley decided not to

---

[4]    Dr. Griffin reviewed data for 3,793 Edens' job applicants of which race identification could be made for 3,119 applicants. Edens was by far the largest vendor of those included in Dr. Fairley's analysis. Griffin Report at 14, and Table 8, 17.

include Service Plus in this calculation, but included that vendor in other calculations that he made. See Fairley Report at Charts 5 and 7. Dr. Griffin concluded that the omission of Service Plus from Chart 6 was deliberate. According to Dr. Griffin, inclusion of the Service Plus data (which appeared to be directionally favorable to minority applicants) would have produced odds ratios for Edens and King that were not statistically significant. Griffin Report at 14 and Table 8.

Equally erroneous is Dr. Fairley's conclusion that if the conviction policy had no disparate impact, then only 162 minority applicants would have been denied employment. Fairley Report at Chart 7. This conclusion fails to take into account that that the population that he studied (paratransit driver applicants) was 76% minority (on an unweighted basis) and 85% minority (on a weighted basis). Griffin Report at 7.[5]

Dr. Fairley also combined all vendors in his analysis for no apparent reason other than providing another faulty basis for his speculative conclusions. Dr. Fairley chose to combine the 5 vendors that he studied despite recognizing the "considerable variations among the 5 providers in home locations . . ." and that "the 5 providers had considerable variation in percent of Minority employees." Fairley Report at 8. Analyzing the data on vendor by vendor approach yielded no statistical race disparities for 3 vendors and, for the other 2, there was no documentation available to discern the actual reasons that an individual was denied employment in the first instance. Griffin Report at 13 and Table 7.

Not to be outdone, Dr. Fairley also relied upon a 5/4 Rule to demonstrate a racial disparity which he claimed to be analogous with the 4/5 Rule adopted by the EEOC as part of its Uniform

---

[5] Utilizing only the data analyzed by Dr. Fairley, Dr. Griffin found that there were actually a surplus of 5 minority dismissals as a result of the application of the conviction policy which has no statistical or practical significance. Griffin Report at 12 and Table 6.

Guidelines on Employee Selection Procedures. 29 C.F.R. § 1607. Fairley Report at 9-10. At his deposition, Dr. Fairley testified that he had never seen the 5/4 rule used in a discrimination case nor has he ever seen it discussed in an authoritative treatise as a means to measure the disparate impact of a facially neutral employment policy. Fairley Dep. at 150-151. More important, when the EEOC standard is applied, there is no disparate impact here. Griffin Report at 15.

Finally, any argument advanced by Plaintiff that suggests that the available evidence did not allow the kind of inquiry required by Wards Cove should be summarily rejected. Plaintiff elected not to analyze the majority of data that was available and was analyzed by Dr. Griffin. Had Plaintiff undertaken an appropriate analysis of available data, he too would have concluded that there is no racial disparity here.

For all of these reasons, this Court should schedule a Daubert hearing for the purpose of determining whether Dr. Fairley's testimony is admissible at trial. It is SEPTA's position that it is not and this case should be dismissed because Plaintiff cannot make a prima facie case of disparate impact discrimination.

## III.  CONCLUSION

For all of the foregoing reasons, SEPTA respectfully requests that its motion be granted and this Court hold a Daubert hearing for the purpose of determining whether the




testimony of Dr. Fairley meets the standards for admissibility under the Federal rules of Evidence.

Respectfully submitted,

|  |  |
|---|---|
| | _____ |
| | **SAUL H. KRENZEL, ESQUIRE** |
| | **ROBERT J. HAURIN, ESQUIRE** |
| | SAUL H. KRENZEL & ASSOCIATES |
| | 42 South 15th Street, Suite 800 |
| | Philadelphia, PA 19102 |
| Dated: October 14, 2004 | (215) 977-7230 |