

# Statement of Opinion on Risk of Victimization of Users of Specialized Transportation Services and Hiring of Drivers with Previous Criminal Convictions

Prepared by Dick Sobsey, Ed.D.
University of Alberta
September 22,  2004

# Contents

*I. Scope of My Opinion* ........................................................................................................ 3

*II. Statement of Opinion* ................................................................................................... 4

A. People with disabilities experience a very high risk of becoming victims of violence and exploitation. ........................................................................................................................ 4

B. People with disabilities experience many forms of victimization. .................................... 8

C. Public transportation services have been identified as environments of substantial risk for crime that require measures to control risk. .................................................................. 9

D. Transportation services have been identified as environments of particular risk of violence for people with disabilities. ................................................................................. 10

E. Specific characteristics of specialized transit services make these services particularly high-risk environments for some types of passenger victimization. ................................. 11

F. Specialized transportation providers act in greater position of heightened responsibility in relation to their passengers. ..................................................................... 13

G. In significant numbers of cases, specialized transit drivers have been identified as perpetrators of violence against people with disabilities. ................................................. 13

H. Previous conviction for violent offenses is an important predictor of future risks of violent and non-violent offenses. ..................................................................................... 18

I. Screening reduces the risk associated with transit services and particularly for those serving vulnerable people. ................................................................................................ 19

J. Best practices in screening increase protection for potential victims of crime ............. 20

K. The screening procedures used by SEPTA are consistent with appropriate practices for controlling risk to passengers. ..................................................................................... 20

*CONCLUSIONS* ............................................................................................................... 21

*APPENDIX A: Qualifications* ........................................................................................... 23

*Appendix B: Documents Consulted* .................................................................................. 23

*Appendix C: Sample published reports of offenses committed by transportation providers* .............................................................................................................................. 26

# I. SCOPE OF MY OPINION

Criminal background checks used to screen out potential drivers of specialized transportation services who have been convicted of specific crimes affect two main categories of individuals: (1) passengers who use paratransit services, particularly those who are most vulnerable to victimization and who will be protected by this screening procedure, and (2) members of the applicant pool, particularly those whose criminal record eliminates from employment as a paratransit driver. The rationale for this practice is predicated on a clear indication that the use of criminal background checks for potential drivers is necessary and adequate to produce improved personal safety of paratransit passengers. This statement of opinion addresses the vulnerability and need for protection of paratransit passengers. It also discusses the role of criminal background checks in contributing to risk reduction.

This statement of opinion addresses the following questions and provides answers them based on available research and professional standards:

a. Are people with mental and physical disabilities in a high-risk category for becoming victims of violence or abuse?

b. Does specialized transportation represent a particular environment of elevated risk?

c. Do specialized transportation drivers have heightened responsibility for the safety of their passengers?

d. Have specialized transportation drivers been identified as a group in which offenders have often been found?

e. What specific circumstances make specialized transportation transit a particularly high-risk situation?

f. Is a history of previous convictions an appropriate device for reducing risks to people with disabilities?

g. Does screening to prevent individuals with previous conviction records from becoming drivers of specialized transit reduce risk for passengers with disabilities?

h. Who would be affected by reducing or eliminating this practice?

i. What kind of criminal-background screening policies and procedures are appropriate to apply to potential drivers of specialized transit services for people with disabilities?

j. Is the current SEPTA policy consistent with these best practices?

A large portion of the general and scholarly literature about and much of the focus of scientific study of violence against vulnerable people has focused on sexual offenses. This might inaccurately give the impression that these offenses constitute the only category of offense that requires special protections for vulnerable people. In fact this is not the case, research on both children and adults with disabilities suggests increased vulnerability and increased victimization across virtually all offense categories.[1] For example, Sullivan and

---

[1] e.g., Sobsey, D. (1994) *Violence in the lives of people with disabilities*. Baltimore: Paul H. Brookes; Sullivan, P., & Knutson, J. (2000). Maltreatment and disabilities: A population-based epidemiological study. *Child Abuse & Neglect, 24,* 1257-1273; Wilson, C., & Brewer, N. (1992). The incidence of criminal victimisation of individuals with an intellectual disability. *Australian Psychologist, 27*(2), 114-117.

Knutson found that the psychiatric disability, orthopedic and health impairment and mental disability categories of children they studied experienced very high rates of substantiated sexual abuse but all three groups had experienced substantiated physical abuse far more frequently than sexual abuse.[2] Therefore, discussion of sexual offenses in this statement of opinion can be interpreted both as a specific concern and also as representative of a much broader spectrum of victimization concerns for vulnerable people.

In this statement of opinion, *specialized transportation services* is a term used to designate all forms of public or commercial transportation that are used primarily by passengers with disabilities or who are elderly. The Paratransit services and Shared Ride Program for Senior Citizens operated by South-East Pennsylvania Transit Authority are examples of specialized transit services.

*Appendices.* I have included several appendices with this report. Appendix A includes my qualifications and curriculum vitae. Appendix B provides a sample list of relevant cases from an electronic database search. Appendix C provides a list of major documents that I reviewed in preparing this report.

## II. STATEMENT OF OPINION

## A. People with disabilities experience a very high risk of becoming victims of violence and exploitation.

Three groups of individuals have been consistently recognized as particularly vulnerable to violence and other forms of victimization: (1) children, (2) people, with disabilities, and (3) senior citizens.[3] For example, the Social Security Act refers to "preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests."[4] The National Criminal History Improvement Program (NCHIP) refers to special protection for vulnerable groups in identifying "persons ineligible to hold positions involving children, the elderly, or the disabled."[5] The recognition that children, people with disabilities, and the elderly as vulnerable people need high levels of protection is not unique to the United States or to legislative initiatives. For example, Canadian efforts to protect vulnerable people have identified the same three groups.[6]

---

[2] Sullivan, P., & Knutson, J. (2000). Maltreatment and disabilities: A population-based epidemiological study. *Child Abuse & Neglect, 24,* 1257-1273

[3] e.g., U.S., Social Security Act, Tile XX, § 2001. [42 U.S.C. 1397 ]

[4] U.S., Social Security Act, Tile XX, § 2001. [42 U.S.C. 1397 ] ¶3

[5] Bureau of Justice Statistics. (2003, May). Improving criminal history records for background checks. *Highlights.* Washington, DC: U.S Department of Justice, Bureau of Justice Statistics.

[6] e.g., Canadian Association of Volunteer Bureaux and Centres. (1996) *Screening Handbook: Protecting Clients, staff, and the community.* Ottawa: Canadian Association of Volunteer Bureaux and Centres, Solicitor General of Canada, Justice Canada, and Health Canada,

These three groups overlap substantially. Senior citizens have much higher rates of disability than younger citizens[7] and many children also have disabilities. Children with disabilities experience much higher rates of victimization than other children.[8] Senior citizens who have disabilities are particularly vulnerable to violence.[9]

Children and adults with disabilities are much more likely to be victims of violence and exploitation than other citizens. This vulnerability has been long recognized in scientific and professional literature. For example, von Hentig, who is often considered the founding father of victimology, suggested that people with mental and physical disabilities were among those most likely to be crime victims.[10] Similarly, disability has been identified as one of several major vulnerability factors for sexual assault.[11]

Much of this vulnerability is a direct result of a mental or physical impairment for many individuals with disabilities.[12] For example, impairments that limit movement and mobility make it more difficult for many individuals to physically fend off an aggressor and more difficult for many individuals to avoid or escape from harm. Impairments that affect judgement and communication make it more difficult for individuals to recognize dangerous situations or to recruit help. Much of the increased risk experienced by people with disabilities, however, is not a direct result of their impairments, but is actually a result of environmental factors and social responses to disability.[13] For example, individuals with disabilities may be provided services in isolated environments that have associated risks. In addition, they are more likely to be placed under the control of caregivers who exercise considerable authority and control, which has a high potential for abuse.

Criminologist, Joan Petersilia, writing about crime victims with developmental disabilities discusses some of the ways in which people with developmental disabilities are made doubly vulnerable by services (including transportation services) that provide inadequate protection:

---

[7] e.g., Nampudakam, M. (1999). Greying blues. *Health for Millions, 25*(5), 3-5; Sheehan, M. N. (2003). Disabilities and aging. *Theoretical Medicine & Bioethics, 24*(6), 525-533. Wilber, N., Mitra, M., Walker, D. K., Allen, D., Meyers, A. R., & Tupper, P. (2002). Disability as a public health issue: findings and reflections from the Massachusetts survey of secondary conditions. *Milbank Quarterly, 80*(2), 393-421.

[8] Sullivan, P., & Knutson, J. (2000). Maltreatment and disabilities: A population-based epidemiological study. *Child Abuse & Neglect, 24,* 1257-1273

[9] Birke, M. G. (2004). Elder law, Medicare, and legal issues in older patients. *Seminars in Oncology, 31*(2), 282-292. Wilber, N., Mitra, M., Walker, D. K., Allen, D., Meyers, A. R., & Tupper, P. (2002). Disability as a public health issue: findings and reflections from the Massachusetts survey of secondary conditions. *Milbank Quarterly, 80*(2), 393-421.

[10] e.g., von Hentig, H. (1940). Remarks on the interaction of perpetrator and victim. *Journal of Criminal Law and Criminology, 31,* 303-309; von Hentig, H. (1948). *The criminal and his victim.* New Haven, CT: Yale University Press.

[11] Grossin, C., Sibille, I., Lorin de la Grandmaison, G., Banasr, A., Brion, F., & Durigon, M. (2003). Analysis of 418 cases of sexual assault. *Forensic Science International, 131*(2-3), 125-130.

[12] e.g., Petersilia, J. (2000). Invisible victims. Violence against persons with developmental disabilities. *Human Rights, 27*(1), 9-13. Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes.

