IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| DOUGLAS EL | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| v. | : | No. 02CV3591 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | JURY TRIAL DEMAND |
| TRANSPORTATION AUTHORITY | : | |
| | : | |
| Defendant. | : | |

_____

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**

**PLAINTIFF'S MOTION TO EXCLUDE THE**

**EXPERT TESTIMONY OF DR. DAVID GRIFFIN**

Defendant, Southeastern Pennsylvania Transportation Authority (hereafter "SEPTA") submits the within Memorandum of Law in opposition to Plaintiff's Motion to Exclude the Expert Testimony of Dr. David Griffin. For the reasons that follow, Plaintiff's Motion should be denied.

**I.      INTRODUCTION**

Two days after Plaintiff filed a specious motion with this Court for an Order precluding Dr. Richard Sobsey from testifying at trial ("Sobsey Motion"), he filed this motion to exclude the testimony of Dr. David Griffin (Griffin Motion"). No good grounds exist for the Griffin Motion either. Indeed, the Griffin Motion consists of nothing more than a cut and paste job of the Sobsey Motion. Furthermore, Plaintiff has elected to again misrepresent and mislead. Thus,

Plaintiff suggests to this Court that the conviction policy at issue here is an across the board exclusion of all candidates for these jobs who have a conviction of any kind.  Stated simply, this is not the case and Plaintiff knows it.  Like the Sobsey Motion that preceded it, the Griffin Motion lacks any factual or legal basis and should be denied.

## II.   STATEMENT OF RELEVANT FACTS

### A.   The Conviction Policy

The sole basis for Plaintiff's motion is that Dr. Griffin failed to take into account certain language of the paratransit conviction policy.  According to Plaintiff, the policy is an across the board bar that works to disqualify any candidate for a paratransit driving position in SEPTA service who has a conviction of any kind.  However, this is not the manner in which the policy is applied.  Simply put, Dr. Griffin analyzed the policy in accordance with its terms and the actual practice of the providers who are responsible for making the hiring decisions of paratransit drivers.  Thus, Dr. Griffin analyzed data obtained directly from providers and it was this source information that formed that basis of his opinions in this case.

It is telling that Plaintiff attaches to his motion only one page of a relevant contract in support of his Motion.[1]  For the Court's convenience, SEPTA attaches hereto as Exhibit 1 the full

---

[1]   Plaintiff also relies on certain testimony of Frank Brandis and Deborah Hartman to support his motion. But this reliance is ridiculous.  First, with respect to Mr. Brandis, the deponent only agreed with Mr. Cohen that what he read into the record was correctly stated.  Plaintiff's Motion at Exhibit C.  Curiously, Mr. Cohen never asked Mr. Brandis how the conviction policy worked.  Had he done so, he would have been told that violent crimes were disqualifying and that other crimes were disqualifying only if they occurred within 7 years of date of application.  See Exhibit 2 attached hereto.  Mr. Brandis infact testified that they require a criminal record check report all available information because there were certain offenses that applicants could not have on their record at all and others that were disqualifying only if they occurred within 7 years of application.  Brandis Dep. at 40, also attached at Exhibit 2.

As for Ms. Hartman, she testified that according to SEPTA's guidelines there were some

section of the contract that involves general minimums for paratransit drivers. Page 6700 which immediately precedes the page attached to Plaintiff's motion states in relevant part that a driver utilized in SEPTA service must have:

> **NO RECORD OF DRIVING UNDER INFLUENCE (DUI) OF ALCOHOL OR DRUGS, AND NO RECORD OF ANY FELONY OR MISDEMEANOR CONVICTION FOR ANY CRIME OF MORAL TURPITUDE OR OF VIOLENCE AGAINST ANY PERSON(S);**
>
> **HAVE NO RECORD OF ANY CONVICTION WITHIN THE LAST SEVEN (7) YEARS FOR ANY OTHER FELONY OR ANY MISDEMEANOR IN ANY CATEGORY REFERENCED BELOW (SEE SCTIONF.2.10.C), AND NOT BE ON PROBATION OR PAROLE FOR ANY SUCH CRIME, NO MATTER HOW LONG AGO THE CONVICTION FOR SUCH CRIME MAY BE. . . .**

See Exhibit 1 (emphasis supplied). Furthermore, the contract delineates the crimes that are automatically disqualifying. These include: "homicide, rape, robbery, risking a catastrophe, assault or aggravated assault, indecent assault or other crimes of violence . . ." Id. at 6702. Thus, the total bar applies only to those who have been convicted of violent crimes. It can hardly be gainsaid that this exclusionary language is appropriate given the nature of paratransit, the rates at which the disabled are victimized and the incredible rate at which those convicted of crimes recidivise.

