## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
------------------------------------------------
DOUGLAS EL,                             :
Individually and on behalf of           :
all others similarly situated,          :
            Plaintiff,                   :
        v.                               :              CIVIL ACTION
                                         :              NO.  02-CV-3591
SOUTHEASTERN PENNSYLVANIA                :
TRANSPORTATION AUTHORITY,                :
            Defendant.                   :
------------------------------------------------
```

## ORDER

THIS MATTER having come before the Court on Defendant's Motion for Summary Judgment, and the Court having reviewed Plaintiffs' Opposition thereto and considered the positions of all parties;

IT IS, on this _____ day of _____, 2005,

ORDERED THAT Defendant's Motion for Summary Judgment is DENIED.

_____
HON. J. CURTIS JOYNER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS EL,<br>Individually and on behalf of<br>all others similarly situated,<br>    Plaintiff,<br><br>    v.<br><br>SOUTHEASTERN PENNSYLVANIA<br>TRANSPORTATION AUTHORITY,<br>    Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION<br>NO. 02-CV-3591 |

MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Eugene A. Spector
David J. Cohen (DJC 4375)
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 496-0300

Timothy M. Kolman
Wayne A. Ely
TIMOTHY M. KOLMAN AND ASSOCIATES
225 N. Flowers Mill Road
Langhorne, PA 19047
(215) 750-3134

Attorneys for Plaintiff and the Class

Dated: April 1, 2005

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................. i

A.    PRELIMINARY STATEMENT ........................................................................1

B.    PROCEDURAL HISTORY..............................................................................1

      1.    Complaint and Answer ...........................................................................1

      2.    SEPTA's Third-Party Complaint............................................................2

      3.    Litigation Developments.........................................................................2

C.    RESPONSE TO SEPTA'S STATEMENT OF "UNDISPUTED" FACTS .......3

      1.    Counter-Statement of Operative Facts....................................................5

      2.    Issue-by-Issue Responses........................................................................7

      3.    Point-by-Point Responses .....................................................................21

D.    ARGUMENT...................................................................................................35

      1.    Summary Judgment Standard ................................................................35

      2.    Plaintiff Has Adduced Evidence Showing That The Challenged Policy Has A Disparate Impact On African-Americans And Hispanics...........................36

      3.    SEPTA Has Failed To Establish Business Necessity .............................47

      4.    Plaintiff Has Demonstrated A Violation Of The Equal Protection Clause Because SEPTA and King Were Both State Actors Subject to Constitutional Requirements......................................................................50

      5.    Plaintiff Has Stated A Claim Under The Pennsylvania Constitution....................51

      6.    Plaintiff's Claims Are Not Barred By The Applicable Limitations Periods .........52

      7.    SEPTA Was Plaintiff's "Employer" For Title VII Purposes.................................55

E.    CONCLUSION.................................................................................................58

A.    **PRELIMINARY STATEMENT**

SEPTA's Motion for Summary Judgment is currently before the Court for disposition. The instant matter concerns SEPTA's promulgation and enforcement of a racially discriminatory policy that forbids individuals with criminal records from being hired to work as paratransit drivers. SEPTA makes several arguments to refute Plaintiff's claims, each of which is addressed in detail below, but has not given this Court sufficient legal basis to dismiss Plaintiff's Title VII and Constitutional claims because genuine issues of material fact remain to be decided as to all the elements of those claims.

Plaintiff has established a prima facie case of disparate impact discrimination through the report of his Harvard-trained statistical expert, Dr. William Fairley. SEPTA has not brought forth uncontroverted evidence to show either that the specific ex-offender exclusion policy for paratransit drivers at issue is necessary for safety reasons, or that a less onerous alternative would not suffice. As a result, SEPTA is not entitled to a business necessity defense. Further, Plaintiff has also shown that a less-discriminatory alternative exists in the form of an alternate, Title VII-compliant policy that SEPTA already has in place to monitor the hiring of its own drivers. Defendant has not established on the record that its own policy cannot be applied to paratransit drivers or answered the plethora of material questions set out below. As a result, SEPTA's Motion should be denied.

B.    **PROCEDURAL HISTORY**

1.    **Complaint and Answer**

On June 4, 2002, Plaintiff filed a Class Action Complaint for violation of Title VII against SEPTA on behalf of a class defined as: "all individuals who, between January 1, 1991 and the present, have been denied employment or terminated by contractors providing paratransit

services under agreements with SEPTA as a result of a past conviction for any felony or misdemeanor." *Complaint*, ¶24 (Case Doc. 1).

On November 13, 2002, Plaintiff filed a First Amended Class Action Complaint ("Amended Complaint") that, in addition to the Title VII claim, added claims against SEPTA for violation of the equal protection clause of the U.S. Constitution, the Pennsylvania Constitution and the Pennsylvania Criminal History Record Information Act. *Amended Complaint*, ¶¶44-56 (Exhibit 19). On December 9, 2002, SEPTA filed its Answer and Affirmative Defenses to Plaintiff's Amended Complaint (Case Doc. 7).

**2.    SEPTA's Third-Party Complaint**

On December 23, 2002, SEPTA filed a Third-Party Complaint against nine companies that had provided paratransit services for SEPTA during the relevant period (Case Doc. 10). Between August 29, 2003 and October 17, 2003, no less than six Third Party Defendants filed motions for summary judgment against SEPTA on its Third-Party Complaint (Case Docs. 42, 46, 47, 48 and 50). On October 29, 2003, SEPTA filed a Consolidated Memorandum of Law in Opposition to the Third-Party Defendants' Motions for Summary Judgment (Case Doc. 52).

On December 10, 2003, this Court entered a Memorandum and Order granting the Third-Party Defendants' Motions for Summary Judgment entering judgment as a matter of law against SEPTA on its Third-Party Complaint (Case Doc. 65).

**3.    Litigation Developments**

On November 12, 2003, SEPTA filed a Motion for Summary Judgment Against Plaintiff (Case Doc. 55).

On November 25, 2003, this Court entered an Order authorizing Plaintiff to seek merits discovery from all Defendants (Case Doc. 63).

From December 2003 to July 2004, Plaintiff actively pursued merits discovery from SEPTA and the paratransit providers, including document requests, interrogatories, depositions, on-site document reviews and the litigation of numerous motions to compel.

On July 7, 2004, SEPTA filed a motion seeking leave to supplement its summary judgment motion in light of the significant discovery that had taken place since its last filing (Case Doc. 120). On July 12, 2004, this Court entered a revised scheduling order that allowed SEPTA to file an Amended Motion for Summary Judgment (Case Doc. 124).

On October 8, 2004, SEPTA filed an Amended Motion for Summary Judgment that was supported by testimony that had not been made available before the close of merits discovery (Case Doc. 136). On October 26, 2004, having been unable to negotiate a resolution of this issue with SEPTA's counsel, Plaintiff filed an emergency motion for leave to take discovery relating to SEPTA's new testimony (Case Doc. 138). This Motion was revised after discussions with SEPTA's counsel and re-filed on October 29, 2004 (Case Doc. 140).

On November 9, 2004, in a telephone conference with the parties, this Court granted Plaintiff's Motion, authorized Plaintiff to serve document requests concerning these affidavits, and ordered SEPTA to present each of the three witnesses for deposition. This discovery was completed on February 24, 2005.

On March 21, 2005, this Court entered an Order setting April 1, 2005 as the due date for Plaintiff's summary judgment opposition (Case Doc. 162).

## C.    RESPONSE TO SEPTA'S STATEMENT OF "UNDISPUTED" FACTS

This case is not suitable for resolution on summary judgment because the record includes a number of genuine issues of material fact, including: **(1)** whether SEPTA's ex-offender exclusion policy for paratransit drivers contains a *per se* exclusion against the hiring of

applicants with a criminal record; **(2)** whether SEPTA's ex-offender exclusion policy for

paratransit drivers is narrowly tailored to avoid unlawful discrimination; and **(3)** whether

SEPTA's ex-offender exclusion policy for paratransit drivers is justified by business necessity.

There is sufficient proof in the record to create a question of material fact with respect to each of

these essential issues.

No less than ten witnesses – including five SEPTA employees – testified that SEPTA's

ex-offender exclusion policy for paratransit drivers contains a *per se* exclusion against the hiring

of applicants with a criminal record. *See e.g., Brandis Tr.,* 66-88, 124-126, 128-136 (Exhibit 1)

(SEPTA's paratransit contracts barred providers from hiring any driver applicant with a

conviction for *any felony or misdemeanor*); *El Tr.,* 119-120 (Exhibit 5) (same); *Elliott Tr.,* 44-46

(Exhibit 6) (same); *Fairley Tr.,* 157-159 (Exhibit 7) (same); *Foley Tr.,* 123-125, 141-142, 144-

146 (Exhibit 9) (same); *Hartman Tr.,* 112, 125, 163-166 (Exhibit 10) (same); *Montague Tr.,* 139-

140 (Exhibit 13) (same); *Rishel Tr.,* 151-152 (Exhibit 14) (same); *Spicer Tr.,* 84-89 (Exhibit 16)

(same); *Ward Tr.,* 44-45, 59-62 (Exhibit 18) (same).

