# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| DOUGLAS EL | : | CIVIL ACTION |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | No. 02CV3591 |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | JURY TRIAL DEMAND |
| TRANSPORTATION AUTHORITY | : | |
| | : | |
| Defendant | : | |
| | : | |

_____

## SEPTA'S REPLY MEMORANDUM OF LAW

## IN SUPPORT OF ITS MOTION FOR  SUMMARY JUDGMENT AND IN RESPONSᴇ  TO PLAINTIFF'S OPPOSITION MEMORANDUM

Defendant, Southeastern Pennsylvania Transportation Authority (hereafter "SEPTA") submits this Reply  Memorandum of Law in Support of its Motion for Summary Judgment against Plaintiff.  For the reasons that follow and those set forth in its opening memorandum (which are largely unchallenged by Plaintiff), SEPTA's motion should be granted and the Amended Complaint should be dismissed with prejudice.

## I.     PRELIMINARY STATEMENT

After more than 16 months of "merits" discovery, Plaintiff has utterly failed to adduce any credible evidence in support of his claims.  He has not offered any credible evidence to establish even a prima facie case of disparate impact discrimination. He has mounted no challenge or offered even a scintilla of evidence to rebut the testimony of the drafter of the

conviction policy or to SEPTA's expert witnesses who make clear that the policy is supported by business necessity.

Instead, Plaintiff resorts to torturing the record, mischaracterizing testimony of numerous witnesses, mischaracterizing arguments advanced by SEPTA, misrepresenting facts, failing to address numerous arguments advanced by SEPTA and ignoring other uncontradicted evidence that refute his unfathomable claims.[1]

But when Plaintiff's misrepresentations and misdirections are stripped away, it becomes clear that SEPTA has unequivocally shown that the conviction policy is supported by business necessity. In this regard, it must be emphasized at the outset that Plaintiff has offered no credible evidence at all to rebut the expert opinions of Drs. Sobsey and Blumstein. Both Dr. Sobsey and Dr. Blumstein describe in great detail the absolute need for SEPTA to require that its providers conduct pre-hire criminal screening. Furthermore, Dr. Sobsey and Dr. Blumstein conclude that public safety dictates that those who have been convicted of violent crimes not be hired in these

---

[1]    Plaintiff's blatant misrepresentations to this Court can be found on nearly every page of his memorandum. For example Plaintiff states that Lucille Ward, an employee of Jagiela, testified that she routinely discouraged people with convictions from applying for a position at Jagiela as paratransit driver. See Plaintiff's Memo at 8, 40. However, Ms. Ward actually testified that she had no memory of ever telling an applicant not to apply because he had a criminal record. Ward Dep. at 58. (Plaintiff's Exhibit 18).

Plaintiff next states that another witness testified that Edens was required to exclude applicants who had been acquitted of criminal charges. See Plaintiff's Memo at 10, 41. This witness actually testified the contract stated that she could consider arrests in making a hiring decision. She never stated that she denied employment to an applicant because of an arrest record. Hartman Dep. at 131-132 (Plaintiff's Exhibit 10). Frank Brandis, SEPTA's Compliance Manager, also testified that he never denied employment to anyone with only an arrest record. Brandis Dep at 47-48. See Exhibit 1 attached hereto.

extremely safety sensitive positions.

But Plaintiff would have this Court ignore SEPTA's experts who so clearly establish the absence of a genuine issue of material fact with respect to the issue of whether SEPTA's conviction policy is supported by business necessity.  This Court should pay no attention to Plaintiff's distorted view of the record and instead question Plaintiff's utter failure to provide any credible evidence to support his dubious claims.

## II.    ARGUMENT

### A.    THE CONVICTION POLICY IS NOT A PER SE EXCLUSION AND APPLIES ONLY TO DRIVERS IN    SEPTA PARATRANSIT SERVICE.

In response to SEPTA's Amended Motion for Summary Judgment, Plaintiff has the unmitigated chutzpah to state that the conviction policy prohibits providers from hiring anyone who has a conviction of any kind in any position.  Plaintiff clearly recognizes that he must establish that the policy is a complete ban to withstand SEPTA's motion.  However, Plaintiff fails miserably.  More important, when Plaintiff's house of cards collapse, the Court is left with a record that shows that SEPTA's policy is supported by business necessity despite Plaintiff's best efforts to obfuscate.

A cursory review of the record shows that the conviction policy at issue here was not a complete bar to hiring individuals with convictions of any crimes in any position with any paratransit provider.   Thus, the Court need only consider the following evidence which refutes Plaintiff's futile attempt to create a material issue of fact in this case:

1.      Evidence submitted by SEPTA in support of its motion for summary judgment includes documents showing that it specifically approved for hire 39 applicants for paratransit driving positions who had criminal convictions.  (SEPTA Exhibit Tab T at exhibit 3).  Another list of 125 individuals who were hired by paratransit providers as rivers despite having a conviction.  (SEPTA Exhibit Tab W).  Additional records which were produced to Plaintiff in December 2004 showing that SEPTA specifically approved for hire an additional 37 individuals who were reviewed under the same policy as Plaintiff.  See Exhibit 2 attached hereto.

2.      The testimony of numerous witnesses including those who actually made the hiring decisions in this case that they hired as paratransit drivers individuals who had previously been convicted of crimes.[2]  Hartman Dep. 153-157 and Exhibits 23-25 attached thereto (SEPTA

---

[2]      Not to be outdone, Plaintiff refers the Court to the transcripts of several witnesses who, according to Plaintiff, testified that SEPTA's policy was a complete bar to hiring individuals with a conviction.  However, that testimony shows that not one witness actually testified that the conviction policy was a  so-called per se exclusion.  See Plaintiff's Memo at 4 and 6.  For example, Plaintiff cites pages 66-88, 124-126 and 128-136 of the transcript of Frank Brandis to support this absurd argument.  In fact, none of these pages stand for the proposition asserted by Plaintiff.  Instead, a review of the transcript reveals that Mr. Cohen read into the record a part of the contract and asked Mr. Brandis if he agreed that he read the contract correctly.  Brandis Dep. at 125-129 (Plaintiff's Exhibit 1).  Significantly, Mr. Cohen never asked Mr. Brandis how the conviction policy was applied in practice.  If he had, he would have been told that the matrix that Mr. Brandis developed was the manner in which the policy was enforced.  Second Brandis Affidavit at ¶¶ 5-8 and Exhibit 2 attached thereto (SEPTA Exhibit Tab T).

