**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DOUGLAS EL                          : CIVIL ACTION
                                    :
   vs.                              :
                                    : NO. 02-CV-3591
SOUTHEASTERN PENNSYLVANIA           :
TRANSPORTATION AUTHORITY            :
                                    :


**<u>MEMORANDUM AND ORDER</u>**

**JOYNER, J.**                                    **July 12, 2005**


     This employment discrimination action is presently before
the Court on motion of the defendant for summary judgment.  For
the reasons which follow, the motion shall be granted as to the
plaintiff's federal law claims and this case dismissed with leave
to Plaintiff to re-file his remaining state law claim in the
appropriate state court.

**<u>History of the Case</u>**

     On or about January 3, 2000, the plaintiff, Douglas El,
applied for a job as a driver for King Paratransit Services, Inc.
in King of Prussia, PA.  In his written job application, Mr. El
disclosed that he had been convicted of second degree homicide
for his role in a gang-related incident in 1960 when he was
fifteen years old and that he had served some 3 ½ years in state
prison for the crime.  He also executed a criminal history
release to enable King to obtain a copy of his criminal record as

a condition to employment.  On January 18, 2000, King extended a
conditional offer of employment to Mr. El contingent upon
successful completion of regulatory requirements, the meeting of
any and all contractual requirements, criminal background
investigations and favorable responses of his record and
character and Mr. El began a two-week paratransit driver training
course.  Although Plaintiff completed that first week of the
training course, he missed part of the second week because a
snowstorm made it impossible for him to get to training from his
home in Philadelphia.  Mr. El therefore had to re-start his
training on January 31, 2000 and he continued to attend
paratransit training until February 8, 2000 when he was
terminated solely because of his 40-year-old homicide conviction.

King Paratransit was under contract with the Southeastern
Pennsylvania Transportation Authority ("SEPTA'), the defendant
here, to provide paratransit services in Bucks County,
Pennsylvania.  Pursuant to Section F2.10.1 of that contract, King
was prohibited, *inter alia,* from placing in SEPTA service, any
paratransit driver who had a record of driving under the
influence of alcohol or drugs (DUI) or a record of any felony or
misdemeanor conviction for any crime of moral turpitude or of
violence against any person(s).

On November 30, 2000, Plaintiff filed a Charge of
Discrimination with the Equal Employment Opportunity Commission

2

("EEOC") and the Pennsylvania Human Relations Commission ("PHRC")
against SEPTA, alleging that SEPTA forced King to fire him
illegally, that SEPTA's policy of excluding persons from
employment based upon their conviction records had an adverse
impact on African-Americans in violation of Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2(k), and
that neither King nor SEPTA could show a business necessity for
denying him a job or firing him based upon his 40-year-old
criminal conviction.  In its Determination dated September 14,
2001, the EEOC agreed with Plaintiff that SEPTA's "policy or
practice of excluding individuals from employment on the basis of
their conviction records has a disparate impact on blacks and
Hispanics in light of statistics showing that they are convicted
at a rate disproportionately greater than their representation in
the population."  Consequently, the Commission held that "such a
policy or practice is unlawful under Title VII in the absence of
a justifying business necessity."  Furthermore, the Commission
held that as there was no evidence that SEPTA considered such
factors as the nature and gravity of the offense, the time that
had passed since the conviction and/or completion of the sentence
and the nature of the job held or sought, it acted on a policy
which unlawfully served as an absolute bar to employment for
individuals who had certain types of criminal convictions.
Efforts to conciliate the matter apparently proved unsuccessful

and Plaintiff instituted this lawsuit on June 4, 2001, alleging
violations of Title VII, the Equal Protection Clause of the
Fourteenth Amendment to the U.S. Constitution, Article I, Section
I of the Pennsylvania Constitution and the Pennsylvania Criminal
History Record Information Act, 18 Pa.C.S. §9125.[1]  After
numerous extensions of the scheduling order deadlines and the
taking of voluminous discovery, Defendant now moves for the entry
of summary judgment in its favor on all of the counts in
Plaintiff's complaint, as amended.