[13] Petersilia, J. (2000). Invisible victims. Violence against persons with developmental disabilities. *Human Rights, 27*(1), 9-13. Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes

When one group is selected as a target for crime more frequently than another, it usually meets three conditions: (1) the group members are exposed more frequently to motivated offenders (proximity), (2) group members are more attractive as targets in that they afford a better yield to the offender (easy sex), and (3) group members are more accessible or less defended against victimization (lack of guardianship or access to justice). Persons with developmental disabilities clearly meet all three of these conditions...

Many aspects of our service delivery system also place persons with disabilities at risk. For example, one study found that 44 percent of all offenders against people with disabilities made initial contact with their victims through the web of special services provided to people with disabilities (Sobsey and Doe 1991). Other delivery system procedures integrate those who are unable to protect themselves with those who are dangerous to others.[14]

In my own work, I have identified two major categories of caregiver offenders that Dr. Petersilia refers to hers as "motivated offenders." These are opportunistic and predatory offenders.[15] Opportunistic offenders, sometimes referred to as corrupted offenders, are strongly influenced by circumstances. They engage in very little planning of their offenses. Forensic psychologists refer to them as "disorganized offenders."[16] They have limited inhibition and poor impulse control. As a result, they are unlikely to offend under close supervision or conditions where detection and punishment is likely. However, isolated with a vulnerable victim, when the chance of detection and punishment seems remote, they often succumb to their impulses and commit offenses. Their frustration or anger tends to manifest itself in battery and their sexual impulses tend to manifest themselves as sexual exploitation or sexual assault. These opportunistic offenders represent a particular challenge to predicting future offenses for two related reasons. First, because their commission of offenses is strongly related to environmental conditions, they may go for long periods of time without committing an offense and yet still pose a high risk if placed in circumstances where the chance of being punished seems remote. Second, because of the strong influence of environmental conditions the category of subsequent offense is frequently unrelated to the category of original offense. For example, an opportunistic previously convicted of robbery is almost as likely to commit a sexual assault or some other unrelated offense as to repeat the original category of crime. For this type of offender, time since last conviction is a very weak

---

[14] Petersilia, J. (2000). Invisible victims. Violence against persons with developmental disabilities, *Human Rights, 27*(1), pp 11-12.

[15] e.g., Bahroo, B.A. (2003). Pedophilia: Psychiatric insights. Family Court Review, 41, 497-507: Firestone, P., Bradford, J.M., Greenberg, D,M., & Nunes, K.L. (2000). Differentiation of homicidal child molesters, nonhomicidal child molesters, and nonoffenders by phallometry. *The American Journal of Psychiatry. 157,* 1847-1850 Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes.

[16] Douglas, J.E., Burgess, A.W., Burgess, A.G., & Ressler, R.K. (1992). *Crime classification manual: A standard system for investigating and classifying violent crime.* San Francisco: Jossey-Bass; Swanson. C.. Chamelin, N., & Territo, L. (2003). *Criminal investigation* (8th ed.). Columbus, OH: McGraw-Hill. Winerman, L. (2004); Criminal profiling: the reality behind the myth. APA Monitor, 35(7), 66.

indicator of future behavior unless circumstances remain unchanged, because they act on impulse in reaction to circumstance.[17]

Predatory offenders engage in greater planning of offenses. Forensic psychologists refer to them as "organized offenders."[18] They seek positions that allow them to exercise power over vulnerable people. Some use this power for sexual gratification; others use it to inflict pain. All predatory offenders use the power of their formal positions or informal roles to exercise control over vulnerable people. Services, including specialized transportation services) that serve exclusively or primarily vulnerable populations (e.g., children, people with disabilities, or senior citizens) attract predatory offenders because they provide access to vulnerable victims.[19] Since predatory offenders attempt to find vulnerable or victims with the least protection, they seek positions that have lowered standards of protection for vulnerable people.[20] For this reason, it is essential that the screening standards for specialized transit drivers be set a stringent level.

Both opportunistic and predatory offenders are more likely to commit offenses against vulnerable people. While offender types (e.g., opportunistic and predatory, organized and disorganized) represent archetypes, studies of actual offenders demonstrate that many commit both types of offense or change from one type to another over time.[21] Specifically, in regard to previous offenders, the low probability of detection and successful prosecution makes crimes against vulnerable people an attractive possibility.

Current studies[22] indicate that children with disabilities are three to four times as likely to be victims of maltreatment and about one third of school-age children with disabilities already have a history of victimization substantiated by child welfare or police records.[23] Adults with disabilities also have an elevated risk for being victimized, although the range of relative risk is more variable across studies. These studies suggest that adults with disabilities may experience relative rates of victimization from about 2 to more than 12 times the rates for

---

[17] Douglas, J.E., Burgess, A.W., Burgess, A.G., & Ressler, R.K. (1992). *Crime classification manual: A standard system for investigating and classifying violent crime.* San Francisco: Jossey-Bass; Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes Winerman, L. (2004); Criminal profiling: the reality behind the myth. *APA Monitor, 35*(7), 66.

[18] Douglas, J.E., Burgess, A.W., Burgess, A.G., & Ressler, R.K. (1992). *Crime classification manual: A standard system for investigating and classifying violent crime.* San Francisco: Jossey-Bass; Swanson. C., Chamelin, N., & Territo, L. (2003). *Criminal investigation* (8th ed.). Columbus, OH: McGraw-Hill. Winerman, L. (2004); Criminal profiling: the reality behind the myth. APA Monitor, 35(7), 66.

[19] Petersilia, J. (2001). Crime victims with developmental disabilities - A review essay. *Criminal Justice and Behavior, 28*(6), 655-694. Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes

[20] Petersilia, J. (2001). Crime victims with developmental disabilities - A review essay. *Criminal Justice and Behavior, 28*(6), 655-694. Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes

[21] C., Chamelin, N., & Territo, L. (2003). *Criminal investigation* (8th ed.). Columbus, OH: McGraw-Hill.

[22] Sobsey, D. (in press). Violence and disability. State of the evidence review. Washington, DC: American Association on Mental Retardation.

[23] Sullivan, P., & Knutson, J. (2000). Maltreatment and disabilities: A population-based epidemiological study. *Child Abuse & Neglect, 24,* 1257-1273.

adults without disabilities of the same age and gender.[24] The overall risk for violence against adults with disabilities is about 4 times the risk experienced by individuals without disabilities. While the risk is increased for all categories of disability and all categories of violent crime, the precise extent of increase is related to the type of disability and the type of crime. For example, sexual victimization of individuals with major mental health problems occurs at extremely high rates. Goodman, Salyers et al. (2001), found that 20.3% of women and 7.6% of men with "severe mental illness" in their sample had been sexually assaulted within the last year and 57.1% of women and 24.5% of men with "severe mental illness had been sexually assaulted sometime in adulthood.[25]  By the most conservative comparisons, these rates are well over 20 times the rates reported among the general population. The U.S. Department of Justice reports that 0.2 % of American households had a family member who was raped or sexually assaulted in the year 2002.[26]

Scholarly study of the violence against people with disabilities and protection of vulnerable people has also increased. My book, *Violence and Abuse in the Lives of People with Disabilities* was published in 1994 presenting a summary of the issues and a model for understanding victimization of people with disabilities. A number of national and international conferences have been held exclusively on these topics since the late 1980s. The United States Department of Justice, Office of Victims of Crime, for example, convened a special symposium of crime with disabilities in 1998, to take a closer look at this "large and underserved victim population."[27] *The Journal of Adult Protection* began publication in 1999 and *Adult Abuse Review* in 2002.

## B. People with disabilities experience many forms of victimization.

Sullivan and Knutson found that children with disabilities were much more likely to be sexually abused than other children, but that it was actually the least frequent major category of child maltreatment affecting 12.7% of cases. By contrast, emotional abuse accounted for 17.6% of cases, physical abuse accounted for 22.2% of cases and neglect accounted for 46.6% of cases.[28] While, Wilson and Brewer reported that sexual assault was more than 12 times as frequent for women with intellectual disabilities as for women without disabilities, the adults with disabilities they studied experienced very high rates of crime in every violent crime category.[29] In fact, in the Wilson and Brewer study, adults with developmental disabilities also were victims of property crimes more frequently than other adults. There was only one

---

[24] e.g., Wilson, C., & Brewer, N. (1992). The incidence of criminal victimisation of individuals with an intellectual disability. *Australian Psychologist, 27*(2), 114-117.

[25] Goodman, L. A., Salyers, M. P., Mueser, K. T., Rosenberg, S. D., Swartz, M., Essock, S. M., et al. (2001). Recent victimization in women and men with severe mental illness: prevalence and correlates. *Journal of Traumatic Stress, 14*(4), 615-632.

[26] Klaus, P.A. (2004, February). *Crime and the nation's households, 2002.* Washington, DC: U.S Department of Justice, Bureau of Justice Statistics.

[27] Tyiska, C.G. (1998, September). Working with victims of crime with disabilities. *OVC Bulletin,* pp. 1-5.

[28] Sullivan, P., & Knutson, J. (2000). Maltreatment and disabilities: A population-based epidemiological study. *Child Abuse & Neglect, 24,* 1257-1273.

[29] Wilson, C., & Brewer, N. (1992). The incidence of criminal victimisation of individuals with an intellectual disability. *Australian Psychologist, 27*(2), 114-117.

category of crime in the study that they experienced less frequently than other adults, motor vehicle theft.

## C. Public transportation services have been identified as environments of substantial risk for crime that require measures to control risk.