As the contract also makes clear, other convictions are only disqualifying events if they occurred within seven (7) years of application for employment or an applicant is currently on

---

convictions that would not disqualify a candidate for being hired as a paratransit driver. Hartman Dep. at 46, 147-153, 157-158 and Deposition Exhibit 19 attached thereto. See Exhibit 3. Ms. Hartman's testimony was consistent with other representatives of paratransit contractors who were deposed in this case. See e.g., Soltner Dep. at 78, 112 (Exhibit 4); Ward Dep. at 34, 84-85 (Exhibit 5).

probation or parole for such an offense. These crimes include, but are not limited to a felony or misdemeanor for a crime of theft, arson, indecent exposure, indecent assault and drug related convictions among others.

In addition, Frank Brandis, Manager of Contract Compliance for SEPTA, developed a criminal conviction matrix which he forwarded to every paratransit provider. See Second Brandis Affidavit attached hereto as Exhibit 2. The purpose of this matrix was to further explain to the decision makers the nature of the crimes that would result in a candidate being disqualified for a driving position in SEPTA paratransit service. The matrix contains numerous crimes for which a conviction would not disqualify an applicant and is consistent with the contract language cited above.

And the records prove as much. Indeed, SEPTA has submitted to this Court in support of its amended motion for summary judgment numerous records that show that individuals with convictions have been hired by the providers as paratransit drivers in SEPTA service. See Exhibit 2 and 6 attached hereto. There are others as well. Perhaps what is most troubling about Plaintiff's motion is that records relating to individuals who were hired as paratransit drivers with convictions are in his possession and some were even analyzed by his expert. Griffin Report at 5-6.[2] It should also be recalled that Plaintiff's expert, Dr. William Fairley, testified that the conviction policy did not bar all candidates with any conviction at all from being hired as a paratransit driver in SEPTA service. Fairley Dep. at 15, 52. See Exhibit 7.

B. **Dr. Griffin's Report**

Apparently, Plaintiff believes that Dr. Griffin should be precluded from testifying at trial

---

[2] Dr. Griffin's Expert Report was attached to the Griffin Motion as Exhibit A.

because he did not perform a complete analysis of the data concerning the conviction policy and instead focused only on criticizing the report of Dr. Fairley. Plaintiff is wrong again. Griffin Memo at 2.[3] Dr. Griffin's detailed analysis of the available data in this case is described beginning on page 17 of his report. Only the first 16 pages of his report are devoted to analyzing the numerous flaws contained in the report and analysis of Dr. Fairley.

As set forth in the Griffin Report, Dr. Griffin was supplied all applicant flow information that was available for analysis from the various paratransit providers. Griffin Report at 17. Dr. Griffin then explained in greater detail the information that he was provided for each provider. Id. For example, Dr. Griffin received 3,793 applicant packets from Edens, 1,564 applicant packets from Triage and 889 applicant packets from Anderson. Id. For reasons unknown, Plaintiff elected not to review the entirety of this data or make it available to his expert.

Dr. Griffin next created a data base which contained a record for each applicant packet that included vendor name, applicant identification information, race, whether the applicant was disqualified and whether the applicant had a criminal history. Id. at 18. A total of 8,048 records were created which covered all driver applicants.[4] Id.

Those who were disqualified from driving in SEPTA service were identified either by a letter of rejection or the presence of a "declined" stamp on the criminal background report. This stamp was used by SEPTA when vendors requested that SEPTA undertake a review of the

---

[3]  Unlike Dr. Fairley who relied on the sampling efforts of counsel for Plaintiff and completely disregarded data that was available for Edens and Anderson Travel, Dr. Griffin undertook to analyze all source information that was made available by the paratransit contractors in this case. Griffin Report at 17.

[4]  Of the 8,048 records created, 6,996 applicants could be race identified. Of those race identified, 5,189 were identified as African American (74.2%), 656 as Hispanic (9.4%), 1,063 as white (15.2%) and 88 as Asian or other (1.3%). Griffin Report at 19.

applicant's information. Other evidence of criminal disqualifications were often noted in other documents that Dr. Griffin analyzed as well. Id. at 19-20.