Similarly, SEPTA was unable to substantiate that its ex-offender exclusion policy for

paratransit drivers is narrowly tailored to avoid unlawful discrimination. *See, e.g., Hartman Tr.*

at 79-85, 104, 120-122 (SEPTA's ex-offender exclusion policy does not permit paratransit

providers to consider the age, nature or job-relatedness of an applicant's past criminal

convictions); *Rishel Tr.* at 153-156 (same). *See also Hartman Tr.* at 164-166 (SEPTA's ex-

offender exclusion policy does not permit paratransit providers to consider any mitigating factors

or exercise any discretion in the hiring or paratransit drivers).

Finally, SEPTA could not, even through its own employees, establish the claimed

business necessity of its ex-offender exclusion policy for paratransit drivers. *See, e.g., Brandis*

-4-

*Tr.* at 222-235, 247-249 (SEPTA employed at least four sets of paratransit driver requirements from 1993 to the present, each of which contained different language and each of which was intended to ensure the safety of paratransit passengers, defeating any claim that the use of any specific paratransit driver requirements is justified by business necessity); *Walsh Tr.,* 42-44, 79, 88-89 (Exhibit 17) (drafter of SEPTA's ex-offender exclusion policy who submitted an affidavit to testify that the ex-offender exclusion policy was supported by business necessity could not describe the basis for this conclusion in his deposition).

Consistent with these examples, the record in this case contains an abundance of testimony that directly contradicts the facts on which SEPTA's summary judgment request relies. *Cf. Sections 1-3, below, with SEPTA Br.* 5-26. In the balance of this Section, Plaintiff will provide a short counter- statement of the relevant facts, followed by an answer to SEPTA's "Statement of Undisputed Facts" on an issue-by-issue basis where possible and on a paragraph-by-paragraph basis for all other facts. Because so many of the facts underlying Plaintiff's claims and SEPTA's defenses are not settled on the present record, SEPTA's Motion should be denied.

### 1.    Counter-Statement of Operative Facts

On January 3, 2000, Plaintiff applied to work as a paratransit driver for King Paratransit Services, Inc. ("King"). *El Tr.* at 66-67. In his King application, Plaintiff disclosed that he had been convicted of homicide for his role in a gang-related incident 40 years earlier as a boy of 15. *Id.* at 67-69. Plaintiff also completed a criminal history record release form so that King could examine his criminal record. *Id.* at 81-82. King accepted Plaintiff's application and scheduled him to begin its two-week paratransit driver training course on January 17, 2000. *Id.* at 72.

On January 17, 2000, Plaintiff went back to King to begin the paratransit driver training course. *Id.* at 76-77. At this time, Plaintiff was put on King's payroll, extended a conditional

offer of employment and considered a King employee. *Id.* at 78-79; *Fiorillo Tr.*, 18-21 (Exhibit 8). Plaintiff attended the first week of King's training course, but missed part of the second week because of a snowstorm. *El Tr.* at 93-97. King invited Plaintiff back to complete his training, and Plaintiff returned to King on January 31, 2000 for this purpose. *Id.* at 97. Plaintiff continued to attend training classes as an employee of King through February 8, 2000. *Id.* at 98.

On February 8, 2000, the head of King's training staff told Plaintiff that he was being terminated because of his homicide conviction, and asked him to leave the premises immediately. *Id.* at 101-102. Although Plaintiff was initially told that King might be able to use him in some other capacity, a few days later he learned that King could not use him in any capacity and did not want him on its premises. *Id.* at 102-107.

King was obligated to terminate Plaintiff as a result of the ex-offender exclusion policy imposed by SEPTA's paratransit service contract. *Fiorillo Tr.* at 9-10, 48-49, 63. This policy, as written by SEPTA and as understood by the paratransit providers, prohibited the employment of anyone with *any felony or misdemeanor conviction. Brandis Tr.* at 66-88, 124-126, 128-136; *Elliott Tr.* at 44-46; *Fairley Tr.* at 157-159; *Hartman Tr.* at 112, 125, 163-166; *Montague Tr.* at *139-*140; *Rishel Tr.* at 151-152; *El Tr.* at 119-120; *Spicer Tr.* at 84-89; *Foley Tr.* at 123-125, 141-142, 144-146; *Ward Tr.* at 44-45, 59-62. *See Section C(2)(a), below.*

At all relevant times, however, SEPTA applied an entirely different – and far less broad – ex-offender exclusion policy in hiring its own employees. This policy, called "Policy/Instruction 6.29", requires SEPTA's human resources and legal departments to conduct an inquiry into the age, job relatedness and nature of an applicant's criminal conviction in making a hiring decision. *Policy/Instruction 6.29*, pp. 2, 4 (Exhibit 21). *See Challenger Tr.,* 85-90 (Exhibit 3); *Elliott Tr.* at 64-95, 98-99; *Foley Tr.* at 158-162; *Walsh Tr.* at 108-109. By way of comparison, SEPTA's

ex-offender exclusion policy for paratransit drivers strictly forbids any such inquiry. *Id.* Policy/Instruction 6.29 and the ex-offender exclusion policy for paratransit drivers are so dissimilar that SEPTA's lawyer has even stipulated that they contain different language to avoid in-depth questioning of a SEPTA witness on this point. *Foley Tr.* at 162. *See Section C(2)(d), below.*

King was not allowed to keep Plaintiff on in any capacity, because SEPTA's ex-offender exclusion policy for paratransit drivers strictly prohibited the hiring of anyone with a criminal record *for any position*, not just for the paratransit driver position. *Brandis Tr.* at 131-136; *El Tr.* at 102-109; *Fiorillo Tr.* at 24. *See Section C(2)(j), below.*

    **2.**    **Issue-By-Issue Responses**

        **a.**    **SEPTA's paratransit contracts contain a sweeping *per se* exclusion against applicants with a criminal conviction (paragraphs 13, 15, 19 and 21-23)**

SEPTA claims that it did not impose a *per se* exclusion against the hiring of paratransit drivers with criminal convictions. *SEPTA Br.* ¶¶ 13, 15, 19 and 21-23. However, the record is replete with testimony, both from SEPTA employees and from paratransit providers, that there was an absolute prohibition against the hiring of any ex-offender to work as a paratransit driver.

For example, no less than five SEPTA employees testified that its paratransit contracts barred providers from hiring any driver applicant with "*any conviction for any felony or misdemeanor.*" *See Brandis Tr.* at 66-88, 124-126, 128-136; *Elliott Tr.* at 44-46; *Foley Tr.* at 123-125, 141-142, 144-146; *Montague Tr.* at 139-140; *Spicer Tr.* at 84-89. Testimony from the paratransit providers and other witnesses supports the existence of a *per se* exclusion in SEPTA's paratransit contracts. *See El Tr.* at 119-120; *Fairley Tr.* at 54-55, 157-159; *Hartman Tr.* at 112, 125, 163-166; *Rishel Tr.* at 151-152; *Ward Tr.* at 44-45, 59-62.

These same witnesses further testified that SEPTA's paratransit contracts also required providers to remove any employee from SEPTA service who had any conviction for *"any felony or misdemeanor." Brandis Tr.* at 66-88, 124-126, 128-136; *El Tr.* at 119-120; *Elliott Tr.* at 44-46; *Fairley Tr.* at 54-55, 157-159; *Foley Tr.* at 123-125, 141-142, 144-146; *Hartman Tr.* at 112, 125, 163-166; *Montague Tr.* at 139-140; *Rishel Tr.* at 151-152; *Spicer Tr.* at 84-89; *Ward Tr.* at 44-45, 59-62.

SEPTA made the *per se* nature of its ex-offender exclusion policy so clear that one paratransit provider routinely discouraged people with criminal records from even applying for the paratransit driver position. *Ward Tr.* at 58.

**b.     SEPTA's ex-offender exclusion policy for paratransit drivers is not narrowly tailored (paragraphs 20-21, 25 and 43-44)**

SEPTA claims that its ex-offender exclusion policy for paratransit drivers is narrowly tailored to avoid a discriminatory effect. *SEPTA Br.* ¶¶ 20-21, 25 and 43- 44. There is simply no record testimony to support this position.