Counsel for Plaintiff used the exact same line of questioning in the other depositions that he cites in his brief. (Rishel Dep. at 151) (Plaintiff's Exhibit 14); (Montague Dep. at 139) (Plaintiff's Exhibit 13); (Foley Dep. at 124) (Plaintiff's Exhibit 9), and (Hartman Dep. at 125).  Nowhere in the cited pages  is there testimony that the actual practice was to bar any applicants with any conviction.  See also, (Wards Dep. at 44-45, 59-62); (Plaintiff's Exhibit 18); Spicer Dep. 84-89 (Plaintiff's Exhibit 16).

Significantly, the three individuals referenced in this section of Plaintiff's brief who had

4

Exhibit Tab K); Soltner Dep. at 79, 150-152 and Exhibits 13 and 14 attached thereto (SEPTA

Exhibits Tab V).

3.       SEPTA produced a criminal matrix that specifically delineated the types of crimes

that would result in a disqualification and those that would be a disqualifying event if they

occurred within 7 years of application.   SEPTA's Contract Compliance Manager testified that

this matrix was supplied to all providers as a tool in making hiring decisions.   (SEPTA Exhibits

Tab M).

4.       The paratransit providers produced numerous records in this case showing that

individuals with criminal convictions were hired by the paratransit providers as drivers.   (SEPTA

Exhibits Tab W)

5.       Plaintiff's own expert testified that the policy that he reviewed allowed the hiring

of individuals who had been convicted of certain crimes. Fairley Dep. at 10.[3] Dr. Fairley's

database also showed numerous individuals who were hired by the providers despite having a

conviction. Griffin Report at 4-5 (SEPTA Exhibit Tab Y).   Inexplicably, Plaintiff's expert failed

to even consider the fact that individuals with convictions were hired as paratransit and instead

equated having a conviction with being denied employment.

_____

responsibility for interpreting and applying the conviction policy all testified that the criminal
matrix was the manner in which the policy was enforced.  Brandis Affidavit at ¶ 5-8. Hartman
Dep. at 125, 147-148, 152-153 and Exhibit 19 attached thereto (SEPTA Exhibit Tab K); Ward
Dep. at 83-85 (SEPTA Exhibit Tab U).

[3]       SEPTA failed to attach pages of Dr. Fairley's Deposition as an Exhibit to its Amended
Motion for Summary Judgment.  All pages referenced there are attached hereto as Exhibit 3.

6.    Counsel for Plaintiff recognized in memos and letters to Dr. Fairley that applicants for paratransit driving positions were hired despite having a criminal conviction. <u>See</u> SEPTA Exhibit Tab X and Exhibit 4 attached hereto.

It short, it is ludicrous for Plaintiff to assert that a material issue of fact exists because of one paragraph in one of many paratransit contracts that SEPTA has been party to. And even that paragraph must be read to the exclusion of the rest of the contractual language that immediately precedes and follows that language upon which Plaintiff relies.[4] To be sure, any fair reading of the contract to which Plaintiff refers refutes this silly argument. <u>See</u> Plaintiff's Exhibit 20, pp. 2507-2510. There, a two tier system is described in detail showing that individuals who have been convicted of certain crimes of violence cannot be considered for employment as a paratransit driver in SEPTA service and others who have been convicted of property crimes and drug offenses within 7 years of the date of application will not be considered for employment as a paratransit driver in SEPTA service. <u>Id</u>. This contract is entirely consistent with the matrix developed by Mr. Brandis and the practice of the providers.

The bottom line is that individuals with convictions can be and regularly are hired by paratransit providers as drivers under their contracts with SEPTA. Those that are excluded include those with a violent past or a recent conviction for property offenses. Plaintiff's attempt at deception by pointing to one paragraph of a lengthy contract to the exclusion of all other contractual language and the actual evidence in this case hardly establishes a genuine issue of material fact. Yet, that is all that Plaintiff can say - - because if the Court does not accept that the

---

[4] Significantly, the contract to which Plaintiff refers makes clear that the general minimums apply only to drivers and attendants. Plaintiff's Exhibit 20 at page 2507. Providers do not use attendants on paratransit vans.

6

conviction policy is a per se exclusion (and it cannot on this record), this case must be dismissed.

2.    **The Conviction Policy Applies Only to Drivers in Paratransit Service.**

Equally absurd is the notion that SEPTA has some power over the paratransit providers to dictate to them who they can and cannot hire.  See Plaintiff's Memo at 20-21.  In support of this argument, Plaintiff infers that SEPTA was involved in King's decision not to hire Plaintiff in any capacity.  This proposition, of course, is not supported by competent evidence either.  Moreover, Plaintiff simply ignores evidence showing that he is incorrect and that SEPTA had no knowledge of Plaintiff's situation at King before his separation. First Brandis Affidavit at ¶¶ 11, 14, 17-18. (SEPTA Exhibit Tab I).        Ms. Fiorillo, King's Human Resources Manager, testified that she did not discuss her decision to separate Plaintiff's employment with King with anyone at SEPTA. Id. at 25 (Plaintiff's Exhibit 8).  What's more, despite Plaintiff's representation to this Court, Ms. Fiorillo never testified that "Plaintiff was disqualified under SEPTA's contract from holding any position at King."  See Plaintiff's Memo at 21 and Fiorillo Dep. at 24.  In fact, there is no mention of the contract at all on the page cited by Plaintiff or the pages immediately preceding page 24.  Furthermore, Ms. Fiorillo could not identify any classification of employees to whom this conviction policy might also apply.  Id. at 25.

Undeterred, Plaintiff next claims that Frank Brandis testified that SEPTA prevented paratransit providers from hiring anyone in any position with a criminal record.  Plaintiff's Memo at 6.  However, Plaintiff neglects to advise the Court of 2 salient points with regard to Mr. Brandis' testimony:

1.    It refers to language from a paratransit contract between SEPTA and Krapfs dated June 3, 2003 and thus has nothing to do with Plaintiff's claim.  Brandis Dep. at 132 (Exhibit 1 attached hereto).