### Standards Applicable to Summary Judgment Motions

Summary judgment is appropriate where, viewing the record in
the light most favorable to the non-moving party, there is no
genuine issue of material fact and the moving party is entitled
to judgment as a matter of law.  Michaels v. New Jersey, 222 F.3d
118, 121 (3d Cir. 2000); Jones v. School District of
Philadelphia, 198 F.3d 403, 409 (3d Cir. 1999).  Indeed, the

---

[1]  In his First Amended Complaint, Plaintiff also included
various "Class Action Allegations," by which he sought to have
this matter cast as a class action on behalf of "all people who
have been denied employment between January 1, 1991 and the
present, by any company that has provided paratransit services
for SEPTA as a result of a past felony or misdemeanor
conviction."  (First Amended Class Action Complaint, ¶28).  As it
appears to the Court that Plaintiff has abandoned his efforts to
pursue this matter as a class action, no further discussion or
analysis on this point is warranted in this memorandum.
Likewise, as Plaintiff also indicates in his Memorandum in
Opposition to Defendant's Motion for Summary Judgment that he is
withdrawing his claim under the Criminal History Record Act,
judgment as a matter of law shall be entered in the defendant's
favor as to that claim without further discussion here.

standards to be applied by district courts in ruling on motions
for summary judgment are clearly set forth in Fed.R.Civ.P. 56(c),
which states, in pertinent part:

> "....The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any,
> show that there is no genuine issue as to any material fact
> and that the moving party is entitled to a judgment as a
> matter of law.  A summary judgment, interlocutory in
> character, may be rendered on the issue of liability alone
> although there is a genuine issue as to the amount of
> damages."

Under this rule, a court is compelled to look beyond the
bare allegations of the pleadings to determine if they have
sufficient factual support to warrant their consideration at
trial.  Liberty Lobby, Inc. v. Dow Jones & Co., 838 F.2d 1287
(D.C.Cir. 1988), cert. denied, 488 U.S. 825, 109 S.Ct. 75, 102
L.Ed.2d 51 (1988); Aries Realty, Inc. v. AGS Columbia Associates,
751 F.Supp. 444 (S.D.N.Y. 1990).  In considering a summary
judgment motion, the court must view the facts in the light most
favorable to the non-moving party and all reasonable inferences
from the facts must be drawn in favor of that party as well.
Troy Chemical Corp. v. Teamsters Union Local No. 408, 37 F.3d
123, 126 (3rd Cir. 1994); Williams v. Borough of West Chester,
891 F.2d 458, 460 (3rd Cir. 1989); U.S. v. Kensington Hospital,
760 F.Supp. 1120 (E.D.Pa. 1991).

"Material" facts are those facts that might affect the
outcome of the suit under the substantive law governing the

claims made.  An issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party" in light of the burdens of proof required by substantive law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 2510, 2512, 91 L.Ed.2d 202 (1986);  <u>The Philadelphia Musical Society, Local 77 v. American Federation of Musicians of the United States and Canada</u>, 812 F.Supp. 509, 514 (E.D.Pa. 1992).  Thus, a non-moving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.  <u>Gleason v. Norwest Mortgage, Inc.</u>, 243 F.3d 130, 138 (3d Cir. 2001).

## **Discussion**

### **I.  Plaintiff's Title VII Claims**

As noted, Plaintiff first asserts that Defendant SEPTA violated Title VII by imposing a uniform employment policy on its paratransit subcontractors prohibiting them from employing anyone who had a past felony or misdemeanor conviction for "any crime of moral turpitude or violence against any person(s)" without inquiring into how long ago the conviction occurred, the circumstances surrounding the conviction or the relationship between the conviction and the position sought.

As a general rule, Title VII, 42 U.S.C. §2000e-2(a) provides:

It shall be an unlawful employment practice for an employer-

6

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

The objective of Congress in the enactment of Title VII was plain by the language of the statute: to achieve equality of employment opportunities and to remove barriers that had operated in the past to favor an identifiable group of white employees over other employees. Griggs v. Duke Power Company, 401 U.S. 424, 429-430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Thus the Supreme Court recognized that under the Act, practices, procedures or tests neutral on their face and even neutral in terms of intent, could not be maintained if they operated to "freeze" the status quo of prior discriminatory employment practices. Id. Indeed, the Court held "the Act proscribes not only overt discrimination but also practices that are fair in form but discriminatory in operation" with the touchstone being business necessity. Griggs, 401 U.S. at 431, 91 S.Ct. at 853.

Stated otherwise, employment practices resulting in a disparate impact on someone because of his or her race, color, religion, sex or national origin are forbidden. In this regard,

42 U.S.C. §2000e-2(k) now provides in relevant part:

> (1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if—

>> (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

>> (ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.[2]
>>     ...

Accordingly, to succeed under Title VII's disparate impact theory of liability, a plaintiff must initially show that a facially neutral policy results in a discriminatory hiring

---

[2]  Specifically, Section 2000e-2(k)(1)(C) states:

The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice."