Criminologist Joan Petersilia's is not alone in her conclusion that dependence on public transit increases risk for victimization.[30] In fact, mass transit has been identified as a "risky environment" for both violent and non-violent crime.[31]

As summarized by one group of transit analysts, "Many studies have documented transit crime."[32] Crimes in public transportation systems range from simple fare non-payment to mass terrorism. While some offenses are committed by passengers, drivers and frontline transit system staff, primarily drivers, also commit many offenses.[33] Most of the victims are passengers.[34] In many cases, these crimes go unreported. As suggested by one group of analysts, "Transit crime is a rather persistent but underreported trend that scares and intimidates riders – particularly women."[35]

While there is no data available on the exact frequency and nature of crimes committed by transit drivers, a review of any news database suggests a fairly wide variety of offenses carried out in the workplace. For example, one search resulted in the list of articles included in Appendix C.[36] ADD Transition sentence these reports

A number of analysts have pointed out the special plight of *captive passengers* or *transit-captive riders*.[37] These individuals do not have access to other forms of transportation and therefore have little choice other than mass transit. Among the most frequent captive

---

[30] Petersilia, J. (2000). Invisible victims. Violence against persons with developmental disabilities. *Human Rights, 27*(1),

[31] e.g., Clarke, R.V. (1996). Crime and the economics of mass transit. In R.V. Clarke (Ed.), Preventing mass transit crime. Monsey, NY: Criminal Justice Press; Liggett, R., Loukaitou-Sideris, A., & Iseki, H. (2004). Protecting against transit crime: The importance of the built environment, in D.J.B. Mitchell, (Ed.), California Policy Options (139-156.). Los Angeles: UCLA School of Public Policy and Social Research / Ralph and Goldy Lewis Center for Regional Policy Studies.

[32] Liggett, R., Loukaitou-Sideris, A., & Iseki, H. (2004). Protecting against transit crime: The importance of the built environment, in D.J.B. Mitchell, (Ed.), California *Policy Options* (139-156.). Los Angeles: UCLA School of Public Policy and Social Research / Ralph and Goldy Lewis Center for Regional Policy Studies, p. 140.

[33] Clarke, R.V. (Ed.), (1996). (Ed.), *Preventing mass transit crime.* Monsey, NY: Criminal Justice Press.

[34] Liggett, R., Loukaitou-Sideris, A., & Iseki, H. (2004). Protecting against transit crime: The importance of the built environment, in D.J.B.Mitchell, (Ed.), California *Policy Options* (139-156.). Los Angeles: UCLA School of Public Policy and Social Research / Ralph and Goldy Lewis Center for Regional Policy Studies.

[35] Liggett, R., Loukaitou-Sideris, A., & Iseki, H. (2004). Protecting against transit crime: The importance of the built environment, in D.J.B. Mitchell, (Ed.), California *Policy Options* (139-156.). Los Angeles: UCLA School of Public Policy and Social Research / Ralph and Goldy Lewis Center for Regional Policy Studies, p.

[36] Cases from outside the U.S. that were more than 5-years old, or did not indicate a close relationship between the offense and the driver's work were eliminated.

[37] Nelson, K.R. (1997). Policing mass transit. *FBI Law enforcement Bulletin, 66*(1). 1-7.

passengers are children, people with disabilities, and the elderly. As a result, it is often the most vulnerable members of society, who are also the captive passengers of public transit. While fear of crime often reduces ridership among those with other alternatives, the captive passengers, who typically share those fears, are typically the last to leave. As outlined by Nelson in the *FBI Law Enforcement Bulletin*, in some cases, public confidence in the safety of a transit or paratransit system can drop so low that the ability of the system to serve the public is severely compromised.

The concept of captive passengers has a special application to paratransit riders. Paratransit services are created specifically to serve individuals whose mental or physical disabilities that make it difficult or impossible for them to use conventional mass transit. As a result, they typically become captive passengers of the paratransit system. In many cases it is the very same impairment that makes an individual a captive passenger of paratransit that also leaves the individual vulnerable to victimization.[38]

Efforts to make paratransit systems safe and control crime risks are a major responsibility for all transit systems. No system can offer absolute safety from crime, but systems can be expected to make reasonable efforts to control foreseeable risks and to establish safety standards that are at least as high as those in the broader community.

## D. Transportation services have been identified as environments of particular risk of violence for people with disabilities.

Minibus and paratransit services are particularly dangerous environments both because these smaller vehicles operate with only one or a few passengers for a larger percentage of the time and because they operate without a fixed route or standardized schedule. The operation of a vehicle with only a driver and single passenger or small group of passengers isolates them from any potential witnesses to an offense. Because many users of paratransit have limited communication skills, many victimized passengers are unable to act as witnesses to offenses committed against them. Therefore, a driver who might commit an offense against a passenger may effectively commit an offense against the passenger with complete privacy. Even when they can tell what has happened to them, passengers with cognitive or psychiatric disabilities are often considered unreliable witnesses and in some cases are not allowed to testify against the person who commits an offense. Even when there is more than one passenger present on a specialized transportation vehicle, it is often true that many of the passengers have impaired communication. For example, one study of paratransit riders found that well over one-third (40%) of riders required paratransit solely because of intellectual disabilities or mental-health related disabilities.[39] In addition, 48% of riders whose primary need for paratransit was due to physical disabilities also had cognitive, mental health related disabilities. This meant that 88% of passengers had some impairment of cognitive abilities or mental health problems as a primary or secondary disability. Still others who have visual or hearing impairments may have limitations that compromise their abilities at witnesses.

---

[38] e.g., Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes

[39] Espinosa, J.M., Baca, M., Estelle, A. & White, M.E. (2002). *At the Crossroads: Disability and transportation in New Mexico.* Albuquerque: Alliance for Transportation Research Institute.

Considering all of these factors, a conservative estimate would be that at least half of paratransit riders have impairments that affect their abilities to perceive or describe an offense in a manner deemed credible.

Transportation services for people with disabilities have been identified as environments associated with high levels of risk for victimization of people with disabilities both through empirical research and conceptual models.[40] Many factors contribute to this increased risk as outlined below.

As outlined in Section E, Violence by specialized transportation providers is generally recognized as a major area of concern. It has been discussed in academic texts and professional prevention training materials.[41]

## E. Specific characteristics of specialized transit services make these services particularly high-risk environments for some types of passenger victimization.

In our 1991 analysis of 162 cases[42] of sexual abuse of children with disabilities or sexual assault of adults with disabilities, and our 1994 update[43] of an expanded sample of 215 cases, we found 11 cases perpetrated by transportation providers. Based on the number of Americans employed as transportation providers and the number of people with disabilities who use transit, transportation providers were responsible for 13.2 times as many cases as would be expected based on their proportion of the adult population.[44] This degree of overrepresentation of transportation providers is statistically significant and has far less than one chance in 10,000 ($z = 12.96$, $p \leq .0001$) of occurring by chance.[45] This finding is similar

---

[40] Petersilia, J. (2001). Crime victims with developmental disabilities - A review essay. *Criminal Justice and Behavior, 28*(6), 655-694.

[41] e.g., The Center for Child and Family Studies, College of Social Work, University of South Carolina. (2002). *Voices ignored: Sexual assault of people with developmental disabilities.* Columbia, SC: University of South Carolina; Sobsey, D. (1994) *Violence and abuse in the lives of people with disabilities: The end of silent acceptance?* Baltimore: Paul H. Brookes.

[42] Sobsey, D., & Doe, T. (1991). Patterns of sexual abuse and assault. *Journal of Sexuality and Disability, 9*(3), 243-259.

[43] Sobsey, D. (1994) *Violence and abuse in the lives of people with disabilities: The end of silent acceptance?* Baltimore: Paul H. Brookes.

[44] This calculation is based on the simplest model. More complex models would add in other related factors and could bring the degree of disproportion down as low as 8.29 times the expected number (adding an adjustment for the degree for the fact that most transportation providers are male and males have a higher rate of committing sexual offenses), or as high as 43.1 times the expected number (adding adjustments for male/female proportion, reduced utilization of transit by people with disabilities, and increased overall rate of sexual offenses committed against people with disabilities). Even the 43 times figure is extremely conservative since all the offenses committed by transit drivers were committed on duty or against victims

[45] The z-score was calculated by the method described by Glass, and Hopkins for comparing an observed proportion (number of transportation providers committing sexual offenses against people with disabilities in our sample divided by the total number of people committing sexual offenses against people with disabilities in our sample) to an established proportion (the number of people working as transportation providers in the United States as a proportion of the population between 16 and 74). See Glass, G.V., & Hopkins, K.H. (1984). *Statistical methods in education and psychology* (2nd ed.). Englewood Cliffs, NJ: Prentice-Hall, inc. pp. 279-

to the overrepresentation of school bus drivers in sexual misconduct against school children, another vulnerable population. According to Shakeshaft's review for the U.S. Department of Education, school bus drivers were responsible for 12% of all sexual misconduct against students in schools. However, considering that there are more than eight times as many teachers as school bus drivers,[46] school bus drivers are at least twice as likely as teachers to commit these offenses.

The isolation of passengers and drivers in a vehicle can make public transportation a high-risk environment. While this risk-factor is present to some degree in all transit, including large buses that follow regular routes and schedules, they are much more present in paratransit and other specialized transportation services because they typically use smaller vehicles, have fewer riders, and do not always follow fixed routes or standardized schedules

In our study of sex crimes against people with disabilities,[47] sex crimes committed on buses and other forms of public transportation, these crimes were most frequently committed when the only the victim and the perpetrator were in the vehicle. While this isolation is an important factor in raising the risk level, it is not the only risk factor. Specialized transit differs from most bus services in at least six important ways.

First, specialized transit has a particularly high proportion of "captive passengers." Transit environments with "captive passengers" have been identified as high risk for crime.[48]

Second, many riders of specialized transit have physical disabilities that result in the inability to unfasten their seatbelts or leave the bus without driver assistance. As a result, they become captive passengers, not merely in the typical sense of having no alternatives, but also in a more direct sense since they are under the control of the driver.