Of the 7,255 driver applicant packets reviewed, Dr. Griffin identified a total of 416 applicants who were disqualified for a substandard criminal history. Id. at 20.[5] Thus, Dr. Griffin did not rely on or disregard any contractual language in rendering his opinions as suggested by Plaintiff. Instead, Dr. Griffin reviewed the source information that came directly from the providers which showed that these candidates were denied employment because of a substandard criminal history.

Based on his analysis of all records made available, Dr. Griffin identified 4 providers for whom sufficient information was provided to ascertain whether the conviction policy has a disparate impact on African Americans and Hispanics. Griffin Report at 20. This involved a review of 5,533 records (81% of those who could be race identified) from Edens, Triage, Service Plus and Anderson. Id. at Table 9. There were a total of 281 criminal disqualifications for these four providers. From his analysis of these 281 disqualifications, Dr. Griffin concluded that the racial composition of those who were actually disqualified by application of the policy was no different from the pool of driver applicants when the data was analyzed in the aggregate or on a provider by provider basis. Id. at 21.

For completeness, Dr. Griffin also analyzed the data limiting it to those who had a

---

[5]    Data from Community Transit was not considered because information regarding the reasons why a particular applicant was refused employment were not known or made available to the parties in this case. Griffin Report at 4, 20. Of course, this did not stop Dr. Fairley from including all individuals from Community Transit who had a criminal record of any kind as those who were dismissed because of a criminal conviction. Id. at 4.

criminal history record for review. Griffin Report at 21 and Table 10. The result was the same. The racial composition of actual criminal disqualifications was statistically indistinguishable from the racial composition of paratransit driver applicants/employees. Id. In short, Dr. Griffin concluded that the application of the policy had no disparate impact on African Americans and Hispanics.

### III. ARGUMENT

#### A. Applicable Legal Standards

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product or reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court charged trial courts with the obligation of acting as a gatekeeper to exclude unreliable expert testimony. The admissibility of expert testimony turns on whether the expert is qualified, the methodology used by the expert is valid and that the expert opinions would assist the fact finder. Daubert, 509 U.S. at 590-91; see also Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 200) (3 factors are qualifications, reliability and fit). These are not exacting standards and Daubert emphasizes the liberal thrust of the Federal Rules of Evidence which favor the admissibility of expert testimony. Daubert, 509 U.S. at 588.

#### B. Dr. Griffin is Qualified.

Dr. Griffin is clearly qualified. He has a BS and MS in Agricultural Economics from Rutgers University and a PHD in Resource Economics from Cornell University. See Exhibit 7. For the last 24 years, Dr. Griffin has directed projects involving the application of statistics and economics to employment litigation matters. Id. Today he is a Director at LECG, LLC. At LECG, Dr. Griffin also directs projects involving the application of statistics in labor and employment matters including claims involving disparate impact discrimination - - the very analysis that he undertook here.

Dr. Griffin has made numerous presentations and published articles on matters related to the employment relationship. See Exhibit 8. Furthermore, Dr. Griffin has served as an expert witness in numerous cases involving employment discrimination. Id. Dr. Griffin's excellent credentials make clear that he is qualified to render an opinion on whether the conviction policy has a disparate impact on African Americans and Hispanics.

C. **Dr. Griffin's Opinions are Reliable.**

It is well recognized that an expert opinion is considered reliable when it is based on good grounds. Daubert, 509 U.S. at 589. Moreover, an expert's testimony is admissible as long as the process or technique he used in formulating his opinion is reliable. Id. Here, it is clear that Dr. Griffin's opinions are based on good grounds and the process that he used in formulating his opinions is reliable.

Thus, Dr. Griffin considered actual applicant flow data from the employers in connection with ascertaining whether the conviction policy has a disparate impact on African Americans and Hispanics. Use of applicant flow data in this manner has long been considered an appropriate means for considering whether a facially neutral hiring practice has a disparate impact. Green v.