SEPTA's merits interrogatory answers named eleven employees (including three ex-employees) with knowledge or information about whether the ex-offender exclusion policy in SEPTA's paratransit contracts was "narrowly tailored" to provide additional safeguards, avoid unlawful discrimination and serve an important public interest. *See February 17, 2004 Supplemental Responses to Plaintiff's First Merits Interrogatories,* ¶12 (Exhibit 22). However, none of these witnesses provided any testimony to justify a conclusion that SEPTA's ex-offender exclusion policy for paratransit drivers is narrowly tailored. *See Brandis Tr.* at 166-167;

-8-

*Challenger Tr.* at 98-99; *Corressel Tr.,* 90-91 (Exhibit 4); *Elliott Tr.* at 50; *Foley Tr.* at 177; *Spicer Tr.* at 58.[1]

Indeed, the record developed in the case does not demonstrate that SEPTA's ex-offender exclusion policy for paratransit drivers is tailored or limited *in any way*. To the contrary, the record uniformly describes this policy as excluding a wide array of people from consideration for the paratransit driver position without any consideration for mitigating factors or the individual circumstances of a given applicant.

For example, SEPTA's ex-offender exclusion policy prohibits paratransit providers from hiring applicants with a conviction for any felony, misdemeanor, or even for summary retail theft. *See Hartman Tr.* at 71-75, 86-89; *Soltner Tr.,* 98-100, 108-111 (Exhibit 15); *Walsh Tr.* at 50-52, 65-70. SEPTA's ex-offender exclusion policy does not allow paratransit providers to consider the age, nature or job-relatedness of an applicant's past criminal convictions in making a hiring decision. *Hartman Tr.* at 79-85, 104, 120-122; *Rishel Tr.* at 153-156. Indeed, SEPTA's ex-offender exclusion policy does not allow paratransit providers to consider *any* mitigating

---

[1] SEPTA's Interrogatory answer also names Penny Fennell, George Hague and Louis Gambaccini as having information on this topic. *See SEPTA's February 17, 2004 Interrogatory Responses,* ¶12. None of these people have worked for SEPTA for years. On March 18, 2004, Plaintiff asked SEPTA to provide contact information for Fennell, Hague and Gambaccini, so that Plaintiff could pursue their depositions. *See Plaintiff's March 18, 2004 letter* (Exhibit 23). On March 22, 2004, SEPTA responded that it had no contact information for Ms. Fennell, but provided "last known addresses" for Mr. Hague in California and Mr. Gambaccini in Pennsylvania. *See SEPTA's March 22, 2004 letter* (Exhibit 24). Despite extensive address, phone and Internet "people finder" searches, Plaintiff was unable to contact any of these people, confirm their state of residence or secure their depositions.

Warren Montague and Richard Krajewski were deposed in this case, but well before SEPTA served its answer to Plaintiff's Merits Interrogatories. Thus, Plaintiff had no basis to question either witness directly on the topic of business necessity. However, based on the testimony that was elicited, it is very likely that neither witness would have been able to support SEPTA's position. *See Montague Tr.* at 139-140 (witness does not know why SEPTA imposed the ex-offender exclusion policy); *Krajewski Tr.,* 124-126 (Exhibit 12) (witness' work did not involve ex-offender exclusion policy for paratransit drivers).

-9-

factors or exercise *any* discretion in the hiring or paratransit drivers. *Hartman Tr.* at 164-166.

SEPTA's paratransit providers were even required to exclude driver applicants from employment

who had been *acquitted* of criminal charges. *Hartman Tr.* at 132.

     In fact, so many paratransit driver applicants were excluded by SEPTA's ex-offender

exclusion policy that the providers actually had trouble maintaining their contractually-required

staffing levels. *Brandis Tr.* at 61-66.  Paratransit providers frequently asked SEPTA's manager

of contract compliance to more narrowly tailor its ex-offender exclusion policy, and were

repeatedly told that the policy would not be tailored in any way. *Id.*  Where the record

testimony shows that SEPTA's ex-offender exclusion policy for paratransit drivers was written

and applied so broadly, there is no basis to accept SEPTA's claim that the policy was "narrowly

tailored".

    **c.**    **SEPTA's ex-offender exclusion policy for paratransit drivers is not
justified by business necessity (paragraphs 12-13, 21 and 25-29)**

     SEPTA also argues that its ex-offender exclusion policy for paratransit drivers is justified

by business necessity. *SEPTA Br.* ¶¶ 12-13, 21 and 25-29.  Again, there is simply no basis on the

record to support this conclusion.

     Public statements made by SEPTA officials on the issue of protecting paratransit riders

completely undercut its business necessity defense. *See August 31,1994 Northeast News

Gleaner Article* (Exhibit 25).  In the wake of a fatal accident caused by a paratransit driver in

1994, SEPTA's General Manager, Louis Gambaccini, sent a letter to paratransit riders describing

efforts to improve the oversight of paratransit services. *Id.*  Mr. Gambaccini's letter identifies

three steps intended to provide enhanced safety to paratransit riders: (1) updating safe-driver

certifications for all drivers; (2) prohibiting the hiring of any driver without a safe-driver

certification; and (3) continuing to enforce SEPTA's drug and alcohol testing requirements. *Id.* Obviously, none of these steps has anything to do with criminal record checks or ex-offender exclusion policies. If SEPTA's General Manager truly believed that the institution of such a policy was necessary to protect the safety of paratransit riders, he certainly would have said so in this letter intended to assure the public that SEPTA was doing everything necessary to provide safe paratransit service.

Further, SEPTA cannot demonstrate that its use of any specific ex-offender exclusion policy for paratransit drivers is justified by business necessity for the simple reason that SEPTA, itself, imposed no less than four different ex-offender exclusion policies on paratransit providers from 1993 to the present, each of which contained slightly different language and slightly different requirements *but had the same purpose: to ensure the safety of paratransit passengers. Brandis Tr.* at 222-235, 247-249. *See Corressel Tr.* at 111-114 (a *per se exclusion* against the hiring of any paratransit driver with any conviction *is not necessary* to protect the safety of paratransit riders). Where SEPTA has used at least three version of the same policy to perform the exact same function, it cannot reasonably claim that any one version is supported by business necessity.

There is also ample evidence that SEPTA could have applied a different ex-offender exclusion policy for paratransit drivers. *Rishel Tr.* at 92-94, 163-168. *See also Rishel Tr.* at 176 (There is no industry standard for transportation providers regarding how to draft an ex-offender prohibition). For example, SEPTA could have imposed an ex-offender exclusion policy for paratransit drivers that required consideration of the age, nature and job relatedness of each applicant's conviction history pursuant to Equal Employment Opportunity Commission guidelines ("EEOC"). *Montague Tr.* at 142-145. Indeed, the record contains testimony that it

-11-

was actually burdensome for the paratransit providers to meet their staffing requirements under the policy at issue, and that this burden could have been reduced or eliminated if SEPTA had given criminal convictions a less preclusive effect. *Rishel Tr.* at 202-204.

Finally, no SEPTA witnesses was able to provide any clear basis for finding that its ex-offender exclusion policy for paratransit drivers is supported by business necessity. For example, even, Vincent Walsh – the attorney who drafted SEPTA's ex-offender exclusion policy for paratransit providers and submitted an affidavit in this litigation stating that the policy was supported by business necessity – could not describe the basis for these conclusions in his deposition or explain how the policy he wrote was applied. *Walsh Tr.* at 42-44, 79, 88-89. Mr. Walsh was not alone. Of the eleven employees named in SEPTA's merits interrogatory answers as having knowledge or information about whether the ex-offender exclusion policy in SEPTA's paratransit contracts was supported by business necessity, *not one* was able to explain in their deposition how or why this was so. *Brandis Tr.* at 167; *Challenger Tr.* at 99-101; *Corressel Tr.* at 112, 114; *Elliott Tr.* at 51-53; *Foley Tr.* at 177-178; *Krajewski Tr.*, 124-126 (Exhibit 12); *Montague Tr.* at 139-140; *Spicer Tr.* at 58-59. *See fn.1, above.*

<blockquote>
**d.    SEPTA's Policy/Instruction 6.29 and its ex-offender exclusion policy for paratransit drivers contain significantly different standards for the review of applicants with criminal records (paragraphs 66-69)**
</blockquote>

SEPTA also seeks to support its business necessity argument by claiming that the ex-offender exclusion policy for paratransit drivers is similar to Policy/Instruction 6.29. *SEPTA Br.* ¶¶ 66-69. A stipulation made on the record by SEPTA's counsel and the testimony of several witnesses require this argument to be rejected as well.