2.    The paratransit contracts were revised in 2003 to apply to all employees <u>under the contract</u> because SEPTA discovered that the providers were using other employees including supervisors, mechanics and trainers to drive the disabled on an as needed basis.  Brandis Dep. at 200 (Exhibit 1 attached hereto); Foley Dep. at 142-143 (Exhibit 5 attached hereto).  SEPTA understandingly wanted to ensure that these individuals also meet the general minimums contained in the contract that apply to drivers.

More important than the misrepresentation above, the undisputed evidence in this case shows that SEPTA was concerned about only about drivers in SEPTA paratransit service. Brandis Dep. at 85 (SEPTA Exhibit Tab M); Montague Dep. at 114-115 (SEPTA Exhibit Tab G); Spicer Dep. at 78 (SEPTA Exhibit Tab E); Soltner Dep. at 162 (SEPTA Exhibit Tab V). Again, Plaintiff offers no credible evidence to rebut his testimony.

In <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-248, the Court discussed the requirements for opposing a summary judgment motion.  There, it made clear "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  <u>Id</u>. at 248.  Merely colorable or not significantly probative evidence will suffice.  <u>Id</u>. 249.   As shown above, Plaintiff does not even offer colorable evidence to refute SEPTA's numerous arguments.  Instead, he offers no evidence.  This Court should dismiss the Amended Complaint in its entirety because no reasonable fact finder could conclude on this record that SEPTA prohibited paratransit providers from hiring any person with any conviction in any position.

**B.    SEPTA'S INTERNAL POLICY**

Throughout Plaintiff's memo, he refers to SEPTA's internal conviction policy as the benchmark for all conviction policies.  Plaintiff's Memo at 49.  According to Plaintiff, this is the policy that should also apply to SEPTA's paratransit drivers.  Plaintiff maintains that SEPTA's failure to utilize this policy somehow demonstrates a violation of Title VII.  However, Plaintiff's argument misses the mark for several reasons.

First, SEPTA does not hire individuals who have been convicted of violent crimes in any position in which the incumbent would have contact with the public under its internal policy. Carpenter Dep. at 82-83, 157-158, 178-180 (attached hereto as Exhibit 6) and Plaintiff's Exhibit 21, Bates 3209.  In fact, Mr. Carpenter, who is responsible for hiring operators at SEPTA including bus drivers, testified that to his knowledge SEPTA has never hired anyone as a bus driver who had a conviction for any crime that would result in the applicant being disqualified for a driving position under the paratransit contract that applied to Plaintiff.  Id. at 180-181. Furthermore, Mr. Carpenter made clear at his deposition that Plaintiff would not be hired as an operator at SEPTA either because of a concern for the safety and well being of the riding public. Id. at 163-164, 174-175, 179.    In short, the SEPTA practice is no different that the paratransit conviction policy – both automatically disqualify applicants who have been convicted of a violent crime.

Mr. Carpenter's testimony on this issue is confirmed by the over 800 records that SEPTA produced in this litigation which show that in the last 5 years, SEPTA did not hire a single driver who had a conviction that would have been a disqualifying event under the policy that applied to Plaintiff.  Plaintiff has understandably decided to ignore this evidence as well.

10

Equally absurd is Plaintiff's attempt to compare and contrast the language of SEPTA's internal policy with that of the policy that applied to Plaintiff.[5]  According to Plaintiff, SEPTA undertakes a case-by-case inquiry into the age, nature and job-relatedness of an applicant's convictions when it makes each and every hiring decision.  In actuality, the Legal Department at SEPTA reviews the records for job applicants who have criminal convictions and determines whether the applicant is suitable for the job applied for.  Carpenter Dep. at 44.  For obvious reasons, the standards may differ for applicants who apply for a position with SEPTA as a bus driver than those that apply to an applicant for a position that has no contact with the public.  But as Mr. Carpenter made clear the standards that apply to operators at SEPTA are virtually identical to the standards for paratransit drivers no matter what kind of spin counsel for Plaintiff puts on the record.

Finally, it should be noted that Plaintiff's attempt to compare the job of a bus driver at SEPTA to that of a paratransit misses the mark.  As SEPTA demonstrated in its opening memorandum, there are significant differences between the two jobs which makes any comparison illogical.  Sobsey Report at 12-13 (SEPTA Exhibit Tab AA); Spicer Dep. at 107-108 (SEPTA Exhibit Tab E); Corressel Dep. at 20-21 (SEPTA Exhibit Tab B), 114; Foley Dep. at 50 (SEPTA Exhibit Tab D).  Moreover, unlike the typical bus passenger, paratransit passengers

---

[5] In what can only be described as bizarre, Plaintiff asserts that SEPTA stipulated away its right to note the similarities between the paratransit conviction policy and SEPTA's procedures for reviewing applicants with criminal conviction histories.  Plaintiff's Memo at 13.  However, SEPTA stipulated that the language in the policies differed only in an effort to move the deposition of Mr. Foley along.  Foley Dep. at 161-163.  Mr. Foley testified that he is not responsible for enforcing the SEPTA policy which is a function of human resources.  Id. at 189.  Moreover, as Mr. Carpenter described, the actual practice at SEPTA is not entirely consistent with is written policy.  Carpenter Dep. at 44.

include the very young and very old who have varying degrees of disabilities and include those with severe developmental disabilities and physical disabilities. Spicer Dep. at 109-110 (SEPTA Exhibit Tab E); Rishel Dep. at 191 (SEPTA Exhibit Tab F); Corressel Dep. at 109-110 (SEPTA Exhibit Tab B). Indeed, SEPTA buses are equipped only to handle two wheelchairs and an individual with a disability who rides a bus is not eligible for paratransit service.

In short, to suggest that a conviction for a violent crime like murder is not related to the job of paratransit driver is to ignore the obvious. However, this is the claim before this Court. It is clear that SEPTA's paratransit conviction policy is job related despite Plaintiff's best efforts to confuse the record.