It should be noted that Subsection (k), enacted as part of the Civil Rights Act of 1991, was Congress' response to the June 5, 1989 decision by the U.S. Supreme Court in Wards Cove v. Antonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) wherein the Court held that a challenged employment practice need only serve, in a significant way, the legitimate employment goals of the employer.  One of the primary purposes of the 1991 Act was to codify the concepts of 'business necessity' and 'job related' enunciated by Griggs, supra, and in the other Supreme Court cases prior to Wards Cove.  As part of this codification of Griggs, the Act made clear that both the burden of production and the burden of persuasion in establishing business necessity rest with the employer.  Lanning v. Southeastern Pennsylvania Transportation Authority,, 181 F.3d 478, 487 (3d Cir. 1999)(citations omitted).

pattern. Foster v. New Castle Area School District, No. 03-2106, 98 Fed. Appx. 85, 89, 2004 U.S. App. LEXIS 7447 (3d Cir. April 16, 2004). Plaintiffs can establish a prima facie case of disparate impact by demonstrating that application of a facially neutral standard has resulted in a significantly discriminatory hiring pattern. Lanning v. SEPTA, 181 F.3d at 485, citing Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). See Also, Tomaselli v. Upper Pottsgrove Township, Civ. A. No. 04-2646, 2004 U.S. Dist. LEXIS 25754 at *13-*14 (E.D.Pa. Dec. 23, 2004)("Disparate impact claims involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.") A plaintiff may meet this burden by identifying a particular employment practice that creates a disparate impact on a protected group through statistical evidence, although the statistical evidence must be "of a kind and degree sufficient to show that the practice in question has caused" the disparate impact. Lawton v. Sunoco, Civ. A. No. 01-2784, 2002 U.S. Dist. LEXIS 13039 at *28 (E.D.Pa. July 17, 2002), aff'd, No. 02-3249, 65 Fed. Appx. 874, 2003 U.S. App. LEXIS 8802 (3d Cir. April 14, 2003), quoting Johnston v. City of Philadelphia, 863 F.Supp. 231, 235 (E.D.Pa. 1994). See Also, Spence v. City of Philadelphia, Civ. A. No. 03-3051, 2004 WL 1576631 at *7 (E.D.Pa. July 1,

2004)("Plaintiff's burden under the disparate impact analysis
goes beyond the need to show statistical disparities in the work
force.  Plaintiff must show a causal connection between the
challenged policy and a racially unequal result," quoting Watson
v. Forth Worth Bank and Trust, 487 U.S. 977, 994, 108 S.Ct. 2777,
101 L.Ed.2d 827 (1988) and EEOC v. Greyhound Lines, 635 F.2d 188,
193 (3d Cir. 1980)).

Once the plaintiff had established a prima facie case, the
burden shifts to the employer to show that the employment
practice is job related for the position in question and
consistent with business necessity.  Id.  In so doing, it is
incumbent upon the employer to demonstrate that the employment
practice operates to measure the minimum qualifications necessary
for successful performance of the job in question.  See, Lanning,
181 F.3d at 489-490; United States v. Delaware, Civ. A. No. 01-
020, 2004 U.S. Dist. LEXIS 4560 at *84, *89-90, 93 Fair Empl.
Prac. Cas (BNA) 1248 (D.Del. March 22, 2004).  Should the
employer meet this burden, the plaintiff may still prevail if he
can show an alternative employment practice has a less disparate
impact and would also serve the employer's legitimate business
interest.  Id., citing Albemarle Paper Co. V. Moody, 422 U.S.
405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Wilson v. PPL
Electric Utilities Corp., Civ. A. No. 02-CV-4662, 2004 U.S. Dist.
LEXIS 6686 at *11 (E.D.Pa. March 31, 2004).  Thus while it has

10

been recognized that a blanket policy of denying employment to any person having a criminal conviction violates Title VII, if the criminal conviction involved conduct which demonstrates a person's lack of qualification for the job, Title VII would not be violated.  See, Field v. Orkin Exterminating Co., Inc., Civ. A. No. 00-5913, 2001 WL 34368768 at *3 (E.D.Pa. Oct. 30, 2001), citing, *inter alia*, Carter v. Gallagher, 452 F.2d 315, 326 (8th Cir. 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) and Washam v. J.C. Penney Co., Inc., 519 F.Supp. 554, 561 (D. Del. 1981).

While it does not dispute that it is an employer generally within the meaning of Title VII, SEPTA argues at the outset that it cannot be held liable to Plaintiff for any Title VII violations as it was not *his* employer.  We therefore shall address this argument first.

Under 42 U.S.C. §2000e(b),

The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person, but such term does not include (1) the United States, a corporation wholly owned by the Government of the United States, an Indian tribe, or any department or agency of the District of Columbia subject by statute to procedures of the competitive service...or (2) a bona fide private membership club (other than a labor organization) which is exempt from taxation under section 501(c) of Title 26...