Third, smaller vehicles used in specialized transit carry fewer passengers. This results in more time spent by passengers alone with the driver, increasing risk if the driver is a potential offender.

Fourth, many people with disabilities have impaired communication skills. Some riders are unable to report offenses committed against them or their fellow passengers. This results in reduced deterrence to crime.

Fifth, most specialized transit does not operate with a fixed route or standardized schedule. As a result, deviations from the appropriate route or schedule are more difficult to detect, further reducing deterrence.

Sixth, specialized transit services require a level of personal contact between drivers and passengers that does not exist in conventional transit. Drivers often assist passengers from and

---

282. Chi-square analysis provides a slightly more complex approach to this calculation but produces the same result.

[46] Bureau of Labor Statistics. (2003, May). National occupational employment and wage estimates. Electronically Retrieved August 2004 from http://www.bls.gov/oes/2003/may/oes_25Ed.htm and http://www.bls.gov/oes/2003/may/oes_53tr.htm. Washington, DC: U.S. Department of Labor.

[47] Sobsey, D., & Doe, T. (1991). Patterns of sexual abuse and assault. *Journal of Sexuality and Disability, 9*(3), 243-259.

[48] Nelson, K.R. (1997). Policing mass transit. *FBI Law enforcement Bulletin, 66*(1). 1-7.

to the threshold of their dwellings, an interaction that does not exist in conventional transit and which creates more opportunities for potential offenders.

Two models have frequently been used to understand the increased risk of exploitation and violence experienced by people with disabilities. Criminologists employ the lifestyles/routine activity model[49] to understand a wide range of crimes. A second distinct model that has been used to understand violence against people with disabilities, children, and other vulnerable groups is the ecological model. Major elements of the two models have been combined into the multifactorial model of victimization of individuals with disabilities.[50] Both of these models stress the relationship between (1) individuals motivated to commit crime, (2) individuals vulnerable to crime, (3) environments that present greater or lesser opportunities to commit a crime, and (4) protective agents (e.g., police, supervisors) that attempt to prevent or deter offenses through methods such as screening procedures, policies, and training.

## F. Specialized transportation providers act in greater position of heightened responsibility in relation to their passengers.

All transit providers have a duty to provide services that are reasonably safe. Because paratransit and other forms of specialized transit were established to serve those individuals whose disabilities preclude independent use of other forms of transit, transit providers must take additional steps to provide reasonable safety. Because specialized transit passengers are known to have increased vulnerability to victimization, transit drivers must act to protect them from victimization while using transit. While the specific job requirements for specialized transit drivers differs depending on the specific employer, most if not all act in a position of heightened responsibility because they typically are in close contact with individuals or small groups of vulnerable people, without direct on-site supervision. These factors make it clear that special transit drivers have heightened responsibility in relation to their passengers with disabilities.

## G. In significant numbers of cases, specialized transit drivers have been identified as perpetrators of violence against people with disabilities.

As previously noted, in our study,[51] specialized transportation providers are often perpetrators of offenses against people with disabilities. In addition, working with groups of people with disabilities and crime victims, I am often contacted by people with disabilities who have been crime victims, their families, or counselors who work with them. Many of the crimes that they

---

[49] These lifestyle model and the routine activity model share major features and are discussed as one model here. Criminologists frequently combine these models except when discussions focus on differences between the two models.

[50] Petersilia, J. (2001). Crime victims with developmental disabilities - A review essay. *Criminal Justice and Behavior, 28*(6), 655-694.

[51] Sobsey, D., & Doe, T. (1991). Patterns of sexual abuse and assault. *Journal of Sexuality and Disability, 9*(3), 243-259; Sobsey, D. (1994) *Violence and abuse in the lives of people with disabilities: The end of silent acceptance?* Baltimore: Paul H. Brookes.

13

have described to me have involved crimes by transportation providers against people with disabilities.

While these cases rarely received public attention, a few cases have received considerable news coverage. For example, a case involving an Oregon paratransit driver who raped a passenger with mental disabilities received little news coverage until a civil suit was launched against the paratransit service provider.[52] Another case involving a French bus driver, who confessed to raping and murdering seven female passengers with mental disabilities and led investigators to the hidden remains,[53] received international press attention because the driver is suspected of about 30 murders. Other accounts collectively became newsworthy because of the frequency of occurrence. For example, a story from California mentioned four specialized transit drivers who allegedly molested several passengers with disabilities. Three plead guilty to lesser charges and the fourth driver was tried for rape. The case only received attention and was investigated after the fourth victim's mother, a dispatcher for the Sacramento Sheriff's office, took an active role.[54] In another story in the Minneapolis-St. Paul *Star Tribune* described 29 sexual misconduct incidents by local paratransit drivers (nine major sexual assaults, 8 incidents involving unwanted fondling or removal of clothing, and 12 others that involved unwanted kissing, indecent exposure, or sexual comments).[55] Not surprisingly, many of these cases were not prosecuted because of a lack of reliable witnesses and many of the complaints were never even recorded in the official records of the paratransit provider.

***Content Analysis Information*** I am currently engaged in a research project using content analysis of news media to determine basic information about crimes committed by and against drivers in passenger transportation. The project began in November 2003 and is currently nearing completion Preliminary results from this study direct relevance to the topic of this report.

Content analysis has been used for the last 50 years or so as recognized research technique for extracting reliable data from existing print materials.[56] Procedures for the scientific application of content analysis have been well established.[57] Studies based on content analysis have been published in a many scholarly journals in a variety of disciplines, such as

---

[52] e.g., Chestnut, C.R. & Frazen, R. (1999, March 6). Rape Leads To Tri-Met Lawsuit. *Portland Oregonian*, p. C01

[53] Rawstorne, T. & Trump. S, (2004, July 21). Was Jo killed by a sex cult? For 14 years Leeds student Joanna Parrish's murder in France has been unsolved. Now the arrest of a serial killer poses the chilling question: was she murdered by a cabal of high-powered men obsessed with rape and torture? *The Daily Mail* (London, England)

[54] Holding, R. (1997, October 20). Crime strikes disabled at alarming rate: The most vulnerable citizens get the least protection. *San Francisco Chronicle*.

[55] Short, A. (1990, September 9). Metro Mobility riders report assaults // Some drivers were convicted sex offenders. *Star-Tribune*, p. 1A.

[56] Neudorf, K.A. (2002). *The content analysis guidebook*. Thousand Oaks, CA: Sage Publications.

[57] Krippendorff, K. (1980). *Content analysis An introduction to its methodology*. Thousand Oaks, CA: Sage Publications. Scharl, A. & Bauer, C. (2004). Mining large samples of web-based corpora. *Knowledge-Based Systems, 17*(5/6), 229-233.

communication studies, criminology education, medicine, political science, psychology, and sociology.[58]

When conducted according to established procedures and interpreted within its natural limitations, content analysis is represents a scientifically recognized research method that provides useful information, which would otherwise be unavailable. It is important to recognize a distinction between two types of content analysis. Analysis of manifest content categorizes factual information[59] contained in text or other materials. It is an objective process that can be easily checked for reliability. Analysis of interpretive content, is a more subjective process, and is typically less reliable. In this statement of opinion, I have restricted my report of the results of content analysis to manifest content of factual information and not included interpretive findings.

I have followed general methods recommended by several authorities on content analysis.[60] First I identified several full-text databases to search.[61] Second, we identified a series of descriptors and conducted searches. Third, we screened the returned news stories according to prespecified criteria for inclusion. Fourth, relevant information from news stories was categorized according to a set of coding definitions and entered into a spreadsheet. Fifth, the same articles were entered into a second database independently by second observer to establish reliability of categorization.[62] Sixth, data was analyzed in summary tables.

Newspaper accounts of basic occurrences of crimes have been shown to correspond well to official crime records when they are available. Although they do not perfectly represent official records of crimes, they provide reliable estimates of the frequency and proportion of patterns of crimes. When no official data is available, they represent the best data source available.[63]

Several studies have compared the results of content analysis of news stories with official data on crime.[64] These findings of these studies show that newspaper reports provide a good data source for determining a rough estimate of the occurrence of crimes. In my application of content analysis, I have been careful to limit conclusions to those that can be safely inferred

---

[58] Neudorf, K.A. (2002). *The content analysis guidebook.* Thousand Oaks, CA: Sage Publications.

[59] "Factual information," in this sense refers to information that is objectively verifiable, that can be proved or disproved objectively as opposed to subjective information that can neither be proved or disproved.

[60] Neuendorf, K.A. (2002). The content analysis guidebook / Kimberly A. Neuendorf. Thousand Oaks, CA: Sage Publications ; Shapiro, G. & Markoff, J. (1997). A matter of definition. In C.W. Roberts (Ed.), *Text analysis for the social sciences: Methods of drawing statistical inferences from texts and transcripts* ( pp. 9-31). Mahwah, NJ: Lawrence Erlbaum Associates; Stone, P. . J. (1997). Thematic text analysis: New agendas for analyzing text content. In C.W. Roberts (Ed.), *Text analysis for the social sciences: Methods of drawing statistical inferences from texts and transcripts* ( pp. 35-54). Mahwah, NJ: Lawrence Erlbaum Associates.

[61] It has been demonstrated that full-text database searches have greater validity. See Althaus, S. L., Edy, J. A., Phalen, P. F.(2001). Using substitutes for full-text news stories in content analysis: Which text is best? *American Journal of Political Science, 45*(3), 707-724.

[62] All variables discussed in this report exhibited coding reliability well above 85%.

[63] Richards, C, (2000) *The loss of innocents: Child killers and their victims.* Wilmington, DE: Scholarly Resources.