USX Corporation, 896 F.2d 801, 805 (3d Cir. 1990), cert. denied, 498 U.S. 814 (1990); Bullington v. U.S. Airlines, 186 F.3d 1301 (10th Cir. 1999), overruled on other grounds by National RR Passenger Corp. v. Morgan, 536 U.S. 101 (2002); EEOC v. Olson's Dairy Queens, 989 F.2d 165, 169 (5th Cir. 1993); Williams v. Owens-Illinois, 665 F.2d 918, 927 (9th Cir. 1982) (noting that an accurate measure of the relevant labor market is actual applicant flow), cert. denied, 459 U.S. 971 (1982).

Dr. Griffin next ascertained the race of job applicants and then determined the number and race of applicants who were impacted by the policy by isolating those who were denied employment because of its application.[6]  This kind of analysis is completely appropriate and, in fact, is required for Plaintiff to make his prima facie case.  Wards Cove v. Antonio, 490 U.S. 642(1989).  As the Wards Cove Court discussed:

> As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.  Such a showing is an integral part of the plaintiff's prima facie case in a disparate-impact suit under Title VII.

 490 U.S. at 657.  Thus, a review of actual dismissals in relation to the policy is what is required by Wards Cove and it is this kind of analysis that Dr. Griffin undertook on behalf of SEPTA. See also, NAACP v. City of Bayonne, 134 F.3d 113, 122 (3rd Cir. 1998) (dismissing claim because Plaintiffs failed to isolate the discriminatory effect of the practice they challenged); Bryant v. International Schools Services, Inc. 675 F.2d 562, 572 (3rd Cir. 1982);  In re Employment

---

[6]   As noted above, Dr. Griffin utilized source information from the providers and SEPTA in this case to determine whether a candidate was disqualified because of a criminal conviction.  Griffin Report at 19-20.  As a result, Plaintiff's argument that Dr. Griffin should be precluded from testifying at trial because he did not consider certain contract language is nonsensical.

Litigation, 198 F.3d 1305, 1312 (11th Cir. 1999) ("plaintiff must. . . . show that there is a legally significant disparity between (a) the racial composition caused by the employment practice, of the pool of those enjoying a job or job benefit; and (b) the racial composition of the qualified applicant pool).

Finally, Dr. Griffin used statistically accepted methods in concluding that the application of the policy did not have a disparate impact on African Americans and Hispanics. Griffin Report at 20-21. Thus, Dr. Griffin calculated the standard deviation units of the excess number of minority disqualifications by application of the policy and found that the standard deviations were all less than 2 and therefore statistically insignificant. Hazelwood School District v. U.S. 433 U.S. 299, 311 n.17 (1977) (a fluctuation of more than 2 to 3 units of standard deviation "would undercut the hypothesis that decisions were being made randomly with respect to race").

Furthermore, Dr. Griffin analyzed the data in accordance with 4/5 Rule adopted by the EEOC as part of its Uniform Guidelines on Employee Selection Procedures. 29 C.F.R. § 1607. The result was the same - - application of the conviction policy had no disparate impact on African Americans and Hispanics.

D.  **Dr. Griffin's Testimony Will Assist The Jury**

Finally, Dr. Griffin's proposed testimony "fits." This standard is also interpreted broadly and is not exacting. American Technology v. U.S., 893 F.2d 651, 655 (3d Cir. 1991), cert. denied, 110 S.Ct. 2176 (1990); Smithkline Beecham v. Eastern Applicators, Inc., 2002 WL 31750188 *2 (E.D.Pa. December 3, 2002). The so-called "fit" standard is satisfied if the proffered expert testimony will aid the jury in resolving a factual dispute. Lauria v. National RR Passenger Corp., 145 F.3d 593, 599-600 (3d Cir. 1998), Smithkline Beecham v. Eastern

Applicators, 2002 WL 31750188 *2 (E.D.Pa. December 3, 2002).

Here, Dr. Griffin will refute Plaintiff's allegation that the conviction policy has an actual disparate impact on African Americans and Hispanics. As described in great detail above, Dr. Griffin's testimony will aid the jury in understanding whether Plaintiff has met his burden of proving a prima facie case of race discrimination. Absent such testimony, the jury will be left to guess whether the policy at issue unlawfully discriminates on the basis of race. Dr. Griffin's proposed testimony shows unequivocally that it does not.

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiff's Motion to Exclude the Expert Testimony of Dr. David Griffin should be denied.

Respectfully submitted,

_____
SAUL H. KRENZEL
ROBERT J. HAURIN
Attorneys for Defendant, SEPTA

DATED:    January 21, 2005