During the deposition of Mr. James Foley, the chief officer for SEPTA's CCT (paratransit) operations during the relevant period, Plaintiff's counsel was questioning Mr. Foley

about the differences between SEPTA's Policy/Instruction 6.29 and SEPTA's ex-offender

exclusion policies for paratransit drivers. *Foley Tr.* at 90-162. After Plaintiff's counsel had

established a number of differences between these policies on the record, SEPTA's counsel

offered the following stipulation: "I will stipulate that [SEPTA's Policy/Instruction 6.29] does

not have the same language as the paratransit contract." *Id. at* 162. As a result of its lawyer's

stipulation, SEPTA is now precluded from arguing that its ex-offender exclusion policy for

paratransit drivers is similar to its ex-offender exclusion policy for SEPTA's fixed-route drivers.[2]

Even if Plaintiff's counsel is not given the full benefit of this stipulation, there is ample

record testimony to support a conclusion that SEPTA's Policy/Instruction 6.29 and SEPTA's ex-

offender exclusion policies for paratransit drivers are not the same. The most obvious and

significant difference being that Policy/Instruction 6.29 requires SEPTA's human resources and

legal departments to conduct an inquiry into the age, job relatedness and nature of an applicant's

conviction in making a hiring decision, while SEPTA's ex-offender exclusion policy for

paratransit drivers distinctly forbids these inquiries. *Id.* at 158-162; *Challenger Tr.* at 85-90;

*Elliott Tr.* at 64-95, 98-99; *Walsh Tr.* at 108-109. *See Section C(2)(c), above.*

It also bears stating that the record does not support a conclusion that Policy/Instruction

6.29 and SEPTA's ex-offender exclusion policy for paratransit drivers contain similar standards

for reviewing applicants with criminal records, because no SEPTA employee was able to provide

---

[2] *See, e.g., Bazner v. Owens-Corning Fiberglas Corp.*, 172 F.3d 47 (6th Cir. 1999)
("stipulations are binding on both the parties and the court; a court's failure to adhere to such a
stipulation is an error of law").

any basis for reaching this conclusion. *See Brandis Tr.* at 141-144; *Carpenter Tr.,* 70-74, 85-86,

167 (Exhibit 2); *Elliott Tr.* at 48-49, 64-65, 127-128; *Spicer Tr.* at 52-53; *Walsh Tr.* at 74-76.[3]

> e.    **There is no reasonable basis to conclude that SEPTA imposed an ex-offender exclusion policy on paratransit drivers to increase the Safety of paratransit services (paragraphs 5, 12-14, 20, 25-26 and 33-45)**

In support of its business necessity argument, SEPTA also claims to have imposed the ex-

offender exclusion policy at issue to make paratransit services safer for passengers. *SEPTA Br.*

¶¶ 5, 12-14, 20, 25-26 and 33-45. However, the record contains ample testimony demonstrating

that SEPTA was not overly concerned with the safety of its paratransit passengers until it needed

to defend against Plaintiff's lawsuit.

To begin, it is not widely known among SEPTA employees that its ex-offender exclusion

policy for paratransit drivers relates to safety. In fact, most of the SEPTA employees deposed in

this case had no idea what purpose this policy served. *See Brandis Tr.* at 128-130; *Carpenter Tr.*

at 166;*Challenger Tr.* at 63, 82-83, 92-93; *Elliott Tr.* at 48-49; *Foley Tr.* at 83-84, 142;

*Montague Tr.* at 138-141; *Spicer Tr.* at 52.

This circumstance likely follows from the fact that when SEPTA's paratransit contracts

speak on the issue of paratransit passenger safety, they do not mention the ex-offender exclusion

---

[3] SEPTA's Motion for Summary Judgment is supported, in part, by the October 8, 2004, Affidavit of Douglas Carpenter, SEPTA's Recruitment Manager. *See Affidavit of Douglas Carpenter* (Exhibit 26). However, in his deposition, Mr. Carpenter explained that he did not write or prepare the statements that appear in his affidavit. *Carpenter Tr.* at 89-90. Rather, SEPTA's lawyer, Robert Haurin, had prepared these statements. *Id.* Mr. Carpenter said that he reviewed what Mr. Haurin had written, suggested a few minor corrections, and signed his name to the finished product. *Id.* However, as Mr. Carpenter's testimony unfolded, it became obvious that he lacked personal knowledge to support many of the key statements contained in his affidavit. *Id.* at 157-165 and 172-176 (witness lacks personal knowledge concerning the scope, effect, application and purpose of SEPTA's ex-offender exclusion policy). Because the key statements in Mr. Carpenter's affidavit are not based on facts within his own personal knowledge, this Court is required to disregard his affidavit. Fed. R. Civ. P. 43(e). *See Iannella v. Sullivan,* 1995 WL 430598, *3 (E.D. Pa. July 20, 1995).

-14-

policy. David Rishel, a principle of Delta Services Group and the drafter of SEPTA's current ex-offender exclusion, offered unpaid and unbiased testimony in this case that SEPTA considered seven things "important" to paratransit passenger safety, including: an inspection system for vehicles, a regular maintenance regime for vehicles, keeping vehicles in good working order, ensuring that drivers have a clean motor vehicle record, ensuring that drivers are drug-free, requiring prompt occurrence reporting and having drivers meet medical requirements for operating paratransit vehicles. *Rishel Tr.* at 62-66, 115-118, 121-122, 144-150, 158-159. SEPTA's safety list does not include any reference to criminal record checks for drivers or to the exclusion of ex-offenders from the paratransit driver position. *Id.*[4]

Indeed, if SEPTA placed such a premium on the safety of paratransit passengers, it could have adopted a fingerprinting requirement for driver applicants that, according to SEPTA's ex-Manager of Special Services, would not only have increased passenger safety but likely also prevented the Michael Graham incident. *Corressel Tr.* at 93-98. *See SEPTA Br.* pp, 2, 7, 34-35 (describing incident). There is also no testimony on the record to indicate that SEPTA considered other ways to augment passenger safety – such as requiring paratransit riders to be accompanied on rides or installing video cameras inside paratransit vehicles – either of which could have served as a significant impediment to passenger attacks. Where SEPTA's key pre-litigation statements do not tie the exclusion of ex-offenders from employment to paratransit

---

[4] Mr. Rishel also testified that SEPTA's paratransit RFP document does not identify criminal record checks for drivers as one of the enumerated ways to ensure paratransit rider safety. *Rishel Tr.* at 62-67, 100-103. Mr. Rishel is not the only source for this information. Cynthia Lister, the ADA Regulatory Coordinator for SEPTA's CCT Department, went even further, saying that the same factors, (e.g., vehicle inspection and maintenance, drug tests for drivers and prompt occurrence reporting) were not simply "important," but "*critical*" to the safety of SEPTA paratransit services. *Id. at* 136-142; *Krajewski Tr.* at 43. Ms. Lister's comments make no mention of criminal record checks or any connection between criminal record checks and paratransit passenger safety.

passenger safety, and SEPTA's own employees were not aware of any such connection, there is

no reasonable basis to find that SEPTA's ex-offender exclusion policy for paratransit drivers had

more to do with safety than with defending against Plaintiff's claims.

f.      **Paratransit services are not demonstrably different from fixed-route services (paragraphs 4-5, 8, 14, 40, 42 and 70-73)**

SEPTA claims it is inappropriate to draw parallels between policies applicable to its

fixed-route service and its paratransit service because of the significant differences between

them. *SEPTA Br.* ¶¶ 4-5, 8, 14, 40, 42 and 70-73.  While the record contains some testimony

discussing differences between the two services, it also contains contrasting testimony that

suggests that these differences are not so significant.

For example, SEPTA fixed-route services and paratransit services are both equipped to

handle riders in wheelchairs. *Rishel Tr.* at 197-198.  SEPTA fixed-route services and paratransit

services both transport vulnerable passengers including the elderly, small children, pregnant

women, people confined to wheelchairs and the disabled – any of whom could be alone with the

driver at a given time. *Id. at* 198; *Foley Tr.* at 66-67; *Spicer Tr.* at 114-115.  In fact, SEPTA's

fixed routes are specifically designed to serve area hospitals (considered "traffic generators" by

SEPTA) and the sick and injured people traveling to and from hospitals. *Spicer Tr.* at 114-115.