**C.**    **PLAINTIFF'S PROOFS ARE LACKING.**

    **1.**    **Dr. Fairley's Report Is Entitled To No Weight In This Proceeding.**

In SEPTA's opening memorandum, it describes in great detail the glaring errors and omissions contained in the report of Dr. William Fairley. In response, Plaintiff claims that Dr. Fairley's opinions are more than sufficient and that SEPTA has waived the right to challenge the sufficiency of his conclusions because it withdrew its Daubert Motion. Plaintiff's Memo at 43. Not surprisingly, Plaintiff has cited no authority for the amazing proposition that SEPTA has waived the right to challenge Plaintiff's failure to establish a prima facie case of discrimination.

However, Plaintiff cannot cover for Dr. Fairley's numerous shortcomings here – and, in fact, Plaintiff never attempts to do so. This speaks volumes about the weight that should be given to Dr. Fairley's opinions.

Plaintiff merely repeats Dr. Fairley's conclusion that the application of the conviction policy has a disparate impact on minorities. How or in what manner Dr. Fairley came to that

conclusion remains unexplained because he did not study individuals who were actually

terminated or not hired because of the application of the policy. This is the analysis that is

required when actual applicant flow data is available for study.[6] Wards Cove v. Antonio, 490

U.S. 642, 657 (1989)

### 2. The EEOC Determination Is Entitled To No Weight Here Either.[7]

Plaintiff also relies upon an EEOC determination to support his dubious discrimination

claim here. The EEOC determination is not probative here because it rests upon the same faulty

factual premise as Plaintiff's entire responsive brief. Thus, the EEOC mistakenly found that the

conviction policy was an absolute bar to employment for individuals who have certain types of

criminal convictions regardless of how long ago the conviction took place. Moreover, the EEOC

apparently did not even consider the nature of the job that Plaintiff sought here, which as shown

in the record before this Court, is an extremely safety sensitive position. Furthermore, when it

---

[6]    To the extent that Plaintiff relies upon national crime statistics to meet his burden of proof, this reliance is misplaced. As Dr. Fairley notes in his report, actual data was available and sufficient for his analysis. (Plaintiff's Exhibit 31 at 2). When applicant flow data is available and sufficient, it should be analyzed, which is exactly what Dr. Fairley purported to do. Smith v. Xerox, 196 F.3d 358, 368 (2d Cir. 1998) (the typical disparate impact case involves analyzing applicant pool data or, in the case of a RIF, those subject to the RIF) (citing cases); Scott v. University of Mississippi, 148 F.3d 493 (5th Cir. 1998) (applicant flow data is preferred method); EEOC v. Carolina Freight, 723 F.Supp. 734 (S.D.Fla. 1989) (applicant pool should be analyzed in case challenging the impact of a conviction policy); Hill v. USPS, 522 F. Supp. 1283 (S.D.N.Y. 1981) (proper data to analyze is applicant pool).

When the actual data is analyzed in a manner consistent with Ward's Cove, the conviction policy did not have a statistically significant disparate impact on African Americans and Hispanics Griffin Report at 20-21. (SEPTA Exhibit Tab Y).

[7]    Plaintiff failed to attach a copy of the Determination by the EEOC in the administrative proceeding that preceded this action. Instead, a copy of the determination involving Douglas El and King Paratransit Services, Inc., Charge No. 170AO1448, was attached to Plaintiff's motion. That determination has no relevance to this proceeding.

made its determination in the King Charge, the EEOC did not have the benefit of the record

before this Court which includes, but is not limited to, the reports of Dr. Sobsey and Dr.

Blumstein, information concerning the tragic events involving Ms. Pokalsky and the arrest of two

paratransit drivers in 1994 which first caused SEPTA to include criminal background checks in

its general minimum requirements for paratransit drivers.  It is hardly supposition that the EEOC

determination would have come out differently if it had this evidence at the time it made its

determination. This is particularly true here because all of the above mentioned evidence is not

rebutted by Plaintiff in his opposition papers.

Furthermore, Plaintiff is simply incorrect in asserting that EEOC findings of probable

cause are "substantive evidence" whatever that means or are always admissible at trial.

Plaintiff's Memo at 45 and n. 14.   To the contrary, in this Circuit, the admissibility of an EEOC

determination is left to the sound discretion of the District Court.  Coleman v. Home Depot, 306

F.3d 1333, 1345 (3d Cir. 2002).  Coleman correctly notes that EEOC determinations can be

excluded at trial where, as here, Rule 403 factors including considerations of undue delay, waste

of time, or "needless presentation of cumulative evidence, which are often necessary to counter

an EEOC report—could kick in and control, especially where the report could be shown to be of

low probative value."

Coleman teaches that EEOC determinations should not be admitted in cases in which a

great deal of time would be devoted to counter the finding of the EEOC.  306 F.3d at 1346.  Here

that would occur.  Indeed, if the King EEOC Determination were admitted here, there would be

undue delay and a waste of time because SEPTA would be required to put on extensive evidence

to counter the EEOC's expansive finding that the conviction policy has a disparate impact.  Thus,

14

there would be a trial within a trial to show, among other things, that the EEOC finding rested on the same faulty factual premise that is fatal to Plaintiff's discrimination claim.

### D.    PLAINTIFF HAS FAILED TO REBUT SEPTA'S AFFIRMATIVE DEFENSE.

Although it is not entirely clear, it appears that Plaintiff actually questions whether SEPTA implemented the conviction policy in 1994 as an additional measure to protect the disabled.  Plaintiff's Memo at 10-12.  Plaintiff's theory that the policy is not safety-related appears to be based on 4 factors:

1.    The lack of a reference to the need for a conviction policy in certain documents following the aftermath of the Graham and Donaldson incidents;

2.    The fact that SEPTA tweaked the language of the conviction policy 4 times in the last 11 years;

3.    Plaintiff's supposition that SEPTA "could have applied a different ex-offender exclusion policy for paratransit drivers"; and

4.    No SEPTA lay witness was able to explain why the policy was supported by business necessity.[8]

---

[8]   Plaintiff once again misleads this Court by citing to testimony of lay witnesses who did not have an understanding of the term "business necessity" in the context of a disparate treatment case.  It is no surprise then that counsel specifically asked these witnesses if they had information related to SEPTA's "business necessity defense."  See e.g., Elliott Dep. at 51-53 (Plaintiff's Exhibit 6); Brandis Dep. at 167 (Plaintiff's Exhibit 1); and Foley Dep. at 177-178 (Plaintiff's Exhibit 9) (Mr. Foley also testified that he did not know what business necessity meant). Notwithstanding Plaintiff's deliberate attempt to confound the witnesses who were deposed, each witness testified that the reason for the policy was the protection of the disabled.  Elliott Dep. at 51; Brandis Dep. at 227 (Plaintiff's Exhibit 1); Foley Dep. at 179 (Exhibit 3 attached hereto).  As Mr. Foley succinctly put it, "common sense tells you that you don't want violent offenders in positions that have contact with the public"  and that the conviction policy "would be greatly increasing the safety of the  -- of the riders." Id. at 179, 181.