Pursuant to 42 U.S.C. §2000e(f),

The term "employee" means an individual employed by an employer, except that the term "employee" shall not include

11

any person elected to public office in any State or
political subdivision of any State by the qualified voters
thereof, or any person chosen by such officer to be on such
officer's personal staff, or an appointee on the policy
making level or an immediate adviser with respect to the
exercise of the constitutional or legal powers of the
office.  The exemption set forth in the preceding sentence
shall not include employees subject to the civil service
laws of a State governmental agency or political
subdivision...

The Third Circuit has held "that the proper inquiry under Title

VII for determining employer status looks to the nature of the

relationship regardless of whether that party may be described as

an "employer." Graves v. Lowery, 117 F.3d 723, 728 (3d Cir.

1997). "The inquiry,...looks to the level of control an

organization asserts over an individual's access to employment

and the organizations' power to deny such access." Id., citing

Sibley Memorial Hospital v. Wilson, 488 F.2d 1338, 1342 (D.C.

Cir. 1973). Thus, the precise contours of an employment

relationship can only be established by a careful factual

inquiry. Graves, 117 F.3d at 729; Schepis v. Raylon Corporation,

Civ. A. No. 03-5970, 2004 U.S. Dist. LEXIS 17127 at *2 (E.D.Pa.

August 23, 2004).

According to the deposition testimony from several SEPTA

representatives, including Frank Brandis and James Foley, SEPTA

prohibits anyone with a past criminal conviction for homicide

from providing paratransit services for it.  In the event that it

discovers that a paratransit subcontractor is employing a driver

with such a criminal record, SEPTA will require that

12

subcontractor to remove that driver from SEPTA service. Similarly, SEPTA also has the authority to have a driver removed, re-assigned or re-trained if, for example, the driver fails to conduct himself properly, complete his trips, fails to report an accident or if there are too many complaints about him. (See, e.g. Depositions of Frank Brandis, pp. 106-107, 138-139 and James Foley, pp. 87-89). In addition, as several representatives of the paratransit subcontracting companies testified, Mr. Brandis and SEPTA have on several occasions specifically directed them to decline to hire someone or terminate an employee because of their criminal record. (See, e.g. Depositions of Deborah Hartman, pp. 46-48 and Pamela Fiorillo, pp. 24, 42-50). In light of this evidence, we find that issues of material fact exist as to whether SEPTA exercised sufficient control over the plaintiff's employment with King Paratransit Services to render it an employer within the meaning of Title VII. Accordingly, summary judgment on this basis must be denied.

Similarly, we find that the plaintiff has adduced sufficient evidence that SEPTA's minimum requirements for paratransit drivers had a disparate impact on African-Americans. On this point, the plaintiff has produced an Expert Report by Dr. William B. Fairley, who possesses Bachelor's and Doctorate degrees in Statistics from Swarthmore College and Harvard University and who has taught statistics at, *inter alia,* New York University,

Swarthmore College, Temple University, Harvard University and the
University of Karachi in Pakistan.   Dr. Fairley reviewed the
SEPTA criminal record policy at issue in conjunction with the
personnel records of SEPTA's paratransit subcontractors and
national data sources from the U.S. Bureau of Justice Statistics
and the Statistical Abstract of the U.S.   According to Dr.
Fairley, "Non-whites are substantially more likely to have a
conviction than Whites nationally in both State and Federal
Courts." (See Report of William B. Fairley, Ph.D. dated July 15,
2004 p. 11).   In Dr. Fairley's opinion, minority employees of
SEPTA's paratransit providers are disparately impacted by the
SEPTA policy in that they are dismissed from employment due to
convictions at a rate that is 200 percent greater than non-
minorities.  (Fairley Report, p. 12-13).

        In response to Dr. Fairley's opinions, the defendants have
produced the expert report of Dr. David Griffin, Ph.D., who is
equally as qualified as is Dr. Fairley to render an opinion on
the issue of whether the SEPTA policy had a (statistical)
disparate impact on minority employees.  Specifically, Dr.
Griffin, who holds a Doctorate in Economics from Cornell
University and Master's and Bachelor's degrees in economics from
Rutgers University, opines that Dr. Fairley's opinions are
fundamentally flawed because he failed to, *inter alia*, study
those employees who were actually dismissed or disqualified

14

because of a criminal conviction (instead assuming they would be dismissed on that basis), failed to weight the data which he used, and failed to use all of the data which was available to him (failing to use at all the data available for one paratransit provider).   Although we find Dr. Griffin's criticisms persuasive, the defendant has withdrawn its <u>Daubert</u> challenge to Dr. Fairley, albeit without prejudice.   Thus, as the matter of determining the admissibility of expert testimony is not appropriately done on summary judgment and the matter of crediting the testimony of these expert witnesses is properly left to the jury, Defendant's motion for summary judgment on the basis of the plaintiff's alleged failure to show disparate impact must be denied.   <u>See Also</u>, <u>Rohrbach v. AT & T Nassau Metals Corp.</u>, Civ. A. No. 3:CV-89-1268, 1994 U.S. Dist. LEXIS 14457 AT *8 (M.D.Pa. June 22, 1994)("Based upon the expert reports, as well as upon <u>Daubert</u>, <u>supra</u>, it would be inappropriate to grant summary judgment based upon the alleged deficiencies in the expert reports.").