[64] e.g., Paulsen, D. (2003). Murder in black and white: The coverage of homicide in Houston, *Homicide Studies, 7*(3), 289-317; Sorenson, S.B., Manz, J.G., & Berk, R.A. (1998). News media coverage and the epidemiology of homicide. *American Journal of Public Health. 88*(10). 1510-1514.

from the data. Since no official data source is available to provide a better picture of these crimes, this data provides the best available source and a good general picture of these crimes. The results of the content analysis of sexual offenses involving passenger transportation drivers can safely be summarized as follows:

**Newspaper accounts reveal that offenses involving passenger transportation drivers and passengers are not rare occurrences. Cases are reported frequently.** Our news database searches found a total of 377 alleged offenders and 623 alleged victims.[65] Three-quarters of these cases were from the United States. For the first 9 months of 2004, reports alleged there were reports involving 49 alleged offenders and 68 alleged victims. Based on previous studies of the proportions of cases that go reported and unreported and on comparisons of official records and news stories for other crimes, these cases would be expected to be a small sample of the actual number of occurrences.

**While news stories include both offenses committed by passengers against drivers and by drivers against passengers, sexual offenses committed by drivers were reported with much greater frequency than those committed against them.** Of the 377 alleged offenders identified in our study, 18 (4.7%) were passengers who allegedly committed offenses against drivers. Of the 623 alleged victims identified in our study, 18 (2.9%) were drivers who allegedly were victimized by passengers.

**Among sex crimes committed against passengers by drivers, cases that involve vulnerable victims (most frequently children and people with disabilities) were prominent.** Of the passengers who were allegedly victimized by passenger transportation drivers in these reports, 451 (73.1%) were less than 18 years old, 162 (26.6%)were adults between age 18 and 64, and 4 (0.6%) were age 65 or older. Of those under the age of 18, 59.6% were age 12 or younger. In addition, 114 (25.7%) of alleged victims under age 18 were reported to be children with disabilities. Among alleged adult victims, 114 (68.7%) were adults with disabilities. Overall more than 90% of the alleged victims were vulnerable because of age, disability, or both. Even among the remaining adult victims without disabilities, other vulnerability factors were often mentioned, such as temporary impairment due to medication or intoxication.

**Information on previous convictions was rarely provided. Of the cases for which information about previous offenses was available, previous convictions were frequent.** No information was available regarding previous criminal record for alleged offenders in cases involving 73.2% of the victims. Nevertheless previous criminal convictions were reported in 15.3% of drivers alleged to have committed current offenses and another 1.2% of offenses were alleged to have been committed by individuals who had pending charges (including bail and outstanding warrants). Newspapers reported previous allegations or charges that did not result in convictions against in another 3.5% of cases. One individual (0.2%) was reported to be an illegal immigrant. In 6.7% of cases the alleged offender was described as having no previous convictions or passing the criminal record check. The large number of cases that include no information about previous criminal record leaves this finding

---

[65] For the purpose of this report, I have eliminated an cases that took place in the taxi industry, which are included in the original study.

open to interpretation. The most conservative interpretation is to say that at least 15.3% percent of these cases are committed by people with previous criminal records. This assumes no alleged offenders with previous criminal records exist in the large number of cases that do not provide this information. Alternatively, one can assume that the incidence of alleged offenders with criminal records in the unknown cases is the same as in the known cases. If this assumption proved to be true, the prevalence of previous criminal records among the alleged offenders would be 57.1%. In my opinion, it is unlikely that the rate among the unknown cases is as high as in the known cases, but it is also unlikely to be zero. I believe that the real rate is likely to be higher than and lower than 57.1%. Even if the most conservative estimate of 15.3% is correct, however, it is a very high number considering the fact that some screening procedures should already be in place.

Several systematic attempts have been made to determine the percentages of public passenger transportation drivers ho have criminal records.  Specifically for the cases that we found identified as paratransit or other specialized transit for people with disabilities, 19.1% of alleged offenders were identified as having previous criminal records and 5.6% were identified as having no previous convictions or having passed criminal record checks. No information about criminal record was available for the other cases.  Thus, the conservative estimate is 19.1% of these offenses committed by drivers with previous criminal records; the alternative estimate, based on the only the known cases suggests 77.2% of these offenses were committed by drivers with previous criminal records. By comparison, when the records of 900 paratransit drivers were checked in Oregon, 1.9% (23/1200) of the drivers were found to have criminal records (for violent crimes, sex crimes, and drug crimes).[66] This suggests that a small number of drivers with criminal records are responsible for disproportionate share of crimes against passengers in specialized transportation. Thus, the 19.1% conservative estimate of sexual offenses committed by drivers with previous criminal records is about 10 times the rate expected from the prevalence of previous convictions among paratransit and other specialized transportation drivers.

A similar comparison can be made for cases involving school bus drivers.  In Illinois the Secretary of State's Office investigated criminal records of the states school bus drivers and found 571 school bus drivers with criminal records including 61 with armed robbery convictions, 25 with sex crime convictions, and 19 with murder convictions.[67] However, these 571 represented 2.3% of the drivers. A similar study in Georgia found that 342 (4.6%) of 7500 drivers had criminal records.[68] Another study of school bus drivers in Connecticut found 1.5% of 3600 school bus drivers had previous convictions.[69] This suggests a simple average

---

[66] Christiansen, K., & Long, J. (2000, March 5). Oregon's medical vans pose risks for patients: Lax oversight, fraudulent billings and several accidents mar the system that thousands rely on, records show. *Portland Oregonian,* p. A01.

[67] School Bus Criminal Checks Uncover 571. (1998, September 2).United Press International .

[68] Farber, H. & Pickel, M.L. (2001, March 1). County bus drivers get careful screening Keeping track: School officials do their best to ensure that drivers haven't committed crimes. *The Atlanta Journal and Constitution.*

[69] Zielbauer, P. (2000, December 2). Connecticut finds some school bus drivers have criminal pasts. National

Coalition for School Bus Safety. Retrieved electronically 9 May 2004 from

www.ncbs.org/news/criminalpasts.htm

of about 2.8% (or a weighted average of 2.71%)of school bus drivers with previous convictions. In the cases we found, 19.2% of alleged offenders were reported to have previous criminal records and 7.3 percent of alleged cases involved drivers reported to have no previous criminal record or reported to have cleared police checks. Again drivers with previous criminal records appear to be responsible for a disproportionate number of offenses. They are responsible for at least 6.9 times the expected number of cases.

**When previous convictions were reported, many were older than seven years and many were for violent crimes other than sexual offenses.** Even when information about criminal record was included in news stories, descriptions were often vague or incomplete. Many included general statements like "previous felony conviction" or "currently on probation" or "on bail from similar charges in 1999" without further details. Others included slightly more detail like "previous felony conviction for armed robbery" or "previous child abuse conviction." Only a few indicated the exact nature and date of the conviction. Although all of the current cases involved sexual offenses and previous convictions for sexual offenses were the most common criminal records described, many involved apparently unrelated offenses, for robbery, homicide, and other violent crimes, some dating back several decades.

In summary, content analysis shows that crimes committed by drivers for passenger carriers are not rare events, and when they occur, they are typically (approximately 90%) committed against vulnerable victims, most frequently children or adults with disabilities. People with previous criminal records commit many of these offenses. Although there is inadequate information to determine exactly how many, cases where information is available on previous convictions allows the determination of a minimum estimate of about one in six cases committed by drivers with previous criminal records.

Since some attempts for criminal record should already be in place and several regional investigations have suggested that the actual percentage of drivers in paratransit and school bus operations with previous convictions is well under 5%, drivers with previous criminal records have been implicated in a much higher proportion of these crimes than other drivers. A conservative estimate suggests that drivers with previous criminal records are implicated in current sex offenses in specialized transit at a rate 10 times higher than the rate for drivers without previous convictions. However, basing the percentage on cases for which complete information is available, the degree of disproportion could be much higher and the rate for drivers with previous convictions being implicated in current sexual offenses could be in excess of 40 times the rate for drivers without previous criminal convictions.

# H. Previous conviction for violent offenses is an important predictor of future risks of violent and non-violent offenses.

Recidivism has been the subject of a great deal of discussion and many research studies. These studies leave no doubt that as a group those convicted of crimes are much more likely to commit subsequent crimes. However, the probability based on group statistics does not mean that every member of the group will commit future crimes or that rehabilitation never occurs. There is no doubt that some individuals who have been convicted of crimes in the past go on to live good and productive lives. Unfortunately, there is no accurate way of predicting which individuals will become repeat offenders and which individuals will not. Attempts to

differentiate those who will reoffend from those who will not have proven to be complex, expensive, subjective, and inaccurate.[70]

The commission of a prior violent offense is one of the most reliable predictor of subsequent criminal activity.[71] This applies to all kinds of criminal offenses and is not limited only to subsequent violent offenses. The commission of a sexual offense is a particularly strong predictor of future sex crimes, however, most recidivists are not specialists and conviction for one category of crime is associated with increased risk for future offenses across all categories. The strength of these predictors moderates over time but remains regardless of how much time passes.

Vern Quinsey, a forensic psychologist and a recognized international authority on predicting recidivism, summarizes the risk associated with hiring individuals with criminal records to work with vulnerable people with this simple statement: "If you can hire enough people without criminal records, don't hire any who have one."[72]

## I. Screening reduces the risk associated with transit services and particularly for those serving vulnerable people.

As Quinsey suggests, the best protection would be achieved by eliminating all applicants with criminal records from employment in positions with direct contact with people with disabilities, the elderly, children and other vulnerable populations. Any deviation from this practice increases the risk of violence for service users. In practice, screening procedures often temper the practice based on the nature of the original conviction, but this is based on the view that a foreseeable risk to service users should be balanced with other considerations, even though these less stringent practices result in greater risk.

Screening of new applicants for employment, particularly those who contact the public, is a commonly accepted, commonly used, and commonly recommended as an essential method to control crimes against vulnerable people. Background checks of new employees are generally recognized as effective measures to control crime in public transit and paratransit, other transportation industries, and a variety of other service industries.[73] The most stringent background checks are appropriate for hiring employees who have direct contact with vulnerable people.