SEPTA's fixed-route and paratransit drivers are both required to conduct themselves

according to the same standards of "professionalism, courtesy and kindness" toward passengers,

and are both considered SEPTA's "service ambassadors" to the public. *See Brandis Tr.* at 137-

138; *Carpenter Tr.* at 60; *Foley Tr.* at 149-151.  This being the case, SEPTA's witnesses were

hard pressed to identify any reason why a different ex-offender exclusion policy would apply to

SEPTA's fixed-route drivers than to paratransit drivers in SEPTA service. *Id.*

-16-

**g.** **There is no business standard for ex-offender exclusion policies in the paratransit industry (paragraphs 26-28)**

Finally, SEPTA claims that ex-offender exclusion policies are standard in the paratransit industry and that its ex-offender exclusion policy is similar to others currently in use. *SEPTA Br.* ¶¶ 26-28. The deposition testimony of the *only* witnesses with knowledge on this issue contradicts this claim so obviously that further discussion is not necessary. David Rishel stated, in response to a series of questions from Plaintiff's counsel, that: there is no industry standard for drafting an ex-offender exclusion policy for paratransit providers; the ex-offender exclusion policies used in other large cities' paratransit services contain different language than used in SEPTA's policy; and other transportation authorities paratransit hiring policies do not contain *per se* exclusions for any felony or misdemeanor. *Rishel Tr.* at 93, 170-176.

**h.** **Dr. Blumstein's Report does not provide conclusive proof of that SEPTA's ex-offender exclusion for paratransit drivers is required by business necessity (paragraphs 46-51)**

SEPTA's brief references the expert report of Dr. Alfred Blumstein to support the argument that people who have been convicted of a crime in the past are more likely to commit a crime in the future than others who have never been convicted. *SEPTA Br.* ¶¶ 46-51, *citing Blumstein Report (SEPTA Br. Ex. CC)*. This conclusion is contradicted by reliable record testimony and, therefore, cannot be resolved in SEPTA's favor.

The record includes extensive testimony from Mr. Rishel that there is no way to know who will commit crimes in the future, and that to determine whether an individual's criminal history bore any relation to whether he will commit another crime, it is necessary to consider the

-17-

individual circumstances of his criminal history. *Rishel Tr.* at 178-179, 195-196, 200-202, 204-205.[5]

Just as Mr. Rishel observed that the mere fact someone is convicted of a crime does not mean that they will commit another crime, the fact that someone lacks a conviction record does not guarantee their employment will be without incident. For example, David DeSouza and Joseph Haden, two drivers accused of committing improper acts while working as paratransit drivers for King, had no criminal records when they were hired. *Fiorillo Tr.* at 68-72. *See SEPTA Br.* p. 3. Similarly, Michael Graham had no conviction record before he was involved in a fatal car accident while working as a paratransit driver for VPSI Paratransit. *SEPTA Br.* pp. 2, 7.[6] SEPTA has not demonstrated on this record that the mere fact someone has been convicted of a crime makes it more likely that person will commit a crime in the future. Indeed, although Plaintiff has a criminal record, he has not committed any crimes, been arrested or convicted of any offense for almost 20 years, *El Tr.* at 33, which stands as strong proof of his rehabilitation and of his ability to perform the job at issue.

---

[5] During Mr. Rishel's deposition, SEPTA's lawyer testified on the record that it was impossible to know which employees would commit crimes in the future "because you can't predict the future." *Rishel Tr.* at 178. Where SEPTA's counsel conceded this point on the record, it is inappropriate for SEPTA to dispute it now. At the very least, this dispute raises a question of material fact that weighs against a grant of summary judgment.

[6] It is worth noting that some opinions in Dr. Blumstein's report significantly undercut SEPTA's case. For example, Dr. Blumstein discusses a study that found some likelihood of recidivism over the *three years* following release from confinement. *Blumstein Report*, pp. 3-5 (emphasis added). However, SEPTA comes before this Court claiming that its ex-offender exclusion policy for paratransit drivers is narrowly tailored and justified by business necessity because it excludes people with a conviction in the last *seven years*. *SEPTA Br.* ¶¶ 12-13, 20-21, 25-29, 43-44. If this Court accepts Dr. Blumstein's report, it is constrained to find that SEPTA's ex-offender exclusion policy is neither narrowly tailored nor supported by business necessity. *See Sections C(2)(b) and C(2)(c), above.*

i.   **Dr. Sobsey's Report does not provide conclusive proof of that SEPTA's ex-offender exclusion for paratransit drivers is required by business necessity (paragraphs 33-45)**

SEPTA's brief contains several references to the expert report of Dr. Richard Sobsey in support of the proposition that paratransit riders are particularly vulnerable and need more significant protections than those able to use SEPTA's fixed-route services. *SEPTA Br.* ¶¶ 33-45, *citing Sobsey Report* (*SEPTA Br. Ex. AA*). To the extent this Court credits Dr. Sobsey's testimony, it should realize that the sources on which Dr. Sobsey relies actually weigh in favor of rejecting SEPTA's business necessity defense.

In his Report, Dr. Sobsey cites 78 news articles in support of the conclusion that paratransit riders are particularly susceptible to harm and need additional safeguards like a criminal record "screen" for protection. *Sobsey Report,* pp. 13-20, 26-29. However, only six of these 78 articles (7%) describe the commission of violent crimes by paratransit drivers against their passengers – the harm against which SEPTA claims it created the policy at issue to avoid. *Id.* at pp. 26-29. If this Court accepts the proposition that SEPTA's ex-offender exclusion policy for paratransit providers would not prevent 93% of incidents involving handicapped riders, then SEPTA's "business necessity" defense should be rejected out of hand.

j.   **SEPTA had considerable control over paratransit driver hiring (paragraphs 7, 15-18, 24, 53 and 62-63)**

SEPTA goes to great lengths to claim that it had no control over paratransit driver hiring, mainly to set up a legal argument, addressed below, that it should not be held responsible for the discriminatory hiring policy at the heart of this lawsuit. *SEPTA Br.* ¶¶ 7, 15-18, 24, 53 and 62-63. However, the record clearly demonstrates SEPTA's significant influence over the hiring of paratransit drivers.

-19-

SEPTA not only set the contract requirements for hiring paratransit drivers without input from the providers, but (even according to some of its own employees) it required the providers to follow these requirements, made the final decision as to whether each applicant would be accepted, and set the terms and conditions of paratransit drivers' employment. *See Fiorillo Tr.* at 9, 48-49, 53-54, 63; *Hartman Tr.* at 47-48, 52-53; *Krajewski Tr.* at 56-59; *Montague Tr.* at 99-100; *Ward Tr.* at 72-74.

SEPTA was also understood to have considerable control over paratransit driver hiring because its paratransit contracts specifically reserved the right to remove any paratransit driver from SEPTA service on demand. *Brandis Tr.* at 106-107, 138-139; *Foley Tr.* at 87-89, 97-98, 151-154; *Hartman Tr.* at 62-66; *Krajewski Tr.* at 56-59; *Montague Tr.* at 99-100; *Rishel Tr.* at 84-86; *Soltner Tr.* at 83, 167; *Ward Tr.* at 32-33, 94-95. SEPTA frequently ordered drivers removed from service, and the paratransit providers routinely complied with these requests to avoid the imposition of liquidated damages also spelled out in SEPTA's contracts. *Id.*

### k.    SEPTA's ex-offender exclusion policy disqualified Plaintiff from holding any job at King (paragraphs 24 and 58-59)

SEPTA claims that its ex-offender exclusion policy is limited in effect, in that it did not prevent King from keeping Plaintiff on in some capacity other than as a paratransit driver. *SEPTA Br.* ¶¶ 24 and 58-59. The deposition testimony of the witnesses closest to these events contradicts this claim so obviously that further discussion is not necessary.[7] SEPTA's Manager of Contract Compliance testified that SEPTA's ex-offender exclusion policy applies to all employees, not just paratransit drivers. *Brandis Tr.* at 131-136. Plaintiff testified several times that King told him that it could not employ him in any capacity because of his conviction record.

---

[7]    SEPTA's Brief even presents the fact that Plaintiff could not work at King in any capacity because of his homicide conviction as being "undisputed". *SEPTA Br.* ¶59

*El Tr.* at 102-109. Finally, King's Human Resource Manager testified that Plaintiff was

disqualified under SEPTA's contract from holding any position at King. *Fiorillo Tr.* at 24.

SEPTA's "Statement of Undisputed Facts" even acknowledges that "Plaintiff was advised by

King that he could not work there in any capacity because of his conviction of homicide."

*SEPTA Br.* ¶59.

### 3.    Point-By-Point Responses (all remaining paragraphs)

¶1.    Plaintiff is an African American. Plaintiff was convicted of homicide. **Answer**:

Denied. In 1960, Plaintiff, then a 15-year-old boy, was arrested for his role in a gang-related

shooting. *El Tr.* at 10-12. Plaintiff pled guilty to second-degree homicide and received a

sentence of three to ten years' imprisonment. *Id.* at *13-17.* Plaintiff was released from jail in

1964 after serving 3½ years of this sentence. *Id.* at 17-18.