This kind of superficial analysis, however, does nothing to advance Plaintiff's cause and warrants no serious consideration  Plaintiff's Memo at 11-12. As discussed more fully below, the record in this case is uncontradicted - - SEPTA has shown that the conviction policy is supported by business necessity despite Plaintiff's persistent attempts to disguise the real issues in this case.

### 1.     The Testimony of Vincent Walsh

Throughout his memorandum, Plaintiff states, without citation to any credible evidence, that SEPTA did not take into account the nature of the job of paratransit driver, the nature of the applicants' conviction and whether the conviction was job-related.  See e.g., Plaintiff's Memo at 13.  Contrary to Plaintiff's argument, this was the very analysis that SEPTA undertook when it developed the conviction standards that were subsequently included in the paratransit contract between SEPTA and King.

Vincent Walsh, Esquire, an Assistant Deputy Counsel at SEPTA, was assigned the task of drafting the conviction policy in 1994 after the fatal car accident on I-95 and the arrest of another paratransit driver.  Walsh Dep. at  29, 34-36 (Exhibit 7 attached hereto); Walsh Affidavit at ¶ 7, 10 (SEPTA Exhibit Tab L). [9]  Mr. Walsh designed what he referred to in his deposition as a two-tier system.  Walsh Dep. at 32-33 and Walsh Affidavit at ¶ 15.  In developing this two-tier system, Mr. Walsh specifically considered whether such a policy might have a disparate impact on minorities.  Walsh Dep. at 42-44.  Furthermore, Mr. Walsh carefully considered the nature of

---

[9]     It is the testimony of Mr. Walsh that is relevant here, not the testimony of Jack Challenger and Carla Elliot upon who Plaintiff relies.  Plaintiff's Memo at 13. These individuals had nothing to do with driver requirements for paratransit drivers.

the job and the nature of the conviction when he drafted the policy.   Mr. Walsh testified as follows on this point:

> "people riding in SEPTA paratransit . . .  are among the most delicate or needy people in terms of attention and care.  They're very vulnerable people.  And they need as much protection as reasonably possible.
>
> And the question of restrictions on drivers had to be done very carefully because people who apply for jobs have their rights, too.  So there was a very careful balancing."

Walsh Dep. at 46.

The two-tier system created by Mr. Walsh distinguished between convictions for crimes of violence against a person and property crimes. Walsh Dep. at 50-51.  Convictions for violent crimes were automatically disqualifying because SEPTA considered them to be too serious and too great a risk to take with regard to the safety of the disabled.  Walsh Dep. at 65, 71-72.[10] With regard to property crimes, there was a 7 year look back period so that an applicant who had been convicted of burglary, larceny, arson and other property crimes more than 7 years before the date of application would not be disqualified.  Walsh Dep. at 86-89.  Thus, contrary to Plaintiff's assertion, SEPTA did take into account the nature and gravity of the conviction and the nature of the job of being a paratransit driver when it developed its conviction policy for paratransit drivers in SEPTA service.  Id. Plaintiff has offered no evidence to rebut or contradict the testimony of Mr. Walsh on these salient points.

### 2.    The Report of Dr. Sobsey.

---

[10]    SEPTA's concerns in this regard have been confirmed by two leading experts in their filed, Dr. Richard Sobsey and Dr. Alfred Blumstein.  Their reports are more fully discussed below and in SEPTA's opening memorandum and their opinions in this case remain unchallenged by Plaintiff.

In its opening memorandum, SEPTA discussed in great detail the report of Dr. Richard Sobsey, a leading expert on the victimization of the disabled. In his report, Dr. Sobsey opined that those who are disabled are particularly vulnerable to being victims of violence and exploitation and are victimized at alarming rates which greatly exceed the rates at which people with no disabilities are victimized. Sobsey Report at 4-10 (SEPTA Exhibits Tab AA). The disabled population to which Dr. Sobsey refers includes those who are dependent on paratransit services. Dr. Sobsey also opined that paratransit was a particularly dangerous environment for the disabled. Id. at 10-11, 13-14.

Based on his research and study, Dr. Sobsey concluded that pre-hire criminal record checks for paratransit drivers provide an essential component of necessary protection for the disabled. Furthermore, Dr. Sobsey concluded that SEPTA's paratransit policy reduced the risk of victimization of the disabled who use paratransit services. Id. at 20, 21.

Dr. Sobsey's conclusions are supported by fact and are not challenged by Plaintiff here. For the Court's convenience, DR. Sobsey's undisputed findings are summarized below:

1.     Children with disabilities experience a much higher rate of victimization than children who have no disabilities. Sobsey Report at 7. Such children are victimized at rates 3-4 times more than children with no disabilities and about 1/3 of school age children with disabilities have been victimized. Id.

2.     Adults with disabilities are about 4 times as likely to be victimized by violence as individuals with no disabilities. Id. at 8.

3.     Based on U.S. Justice Department Statistics which report that .2% of households had a family member who was raped, individuals with severe mental illness are more than 20

times more likely to be the victim of a sexual assault than those in the general population.  Id.  In fact, 57% of women and 24.5% of men with severe mental disabilities had been sexually assaulted sometime in their adulthood.  Sobsey Report at 8.  Such individuals, moreover, experience higher rates of victimization in every violent crime category and property crimes than those who are not disabled. Id. at 8-9.

4.      Public transportation has been identified as a high risk environment for both violent and property crime. Sobsey Report at 9.  Most of the victims of these crimes are passengers who are described as captive passengers or captive riders because they have no access to other kinds of transportation.  Id.  Among the most frequent captive passengers are children, the disabled and the elderly - - who are also considered the most vulnerable to crime.  Id. at 9-10. The captive passenger concept has special applicability to paratransit passengers because paratransit services are designed specifically to serve individuals whose disabilities make it impossible for them to use conventional transportation including fixed route transportation such as SEPTA's bus lines or commuter rail lines.  Id. at 10, 12.