The plaintiff having made a sufficient showing of a prima facie case, we next consider whether SEPTA has shown that the employment practice is job related for the position in question and consistent with business necessity.   Again, as the business necessity test asks whether there are other ways for an employer to achieve its goals that do not result in a disparate impact,

15

it is incumbent upon the employer to demonstrate that the
employment practice operates to measure the minimum
qualifications necessary for successful performance of the job in
question.   See Also, Smith v. City of Jackson, Miss.,
___U.S.___, 125 S.Ct. 1536, 1546 (2005).

Specifically, the policy at issue in this case is contained
in Section F2.10.1(e) and (f) of SEPTA's contracts with its
paratransit providers under the heading "General Minimums."  That
section states, in relevant part:

> Prior to the Contractor's utilizing any current employee of
> Contractor, or any applicant for employment with Contractor,
> in SEPTA contract ParaTransit Service, the Contractor shall
> ensure that all drivers and attendants utilized in SEPTA
> service have met the following minimum requirements:
>
> ...
>
> e.    NO RECORD OF DRIVING UNDER INFLUENCE (DUI) OF
>       ALCOHOL OR DRUGS, AND NO RECORD OF ANY FELONY OR
>       MISDEMEANOR CONVICTION FOR ANY CRIME OF MORAL
>       TURPITUDE OR OF VIOLENCE AGAINST ANY PERSON(S);
>
> f.    HAVE NO RECORD OF ANY CONVICTION WITHIN THE LAST
>       SEVEN(7) YEARS FOR ANY OTHER FELONY OR ANY OTHER
>       MISDEMEANOR IN ANY CATEGORY REFERENCED BELOW (SEE
>       SECTION F.2.10.C), AND NOT BE ON PROBATION OR
>       PAROLE FOR ANY SUCH CRIME, NO MATTER HOW LONG AGO
>       THE CONVICTION FOR SUCH CRIME MAY BE;

The defendant has produced ample evidence via the expert
reports of Dr. Griffin, and Drs. Alfred Blumstein and Dick Sobsey
that the above SEPTA policy is job related for the position in
question and consistent with business necessity.   Specifically,

16

Defendants' experts attest that: (1) "former prisoners are much more likely to engage in criminal conduct (subsequent to release) than the 'typical' adult in the general population. ...[R]eleased prisoners are approximately 31 times more likely to engage in homicide, 5-6 times more likely to engage in rape, and 10-11 times more likely to engage in assault than a randomly selected adult from the general population..."[3]; (2) "[b]ased on this analysis relevant to assessing the risks associated with individuals with prior convictions for a violent offense, it is entirely prudent and reasonable for SEPTA, in fulfilling its responsibility to do whatever it can to protect the vulnerable population that uses its paratransit services, to require drivers hired to be free of any such convictions.  While it is entirely possible that some such individuals no longer pose such a great risk, neither SEPTA nor its contractors who make the hiring decisions are in a position to make the clinical judgment that even parole boards have difficulty making--to be able to distinguish those who pose a risk from those who do not...,"[4] and (3) "...Specialized transportation services serving people with disabilities and senior citizens are inherently high-risk

---

[3]  Report of Dr. David Griffin, dated September 20, 1994 at p.2, ¶2, annexed to Defendant's Motion for Summary Judgment as Exhibit "II."

[4]  Report of Dr. Alfred Blumstein dated October 4, 2004 at p.8, annexed to Defendant's Motion for Summary Judgment as Exhibit "CC."

environments for victimization and every effort must be made to provide the safest possible services.  Criminal record checks provide an essential component of the necessary protection...; ...a reasonable policy to control the risk of victimization of passengers is one that prohibits any individual who has been convicted of a sexual offense, has been convicted of a crime of violence, or has committed a crime against a vulnerable person from being a paratransit driver, regardless of the amount of time that has passed since the conviction.  The SEPTA policy reduces the risk of victimization for a population that is known to have elevated risk."[5]    Thus we find that SEPTA has met its burden of proving that the criminal record/employment policy which Plaintiff challenges here operates to measure the minimum qualifications necessary for successful performance of the job in question, i.e., paratransit driver.

Accordingly, we next consider whether the plaintiff can show an alternative employment practice that has a less disparate impact and would also serve the employer's legitimate business interest.