---

[70] Dolan, M., & Doyle, M. (2000). Violence risk prediction. Clinical and actuarial measures and the role of the Psychopathy Checklist. *British Journal of Psychiatry, 177,* 303-311; Gray, N. S., Snowden, R. J., MacCulloch, S., Phillips, H., Taylor, J., & MacCulloch, M. J. (2004). Relative efficacy of criminological, clinical, and personality measures of future risk of offending in mentally disordered offenders: a comparative study of HCR-20, PCL: SV, and OGRS. *Journal of Consulting and Clinical Psychology, 72*(3), 523-530. Zamble, E., & Quinsey, V. (1997). *The criminal recidivism process.* New York: Cambridge University Press.

[71] Zamble, E., & Quinsey, V. (1997). *The criminal recidivism process.* New York: Cambridge University Press.

[72] Quinsey, V. [Interview]. (2001, September). What can we learn from criminal background checks? An interview with forensic psychologist Vern Quinsey. *Nexus, 7*(2), [Downloaded from the National Committee for the Prevention of Elder Abuse on 13 May 2002 from http://www.preventelderabuse.org/nexus/bgchecks.html]

[73] Sobsey, D. (1994) *Violence in the lives of people with disabilities.* Baltimore: Paul H. Brookes

Failure to provide or reducing the role of criminal background checks would increase victimization of people with disabilities who use specialized transit. In particular, hiring applicants with a history of convictions for violent offenses, sexual offenses, or offenses against vulnerable people, regardless of how much time has passed since the conviction, would substantially increase the risk to passengers with disabilities, children, and elderly passengers. In my opinion, it is undesirable to allow this foreseeable risk to individuals who as a group already experience a much higher rate of victimization than other members of the community.

## J. Best practices in screening increase protection for potential victims of crime

As previously stated, it is my opinion that hiring an individual with a prior history of a sexual or violent offense or an offense committed against a vulnerable person to work as a paratransit driver will always increase the risk to passengers. This increased risk is unavoidable as a statistical probability.[74,75] While there is no doubt that many individuals achieve genuine rehabilitation, there is no practicable way of differentiating those who do from those who do not, regardless of the time that has passed since the previous conviction. Some individuals, who might never reoffend in a lower-risk environment, will reoffend in the high-risk environment of paratransit where they have close and frequently isolated contact with vulnerable people.[76]

In my opinion, limiting the prohibition to employment in direct contact with vulnerable people for less serious offenses to a specific number of years since conviction represents a calculated risk. However, limiting the prohibition to employment in direct contact with vulnerable people for more serious offenses to a specific number of years since conviction represents unreasonable risk.[77]

## K. The screening procedures used by SEPTA are consistent with appropriate practices for controlling risk to passengers.

In preparing the report, I have read and carefully considered the SEPTA hiring policies, particularly the table indicating which offenses are subject to an absolute prohibition and which offenses are subject to a seven-year hiring prohibition. In my opinion, the general

---

[74] This is illustrated by the differences between long-term and short-term recidivism rates. While short-term recidivism rates are most striking, long-term recidivism continues to add "failures" over time.

[75] Quinsey, V. [Interview]. (2001, September). What can we learn from criminal background checks? An interview with forensic psychologist Vern Quinsey. *Nexus, 7*(2), [Downloaded from the National Committee for the Prevention of Elder Abuse on 13 May 2002 from http://www.preventelderabuse.org/nexus/bgchecks.html]

[76] Sobsey, D. (1994) *Violence and abuse in the lives of people with disabilities: The end of silent acceptance?* Baltimore: Paul H. Brookes.

[77] In many cases, those convicted of more serious crimes are in prison or under close supervision for extended periods. As a result, restrictions limited to five or seven years from conviction have already expired by the time that they are released from supervision. For example, Bureau of Justice Statistics reports that among those who served more than five years in prison 54% were rearrested within 3 years, but these arrests occur at least 61 months and often decades after their original conviction. See, Langan, P.A., & Levin, D.J. (2002). Recidivism in prisoners released in 1994. *Federal Sentencing Reporter,* 15(1), 58-65.

This statement of opinion was prepared based on my own research and that of other researchers and experts in the field. It is provided with a reasonable degree of scientific certainly based on the available evidence.

Richard (Dick) J. Sobsey
Edmonton, Alberta CANADA

September 22, 2004

policy and listing of offenses is reasonable and well thought out. It is substantially consistent with my opinion that violent offenses, sexual offenses, and offenses against vulnerable people should result in absolute prohibition from employment as a paratransit driver. In considering the SEPTA policy, I see no conflict with the general principles that should guide the development and implementation of screening procedures.

## CONCLUSIONS

Many individuals with disabilities and many elderly individuals are extremely vulnerable. As a group people with disabilities require an extremely high standard of protection.

Specialized transportation services serving people with disabilities and senior citizens are inherently high-risk environments for victimization and every effort must be made to provide the safest possible services. Criminal record checks provide an essential component of the necessary protection.

A driver's history of violent or sexual offenses is a substantial risk factor. The hiring of an individual who has been convicted of violent or sexual offenses increases the future risk of offenses against passengers.[78] While repeated and recent offenses are more predictive of future behavior than single and older offenses, there continues to be risk associated with a past history of violent or sexual offenses that continues regardless of the number of intervening years. In my opinion, a reasonable policy to control the risk of victimization of passengers is one that prohibits any individual who has been convicted of a sexual offense, has been convicted of a crime of violence, or has committed a crime against a vulnerable person from being a paratransit driver, regardless of the amount of time that has passed since the conviction. The SEPTA policy reduces the risk of victimization for a population that that is known to have elevated risk.

---

[78] e.g., Zamble, E., & Quinsey, V. (1997). *The criminal recidivism process.* New York: Cambridge University Press.

# APPENDIX A: QUALIFICATIONS

I, Richard J. (Dick) Sobsey, an a Professor of Educational Psychology and Director of the J.P. Das Developmental Disabilities Centre at the University of Alberta in Edmonton. In addition, I have a second appointment to the John Dossetor Health Ethics Centre at the University of Alberta. I was licensed as a Registered Nurse in 1971 in the State of New York and certified as a special education teacher in 1976 in the State of New York. I have worked with children and adults with disabilities since 1968.

I hold an Associate Degree in Nursing (1971), A Bachelor's Degree in Human Services for the Handicapped (1976), A Master of Education Degree in Special Education (1977) and a Doctor of Education Degree in Special Education (1981). Since 1975, my work has focused on interdisciplinary approaches to improving services to people with disabilities. I have been a significant contributor to the development of transdiciplinary service delivery, an approach based on the central premise that services to people with disabilities must cross traditional disciplinary boundaries and not be based solely on a single area of expertise. As a result, my work is frequently cited and discussed in a variety of scholarly health and social science disciplines, such as child development, criminology, education, nursing, law, sociology, psychology, and women's studies.

Since 1986, my major area of research and publication has been violence against and abuse of people with disabilities. I have published three books and numerous articles on this topic. I have been an invited speaker on this topic at a variety of scholarly and professional conferences in the United States, Canada, and abroad. I have a second academic appointment at the University of Alberta in Health Care Ethics at the University of Alberta and specialize in the ethics of care of people with disabilities.

In the course of my research on crimes against people with disabilities, I have given some specific attention to crimes committed by transportation providers on a number of occasions since the late 1980s. [79] This includes being contacted by people with disabilities and their family members who had been victims of crime by regular and special transportation providers. In May of 2003, after an allegation of a physical assault by a school bus driver against a child with Down syndrome, I began to intensify my research on crimes committed against people with disabilities by public transit providers. Since that time, I have reviewed approximately 2000 published accounts of crimes involving public transportation staff and passengers and conducted a formal analysis of sexual offenses involving approximately 550 perpetrators and 800 victims. [CV is Attached to Document]

---

[79] The first instance that I recall being brought to my attention involved an individual who was wanted to practice law in Ontario. Provincial law required that required that he be of "good character" to be admitted to the bar. He had previously worked as a school bus driver and was convicted of sexual abuse of a deaf child who rode his bus. The Law Society of Ontario eventually denied admission to the bar. [see Lipovenko, D. & Fine, S. (1989, 12 September). Child molester denied the right to practice law. *The Globe and Mail*, p. A1.]

## Appendix B: Documents Consulted

Amended Complaint , EL. v SEPTA

American Public Transit Association. (2001, October 4). Testimony Transit Safety In The Wake of September 11th: Testimony of the American Public Transportation Association before the Housing and Transportation Subcommittee of the Senate Banking, Housing, and Urban Affairs Committee. Washington, DC: APTA.

Andre, C. E. (1985). Child maltreatment and handicapped children: An examination of family characteristics and service provision. *Dissertation Abstracts International, 46(3)*, 792A.

Balogh, R., Bretherton, K., Whibley, S., Berney, T., Graham, S., Richold, P., et al. (2001). Sexual abuse in children and adolescents with intellectual disability. *Journal of Intellectual Disability Research, 45*(Pt 3), 194-201.

Brown, H. (1992). Abuse of adults with learning difficulties. *Mental Handicap Bulletin, 86*(4), 18-19.

Brown, J., & Lanagan, P.A. (1998, March). *State court sentencing of convicted felons, 1994.* Washington, DC: U.S. Department of Justice. Bureau of Justice Statistics [Report NCJ-164614]

Bureau of Justice Statistics. (2003, May). Improving criminal history records for background checks. *Highlights.* Washington, DC: U.S Department of Justice, Bureau of Justice Statistics.