¶2.    SEPTA is a body corporate and politic that exercises the public powers of the

Commonwealth of Pennsylvania and is as an agency and instrumentality thereof. **Answer:**

Denied. SEPTA is a quasi-public agency created by the Pennsylvania General Assembly under

the Metropolitan Transportation Authorities Act of 1963, 66 P.S. §§ 2001-43 and presently

operating under 74 P.S. §§ 1701-85 (2000). *Amended Complaint at* ¶*9.*

¶3.    King is a private entity that is no longer in business. **Answer:** Admitted.

¶4.    The Americans with Disabilities Act of 1990 requires SEPTA to provide

transportation services to individuals who are unable to use fixed-route transportation within a

defined service area because of their disability. These services are referred to as paratransit

services. Paratransit service, moreover, involves door-to-door transportation to the disabled and

the elderly. **Answer:** Admitted.

¶5.    Because of the population that is served by paratransit, SEPTA is especially concerned with the safety of these passengers. **Answer**: Denied.  The record contains ample testimony demonstrating that SEPTA was not overly concerned with the safety of its paratransit passengers until it needed to defend against Plaintiff's lawsuit. *Brandis Tr.* at 128-130; *Carpenter Tr.* at 166; *Challenger Tr.* at 63, 82-83, 92-93; *Elliott Tr.* at 48-49; *Foley Tr.* at 83-84, 142; *Montague Tr.* at 138-141; *Spicer Tr.* at 52.  The record also contains testimony from two SEPTA managers that the standards SEPTA applied in hiring its own fixed-route drivers were no different than those applied to paratransit drivers. *Foley Tr.* at 127-129; *Montague Tr.* at 161-162.  This testimony directly contradicts SEPTA's claim that it is particularly concerned with the protection of paratransit passengers. *See SEPTA Br. 5, 11-14, 20, 25-26, 33-45.*  Indeed, it appears that SEPTA did not place any particular premium on paratransit passenger safety, because it did not adopt any of several available options – such as driver fingerprinting, installing video cameras inside paratransit vehicles or requiring paratransit riders to be accompanied on rides – that would certainly have increased passenger safety. *Corressel Tr.* at 93-98. *See Section C(2)(e), above.*

¶6.    SEPTA provides paratransit services in Philadelphia and the four surrounding counties, Bucks, Chester, Delaware and Montgomery by contracting with outside providers including King. **Answer:** Denied.  As set out in *SEPTA's* "Statement of Undisputed Facts," King is no longer a going concern, and has not provided paratransit services since 2000 or 2001. *SEPTA Br.* ¶3. *See Fiorillo Tr.* at 8.

¶9.    In August 1994, Michael Graham, a paratransit driver employed by VPSI Paratransit, a SEPTA paratransit provider, was involved in a fatal accident on I-95 when his northbound traveling paratransit van jumped a guardrail and crashed into a vehicle in the

-22-

southbound lanes of I-95. One passenger of the vehicle that was struck by Mr. Graham was killed and the other was critically injured. Mr. Graham was charged with vehicular homicide and driving under the influence as a result of this accident. At the time of the accident, Mr. Graham was a fugitive having failed to appear in court for 2 drunk driving arrests that occurred in 1992. Mr. Graham had also been arrested 2 times for driving under the influence in the 3-week period immediately preceding the date of the accident. A total of $4.5 million was paid to resolve claims related to this accident. **Answer:** Admitted in part and denied in part. Plaintiff admits that Michael Graham, while working as a paratransit driver for VPSI Paratransit, was involved in an automobile accident in August 1994. *See SEPTA Br.* pp, 2, 7, 34-35 (describing incident). However, SEPTA has not produced discovery in this case that enables Plaintiff to confirm: the nature of injuries sustained by the victims of that accident, Mr. Graham's arrest record at the time of that accident, whether any criminal charges were filed against Mr. Graham as a result of that accident, or the existence of (or any payment for) legal claims brought as a result of that accident.

¶10.    On August 5, 1994, a paratransit driver employed by Triage Paratransit Company was arrested for auto theft. A subsequent criminal record check revealed that the driver, Michael Donaldson, had been previously convicted of involuntary deviate sexual intercourse. **Answer:** Denied. SEPTA has not produced discovery in this case that enables Plaintiff to confirm: the facts surrounding this alleged incident, the results of any criminal record checks run seeking Mr. Donaldson's criminal records, or Mr. Donaldson's arrest record at the time of his hiring or the incident alleged here.

¶11.    Because of incidents set forth in paragraphs 9 and 10, the community demanded that SEPTA take action to prevent these kinds of incidents from happening in the future. **Answer:** Admitted in part and denied in part. SEPTA produced in discovery a total of three

-23-

articles published about the Graham incident and SEPTA's response in *The Philadelphia Inquirer* and *The Philadelphia Daily News* on August 5, 1994 and August 9, 1994. These articles admittedly discuss concerns in the disabled community for a safer and more efficient paratransit service. *See August 5, 1994 and August 9, 1994 News Articles* (Exhibit 27). However, these articles also describe SEPTA's response to the disabled community's concerns, which was to issue public statements about imposing an I.D. badge requirement so that passengers could name individual drivers when reporting a complaint, and to review scheduling problems to reduce delays in passenger pick-ups and drop-offs. *Id*. Based on these statements, SEPTA did not consider the imposition of an ex-offender exclusion policy to be supported by business necessity.

By way of further answer, on August 31, 1994, an article appeared in *The Northeast News Gleaner* reporting on a letter sent to paratransit riders about SEPTA's efforts to improve and maintain safety standards. *See August 31, 1994 Article*. This article describes three steps that Louis Gambaccini, SEPTA's General Manager, said would improve SEPTA's oversight of paratransit services. *Id*. These steps included: (1) a new requirement for updating safe-driver certifications for all drivers; (2) a new requirement that no new driver will be hired without a safe-driver certification; and (3) SEPTA's ongoing enforcement of drug and alcohol testing requirements. *Id*. Obviously, none of these steps has anything to do with imposing an ex-offender exclusion policy on paratransit drivers, which only further undercuts SEPTA's business necessity defense.

¶12.    Prior to the incidents referred to in paragraphs 9 and 10, providers were not required to conduct a criminal background check for driver applicants in SEPTA service. **Answer:** Admitted.

-24-

¶16.    On or about July 1, 1999, SEPTA and King entered into a written contract pursuant to which King agreed to provide paratransit services to customers on behalf of SEPTA. **Answer**: Denied.  On July 1, 1998, SEPTA and King Limousine Service, Inc. entered into a contract for the provision of paratransit service in Montgomery County.  On July 1, 1999, SEPTA and King Paratransit Service, Inc. entered into two contracts for the provision of paratransit service in Delaware and Bucks Counties.  All of these contracts related to King's provision of paratransit services for SEPTA, and all contained the same *per se* ex-offender exclusion policy: "The contractor shall... reject/bar any applicant or current employee from SEPTA-related work whose record includes a conviction for driving under the influence (DUI), and *any conviction for any felony and/or misdemeanor.*" *See, e.g., July 1, 1999 King Contract* (Exhibit 20).

¶20.    In addition to the criminal history provisions, the contract also required that driver applicants meet the following minimum requirements, all of which are related to safety, before being employed as a paratransit driver in SEPTA service:

a.    pass a physical examination performed by a licensed physician to include a drug and alcohol screen and confirmation that the applicant can lift up to fifty pounds minimum;
b.    Have a valid driver's license;
c.    Have a safe driving record;
d.    Have a valid driver's license for a minimum of three years; speak and understand English;
e.    Have knowledge of the service area and the ability to use a map.

**Answer:** Admitted.  Historically, (e.g., outside of this litigation) these are just the sort of requirements SEPTA found to be related to the provision of safe paratransit service.  As explained above, when SEPTA's paratransit contracts and RFP documents speak on the issue of providing safe service to paratransit passengers, they do not reference ex-offender exclusion

-25-

policies. *Rishel Tr.* at 62-67, 100-103, 115-118, 121-122, 144-150, 158-159. *See Section C(2)(e)* and *Answer to ¶11, above.* Rather, the things considered "important" or "critical" to paratransit passenger safety had to do with regular vehicle maintenance and ensuring that drivers had a clean motor vehicle record. *Id.* On the facts presented, there is simply no reasonable basis to conclude that SEPTA's ex-offender exclusion policy for paratransit drivers is justified by business necessity.

¶21.    To aid the contractors in applying the criminal conviction requirements of the paratransit contracts, SEPTA sent to each provider a matrix which showed the types of convictions that would disqualify an individual from being used by a paratransit provider as a driver in SEPTA service. The matrix was consistent with the Agreement and other paratransit contracts. **Answer:** Denied. The record is clear that SEPTA has different ex-offender exclusion policies for paratransit drivers and its own drivers. *See Sections C(1) and C(2)(d), above; Kern Tr.,* 141-152 (Exhibit 11). Indeed, SEPTA's counsel has stipulated to this very fact on the record. *See Kern Tr.* at 152.