5.      Paratransit services are particularly dangerous environments for the disabled because the vehicles operate with only one or few passengers, without a fixed or standard schedule.  Sobsey Report at 10-11.   One study revealed that 40% of paratransit riders required the service solely because of intellectual or mental health disabilities.  This same study showed that up to to 88% of all paratransit riders required the service because of intellectual disabilities or mental health disabilities or had some other cognitive or mental health disabilities in addition to a physical disability.  Sobsey Report at 10.  Others have visual or hearing impairments.  Id.

This means that a great many paratransit customers (SEPTA's included) have impairments that affect their abilities to perceive or describe an offense in a manner that is credible. Id. at 11.

6.     Dr. Sobsey conducted a study in 1991 which was updated in 1994 that involved 215 cases of sexual abuse of children and adults with disabilities.   Sobsey Report at 11.  The study further revealed that a transportation provider was responsible for 13.2 times as many cases of sexual abuse as would be expected based upon their proportion to the adult population.  Id. These sex crimes were most frequently committed when only the victim and perpetrator were in the vehicle.  Id. at 12 - - a situation that occurs daily on SEPTA paratransit vans.  Spicer Dep. at 108 (SEPTA Exhibit Tab E); Corressel Dep. at 114 (SEPTA Exhibit Tab B).

7.     Dr. Sobsey's research revealed also that a paratransit driver acts in a position of trust with regard to passengers with disabilities and these drivers have been identified as perpetrators of violence against the disabled in a significant number of cases.  Sobsey Report at 13-14.

8.     Newspaper accounts studied by Dr. Sobsey reveal that sexual offenses involving passenger transportation drivers are frequently reported.  Sobsey Report at 16.  For example, newspaper accounts reported the following:

     a.     377 alleged offenders and 623 victims and 49 alleged offenders and 68 alleged victims in the first 9 months of 2004;

     b.     the vast majority of these cases involved sexual offenses committed by drivers against passengers;

     c.     **of the 377 offenders identified in the study, 359 (95.3% were drivers who allegedly committed these crimes against passengers; of the 623 victims identified in**

20

**the study, 605 (97.1%) were passengers who were allegedly victimized by drivers.** <u>See</u>

Sobsey Errata Sheet (SEPTA Exhibit Tab AA) (emphasis added)

        d.      the most frequently victimized (73%) were children under the age of 18

and 25.7% of those children were reported to be disabled;

        e.      of the adults victimized by sexual offenses (27% of the total), 68.7% of

those adults had a disability of some kind;

        f.      previous criminal convictions were reported for 15.3% of the drivers and

another 1.2% of the offenses were alleged to have been committed by drivers who had criminal

charges pending against them;

        g.      in only 6.7% of the cases of sexual offenses reported, the driver involved

had no prior conviction or passed a criminal record screen; and

        h.      for cases involving paratransit or specialized transportation, 19.1% of the

drivers were reported to have prior criminal convictions and only 5.6% were identified as having

no prior conviction or as having passed a criminal record screen. Sobsey Report at 16-18.  Noting

that the 19.1% was a conservative estimate, Dr. Sobsey suggested that up to **77% of sexual**

**offenses reported were committed by paratransit drivers with prior criminal records.**

        9.      Dr. Sobsey estimated that the rate for drivers with previous convictions being

implicated in a sexual offense is up to 40 times higher than drivers with no prior convictions.

Sobsey Report at 16-18.

        Dr. Sobsey's findings are undisputed on this record.  Indeed, Plaintiff has no answer for

Dr. Sobsey.  Instead, lacking any credible evidence, Plaintiff again resorts to misleading this

Court. Thus, Plaintiff would have this Court believe that Dr. Sobsey's conclusions were based

upon a review of 78 news articles of which *only* 7 describe violent acts against paratransit passengers. Plaintiff's Memo at 19. However, the 78 articles to which Plaintiff refers are merely examples of published reports of offenses committed by transit or paratransit drivers. Sobsey Report at Appendix C. Included in that list is a reference to the rape of Lisa Pokalsky, a SEPTA paratransit passenger. Id. at 28.

What's more, as Dr. Sobsey's report reflects, his opinions are based on far more than a review of 78 news articles. Thus, the record here reflects that Dr. Sobsey's conclusions are based on his 36 years of experience in the field, his research and independent studies that he conducted. Since 1975, Dr. Sobsey has focused his work on interdisciplinary approaches (including criminology) to improving services to people with disabilities. His work in this regard is frequently cited in numerous disciplines including child development, criminology, education, law and other disciplines. He has published numerous books and articles specifically concerning the victimization of the disabled.

Specifically, in this case, Dr. Sobsey considered whether criminal background checks to screen out applicants for paratransit driving positions was appropriate given the nature of the individuals who rely on such services and the environment in which they work. Dr. Sobsey concluded that such screening procedures were not only appropriate but would greatly reduce the risk of victimization of a population that his research and that of others in the field found to be at a high risk for violence and abuse. Sobsey Report at 21. Furthermore, Dr. Sobsey notes that a driver's history of violence or sexual offenses is a substantial risk factor that cannot be ignored. Id. And this risk does not go away despite the passage of time. Id.

22

In reaching his conclusions, Dr. Sobsey consulted numerous publications (49 in all) involving crime and the disabled. Dr. Sobsey, in fact, authored 4 of these publications and, is also the author of 3 books and numerous articles on the abuse and violence against the disabled. He also researched and reviewed over 2,000 published accounts of crimes involving transportation staff and passengers. Dr. Sobsey also conducted another formal analysis of sex offenses involving 550 perpetrators and 800 victims. Furthermore, Dr. Sobsey conducted his own study of 215 cases of sexual abuse directed at children and adults with disabilities

Dr. Sobsey's current research project is confirmed by other experts who have studied the plight of the disabled and those who have studied the rates at which convicts recidvise. Sobsey Report at 18-19. These studies demonstrate that the commission of a violent crime or sexual offense is a reliable predictor of subsequent criminal activity. Id.