In this regard, Mr. El points to SEPTA's policy for hiring its own fixed route bus, train, trolley, etc. drivers.  That policy, which is numbered 6.29.2 provides in relevant part:

---

[5]  Report of Dr. Richard (Dick) J. Sobsey, dated September 22, 2004, at p. 21, annexed to Defendant's Motion for Summary Judgment as Exhibit "AA."

18

B.  Use of Conviction Records of Job Applicants Who
    Accurately Disclose Convictions for Any Criminal
    Offense, Regardless of How Minor, on Employment
    Application Form

    1.  Conviction records or information about
        convictions may be considered by the Authority
        when:

    a.  (1) The conviction(s) is for any murder, felony,
    misdemeanor of any degree and

        (2) The conviction relates to the applicant's
    suitability for employment in the position for which
    he/she has applied.

    b.  In the event that the Authority decides not to hire
    the applicant based in whole or in part on the
    applicant's criminal history record information, which
    he/she has accurately disclosed on his/her employment
    application, then the Authority shall notify the
    applicant in writing, setting forth the basis for the
    rejection.

    c.  The following sets forth some examples of the types
    of convictions for criminal offenses that may preclude
    a job applicant from employment; however, these
    examples are not all inclusive, neither as to type of
    offense, nor as to the specific job classifications
    listed:

| Murder, Felony Misdemeanor of any Degree for: | Job Classifications |
|---|---|
| ... | |
| Physical offenses against other persons (including murder, robbery, assault, kidnaping, sexual offenses and corrupting the morals of minors) | All police positions All positions bringing employee into contact with the public, such as operators, or positions that are isolated or remote situations. |
| ... | |

     d.  It shall be the responsibility of the Senior Director, Human Resources or his/her designee, in consultation with SEPTA's Legal Department and the Deputy General Manager, when necessary, to decide whether or not a specific job applicant with a criminal conviction may be hired.  In all instances when an applicant with a criminal record is being considered for a position within Operations, the Chief of Operations must also approve the applicant in writing. In the event an applicant is not hired because of a criminal record, the Senior Director, Human Resources shall advise the applicant in writing of the basis for the decision not to hire.

     As Carla Elliott, Esquire, of SEPTA's Human Resources Department testifed, under this policy when a job applicant reveals that they have been previously convicted of a crime, their application is given heightened scrutiny to determine the suitability of that applicant for the position for which they are applying.  (Elliott Deposition, annexed as "Exhibit 6" to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at pp. 65-67).  It is then up to the Senior Director of Human Resources to decide, after consulting with SEPTA's Deputy General Manager and the Legal Department, whether or not a specific job applicant with a criminal conviction can be hired. (Elliott Dep., at pp.68, 72-74).  SEPTA itself thus does not automatically preclude a job applicant from a position with it because of a criminal record, but rather on a case-by-case basis gives such applications heightened scrutiny to determine whether the conviction is sufficient to find that candidate unsuitable for the position for which he or she has applied.  (Elliott Dep.,

at pp. 88-90).

In carefully reviewing the record in this case, we note that while the paratransit contractors clearly have the capability to also perform a case-by-case analysis of each prospective employee, SEPTA simply considered some offenses to be so serious that it didn't want applicants with such convictions on their records to be employed in SEPTA paratransit service no matter how long ago the convictions had occurred. (See, Deposition of Lisa Soltner, annexed to Defendant's Motion for Summary Judgment as "Exhibit U," pp. 167-169; Deposition of Vincent J. Walsh, Jr., Esquire, annexed as "Exhibit 17" to Plaintiff's Response to Defendant's Summary Judgment Motion at pp. 50-52, 65).  In thus making a distinction between the employment policy which it utilized in hiring its own, fixed route drivers and the policy which it imposed on its paratransit subcontractors, SEPTA considered that in stark contrast to fixed route transportation where large numbers of able-bodied people were picked up at the same designated stops and rode the same route at the same time each day, paratransit served the most vulnerable physically and mentally disabled passengers by picking them up at their own homes at different times and following different routes, depending upon where the handicapped passenger needed to go.  In addition, paratransit drivers are required to be in close physical proximity to their passengers in that they must

physically assist them into and out of the vehicles and are often
alone in paratransit vehicles with them.  (Deposition of Vincent
Walsh, at pp. 87-89).  This distinction is, we find, clearly job
related to the driver position in question and consistent with
business necessity.  Furthermore, given that we can find no
evidence whatsoever on this record in the report of Dr. Fairley
or elsewhere from which a jury could find that implementation of
SEPTA's internal Policy 6.29 would have any less of a disparate
impact on minority paratransit driver applicants than does the
policy which is currently imposed on them under the sub-
contracts, we can reach no other conclusion but that the
plaintiff has failed to satisfy the burden of proof needed to
sustain a claim under Title VII.  Consequently summary judgment
must be granted to the defendant on Count I of the Amended
Complaint.