Canadian Association of Volunteer Bureaux and Centres. (1996) *Screening Handbook: Protecting clients, staff, and the community.* Ottawa: Canadian Association of Volunteer Bureaux and Centres, Solicitor General of Canada, Justice Canada, and Health Canada,

Christensen, K. (2000, September 8). Ruling Sides With Rape Victim In Lawsuit Against Tri-Met The $2 Million Suit Involves An Attack On A Mentally Disabled Woman By A Subcontractor's Driver of the Oregonian Staff. *Portland Oregonian*, p. D06.

Cooper, C., Eslinger, D., Nash, D., al-Zawahri, J., & Stolley, P. (2000). Repeat victims of violence: report of a large concurrent case-control study. *Archives or Surgery, 135*(7), 837-843.

Cowardin. N.W. (1986). *Preventing sexual exploitation of adolescents with exceptional needs.* [Report]. Seattle: Seattle Rape Relief Crisis Centre.

Crosse, S. B., Kaye, E., & Ratnofsky, A. C. (1993). *A report on the maltreatment of children with disabilities* (No. Contract No: 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). Washington, DC: National Center on Child Abuse and Neglect.

Demetriades, D., Murray, J., Sinz, B., Myles, D., Chan, L., Sathyaragiswaran, L., et al. (1998). Epidemiology of major trauma and trauma deaths in Los Angeles County. *Journal of the American College of Surgeons, 187*(4), 373-383.

Farber, H. & Pickel, M.L. (2001, March 1). County bus drivers get careful screening Keeping track: School officials do their best to ensure that drivers haven't committed crimes. *The Atlanta Journal and Constitution.*

Frisch, L. E., & Rhoads, F. A. (1982). Child abuse and neglect in children referred for learning evaluation. *Journal of Learning Disability, 15*(10), 538-541.

Glassman, P., Miller, C., Ingraham, R., & Woolford, E. (2004). The extraordinary vulnerability of people with disabilities: guidelines for oral health professionals. *Journal of the California Dental Associaton, 32*(5), 379-386.

Goodman, L. A., Salyers, M. P., Mueser, K. T., Rosenberg, S. D., Swartz, M., Essock, S. M., et al. (2001). Recent victimization in women and men with severe mental illness: prevalence and correlates. *Journal of Traumatic Stress, 14*(4), 615-632.

Grossin, C., Sibille, I., Lorin de la Grandmaison, G., Banasr, A., Brion, F., & Durigon, M. (2003). Analysis of 418 cases of sexual assault. *Forensic Science International, 131*(2-3), 125-130.

Hammel, L. (1999, September 26). 253 incidents of misconduct are alleged sex, drug, alcohol accusations against some drivers for DMA. *Sunday Telegram* (Worcester, MA). p. A1.

Hanson, R. K., & Bussiere, M. T. (1998). Predicting relapse: a meta-analysis of sexual offender recidivism studies. *Journal of Consulting and Clinical Psychology, 66*(2), 348-362.

Hard, S. (1986). Sexual abuse of the developmentally disabled: A case study. Paper presented at the National Conference of Executives of Associations for Retarded Citizens, Omaha, Nebraska.

Harris, G. T., & Rice, M. E. (2003). Actuarial assessment of risk among sex offenders. *Annals of the New York Academy of Science, 989*, 198-210; discussion 236-146.

Kendall-Tackett, K. (2002). Abuse and neglect of children with disabilities. *Rehabilitation Psychology News, 29*, 12-13.

Klaus, P.A. (2004, February). *Crime and the nation's households, 2002.* Washington, DC: U.S Department of Justice, Bureau of Justice Statistics.

Liggett, R., Loukaitou-Sideris, A., & Iseki, H. (2004). Protecting against transit crime: The importance of the built environment, in D.J.B. Mitchell, (Ed.), California *Policy Options* (139-156.). Los Angeles: UCLA School of Public Policy and Social Research / Ralph and Goldy Lewis Center for Regional Policy Studies.

MacNamara, R. D. (1992). *Creating abuse-free caregiving environments for children, the disabled, and the elderly: Preparing, supervising, and managing caregivers for the emotional impact of their responsibilities.* Springfield, Ill.: U.S.A.: C.C. Thomas.

Marchetti, A. G., & McCartney, J. R. (1990). Abuse of persons with mental retardation: Characteristics of the abused, the abusers, and the informers. *Mental Retardation, 28*(6), 367-371

McCarthy, M., & Thompson, D. (1997). A prevalence study of sexual abuse of adults with intellectual disabilities referred for sex education. *Journal of Applied Research in Intellectual Disabilities, 10*(2), 105-124.

Nelson, K.R. (1997). Policing mass transit. *FBI Law enforcement Bulletin, 66*(1).

Ombudsman of British Columbia. (1987, April). *The use of criminal records checks to screen individuals working with vulnerable people* (Public Report No. 5). Vancouver: Ombudsman of British Columbia.

Petersilia, J. (2001). Crime victims with developmental disabilities - A review essay *Criminal Justice and Behavior, 28*(6), 655-694.

Petersilia, J. (2000). Invisible victims. Violence against persons with developmental disabilities,. *Human Rights, 27*(1), 9-13.

Quinsey, V. [Interview]. (2001, September). What can we learn from criminal background checks? An interview with forensic psychologist Vern Quinsey. *Nexus, 7*(2), [Downloaded from the National Committee for the Prevention of Elder Abuse on 13 May 2002 from http://www.preventelderabuse.org/nexus/bgchecks.html].

Quinsey, V.L, Harris, G.T., Rice, M. E., & Cormier, C.A. (1998). *Violent offenders: Appraising and managing risk.* Washington, DC: American Psychological Association.

Rawstorne, T. & Trump. S, (2004, July 21). Was Jo killed by a sex cult? For 14 years Leeds student Joanna Parrish's murder in France has been unsolved. Now the arrest of a serial killer poses the chilling question: was she murdered by a cabal of high-powered men obsessed with rape and torture? *The Daily Mail* (London, England),

Richards, C, (2000) *The loss of innocents: Child killers and their victims.* Wilmington, DE: Scholarly Resources.

School Bus Criminal Checks Uncover 571. (1998, September 2). United Press International.

Scott, D. (1993). Policing mass transit. *FBI Law enforcement Bulletin, 62*(7). 1-4.

Sobsey, D. (2002). Exceptionality, education, & maltreatment, *Exceptionality, 10*(1), 29-46.

Sobsey, D. (1996) Violence and abuse in the lives of people with disabilities: The end of silent acceptance? Baltimore: Paul H. Brookes.

Sobsey, D. (in press). Violence and disability. State of the evidence review. Washington, DC: American Association on Mental Retardation.

Sobsey, D., & Doe, T. (1991). Patterns of sexual abuse and assault. *Journal of Sexuality and Disability, 9*(3), 243-259.

Sorenson, S. B., Peterson Manz, J. G., & Berk, R. A. (1998). News media coverage and the epidemiology of homicide. *American Journal of Public Health, 88*(10), 1510-1514.

SEPTA Conviction Records and Falsification of Emplyment Application: Criminal record check policy, used by King in reviewing application for employment of El including grid of offenses and bearing on employment.

Sullivan, P. M., & Knutson, J. F. (2000). Maltreatment and disabilities: A population-based epidemiological study. *Child Abuse & Neglect, 24*(10), 1257-1273.

Tengstrom, A. (2001). "Long-term predictive validity of historical factors in two risk assessment instruments in a group of violent offenders with schizophrenia." *Nordic Journal of Psychiatry, 55*(4): 243-9.

Turk, V., & Brown, H. (1992). Sexual abuse and adults with learning disabilities: Preliminary communication of survey results. *Mental Handicap, 20*(June), 56-58.

Tyiska, C.G. (1998, September). Working with victims of crime with disabilities. *OVC Bulletin*, pp. 1-5.

U.S. Census Bureau. (1997). Americans with disabilities: 1997-Table 1. Prevalence of Disability by Age, Sex, Race, and Hispanic Origin. Retrieved 10 May 2004 from URL: http://www.census.gov/hhes/www/disability.html

Wilson, C., & Brewer, N. (1992). The incidence of criminal victimisation of individuals with an intellectual disability. *Australian Psychologist, 27*(2), 114-117.

Zamble, E., & Quinsey, V. (1997). *The criminal recidivism process.* New York: Cambridge University Press.

# APPENDIX C: SAMPLE PUBLISHED REPORTS OF OFFENSES

# COMMITTED BY TRANSPORTATION PROVIDERS

The following example provides an illustration of the kinds of offenses that are committed by transit or paratransit drivers at work. This list was developed by searching the Factiva database using and searching for "bus driver/ paratransit driver charged" or "bus driver/ paratransit driver sentenced" or "bus driver/ paratransit driver convicted" or "bus driver/ paratransit driver arrested." The bolded items indicate offenses against people with disabilities or that primarily affected passengers with disabilities. Cases that were identified as dismissed charges or acquittals and cases that involve offenses that are not linked to the driver's employment were eliminated. All other cases were retained regardless of relevance in order to illustrate the full results of the search.[80]

- **2004 Chatsworth, GA Special education school bus driver is charged with assault for beating and choking disabled student on the bus. Videotape shows her beating the child with a loose-leaf binder, choking him, pulling his shirt, threatening him and laughing about it with other students on the bus.**
- 2004 Clarksville, TN School bus driver pleads guilty to driving under the influence of alcohol and child endangerment after bus carrying 14 children collides with another vehicle
- 2004 Colorado Contract bus driver pleads guilty to reckless driving causing death of passenger in second vehicle.
- 2004 Dayton, OH Public Transit drivers charged with physically assaulting two female riders.
- 2004 Denver, CO Public transit driver arrested for sexual assault of 14-year-old girl passenger
- 2004 Chesapeake, VA School bus driver convicted of leaving day-care student on bus.
- **2004 Hastings, MN School bus driver is charged with sexual touching of an 8-year-old disabled boy who rode his bus.**
- **2004 Iowa City, IA Paratransit driver convicted of drunken driving**
- **2004 Jamestown, ND School bus driver charged with child abuse and assault for hitting an 11-year-old boy four or five times**
- **2004 Milwaukee, WI School bus driver pleads guilty to threatening to beat and break the arm of developmentally disabled student and slapping him.**
- **2004 Oregon City OR, Specialized Transportation bus driver convicted of rapes on multiple occasions of woman who is blind, in a wheelchair, has mental disability and cannot speak.**
- **2004 Oswego, NY Paratransit driver charged with drunken driving contributing to the death of disabled passenger by rolling bus while intoxicated makes statement in court saying his victim, "already had some real (health) problems and wasn't going to live long anyway"**
- 2004 Rockport, TX School bus driver charged with attempted murder after shooting two other drivers in the bus barn
- **2004 Santa Fe, NM Bus Driver convicted of statutory rape of 14-year-old passenger with emotional disability**
- 2004 St. Lucie Co., FL Female school bus driver charged with lewd and lascivious conduct and sexual battery on a child for act committed with 14-year-old girl who rode her bus

---

[80] It should be pointed out that these search descriptors were not those used in our broader search of cases. Those searches used descriptors that returned a broader set of cases (e.g., crimes committed against drivers by passengers), but also yielded more irrelevant cases.