¶30.    On September 6, 2000, David DeSouza, a paratransit driver for King, sexually assaulted and raped Lisa Pokalsky, a paratransit customer. **Answer:** Admitted.

¶31.    At the time of this incident, Ms. Pokalsky suffered from cerebral palsy, was confined to a wheelchair and weighed only 80 pounds. **Answer:** Admitted.

¶32.    King did not conduct a background check of Mr. DeSouza before it hired him as a driver and, had it done so, it would have learned that Mr. DeSouza had been previously arrested for the rape of a disabled woman. Ms. Pokalsky received $900,000 in settlement of her claims against King and SEPTA. **Answer:** Denied. SEPTA produced an August 25, 2000 criminal history record for Mr. David SeSouza that King obtained as part of Mr. DeSouza's application.

*See DeSouza Criminal History Record* (Exhibit 28); *Fiorillo Tr.* at 69-72. This report shows that Mr. DeSouza had a clean criminal record in the jurisdictions searched and that King's Human Resource Manager was aware of this. *Fiorillo Tr.* at 69-72. SEPTA has not produced discovery in that would enable Plaintiff to confirm whether Mr. DeSouza had any arrests or convictions at any time. While Plaintiff admits that Ms. Pokalsky filed a civil lawsuit against SEPTA to seek compensation for her injuries, SEPTA has not produced any discovery that would enable Plaintiff to confirm whether that litigation was settled, or for how much.

¶50. Although an individual's propensity to commit a violent crime in the future decreases as the duration for being crime free increases, there is no way for a trained criminologist to predict with any reasonable level of certainty whether a particular individual may commit a crime in the future. Thus, criminologists cannot predict whether a particular individual with a criminal record might commit a crime in the future with any assurance that they will be correct. Nevertheless, it is known that the risk of an individual committing a crime in the future is always higher for someone who has previously committed a crime when compared to someone who has never committed a crime. **Answer:** Denied. David Rishel, a principle of Delta Services Group and the person directly responsible for creating the current version of SEPTA's ex-offender exclusion policy, offered unpaid and unbiased testimony in this case that there is simply no way to know who will commit crimes in the future, and that to determine whether an individual's criminal history bears any relation to whether they will commit another crime, requires consideration into the individual circumstances of their criminal history. *Rishel Tr.* at 178-179, 195-196, 200-202, 204-205. Even accepting that an individual analysis into the circumstances of each applicant's criminal history can provide credible information about the

-27-

likelihood of recidivism, *no witness in this case has testified that SEPTA's ex-offender exclusion policy for paratransit drivers permitted any such analysis.*

By way of further answer, during Mr. Rishel's deposition, SEPTA's lawyer provided testimony to contradict the assertion made here, saying that it was impossible to know which employees would commit crimes in the future "because you can't predict the future." *Id. at* 178.

¶51.    Neither SEPTA nor its contractors who make hiring decisions for paratransit drivers are in position to make a judgment that parole boards have difficulty making -- identifying individuals who pose a risk to the disabled from those who do not. Therefore, it is entirely prudent for SEPTA to require that paratransit drivers be free of convictions for violent crimes. Moreover, the 7-year period for property crimes is reasonable given the amount of trustworthiness that is involved in being a paratransit driver. **Answer:** Denied. SEPTA's attorney has stipulated on the record that paratransit providers could have evaluated driver applicants' criminal records and made a decision about whom to hire. *Ward Tr.* at 95-97. Further, the testimony in this case has been uniform that SEPTA's paratransit providers were, at all times, capable of evaluating the criminal records of driver applicants and considering the age, nature and job-relatedness of criminal convictions in making their hiring decisions. *See Elliott Tr.* at 100, 103-105; *Kern Tr.* at 83-86, 154; *Rishel Tr.* at 94-95; *Soltner Tr.* at 168-169; *Ward Tr.* at 95-97. Indeed, without any specific training, without detracting from his duties and without costing his employer more than any other method of analysis, SEPTA's director of contract compliance was able to perform a case-by-case analysis of each applicant's criminal history record to determine if SEPTA would permit a given paratransit driver applicant to be retained. *Brandis Tr.* at 245-247.

By way of further answer, the great weight of testimony in this case supports the conclusion that SEPTA's paratransit contracts barred providers from hiring any driver applicant with *any conviction for any felony or misdemeanor*, and does *not* support the existence of SEPTA's claimed seven-year limitation on the hiring of ex-offenders. *See Brandis Tr.* at 66-88, 124-126, 128-136; *El Tr.* at 119-120; *Elliott Tr.* at 44-46; *Fairley Tr.* at 157-159; *Foley Tr.* at 123-125, 141-142, 144-146; *Hartman Tr.* at 112, 125, 163-166; *Montague Tr.* at 139-140; *Rishel Tr.* at 151-152; *Spicer Tr.* at 84-89; *Ward Tr.* at 44-45, 59-62. Even if SEPTA could demonstrate that it imposed a seven-year ex-offender exclusion policy, the justification for such a policy is undercut by its own expert's conclusion that there may be a likelihood of recidivism over the *three years* following a convicted criminal's release from confinement. *Blumstein Report*, pp. 3-5. *See Section C(2)(g), above.*

¶52.    Plaintiff was convicted of homicide. He was convicted in the shooting death of Earl Jones, a 16-year-old boy. **Answer:** Denied. In 1960, Plaintiff, then a 15-year-old boy, was arrested for his role in a gang-related shooting. *El Tr.* at 10-12. Plaintiff pled guilty to second-degree homicide and received a sentence of three to ten years' imprisonment. *Id.* at *13-17*. Plaintiff was released from jail in 1964 after serving 3½ years of this sentence. *Id.* at 17-18.

¶53.    Plaintiff never applied for employment with SEPTA, nor was he ever denied employment with SEPTA. Plaintiff has never worked for SEPTA. **Answer:** Admitted in part and denied in part. Plaintiff has never applied to work for SEPTA. However, SEPTA set the contract requirements for hiring paratransit drivers, required the providers to follow these requirements, made the final decision as to whether each applicant would be accepted, and set the terms and conditions of paratransit drivers' employment. *See Fiorillo Tr.* at 9, 48-49, 53-54, 63;

*Hartman Tr.* at 47-48, 52-53; *Krajewski Tr.* at 56-59; *Montague Tr.* at 99-100; *Ward Tr.* at 72-74.

¶54.    In addition to his arrest and conviction for homicide, Plaintiff has been arrested for drug related charges on 5 or 6 occasions.  Plaintiff was found guilty of drug related charges on 3 occasions.  These drug convictions occurred long after Plaintiff's conviction for murder. **Answer:** Denied.  Plaintiff was released from jail in 1964 after serving 3½ years of his sentence. *El Tr.* at 17-18.  In 1971, Plaintiff pled guilty to possession of marijuana and received a suspended sentence. *Id.* at 27.  In 1983, Plaintiff pled guilty to possession of marijuana with intent to deliver and received 18 months of probation. *Id.* at 28.  In 1984 Plaintiff pled guilty to conspiracy to buy or sell marijuana and received 12 months of probation. *Id.* at 29-33.  Plaintiff has not committed any crimes, been arrested or imprisoned since 1984. *Id.* at 33.

¶55.    Notwithstanding the requirements contained in the Agreement that prohibit the employment of violent convicted felons, Plaintiff was inexplicably hired by King as a paratransit driver to work in SEPTA service. **Answer:** Denied.  Plaintiff applied to work for King on January 3, 2000. *El Tr.* at 66.  King accepted Plaintiff's application, which fully disclosed his second-degree homicide conviction, and scheduled him to begin driver training on January 17, 2000. *Id.* at 72.  Plaintiff attended King's training classes from January 17, 2000 to February 8, 2000, when King discharged him as a result of SEPTA's ex-offender exclusion policy. *Id.* at 76-107.

¶56.    Plaintiff commenced training for the position of driver at King on or about January 17, 2000 with approximately 30 other individuals who likewise commenced training to become a driver on that date.  Of the approximately 30 individuals who commenced training at the same time that Plaintiff commenced training at King, the vast majority ("99%" according to

-30-

Plaintiff) of those individuals were African Americans. **Answer:** Denied. King accepted Plaintiff's application, which fully disclosed his second-degree homicide conviction, and scheduled him to begin driver training on January 17, 2000. *El Tr.* at 72. Plaintiff attended two separate driver training classes with King. The first, which began on January 17, 2000, included about 30 people. *Id.* at 76-77. Plaintiff testified that 99% of his first training class was African-American. *Id.* at 81. However, there is contradictory record testimony on this fact, namely that King's human resource manager expressly denied that 99% of Plaintiff's first training class was African-American, testifying instead that only "a good portion of the employees" in Plaintiff's first training class "were African-American." *Fiorillo Tr.* at 35-36. Plaintiff testified that his second training class at King was "mostly African-American," but did not provide any percentage for the minorities in this class. *El Tr.* at 100.