Based on his experience, independent research, the research and studies conducted by others and his review of content analysis, Dr. Sobsey concluded that a procedure like SEPTA's to screen out individuals with past criminal records was perfectly justified because of environment in which paratransit drivers work and the population that they serve especially those who have been convicted of violent crimes. [11] In this latter regard, Dr. Sobsey notes in his report that the commission of a prior violent crime was the best predictor of future criminal activity - - a conclusion shared by leading criminologists include Dr. Blumstein whose report is discussed

---

[11]     Dr. Sobsey noted that the best protection for paratransit riders would be eliminating all driver applicants with criminal convictions and that screening applicants for prior convictions is essential to control crime against the disabled. Id. at 19, 21. Furthermore, Dr. Sobsey concluded that a reduction or elimination of completing criminal background checks for paratransit drivers by SEPTA or its contractors would likely increase the risk of disabled passengers who use paratransit service. Id. These conclusions are likewise not contradicted by the record.

below.   See Sobsey Report at 19 and notes 71-72.  As a consequence, SEPTA's matrix which distinguishes between violent crimes and property crimes is perfectly sound and further supports the job relatedness of the policy at issue in this case.

The above uncontradicted facts in this record and those more fully discussed in SEPTA's opening memorandum cannot be ignored.  But Plaintiff does just that.  As noted above, on this evidence alone, the Court should dismiss Plaintiff's discrimination claim.

### 3.    The Report of Dr Blumstein

Plaintiff's attack of the report of Dr. Blumstein is equally devoid of merit.  Indeed, relying on the weakest of reeds, Plaintiff attempts to contradict the testimony of an expert in the field of criminology with the testimony of David Rishel, a transportation consultant.  Plaintiff's Memo at 17-18. [12]  And Plaintiff cannot even get that right.  Indeed, nowhere in the pages cited by Plaintiff does Mr. Rishel testify that there is no way to know who will commit a crime in the future.[13]  In short, like most of the other credible and material facts on the record, Plaintiff elects to ignore rather than respond with contradictory evidence.

What is most compelling evidence here are the rates at which convicted criminals recidivise including those who commit violent crimes.  Indeed, two separate studies by the

---

[12]    Mr. Rishel was hired by SEPTA to review and simplify its Request for Proposal document for its contract for paratransit service.  Rishel Dep. at 45-46; copies of which are attached hereto as Exhibit 8.

[13]    Plaintiff is also incorrect when he represents to the Court that Mr. DeSouza had no criminal record before he was hired as a paratransit driver by King.  Plaintiff's Memo at 18. Prior to being hired by King as a paratransit driver, Mr. DeSouza was arrested for the rape of a disabled woman, the same crime he committed against Lisa Pokalsky for which he was eventually convicted.  See SEPTA Exhibit Tab Z.

Department of Justice tracked recidivism of persons released from prison in 1983 and 1994. [14]
Both showed alarming statistics which Dr. Blumstein relied on including:

1. Although 22.5% of the 272,111 [convicts in a 1994 Department of Justice study]
were released from prison in 1994 following an arrest and conviction for a violent crime, 53.7%
of all the prisoners had a prior arrest for violence.

2. 21.6% of released criminals were arrested for a violent crime after their release.

3. 67.8% of the prisoners released in 1994 had a record of violence.

4. In 1983, 6.6% of those who were in prison for homicide were rearrested for
homicide, by far the single largest offense for which murderers were rearrested; in 1994 1.2 % of
released murderers were rearrested for homicide.

Dr. Blumstein noted that "these results highlight the unacceptable high risk of recidivism and
victimization by those with prior convictions for violence."  Furthermore Dr. Blumstein found
that "in light of the serious consequences of a violent offense to the individual victim, to
paratransit patrons more generally, and to SEPTA as an institution, it is incumbent on SEPTA to
take reasonable steps to minimize the risk of violent victimization of its paratransit patrons who
are already at increased risk of victimization by conducting pre hire criminal background checks
and disqualifying those who had a conviction for a violent offense.  Blumstein Report at 4

---

[14] For reasons known only to Plaintiff, he notes also that Dr. Blumstein relied on
Department of Justice studies that tracked rates of recidivism for a period of only three years
following release from incarceration. Plaintiff fails to mention that Dr. Blumstein also relied
upon his own independent research of the "career criminal" and found that the duration of
criminal activity for an individual who engaged in a violent offense was about twice as long as
someone who engaged only in a property offense.  Blumstein Report at 6-7 (SEPTA Exhibits Tab
CC).

(footnotes omitted) (SEPTA Exhibit Tab CC).  If this were not enough, Dr. Blumstein made

clear, that there is not better way to predict whether an individual may commit a crime in the

future than reviewing past criminal conduct.  <u>Id</u>.

       In his report, Dr. Blumstein notes also that the 7 year look back period for property

crimes was a reasonable compromise between having total protection for the disabled (which Dr.

Sobsey advocates) and the large number of individuals who may have been convicted of such

crimes and find themselves in the workforce.  <u>Id</u>. at 5.  In short, Dr Blumstein concurs that the

two tier system developed by Mr. Walsh and later summarized by Mr. Brandis in his matrix

further the purpose of SEPTA's policy which is to protect SEPTA's disabled passengers, "who

are particularly vulnerable to violence . . . ." <u>Id</u> at 6.

       Importantly, Dr. Blumstein notes that it is known that the risk of an individual

committing a crime in the future is always higher for someone who has previously committed a

crime when compared to someone who has never committed a crime.  <u>Id</u>.  As a consequence, Dr.

Blumstein agrees with Dr. Sobsey, SEPTA's matrix and the manner in which it distinguishes

between crimes of violence and property crimes is entirely prudent and reasonable.  <u>Id</u>. at 8.

       Dr. Blumstein's opinions stand unchallenged here as well and provide further evidence

that the conviction policy is supported by business necessity.