## II.  Plaintiff's Equal Protection Claim

Plaintiff next asserts that SEPTA "committed deliberate,
ongoing and repeated violations of the Equal Protection Clause of
the Fourteenth Amendment by requiring its paratransit contractors
to deny public employment to all persons with a misdemeanor or
felony conviction without inquiring into how long ago the
conviction occurred, the circumstances surrounding the conviction
or the relation between the conviction and the position sought or
held because these requirements are not reasonably related either

to the person's fitness to perform the job at issue or to any
legitimate government objective."  (Amended Complaint, ¶46).

The Equal Protection Clause provides that "no State shall...
deny to any person within its jurisdiction the equal protection
of the laws."  Shaw v. Reno, 509 U.S. 630, 642, 113 S.Ct. 2816,
125 L.Ed.2d 511 (1993), quoting U.S. Const., Amdt. 14, §1.  Its
central purpose is the prevention of official conduct
discriminating on the basis of race.  Washington v. Davis, 426
U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976).  Proof
of racially discriminatory intent or purpose is required to show
a violation of the Equal Protection Clause.  City of Cuyahoga
Falls v. Buckeye Community Hope Foundation, 538 U.S. 188, 194,
123 S.Ct. 1389, 1394, 155 L.Ed.2d 349 (2003).  See Also,
Development Group, LLC v. Franklin Township Board of Supervisors,
Civ. A. No. 03-2936, 2003 U.S. Dist. LEXIS 18042, * 18-*19
(E.D.Pa. Sept. 24, 2003)("To proceed on such a [equal protection]
theory, Plaintiffs must allege facts demonstrating that
Defendants, acting under color of state law, intentionally
treated Plaintiffs differently from others similarly situated and
that there is no rational basis for the difference in
treatment.")  Thus, official action will not be held
unconstitutional solely because it results in a racially
disproportionate impact.  Village of Arlington Heights v.
Metropolitan Housing Development Corp., 429 U.S. 252, 264-265, 97

S.Ct. 555, 563, 50 L.Ed.2d 450 (1977).  This is not to say that disproportionate impact is irrelevant, but it is not the sole touchstone of an invidious racial discrimination.  <u>Id</u>., citing <u>Davis</u>, 426 U.S. at 242, 96 S.Ct. At 2049.

There are three ways that such intentional discrimination can be shown: (1) a law or policy that explicitly classifies citizens on the basis of race; (2) a facially neutral law or policy which is applied differently on the basis of race; or (3) a facially neutral law or policy that was motivated by discriminatory intent and has a racially discriminatory impact, even if it is applied evenhandedly.  <u>Antonelli v. State of New Jersey</u>, 310 F.Supp.2d 700, 714 (D.N.J. 2004), citing <u>Hunt v. Cromartie</u>, 526 U.S. 541, 546, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); <u>Village of Arlington Heights</u>, <u>supra</u>, and <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed.2d 220 (1886). To prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker adopted the policy at issue "because of," not merely "in spite of," its adverse effects upon an identifiable group.  <u>Pryor v. National Collegiate Athletic Ass'n.</u>, 288 F.3d 548, 562 (3d Cir. 2002), quoting <u>Personnel Administrator of Massachusetts v. Feeney</u>, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).  A mere awareness of an otherwise neutral policy will not suffice.  <u>Id</u>.

Once a plaintiff establishes a discriminatory purpose based

on race the decisionmaker must come forward and try to show that
the policy or rule at issue survives strict scrutiny, *i.e.*, that
it had a compelling interest in using a race-based classification
and this classification is narrowly tailored to achieve that
compelling interest.  Id.  Finally, "determining whether
invidious discriminatory purpose was a motivating factor in the
adoption of a facially neutral policy demands a sensitive inquiry
into such circumstantial and direct evidence of intent as may be
available."  Pryor, 288 F.3d at 563, quoting Arlington Heights,
429 U.S. at 266.

In application of all of the preceding principles to the
case at hand, we find that there is no evidence whatsoever on
this record that SEPTA enacted or imposed the criminal record
policy at issue on its paratransit subcontractors for the purpose
of discriminating against African-Americans or any other minority
for that matter.  Rather, as we discussed in Section I above, the
evidence clearly shows that SEPTA's sole intention and purpose in
enacting the criminal record/employment policy which Plaintiff
challenges here was to provide its most vulnerable passengers
with safe and reliable transportation.  Thus, notwithstanding
that he has produced evidence that the policy disparately impacts
African-American applicants, the complete absence of any evidence
that the policy was enacted "because of" its adverse effects on
this identifiable group is fatal to Plaintiff's Equal Protection

Claim.  Summary judgment shall therefore be entered in favor of the defendant on Count II of the Amended Complaint.