- 2004 Tacoma, WA School bus driver charged with vehicular homicide after hitting 13-year-old and tests showed she was under the influence of morphine and at least one other drug. The driver had previous convictions for drunken driving and driving while suspended when hired.
- **2004 Taunton, MA Specialized transportation driver charged with assault for beating 28-year old male passenger for trying to open van window to talk to a cat.**
- 2004 Union, SC School bus driver convicted of molesting 6 girls from age 6 to age 11 who rode his bus
- 2003 Boston, MA Public transit bus driver arrested for drunken driving after passenger calls in a complaint on cell phone
- **2003 Chicago, IL Specialized transportation driver charged with sexual assault on passenger with severe disabilities**
- 2003 Canandaigua, NY Tour bus driver convicted of manslaughter, assault, and reckless driving after crash kills five people.
- **2003 Coralville, IA Paratransit driver with blood alcohol three times the legal limit convicted of drunken driving after running vehicle into pole.**
- **2003 Goshen, NY Paratransit driver is charged with first-degree sodomy, sexual misconduct and endangering the welfare of an incompetent person after attack on passenger who was in a wheelchair and had mental disabilities.**
- **2003 Las Vegas, NV Paratransit driver is convicted in sexual assault of mentally disabled adult with mental age of 5, lawsuit against transit provider was settled for undisclosed amount.**
- **2003 Lititz, PA Contract Bus Driver convicted of rape of 28-year-old woman with mental retardation**
- 2003 Minneapolis, MN School Bus Driver convicted of sexual contact with two kindergarten boys who rode his bus
- **2003 Mollala, OR Specialized transportation driver is charged with sexually abusing blind, 18-year-old woman on his bus on at least three occasions**
- **2003 Orange County, CA Paratransit driver charged with sodomy of a 42-year-old passenger and sexual battery of a 27-year old passenger, Both women have mental and physical disabilities.**
- 2003 Philadelphia, PA school bus driver convicted of kidnapping 13 children who rode his bus.
- 2003 San Jacinto, CA School bus driver pleads guilty to being under the influence of methamphetamine and child endangerment while transporting students after hitting barriers making u-turn in a field and her pipe was found on bus.
- **2003 Syracuse, NY Paratransit driver convicted molesting a 72-year old disabled woman passenger and acquitted of more serious sodomy charge. He is under investigation for a similar offense against another passenger**
- 2003 Springfield, NE School bus driver convicted of first degree sexual assault of a 12-
- year-old boy.
- 2002 Bismark, ND Intercity bus driver convicted of raping 15-year-old girl who rode his bus.
- 2002 Boston, MA Intercity bus driver arrested for drunken driving after passenger calls in 911 compliant by cell phone. The 911 operator reported terrified, screaming passengers begging the driver to stop in the background.
- 2002 Camden, NJ School bus driver convicted of sexually assaulting 13-year-old girl who rode his bus and giving alcohol to another 14-year-old girl on his bus
- 2002 Calvert County, MD School bus driver charged with driving while impaired and failure to control speed by drugs after leaving the scene of an accident with 14 students on bus.
- 2002 Eden Prairie, MN School bus driver convicted of exposing himself to 5-year old who rode bus.
- 2002 Eureka, IL School bus driver convicted of driving under the influence of alcohol while transporting students.
- 2002 Greensburg, PA School bus driver convicted of driving under the influence of a controlled substance with 60 children on bus.
- **2002 Lake Washington, WA School bus driver convicted of raping a developmentally disabled 19-year-old woman passenger with a mental age of 5.**
- 2002 Los Angeles, CA Public transit bus driver convicted of sexually assaulting a 15-year-old boy he met on his bus.
- 2002 Marana, AZ School bus driver sentenced for drunken driving while transporting students.

- 2002 Marlboro, NJ Bus Driver pleads guilty to a disorderly passenger charge after threatening passengers that "I'm taking you to the Taliban."
- **2002 Mobile, AL School bus driver and school bus aide on route serving school for students with severe disabilities are charged with child abuse after videotape showed them verbally abusing and striking special education student**
- 2002 Naples, FL School bus driver convicted of giving pornography to 10-year-old girls on bus.
- 2002 San Jose, CA Bus driver convicted of killing another transit worker and wounding five others in the bus yard.
- 2002 Union, WV School bus driver convicted of offering a 10-year-old girl $1 to take off her pants
- **2002 Woonsocket, RI Paratransit driver is charged with multiple sexual assaults of women with developmental disabilities who he transported**
- 2001 Baltimore, MD Public Transit Bus driver convicted of stealing hundreds of bus passes to sell on black market
- **2001 Doylestown, PA Paratransit driver convicted of raping 30-year-old passenger with cerebral palsy. Second woman alleged sexual assault by the same driver**
- 2001 Euclid, OH School bus driver convicted of vehicular homicide after motor vehicle collision.
- 2001 Joshua Tree, CA School bus driver convicted of gross vehicular manslaughter after running over student.
- **2001 Minneapolis, MN Paratransit driver is charged for third time for alleged sexual assault of passengers with mental disabilities. This time the case involves a 24-year-old victim with a mental age of 10. Two previous charges of third degree sexual assault of an incompetent person were dismissed because he claimed that he did not realize the women who rode his bus were impaired.**
- **2001 Norristown, PA Paratransit driver is convicted of indecent assault and defiant trespass against a 30-year-old woman passenger with mental age of 10. Original charge was rape.**
- **2001 Norristown, PA Paratransit drivers arrested for billing for services to passengers who did not exist.**
- 2001 Ohio Tour bus driver pleads guilty to smuggling large quantities of cocaine and marijuana
- 2001 Palm Beach, FL Boys and Girls Club bus driver arrested for offering money to women he thought were prostitutes while driving bus.
- 2001 Pamona, CA Public Transit Bus driver convicted of sexual penetration with a foreign object of a 26-year-old woman passenger on his bus. A second passenger testified that she had been sexually assaulted by the same driver. The bus company had previously paid a $650,000 settlement to another woman who had alleged being sexually assaulted after being knocked unconscious by the same driver.
- **2001 Roosevelt, NY Specialized Transportation driver is charged with sexually assaulting a 44-year-old woman who he was transporting to the cerebral palsy center.**
- 2001 Sommerville, NJ School bus driver convicted of child endangerment for taking suggestive pictures of students of 13-year-old girl and 16-year-old boy petting" on bus
- 2001 St. Paul, MN School bus driver convicted of driving under the influence of alcohol with 40 students on his bus.
- **2001 Virginia Beach, VA Paratransit driver charged with assault on disabled passenger who complained that his wheelchair was not properly fastened in place. Although the passenger was bleeding from his nose and mouth and there were no apparent injuries to the driver, the driver also charged the passenger with assault.**
- **2001 White River Junction, VT Specialized transportation bus driver convicted of sexual contact with a mentally disabled passenger who had a mental age of 8.**
- 2000 Anderson, IN School bus driver convicted of molesting a 9-year-old girl who rode on bus.
- 2000 Baltimore, MD Public transit driver is convicted of counterfeiting transit authority payroll checks.
- 2000 Bentonville, AR School bus driver convicted of rape of 13-year-old female student who rode his bus.
- **2000 Brookline, MA Specialized transportation driver charged with rape of passenger. Driver had defaulted on previous warrant.**
- 2000 Fairborn, OH School bus driver convicted of vehicular homicide after bus struck 5- year-old girl
- 2000 Ithaca, NY Public transit driver pleads guilty to criminally negligent homicide after killing pedestrian while driving bus under the influence of alcohol and marijuana

- **2000 Jacksonville, FL Paratransit driver charged with raping a 20-year-old woman passenger with developmental disabilities**
- 2000 Manitowac, WI School bus driver convicted of sexually assaulting four boys
- 2000 Rochester, MN School bus driver pleads guilty to kidnapping and second-degree burglary after 11-year-old girl who rode his bus is found bound and gagged on his bus locked bus
- 2000 St. Paul, MN School bus driver convicted of drunken driving with 5 students on his bus.
- 2000 VA School Bus Driver Convicted of DUI with 40 children on her school bus.
- 2000 Washington County, OR School bus driver convicted of two counts of harassment for inappropriate touching of two elementary school girls who rode his bus. Original charge was sexual abuse
- 2000 Washington DC Public Transit Bus driver convicted of negligent homicide in after hitting pedestrian while talking on cell phone
- 2000 West Palm Beach, CA Bus driver is convicted of attempted murder of another driver