¶57.    Following the commencement of Plaintiff's employment, King obtained a criminal history record regarding Plaintiff. King apparently obtained criminal history records for all of its prospective employees. This is not required by the Agreement. **Answer:** Denied. SEPTA set the contract requirements for hiring paratransit drivers, imposed these requirements on the providers, made the final decision as to whether each applicant would be accepted, and set the terms and conditions of paratransit drivers' employment. *See Fiorillo Tr.* at 9, 48-49, 53-54, 63; *Hartman Tr.* at 47-48, 52-53; *Krajewski Tr.* at 56-59; *Montague Tr.* at 99-100; *Ward Tr.* at 72-74. SEPTA's paratransit contracts obligated providers to obtain a criminal history record release from every applicant, gave the providers language to use in the release, and required the providers to forward each applicant's criminal history record to SEPTA. *Fiorillo Tr.* at 26-27, 53-54, 56, 65-67. Plaintiff completed a criminal history record release as part of his application to King. *El Tr.* at 82.

-31-

¶58.    On January 27, 2000, Ms. Fiorillo advised Sen Wan Wieh, King's supervisor, that Plaintiff could not continue in the employment of King because of a criminal conviction for homicide. Ms. Fiorillo did not discuss her decision to separate Plaintiff's employment with King with anyone from SEPTA. **Answer:** Denied. King's human resource manager received Plaintiff's criminal history record on January 27, 2000 and, on that day, mentioned to King's operations manager that Plaintiff fell below the criminal history requirements in SEPTA's paratransit contract because of his conviction for second degree homicide in 1960. *Fiorillo Tr.* at 29-30. On February 2, 2000, King's human resource manager completed paperwork to initiate Plaintiff's termination. *Id.* at 31. King terminated Plaintiff on February 8, 2000. *El Tr.* at 98-101. SEPTA made the ultimate decision about whether Plaintiff would be terminated. *Fiorillo Tr.* at 63.

¶59.    Plaintiff was advised by King that he could not work there in any capacity because of his conviction of homicide. **Answer:** Admitted. SEPTA's ex-offender exclusion policy applies to all employees, not just paratransit drivers. *Brandis Tr.* at 131-136. King could not employ Plaintiff in any capacity because of his conviction record. *El Tr.* at 102-109. Plaintiff was disqualified under SEPTA's contract from holding any position at King. *Fiorillo Tr.* at 24.

¶60.    Plaintiff was removed from the payroll at King on January 27, 2000, and his employment was terminated on that date. **Answer:** Denied. *See Answer to* ¶58.

¶61.    On November 30, 2000, Plaintiff filed a charge of discrimination against SEPTA. **Answer:** Admitted. Plaintiff signed a charge of discrimination against SEPTA on May 22, 2000, that was filed with the EEOC on November 30, 2000. *El Tr.* at 118, 128. On March 12, 2001, SEPTA filed a motion to dismiss Plaintiff's discrimination charge. *See SEPTA's Motion to*

-32-

*Dismiss* (Exhibit 29). On September 14, 2001, the EEOC issued a Determination in Plaintiff's

favor on his charge of discrimination against SEPTA. *See EEOC Determination* (Exhibit 30).

¶62.    With regard to paratransit drivers in SEPTA service, SEPTA does not:

    a.    interview or hire applicants for driving positions;
    b.    establish work schedules or set the hours that drivers work;
    c.    establish pay rates for drivers;
    d.    direct the manner in which drivers perform their jobs;
    e.    supervise drivers;
    f.    involve itself in the day to day operations of King or other
        paratransit providers;
    g.    provide employee benefits for drivers;
    h.    treat drivers as its own employees for tax purposes;
    i.    retain the right to assign work to drivers;
    j.    discipline drivers employed by paratransit providers for job
        misconduct or poor job performance;
    k.    evaluate the performance of drivers; or
    l.    promulgate work rules that apply to drivers.

**Answer:** Denied. SEPTA, according to its own employees, set the contract requirements for

hiring paratransit drivers; caused the providers to follow these requirements; made the final

decision as to whether each applicant would be accepted; and set the terms and conditions of

paratransit drivers' employment. *See Fiorillo Tr.* at 9, 48-49, 53-54, 63; *Hartman Tr.* at 47-48,

52-53; *Krajewski Tr.* at 56-59; *Montague Tr.* at 99-100; *Ward Tr.* at 72-74. SEPTA was also

understood to have considerable control over paratransit driver hiring because it specifically

reserved the right to remove any paratransit driver from SEPTA service on demand. *Brandis Tr.*

at 106-107, 138-139; *Foley Tr.* at 87-89, 97-98, 151-154; *Hartman Tr.* at 62-66; *Krajewski Tr.*

at 56-59; *Montague Tr.* at 99-100; *Rishel Tr.* at 84-86; *Soltner Tr.* at 83, 167; *Ward Tr.* at 32-33,

94-95. In fact, SEPTA frequently ordered drivers removed from service, and the paratransit

providers routinely complied with these requests in order to avoid the imposition of liquidated

damages. *Id.*

¶63.    Some of the paratransit drivers employed by the contractors are represented for purposes of collective bargaining by labor organizations.  SEPTA does not participate in negotiations with the labor organizations for a collective bargaining agreement either.  **Answer:** Admitted.

¶64.    Plaintiff commenced this action by filing a Complaint against SEPTA on June 4, 2002.  According to Plaintiff, he believes that SEPTA discriminated against him on the basis of his race because of the provision in the Agreement involving minimum requirements that SEPTA "imposed" on King.  **Answer:** Denied.  Plaintiff's Complaint alleged a violation of Title VII against SEPTA on behalf of a class defined as: "all individuals who, between January 1, 1991 and the present, have been denied employment or terminated by contractors providing paratransit services under agreements with SEPTA as a result of a past conviction for any felony or misdemeanor." *Complaint* at ¶24.  Plaintiff's Amended Complaint, in addition to the Title VII claim, added claims against SEPTA for violation of the equal protection clause of the U.S. Constitution, the Pennsylvania Constitution and the Pennsylvania Criminal History Record Information Act.  *Amended Complaint* at ¶¶44-56.  Plaintiff founded these additional claims on his belief that SEPTA's ex-offender exclusion policy has a discriminatory effect on African-Americans and Hispanics because they are convicted at a disproportionately higher rate than Caucasians.  *See Amended Complaint* at ¶¶ 35-43; *El Tr.* at 123-127.

¶65.    Representations of paratransit contractors who provide paratransit services pursuant to a contract with SEPTA have testified that the majority of individuals that they employed in driving positions are African American.  For example, 85% of Edens' paratransit drivers are African American.  **Answer:** Admitted.

-34-

¶69.    Because of his conviction for murder, Mr. El would not be eligible for hire at SEPTA as an operator. The standards for hiring operators at SEPTA are comparable in practice to the requirements contained in the paratransit contracts regarding the hiring of drivers in SEPTA service. **Answer:** Denied. SEPTA's ex-offender exclusion policy for paratransit drivers plainly bars providers from hiring any driver applicant with *any conviction for any felony or misdemeanor. Brandis Tr.* at 66-88, 124-126, 128-136; *Elliott Tr.* at 44-46; *Foley Tr.* at 123-125, 141-142, 144-146; *Montague Tr.* at 139-140; *Spicer Tr.* at 84-89. *See El Tr.* at 119-120; *Fairley Tr.* at 157-159; *Hartman Tr.* at 112, 125, 163-166; *Rishel Tr.* at 151-152; *Ward Tr.* at 44-45, 59-62. By contrast, Policy/Instruction 6.29 mandates an individual inquiry into the age, nature and job-relatedness of each applicant's criminal history as part of the hiring decision. *Challenger Tr.* at 85-90; *Elliott Tr.* at 64-95, 98-99; *Foley Tr.* at 158-162 (SEPTA's attorney stipulates that Policy/Instruction 6.29 does not contain the same language as SEPTA's paratransit contracts); *Walsh Tr.* at 108-109.

By way of further answer, there is conflicting record evidence about whether Plaintiff would be eligible for hire as a SEPTA operator. SEPTA's EEO director explained that Plaintiff's 40-year-old second degree homicide conviction would not cause him to be automatically rejected for work as a SEPTA driver, rather his application would receive the same "case-by-case heightened scrutiny" as any other applicant. *Elliott Tr.* at 116-118, 125-129.

## D.    ARGUMENT

### 1.    Summary Judgment Standard

Under Fed. R. Civ. P. 56, a party is entitled to summary judgment only where the entire record, read in favor of the non-moving party, does not reveal the existence of *any* disputed material fact:

(a)    A party against whom a claim, counterclaim, or cross-claim is asserted or

-35-