### E. NO LESS RESTRICTIVE POLICY WOULD SERVE SEPTA'S LEGITIMATE BUSINESS NEEDS.

Plaintiff maintains that the paratransit drivers undertake a case by case analysis of each driver applicant with a conviction apparently to determine whether the applicant is an acceptable risk. Plaintiff than represents to this Court that this is the manner in which SEPTA analyzes applicants with a conviction. In fact, it is not. See Carpenter Dep. at 44, 82-83, 157-58, 178-180. Moreover, even if this were the case, Dr. Sobsey described in great detail the differences between fixed route transportation and paratransit:

(1)    Paratransit riders are "captive passengers" which has been identified as high risk for crime[15];

(2)    Paratransit riders are often unable to unfasten their seatbelts or leave the van without driver assistance because of a physical disability;

(3)    Paratransit riders are often alone with drivers increasing the risk if the driver is a potential offender;

(4)    Paratransit riders often have impaired communication skills so that the ability to report criminal activity is compromised;

(5)    Paratransit operates on a different schedule on a daily basis which makes deviations from the route more difficult to detect; and

(6)    Because paratransit drivers must provide hands on assistance to passengers, there is often personal contact between the two.

---

[15]    The captive passenger concept is discussed by Dr. Sobsey on page 10 of his report. There, Dr. Sobsey notes that it is the very impairment that makes an individual a captive passenger in paratransit that also causes such individual to be particularly vulnerable to victimization.

Sobsey Report at 12-13.  SEPTA's paratransit service is no different.  SEPTA paratransit

provides door to door service to individuals that cannot use the bus and train because of their

disability.  The drivers are alone with passengers on a daily basis.  Paratransit drivers in SEPTA

service run different routes each day in contrast to SEPTA bus drivers who drive on fixed route

that make scheduled stops at predetermined times.  Spicer Dep. at 107-108; Corressel Dep. at 20-

21, 114; Foley Dep. at 50.

In addition, unlike paratransit, SEPTA buses hold many passengers and are equipped to

hold only two wheelchairs.  SEPTA bus passengers are not strapped in and do not require driver

assistance to exit the vehicle.  SEPTA bus drivers are not routinely alone with passengers on a

bus and if they are, the odds of that individual being defenseless and unable to flee appear remote

inasmuch as buses are equipped to handle only two wheelchairs.  Again, Plaintiff offers no

evidence to show that SEPTA bus transportation present even remotely similar challenges to an

institution that is charged with providing safe public transportation to the disabled community.

Perhaps the most important reason for rejecting Plaintiff's so called less restrictive

alternative can be found in the report of Dr. Blumstein.  As Dr. Blumstein notes, even trained

criminologists are unable to identity whether a particular individual is likely to commit a crime is

in the future.  Blumstein Report at 7-8.  Obviously, if criminologists cannot make this call,

neither can anyone from SEPTA or for employees who work for paratransit providers.  This

factor alone shows that Plaintiff's suggestion that a case-by case approach in analyzing whether a

particular individual with a violent criminal past may commit a commit a crime in the future is

simply not workable here.  Indeed, parole boards get this kind of risk analysis wrong everyday.

The lives and well being of SEPTA's paratransit riders are too important to ask individuals with no experience to make these kinds of potential life threatening decisions.

However, the literature is clear on issue - - those who have done it in the past are more likely to do it in the future. Stated simply, a parole board like inquiry or a case by case approach does not serve SEPTA's legitimate need to protect its disabled riders, and Plaintiff has offered no credible evidence to support his argument that a less restrictive alternative is available to SEPTA that would serve its legitimate business need to protect the disabled.

Plaintiff has utterly failed to come forward with any evidence at all to rebut SEPTA's business necessity defense. Plaintiff's discrimination claim must therefore be dismissed.

### F.    PLAINTIFF'S 14TH AMENDMENT CLAIM FAILS.

In Washington v. Davis, 426 U.S. 229, 240-42 (1976), the Supreme Court made clear that a facially neutral law will not violate the equal protection clause simply because it has a disparate impact on a particular race. Rather, the disproportionate impact must be traced to a purposeful intent to discriminate on the basis of race. Plaintiff has offered no evidence that SEPTA intended to discriminate against African Americans or Hispanics when it implemented the conviction policy. As a consequence, Count II of the Amended Complaint must be dismissed.

### G.    THE CONTUNING VIOLATION THEORY IS INAPPLICABLE.

In a baseless attempt to save what are clearly stale claims, Plaintiff maintains that the continuing violation theory is applicable because "Plaintiff continues to be barred from paratransit employment as a result of SEPTA's unconstitutional employment requirements." Plaintiff's Memo at 54. Not surprisingly, Plaintiff does not cite a single case in support of this amazing proposition either. Instead, Plaintiff relies on cases that have nothing to do with the

facts in this case.  See e.g., Virginia Hospital Ass'n Baliles, 868 F.2d 653, 663 (4th Cir. 1989)

(holding only that the continuing enforcement of an unconstitutional statute against a party was

not barred by the statute of limitations); Harris v. New York City, 186 F.3d 243, 249 (2d Cir.

1999) ("to advance a continuing violation claim a plaintiff must point to his disparate treatment

stemming from a continuous practice of intentional discrimination.").

      Plaintiff has not alleged and certainly has not shown that he has been subject to a

continuous practice of discrimination.  To the contrary, Plaintiff alleges only that he was

discriminated against when his employment with King was terminated on February 8, 2000.[16]

This is more than 2 years prior to the time that he initiated this action which Plaintiff has

conceded is applicable to his constitutional claims.  In short, this is a discrete discriminatory act

which is not actionable because it is time barred.  National Railroad Passenger Corp. v. Morgan,

536 U.S. 101, 113 (2002).

      Plaintiff's Federal and State Constitutional claims must therefore be dismissed.

---

[16]    The actual date of Plaintiff's separation was January 27, 2000 which renders his discrimination claim time barred as well.  Fiorillo Dep. at  18, 41, 51 and Exhibit 2 attached thereto (SEPTA Exhibits Tab A).

III.    **CONCLUSION**

For all of the foregoing reasons and those more fully set forth in SEPTA's Opening

Memorandum, its Amended Motion for Summary Judgment should be granted and the Amended

Complaint should be dismissed with prejudice.

Respectfully submitted,

_____
**ROBERT J. HAURIN, ESQUIRE**
**SAUL H. KRENZEL, ESQUIRE**
SAUL H. KRENZEL & ASSOCIATES
42 South 15th Street, Suite 800
Philadelphia, PA 19102
Dated:  April 11, 2005            (215) 977-7230