### III. Plaintiff's Claim Under the Pennsylvania Constitution

In Count III, Mr. El contends that "SEPTA has committed deliberate, ongoing and repeated violations of Article I, Section I of the Pennsylvania Constitution by requiring its paratransit providers to deny public employment to all persons with a misdemeanor or felony conviction without inquiring into how long ago the conviction occurred, the circumstances surrounding the conviction, or the relation between the conviction and the position sought (or held) because these requirements are not reasonably related either to the person's fitness to perform the

job at issue or to any legitimate government objective." (Am. Compl., ¶50).

Article I, §1 of the Pennsylvania Constitution reads as follows:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

This section, like the due process clause in the Fourteenth Amendment of the United States Constitution, guarantees persons in the Commonwealth of Pennsylvania certain inalienable rights. Nixon v. Commonwealth, Department of Public Welfare, 576 Pa. 385, 819 A.2d 277, 286 (2003). Included among these rights, although not fundamental, is the right to pursue a lawful occupation. Nixon, 819 A.2d at 288; Adler v. Montefiore Hospital Association of Western Pennsylvania, 453 Pa. 60, 311 A.2d 634 (1973). Such a right is therefore subject to the rational basis test, *i.e.,* a state may not deprive an individual of that right unless it can be shown that such deprivation is reasonably related to the state interest that is sought to be protected. Warren County Human Services v. State Civil Service Commission, 844 A.2d 70, 73 (Pa. Cmwlth. 2004). For these reasons, provisions which operate to deny public employment to someone on the basis of a prior criminal conviction have been held violative of the Pennsylvania Constitution unless that denial is reasonably related to the

27

furtherance of a legitimate public objective.  Hunter v. Port
Authority of Allegheny County, 277 Pa. Super. 4, 419 A.2d 631,
638 (1980).

As the Pennsylvania Supreme Court has recognized,

There is no question that protecting the elderly, disabled
and infirm from being victimized is an important interest in
this Commonwealth and that the General Assembly may enact
laws that restrict who may work with these individuals.
Further, barring certain convicted criminals from working
with these citizens may be an effective means of protecting
such citizens from abuse and exploitation.

Nixon, 839 A.2d at 288.

As discussed, SEPTA in this case has amassed significant
evidence of the greatly increased risk that former convicts will
again engage in criminal conduct as well as the inherent dangers
posed to the vulnerable handicapped and disabled passengers by
the very nature of the paratransit services which SEPTA must
provide.  While we would likewise conclude that this evidence
more than adequately evinces a rational basis for the employment
policy which SEPTA imposes on its paratransit contractors, we
nevertheless take note of what appears to be an unresolved issue
of Pennsylvania state law posed by the Commonwealth Court's
holding in Warren County, supra that the lifetime ban under
Pennsylvania's Child Protective Services Law, 23 Pa.C.S.
§6344(c)(2) prohibiting previously convicted applicants from

employment in child-care is unconstitutional.[6]  Accordingly, we shall exercise our discretion to decline to exercise our supplemental jurisdiction any further and shall therefore defer this matter to the Pennsylvania state courts.  <u>See</u>, 28 U.S.C. §1367(c).

An appropriate order follows.

---

[6]  The Pennsylvania Supreme Court expressly declined to address this issue in <u>Nixon</u>, 839 A.2d at 288, n.16 but noted that those courts which have addressed the rationality of this type of ban have been divided.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
DOUGLAS EL                      : CIVIL ACTION
                                :
      vs.                       :
                                : NO. 02-CV-3591
SOUTHEASTERN PENNSYLVANIA       :
TRANSPORTATION AUTHORITY        :
```

**ORDER**

AND NOW, this    12th    day of July, 2005, upon consideration of Defendant's Motion for Summary Judgment and Plaintiff's Response thereto, it is hereby ORDERED that the Motion is GRANTED IN PART and DENIED IN PART and judgment as a matter of law is entered in favor of Defendant and against Plaintiff in no amount on Counts I, II and IV of Plaintiff's Amended Complaint.

IT IS FURTHER ORDERED that the Motion is DENIED as to Count III alleging violations of Article I, Section I of the Pennsylvania Constitution, but as this Court declines to continue exercising supplemental jurisdiction pursuant to 28 U.S.C. §1367, Count III of this action is hereby DISMISSED with leave to Plaintiff to re-file it in the appropriate Pennsylvania state court.

BY THE COURT:


s/J. Curtis Joyner
J. CURTIS JOYNER,        J.

30